UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA
WEST PALM BEACH DIVISION
www.flsb.uscourts.gov

In re:                                    Case No.:  22-12790-EPK
                                          Chapter 7
EXCELL AUTO GROUP, INC.,

        Debtor.
_____/

**TRUSTEE'S NOTICE OF FILING OF TRANSCRIPT §341 MEETING OF CREDITORS**


        Nicole Testa Mehdipour ("**Trustee**"), Chapter 7 Trustee for the estate of Excell Auto

Group, Inc., by and through undersigned counsel, hereby files the transcript of the §341 Meeting

of Creditors taken on May 13, 2022.

        Respectfully submitted this 31th day of May 2022.

                                          FURR AND COHEN, P.A.
                                          One Boca Place, Suite 419A
                                          2255 Glades Road
                                          Boca Raton, FL 33431
                                          Telephone: (561) 395-0500
                                          Facsimile: (561) 338-7532

                                          BY:    /s/ Alan R. Crane
                                               *Special Counsel for Trustee*
                                               Alan R. Crane, Esq.
                                               Florida Bar No.: 0963836
                                               E-mail: acrane@furrcohen.com

Page 1

```
 1              UNITED STATES BANKRUPTCY COURT
                 SOUTHERN DISTRICT OF FLORIDA
 2

 3

     IN RE:                      CASE NO. 22-12790-EPK
 4

 5    EXCELL AUTO GROUP, INC.,

 6              Debtor.
     _____/
 7

 8                341 MEETING OF CREDITORS

 9                    May 13, 2022

10         The above-entitled cause came on for a Section

11   341 Meeting of Creditors before Nicole Testa Mehdipour,

12   one of the trustees in the UNITED STATES BANKRUPTCY COURT,

13   in and for the SOUTHERN DISTRICT OF FLORIDA, via Zoom

14   Videoconference, on May 13, 2022, commencing at or about

15   8:39 a.m., and the following proceedings were had.

16

17

18

19

20

21

22

23

24         Transcribed from a digital recording by:
                 Cheryl L. Jenkins, RPR, RMR
25
```

```
 1
                   APPEARANCES VIA ZOOM:
 2
 3            NICOLE TESTA MEHDIPOUR, Trustee
 4
                     FURR & COHEN, by
 5                  ROBERT FURR, Esquire
                    ALAN CRANE, Esquire
 6                  JASON RIGOLI, Esquire
                          and
 7                  DAVID A. RAY, P.A., by
                    DAVID A. RAY, Esquire
 8          On behalf of Nicole Testa Mehdipour
 9
              WEISS HANDLER & CORNWELL, by
10                 HARRY WINDERMAN, Esquire
                   On behalf of the Debtor
11
12                    WERNICK LAW, by
                   AARON A. WERNICK, Esquire
13          On behalf of Kristin and Scott Zankl
14
                   SHRAIBERG PAGE, by
15                BRADLEY SHRAIBERG, Esquire
            On behalf of Franklin Capital Funding, LLC
16
17          RAPPAPORT OSBORNE & RAPPAPORT, by
                  JORDAN RAPPAPORT, Esquire
18      On behalf of Richard Applegate, Andrew Greenberg,
        Richard Greenberg, Stefano Riga and Tarek Aboualazzm
19
20                  MELAND BUDWICK, by
                   JAMES C. MOON, Esquire
21                        and
            CHRISTOPHER GEON, Esquire (in-house counsel)
22      On behalf of Chapford Specialty Finance, LLC and Chapford
                 Credit Opportunities Fund, LP
23
24
25
```

Page 3

```
 1                    ALSO PRESENT VIA ZOOM
 2

 3              M.A. DINKIN LAW FIRM, by
               MITCHELL A. DINKIN, Esquire
 4    On behalf of Savannah Row Development Company, LLC

 5                  AKERMAN, LLP, by
                   BRETT MARKS, Esquire
 6                 EYAL BERGER, Esquire
         On behalf of Ed Brown and Millco Atwater, LLC
 7

 8                  NASON YEAGER, by
                  IVAN J. REICH, Esquire
 9    On behalf of the DCG 2008 Irrevocable Wealth Trust
10

11              MORITT HOCK & HAMROFF, by
                THERESA DRISCOLL, Esqurie
         On behalf of Integrated Vehicle Leasing
12

13    LEIDERMAN SHELOMITH ALEXANDER + SOMODEVILLA, by
                ZACH B. SHELOMITH, Esquire
14          On behalf of Woodside Credit, LLC
15

16               BRINKLEY MORGAN, by
                   MARK LEVY, Esquire
                 On behalf of Chad Zakin
17

18             NATHAN G. MANCUSO, Esquire
        On behalf of Excell Auto Sport and Service, Inc.
19

20        BEIGHLEY MYRICK UDELL & LYNNE, by
                 THOMAS ZEICHMAN, by
21          On behalf of Prestige Luxury Cars, LLC
22

23               JAMES MILLER, Esquire
      On behalf of Auto Wholesale of Boca, MMS Ultimate and
                      Moshe Farache
24
25
```

Page 4

```
 1
                         BREUER LAW, by
 2               STEPHEN C. BREUER, Esquire
                   On behalf of David Amsel
 3
 4                    BAKER DONELSON, by
                    TRAVIS HARVEY, Esquire
 5          On behalf of BAL Investments, LLC
 6                      PACK LAW, by
                    JOE PACK, Esquire
 7                JESSY KREHL, Esquire
     On behalf of Greenbucket, OLP EAG, LLC and EAG Wholesale
 8
 9               DANIEL GOLD, Trial Attorney
                  Office of the U.S. Trustee
10                 Department of Justice
11
                       ALSO PRESENT
12
                       Adam Balinsky
13
                      Aaron Parkinson
14
                       Mr. Goodman
15
                    Matthew Troccoli
16
                       Sean Kirwan
17
                        Mr. Baum
18
                      Greg Nelson
19
                     Gregor Rasard
20
                       Alex Byall
21
                    Barry Lefkowitz
22
                    Lillian Roberts
23
                    - - - - - - -
24
25
```

1

2                    **WITNESS**

Scott Zankl                              Page

3     Examination by Ms. Mehdipour        8
      Examination by Mr. Moon             98
4     Examination by Mr. Dinkin          110
      Examination by Ms. Driscoll        112
5     Examination by Mr. Shelomith       116
      Examination by Mr. Shraiberg       121,168
6     Examination by Ms. Roberts         128
      Examination by Mr. Krehl           131
7     Examination by Mr. Miller          136
      Examination by Mr. Harvey          157
8     Examination by Mr. Dinkin          110
      Examination by Ms. Driscoll        112

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

1                    MS. MEHDIPOUR:  All right.  Good morning

2       everyone.  Again, this is Trustee Nicole Mehdipour.  I've

3       been appointed by the United States Trustee's Office as

4       the Chapter 7 bankruptcy trustee in this case.

5                    Today we're here for the 341 Meeting of

6       Creditors for Excell Auto Group, which filed a Chapter 7

7       bankruptcy on April 8th, 2022.

8                    Pursuant to the U.S. Department of Justice

9       Executive Office for United States Trustees, any

10      electronic recording in any manner whatsoever, whether

11      it's audio, photograph or video is strictly prohibited.

12      No one is permitted to record or televise the debtor, me,

13      or any party in this proceeding.  By dialing into this

14      meeting you are agreeing and acknowledging that you accept

15      these terms.

16                   For those of you who are not familiar with

17      the way a 341 Meeting works, this is an official forum

18      where I get to ask the debtor any questions about assets

19      and liabilities, and then I'll open up the forum to any

20      creditors or parties in interest who would like to ask

21      questions.

22                   All right.  Mr. Winderman, would you please

23      let me know, I see three people, who is here today on

24      behalf of the debtor?

25                   MR. WINDERMAN:  I'm here, Harry Winderman,

```
 1   from Weiss Handler & Cornwell.  Along with me is

 2   Scott Zankl, who is appearing on behalf of the debtor.

 3   He's accompanied by his wife, Kristin Zankl, and his other

 4   bankruptcy counsel, Aaron Wernick.

 5              MS. MEHDIPOUR:  Is anyone else in the room?

 6              MR. WINDERMAN:  No, ma'am, I would announce

 7   them.

 8              MS. MEHDIPOUR:  Thank you.  Okay.  Good

 9   morning.

10              All right.  Does Ms. Zankl intend to testify

11   today on behalf of the debtor in any manner?

12              MR. WINDERMAN:  No, ma'am.

13              MS. MEHDIPOUR:  Thank you.

14              All right.  I've reviewed the photo ID for

15   Scott Zankl.  Mr. Zankl, I need to swear you in.  Would

16   you please confirm that you're -- would you raise your

17   right hand?  Is Scott in the middle, Mr. Zankl in the

18   middle?  I see him.

19              Okay.  There are a lot of people on this

20   Zoom and so it's hard for me to see.  There we go.

21              All right.  Sir, do you affirm to tell truth

22   the truth, the whole truth, and nothing but the truth

23   under penalty of perjury?

24              MR. ZANKL:  I do.

25   Thereupon,
```

Page 8

```
 1                          SCOTT ZANKL,
 2    having been first duly sworn, was examined and testified
 3    as follows:
 4                          EXAMINATION
 5    BY MS. MEHDIPOUR:
 6          Q.    Would you please state your full name for
 7    the record?
 8          A.    Scott Zankl.
 9                MS. MEHDIPOUR:  All right.  We already have
10    appearances for the debtor.
11                At this point, although it's going to take a
12    bit of time, I am going to ask any creditors or parties in
13    interest to make an appearance, and so if you would please
14    state your name, if you are an attorney, who you
15    represent, and if you represent multiple parties, would
16    you please list those parties?
17                I think the best way to do this would be for
18    me to just call out those folks that I see, and that I
19    recognize on the Zoom meeting.  So we'll go with Mr. Moon.
20                MR. MOON:  Thank you.  James Moon, M-o-o-n,
21    on behalf of Chapford Specialty Finance, LLC and Chapford
22    Credit Opportunities Fund, LP.
23                MS. MEHDIPOUR:  Thank you.  Good morning.
24                All right.  Mr. Dinkin.
25                MR. DINKIN:  Good morning.  My name is
```

Page 9

1   Mitchell Dinkin.  I'm the attorney for creditor Savannah

2   Row Investment.

3                    MS. MEHDIPOUR:  Thank you.

4                    Mr. Marks.

5                    MR. MARKS:  Good morning, Madam Mehdipour.

6   This is Brett Marks.  On the phone with me is my partner

7   Eyal Berger, and we both represent Ed Brown, and a company

8   called Millco Atwater.

9                    MS. MEHDIPOUR:  Thank you.  Good morning.

10                   Mr. Gold.

11                   MR. GOLD:  Yes, good morning.  Dan Gold,

12  last name is spelled G-o-l-d, from the United

13  States Trustee.

14                   MS. MEHDIPOUR:  Thank you.

15                   Mr. Reich.

16                   MR. REICH:  Yes, hi, Madam Trustee.

17  Ivan Reich on behalf of the DCG 2008 Irrevocable Wealth

18  Trust, and also with us today is the trustee of that

19  trust, Mr. (Inaudible).

20                   MS. MEHDIPOUR:  Thank you.  Good morning.

21                   Ms. Driscoll.

22                   MS. DRISCOLL:  Yes, good morning.

23  Theresa Driscoll, Moritt Hock & Hamroff for Integrated

24  Vehicle Leasing.

25                   MS. MEHDIPOUR:  Thank you.

Page 10

```
 1                    Mr. Wernick.
 2                    MR. WERNICK:  Yes, Aaron Wernick on behalf
 3   of Scott Zankl and Kristin Zankl.
 4                    MS. MEHDIPOUR:  Thank you.
 5                    Mr. Shelomith.
 6                    MR. SHELOMITH:  Good morning.
 7   Zach Shelomith on behalf of Woodside Credit, LLC.
 8                    MS. MEHDIPOUR:  Thank you.
 9                    Mr. Crane and Mr. Rigoli.
10                    MR. RIGOLI:  Good morning.  Jason Rigoli,
11   and Alan Crane is on the line with us, counsel for the
12   trustee, Nicole Mehdipour.
13                    MS. MEHDIPOUR:  Thank you.  Good morning.
14                    Mr. Ray.
15                    MR. RAY:  Good morning.  David Ray for the
16   Chapter 7 trustee.
17                    MS. MEHDIPOUR:  Thank you.
18                    Mr. Berger.
19                    MR. BERGER:  Ms. Mehdipour, I represent the
20   same parties that Mr. Marks announced, Ed Brown and Millco
21   Atwater.
22                    MS. MEHDIPOUR:  Thank you.
23                    Mr. Levy.
24                    MR. LEVY:  Good morning.  Mark Levy on
25   behalf of Chad Zakin.
```

1          MS. MEHDIPOUR:  Mr. Mancuso.

2          MR. MANCUSO:  Good morning.  Nate Mancuso on

3   behalf of Excell Auto Sport and Service, Inc.

4          MS. MEHDIPOUR:  Very good.

5          Mr. Furr, I didn't introduce you.

6          MR. FURR:  Good morning.  Robert Furr, also

7   special counsel to the trustee.

8          MS. MEHDIPOUR:  Mr. Zeichman.

9          MR. ZEICHMAN:  Good morning.  Tom Zeichman

10  on behalf of creditor Prestige Luxury, LLC.

11         MS. MEHDIPOUR:  Mr. Miller.

12         MR. MILLER:  Good morning.  James Miller on

13  behalf of Auto Wholesale of Boca, MMS Ultimate and

14  Moshe Farache.

15         MS. MEHDIPOUR:  Mr. Shraiberg.

16         MR. SHRAIBERG:  Good morning.

17  Bradley Shraiberg on behalf of Franklin Capital Group.

18         MS. MEHDIPOUR:  Mr. Rappaport.

19         MR. RAPPAPORT:  Good morning.

20  Jordan Rappaport on behalf of Tarek Aboualazzm, Stefano

21  Riga, Richard Applegate, Richard Greenberg and Andrew

22  Greenberg.

23         MS. MEHDIPOUR:  Very good.

24         All right.  I'm working my way down the list

25  here.  Mr. Balinsky.

Page 12

```
 1                    MR. BALINSKY:  Hi.  I'm Adam Balinsky, I'm a
 2  principal of Chapford Credit Opportunity Fund --
 3                    MS. MEHDIPOUR:  Thank you.
 4                    MR. BALINSKY:  -- represented by Mr. Moon.
 5                    MS. MEHDIPOUR:  Thank you.
 6                    Mr. Parkinson.
 7                    MR. PARKINSON:  Aaron Parkinson here
 8  (inaudible) -- Investments.
 9                    MS. MEHDIPOUR:  Good morning.
10                    Mr. Shaw.
11                    MR. SHAW:  This is (inaudible) Shah with
12  respect to OLP EAG, LLC and ENG Wholesale, LLC.
13                    MS. MEHDIPOUR:  Thank you.
14                    Mr., is it Geon (phonetic)?
15                    MR. GEON:  Yes, ma'am.  Chris Geon, in-house
16  counsel for Chapford Credit Opportunities Fund.
17                    MS. MEHDIPOUR:  Good morning.  Thank you.
18                    Mr. Goodman.
19                    MR. GOODMAN:  Hi.  Yes, I'm just watching as
20  an interested party.
21                    MS. MEHDIPOUR:  Thank you.
22                    Mr. Troccoli.
23                    MR. TROCCOLI:  Good morning.  I represent
24  the same party as Mr. Shelomith, Woodside Credit, LLC.
25                    MS. MEHDIPOUR:  Good morning.
```

1                  Mr. Rose.

2                  MR. ROSE:  (No verbal response.)

3                  MS. MEHDIPOUR:  Mr. Scott Rose.

4                  MR. MOON:  Madam Trustee, Scott Rose is also

5    one of the principals with Chapford Specialty Finance.

6                  MS. MEHDIPOUR:  Thank you, Mr. Moon.

7                  All right.  Is there anyone that I have

8    forgotten?  Some people are signed in with just a phone

9    number.

10                 Oh, Mr. Breuer, there you are.  Good

11   morning.

12                 MR. BREUER:  Good morning.  Stephen Breuer

13   on behalf of David Amsel.

14                 MS. MEHDIPOUR:  Mr. Kirwan.

15                 MR. KIRWAN:  Good morning.  Sean Kirwan.

16   I'm one of the principals of Woodside Credit, LLC.

17   Mr. Troccoli and Mr. Shelomith are my attorneys.

18                 MS. MEHDIPOUR:  Good morning.

19                 MR. KIRWAN:  Good morning.

20                 MS. MEHDIPOUR:  Is it Mr. Baum?

21                 MR. BAUM:  Yeah, I'm here with Franklin,

22   represented by Bradley Shraiberg.

23                 MS. MEHDIPOUR:  Very good.  Good morning.

24                 And is there anyone that I have missed?

25                 MR. HARVEY:  Yes, good morning.  Travis

Page 14

1   Harvey, H-a-r-v-e-y, on behalf of BAL Investments, LLC.

2                   MS. MEHDIPOUR:  Good morning.

3                   Anyone else?

4                   UNIDENTIFIED:  Yes.

5                   MR. RASARD:  We have Gregory Rasard

6   (phonetic) from Chapford Capital Group.

7                   MS. MEHDIPOUR:  Good morning.

8                   MR. BILE:  And you have Alex Byall from

9   Chapford Capital Group.

10                  MS. MEHDIPOUR:  Thank you.

11                  MR. LEFKOWITZ:  And Barry Lefkowitz from

12  Franklin Capital Group.

13                  MS. MEHDIPOUR:  Very good.

14                  UNIDENTIFIED:  And Harold (inaudible) from

15  (inaudible) --

16                  MS. MEHDIPOUR:  Thank you.  Good morning.

17                  Anyone else?

18                  MR. NELSON:  Greg Nelson from Franklin

19  Capital Group.

20                  MS. MEHDIPOUR:  Okay.  It looks like we have

21  41 participants.

22                  Anyone else care to make an appearance?

23                  (No verbal response.)

24                  MS. MEHDIPOUR:  All right.  Very good.

25                  My suggestion is that I will entertain

Page 15

1    questions from parties in interest and creditors when I'm

2    finished with my examination, and what I would recommend

3    is that if you are on the line and you care to ask

4    questions, what you will do is send a chat message, which

5    is just to me, that states who you are and who you

6    represent, and at the end of my examination, I will go

7    ahead and call on you to ask any questions.

8              Please also note that we are going to be

9    scheduling a Rule 2004 Exam on June 2nd on behalf of me,

10   as the trustee, with my counsel, and then we will be

11   providing a procedure, which we hope the Court to approve,

12   in the form of a scheduling order, where we then set a

13   number of days aside specifically for any creditors or

14   parties in interest who would like to cross-notice.

15             I will be sending a mass email out today

16   with all of that information and dates to all of the

17   parties.

18             Okay.  Let's go ahead and get started.

19   BY MS. MEHDIPOUR:

20        Q.   Mr. Zankl, would you please tell me what

21   your position was with the debtor.  And when I refer to

22   the debtor, it's going to be Excell Auto Group, Inc.

23        A.   My position was owner/general manager.

24        Q.   And did you read the bankruptcy schedules

25   and papers before they were filed?

1          A.    Yes.

2          Q.    Okay, and were all of your assets listed in

3     your bankruptcy papers?

4               MR. WINDERMAN:  Can I get some

5     clarification?  We uploaded amended schedules last night,

6     and if you're referring to the original schedules as

7     amended --

8               MS. MEHDIPOUR:  Correct.

9               MR. WINDERMAN:  -- that will be fine.

10               Thank you.

11    BY MS. MEHDIPOUR:

12          Q.    So let me repeat the question, Mr. Zankl.

13               In your bankruptcy papers, did you list all

14    of the assets of Excell Auto Group, in your original

15    papers or as amended?

16          A.    Yes.

17          Q.    And have you listed all of your creditors in

18    your bankruptcy papers?

19          A.    No, I don't believe I have.  I'm seeing some

20    on here that I don't believe I've listed.

21          Q.    Okay.  Who is missing from the bankruptcy

22    papers, if you would please give me that list?

23          A.    I believe I did not list Greenbucket.

24          Q.    Okay.

25          A.    And OLP.

1          Q.     OLP?

2          A.     Yes.

3          Q.     Okay, and how much money do you believe

4    Excell owes Greenbucket?

5          A.     I wouldn't -- I'd need to see the documents.

6    I wouldn't be able to answer that without the documents.

7          Q.     Okay, and what documents would you look at

8    in order to make a determination as to the amount owed to

9    Greenbucket?

10         A.     The contracts that were done.

11               MR. PACK:  I'm sorry for the interruption.

12   This is Joe Pack.  I was just brought in.  I was just

13   literally dialing in that minute.  I'm counsel to

14   Greenbucket.

15               MS. MEHDIPOUR:  Thank you, Mr. Pack.

16               MR. PACK:  I'd also like to announce that

17   I'm dialing in as counsel to OLP EAG, LLC and EAG

18   Wholesale.

19               MS. MEHDIPOUR:  Thank you, Mr. Pack.  I'll

20   give you an opportunity at the end of my examination to

21   ask any questions, if you wish.

22               MR. PACK:  Thank you, Ms. Mehdipour.  Also

23   my colleague Jessy Krehl will probably be dialing in

24   shortly.  Let me announce, preemptively on behalf of him.

25               Sorry for the interruption, and thank you.

Page 18

```
 1                MS. MEHDIPOUR:  Thank you, Mr. Pack.
 2   BY MS. MEHDIPOUR:
 3          Q.    Mr. Zankl, getting back to Greenbucket, what
 4   specific documents would you look at?  You said there was
 5   a contract.  What type of contract?
 6          A.    It was a participant contract, an investment
 7   contract.
 8          Q.    Okay, and what did the contract say, what
 9   were the terms of it?
10          A.    I wouldn't -- I need to see the contracts, I
11   don't remember exactly.  It was years ago.
12          Q.    Okay.  Was Greenbucket providing an
13   investment to Excell Auto Group?
14          A.    Yes.
15          Q.    Do you know what the principal amount was?
16          A.    I would need to see those documents.
17          Q.    Was it in a lump sum, or was it in
18   installments?
19          A.    That was installments, installments.
20          Q.    And do you recall, was there a profit split,
21   or was interest supposed to be paid?
22          A.    The documents would state it.  I need to see
23   the documents.
24          Q.    Okay, and could you direct me specifically
25   to where I would find those documents?  If they are in my
```

1    possession, where would they have been located in the

2    business premises?

3              A.    Yes, you do have the documents.  They would

4    have been in the accounting office.

5              Q.    Okay, and when you refer to the accounting

6    office, you mean the back office that had the keypad on

7    the door that was looked?

8              A.    Yes, yes, yes, yes.

9              Q.    Okay.  All right.  I have the same questions

10   for OLP in terms of how that worked, was it part of the

11   same agreement, or did you enter into a separate agreement

12   with OLP?

13             A.    A separate agreement.

14             Q.    Okay.  So the same questions for that deal,

15   was this an investment, or lump sum, or installments?

16             A.    It was installments, and it was an

17   investment, yes.

18             Q.    Okay.  Do you know how much you received

19   from OLP?

20             A.    I'd have to see the documents.

21             Q.    Okay.  Do you know what the terms of the

22   arrangement were, in terms of profit or interest payments?

23             A.    Interest, once again, I mean, I'd have to

24   see the documents.

25             Q.    Okay, and is the answer the same to the

Page 20

1    question about where those documents would have been

2    located?

3            A.    Yes, they were in that office.

4            Q.    Okay.  Other than those two creditors that

5    are not on your schedules, are there any other parties in

6    interest or creditors that you would like to disclose at

7    this point that need to be on your Schedule E and F --

8            A.    No.

9            Q.    -- which lists the unsecured creditors in

10   your case, or on Schedule D, which lists the secured

11   creditors?

12           A.    No.

13           Q.    I'd like to go through the history of the

14   debtor company.

15                 When was Excell Auto Group formed?

16           A.    Back in 2000.

17           Q.    2001?

18           A.    No, the year 2000.

19           Q.    Thank you.

20                 And when the company was formed, who were

21   the initial owners?

22           A.    Just myself.

23           Q.    100 percent owner?

24           A.    Yes.

25           Q.    Okay, and when the bankruptcy was filed

1    about five weeks ago, who were the owners?

2            A.    Myself, 25 percent -- 25.5 percent, my wife

3    25.5 percent, and Ed Brown, 49 percent.

4            Q.    At what point did the ownership structure

5    change from you having a hundred percent ownership

6    interest to the percentages that you've just testified

7    about?

8            A.    To what I just testified about, back in --

9    it was right around, I want to say June, I think, June

10   of '20, I think.

11           Q.    June of 2020?

12           A.    I believe so, yes.

13           Q.    Okay, and why did the ownership structure

14   change at that point?

15           A.    Because -- it changed because Mr. Brown

16   invested into the company.

17           Q.    And what documents would I look for in order

18   to determine how that ownership structure changed in terms

19   of something that memorialized it?

20           A.    They would have, they would have been in the

21   office, the accounting office, which you have possession

22   of.

23           Q.    And do you know what kind of document it

24   was?

25           A.    Yes, it was a contract.

Page 22

1          Q.    Okay.  Did you have an attorney help you

2    with the drafting and preparation of that contract?

3          A.    Yes.

4          Q.    Who was that?

5          A.    Tom Grenear (phonetic).

6          Q.    Okay.  When Excell Auto Group started back

7    in 2000, what was the business purpose?  What did it do?

8          A.    When it first started it was a finance

9    company, assisted people to achieve financing for cars.

10         Q.    And when did that come to change over time?

11         A.    I don't -- it changed to where it was still

12   doing the financing, but then also buying and selling

13   cars, right around 2003, I think, 2004, right around there

14   it started to do just as much in the car sales as it did

15   the finance.

16         Q.    Okay, and when the company was formed what

17   was your role?

18         A.    When it was formed it was just myself, I was

19   the only employee, so I did everything.

20         Q.    And back in 2000, where was the company

21   operating out of?

22         A.    Boca Raton, Florida.

23         Q.    At the same address as when it filed for

24   bankruptcy, at 1001 Clint Moore Road, or a different one?

25         A.    A different address.

1        Q.    Okay.  What was the address, do you recall?

2        A.    No, I don't.

3        Q.    All right, and so in the beginning you were

4    handling everything, it sounds like, is that right?

5        A.    Yes, yes.

6        Q.    And then at what point did your role change

7    regarding your role and responsibilities with the company?

8        A.    Can you -- as far as what?

9        Q.    In terms of responsibilities, day-to-day

10   functions.

11       A.    That changed probably, I'd say, around 2006.

12       Q.    Okay.

13       A.    2006.

14       Q.    And in 2006, is that when you -- did you

15   start to employ other staff to come in?

16       A.    Yes.

17       Q.    And who did you bring in at that point?

18       A.    I brought in -- I actually brought in sales

19   staff prior to that, 2003, 2004, and then brought in

20   office staff to handle the books and all that in 2006.

21       Q.    Okay.  Do you remember which employees you

22   brought in in 2003?

23       A.    I remember one of the gentleman's name was

24   Joe Palasano (phonetic).

25       Q.    Okay.

1          A.     He was a sales guy, he was a sales guy.

2          Q.     And anyone else?

3          A.     In the very beginning, no.  In 2006 I had

4    about six sales guys at that time.

5          Q.     And what did that number -- how did that

6    number change just prior to the bankruptcy filing?  How

7    many sales folks did you have working for you?

8          A.     Three -- excuse me, no.  Yes, three.

9          Q.     Okay, and when I say working for you, I'm

10   talking about specifically Excell Auto Group, not the

11   other entities.

12         A.     Oh, oh, oh, sales guys for Excell, there

13   wasn't any.

14         Q.     Okay.  So in 2022 it would be zero?

15         A.     Yes, yes.

16         Q.     All right.  Were you, yourself, doing any

17   sales work on behalf of Excell Auto Group at that time?

18         A.     No.

19         Q.     Okay, and what was Ms. Zankl's role at

20   Excell Auto Group initially?

21         A.     She didn't really start doing anything with

22   the company until, really until 2022.

23         Q.     Okay, and would you explain to me when

24   Ms. Zankl specifically started doing work for Excell Auto

25   Group, and what her responsibilities and tasks were?

1          A.     Yes, it was -- she was dedicated for the

2   employees, as far as hiring, bringing on new staff,

3   setting up policies and procedures for the staff, vacation

4   time, she brought in the drug policy.

5          Q.     And so Ms. Zankl was working in more of a

6   human resources capacity?

7          A.     Yes.

8          Q.     Okay, and do you remember what month that

9   started this year?

10         A.     I would say in January.

11         Q.     Okay.  So January of 2022 is when Ms. Zankl

12  started working and performing human resource

13  responsibilities for the debtor, is that right?

14         A.     Yes.

15         Q.     Okay, and was Ms. Zankl compensated for any

16  of that, for any of that work?

17         A.     Just her W-2 salary.

18         Q.     Okay, and what was the W-2 salary, how much

19  was that?

20         A.     I'd have to, I'd have to see the W-2.  I

21  don't know off the top of my head.

22         Q.     Okay.  In a general sense, would you please

23  explain what Dealertrack is?

24         A.     Dealertrack is, it's an accounting software

25  that dealerships use to keep track of their sales and

1   inventory, and as well as uploading details, and printing

2   contracts for customers.

3           Q.   Okay, and does it have two aspects of the

4   software, one on the accounting side and one for the

5   deals?

6           A.   Yes, it does.  It has one side that is

7   dedicated to sales, and it has one side dedicated to the

8   accounting side.

9           Q.   Okay, and how would a person keep track of a

10  sales transaction in Dealertrack?

11          A.   Can you explain more, like --

12          Q.   Sure.

13          A.   -- what you're actually asking?

14          Q.   Sure.

15               You have a transaction where someone is

16  coming to purchase a vehicle.  How would you go about

17  entering that information into the system?

18          A.   Well, the sales side, only the sales guys

19  could enter the sales information.  The salesmen did not

20  have access to the accounting side.  So, they would just

21  enter the customer's name and address, and what car they

22  were looking to purchase on the sales side.

23          Q.   And when you say only the sales guys, did

24  that include yourself?

25          A.   Yes, we only had access to the sales side of

Page 27

```
 1   Dealer Track.  We didn't have access to the accounting
 2   side.
 3            Q.    Okay, and who were the folks that had --
 4   would you tell me their names, in addition to yourself,
 5   who had the access on the sales side?
 6            A.    Myself, Jonathan Martin, Oleg Kouznetsov.
 7            Q.    Okay.
 8            A.    And --
 9            Q.    Anyone else?
10            A.    Well, at the time I filed, or -- right at
11   the time I filed, correct, is what you're asking?
12            Q.    At the time you filed, who would have had
13   access.  Let's say in 2022, to make it easier.
14            A.    That would have been also then
15   Gustavo Leiva.
16            Q.    Okay.  So that's Gustavo L-e-v-i-a?
17            A.    Yes.
18            Q.    And how do you spell Oleg's last name?
19            A.    I destroy --
20            Q.    Is it with a K?
21            A.    Yes.
22            Q.    It is with a K?
23            A.    It is with a K, yes.
24            Q.    All right, and did Ms. Zankl have access to
25   Dealertrack in any way?
```

1          A.      No, no.

2          Q.      Did anyone outside the company have access

3   to Dealertrack in any way?

4          A.      No.

5          Q.      What about your CPA, did your CPA have

6   access to the accounting side of that software?

7          A.      No.

8          Q.      Okay.  Was there someone responsible for

9   reviewing Dealertrack and ensuing the accuracy of the

10  information that would be inputted?

11         A.      Yes.

12         Q.      Who was that?

13         A.      That would have been either -- there was a

14  couple people, it would have been either Teddi Powlen, and

15  at the end, up until 2022, it also would have been

16  Nidia Levia.

17         Q.      Okay, and when you say Teddi's name, did her

18  last name change at one point?

19         A.      Yes.

20         Q.      Was it Soufol?

21         A.      Soufol, yes.

22         Q.      And then what was her current name, her last

23  name?

24         A.      Powlen, P-o-w-l-e-n, I think.

25         Q.      Thank you.

Page 29

1            Okay, and so was there a procedure in place
2    where, we'll call them by their first names, Teddi and
3    Nidia, would follow in order to make sure the information
4    was accurate?
5            A.    I really didn't get -- I really wasn't
6    involved in that.  I mean, they handled everything on the
7    accounting side.
8            Q.    Okay.  So, did you, yourself, have access to
9    Dealertrack's accounting portal?
10           A.    No, I did not.
11           Q.    Do you know why that was?
12           A.    I just never needed it.  That wasn't what I
13   did.  I was just in charge of doing all the sales, so I
14   never had access, nor did I need it.
15           Q.    Who was -- who would you consider to be the
16   supervisory person who was responsible for the accuracy of
17   the information that would be inputted into Dealertrack?
18           A.    It would have been both --
19           Q.    Okay.
20           A.    -- Teddi and -- yeah, it would have been
21   both of them.  They kind of watched each other.  So, I
22   mean --
23           Q.    And are you able to explain on the financial
24   side how Dealertrack worked, or is that something that
25   Teddi and Nidia would need to explain to me?

1         A.    Yeah, yes, it would be them.

2         Q.    Okay.  When you were analyzing and reviewing

3    inventory of Excell Auto Group through the years, how

4    would you keep track of the inventory that the company was

5    holding, would it be through Dealertrack?

6         A.    No -- I mean, yes, there was a Dealertrack,

7    but I didn't use that part.  That would have been done on

8    the accounting side.  Throughout the years I just kept my

9    own spreadsheet.

10        Q.    Okay, and when you say you kept your

11   spreadsheet, would that have been in a program like

12   Excel --

13        A.    Yes.

14        Q.    -- or Google, I don't remember the name of

15   it.

16        A.    It was just a spreadsheet I kept in a file

17   that I just updated.

18        Q.    Okay, and was that on the computer that, the

19   laptop -- excuse me, the desktop that you kept in your

20   office at Excell?

21        A.    Yes.

22        Q.    All right, and where would those Excel or

23   spreadsheets be saved, were they in a Google portal, or

24   were they on the hard drive?

25        A.    I'm not a -- I don't really know the

1    difference.  I know --

2              Q.    Okay.

3              A.    -- it was saved under Excell inventory, the

4    file.

5              Q.    Okay.  So at any given point if you wanted

6    to know what you had for sale, you could go into your

7    computer and you would be able to find a spreadsheet that

8    would show you what your inventory was at any given

9    moment, is that right?

10             A.    That is true, yes.

11             Q.    Okay.

12             A.    But I also did -- I just knew what I had,

13   too.  I mean --

14             Q.    So if the salespeople wanted to know what

15   was on the floor or available for purchase or sale, how

16   would they understand what the inventory was comprised of?

17             A.    We had a sales meeting every single day at

18   9:30, to 10:30, and we would go over the inventory every

19   morning.

20             Q.    Okay, and at those sales meetings did you

21   have lists that you would distribute to each of those

22   members, or how did you understand and get on the same

23   page as to what was available?

24             A.    No, I would not hand out lists.  We would

25   just, we would verbally go over all the cars, and all the

Page 32

1    cars were in the showroom floor, so --

2         Q.    Okay.

3         A.    -- and they were all there --

4         Q.    Okay, and when you say the showroom floor,

5    you're referring to the 1001 Clint Moore Road, Boca

6    premises?

7         A.    Yes.

8         Q.    Okay.  In terms of computerized books and

9    records, were all members of Excell, or employees, able to

10   collaborate on various documents in a cloud or, do you

11   know, were they limited to what was on their own hard

12   drive?

13        A.    Can you give me anything specific or --

14        Q.    So, if you were preparing your inventories,

15   would Nidia or Teddi have access to those inventory

16   spreadsheets?

17        A.    No.

18        Q.    Okay, and the same question would be if they

19   were preparing financial statements, or inventories, or

20   anything financial related, would you have access to their

21   documents?

22        A.    Only if they gave them to me.

23        Q.    Okay.

24        A.    I don't have access any other way.

25        Q.    Okay.  Who was the person in charge of IT at

1    Excell Auto Group?

2           A.    We really didn't have anybody that was --

3    the girls, if there was an issue with anything, they would

4    call somebody to come in that they knew.  We really didn't

5    have a dedicated IT.

6           Q.    Okay, but at one point did that change where

7    you used an outside provider?

8           A.    It was always, always like that.

9           Q.    All right.

10          A.    We didn't have, like, a dedicated IT.

11                Now, when you're referring to an IT, you

12   mean fixing computers, is that what you mean, or what --

13          Q.    Well, there is two aspects.  There is one,

14   who was responsible if there were IT issues within the

15   company, and then the second question would be, did you

16   ever use a service provider to come in and work on your

17   computers, or set up your system?  So let's go with the

18   first question, I think you answered, which was, no, you

19   had no one internally who was in that role, is that

20   correct?

21          A.    As far as, yeah, doing the repairs, or if

22   the computers had issues, we always brought somebody from

23   outside to fix them, yes.

24          Q.    Okay.  Who was that person that you brought

25   in?

1        A.    That would actually be a question that Teddi

2   or Nidia could answer.

3        Q.    Okay.

4        A.    Because they're the ones who would call.  I

5   didn't get involved with that.

6        Q.    Okay, and we'll talk about Teddi and Nidia

7   in more detail in just a moment, but did you ever instruct

8   either of those folks as to what to put into the books,

9   and what to record as to certain transactions?

10        A.    No, no, just the transactions, how they

11   would be loaded, and the deals of how they got put in.

12        Q.    Okay, and in terms of who supervised their

13   accounting and financial responsibilities, who would that

14   person have been?

15        A.    Themselves.

16        Q.    Okay.  Okay.  All right.  So it's a good

17   opportunity to specifically talk about Ms. Soufol, Teddi,

18   and we've touched on some testimony about her role.

19              When she was initially hired, do you

20   remember what year that was?

21        A.    Well, she came -- she originally retired

22   back in 2007, 2007, yeah, 2007, and then she worked for a

23   couple of years, she left, and then she came back in two

24   thousand and, I want to say thirteen, maybe.

25        Q.    Okay.  So let's go back a second, because

Page 35

1   you said she retired in '7.  When did she -- did she come

2   to you in the beginning of the company's business, or what

3   year did she come?  The business was started in 2001, you

4   said, right?

5           A.    Yes, she originally first was hired -- first

6   she was hired back in 2007.

7           Q.    Okay, and what kind of background did she

8   come from?

9           A.    Comptroller, she was a comptroller at a lot

10  of other car dealerships.

11          Q.    Okay, and what was her position that you

12  hired her for at Excell?

13          A.    Comptroller.

14          Q.    Okay, and did that -- what did you believe

15  in your mind her responsibilities were at comptroller?

16          A.    Well, that's a normal comptroller position,

17  it's managing and handling the books, and the day-to-day

18  of the accounting office, and implementing policies and

19  procedures.

20          Q.    Who directly reported to Teddi?

21          A.    Well, that -- she -- pretty much everybody.

22          Q.    Did the sales --

23          A.    (Inaudible.)

24          Q.    -- report to her?

25          A.    They had to report to her when it came to

Page 36

1    accounting issues or accounting -- anything with

2    accounting or money, they had to report to her, yes.

3           Q.    Okay, but as far as sales and deals, the

4    sales folks reported to you as their supervisor?

5           A.    When it came to the deals, yes, but if there

6    was an issue or anything with money, collecting money or

7    anything like that, they would go to Teddi.

8           Q.    Okay, and did her role as comptroller change

9    over time?

10          A.    It did.

11          Q.    And how did that change?

12          A.    She wanted to retire.  So in the last, I'd

13   say, two, two and a half years, she went from a full-time

14   to, you know, kind of a part-time, but I kept her on a

15   full-time salary.

16          Q.    Okay.  So she was compensated as a full-time

17   employee, but she was working as a part-time employee, is

18   that right?

19          A.    Yes.

20          Q.    Okay.  Did anyone come in to supplement her

21   role, or to assist in the fact that her hours were

22   reduced?

23          A.    Yes, that was Nidia.

24          Q.    Okay, and what year did Nidia come in?

25          A.    When she was first hired, or when did she

1    start there?

2            Q.    When did she first start working for you?

3            A.    I want to say right around two thousand -- I

4    don't know the specific date, but I think it was right

5    around 2015, I believe.

6            Q.    Okay.  Okay, and when did Teddi leave the

7    company?

8            A.    When did she leave?

9            Q.    Uh-huh.

10           A.    I think it was probably the second week in

11   April of '22.

12           Q.    Okay.  Let's talk about Nidia Levia.  She

13   came in in 2015 you said?

14           A.    I believe so.  It was, it was either 2015 or

15   2016, but it was one of those two.  I don't remember

16   exactly.

17           Q.    And what position was she hired for?

18           A.    Receptionist.

19           Q.    Okay, and when she initially came in as

20   receptionist, was she doing -- in addition to that, was

21   she doing any financial work with Teddi?

22           A.    No.

23           Q.    Okay.  So when did that change?

24           A.    Teddi started to train her two thousand and

25   -- the end of 2018, maybe, 2019.

1          Q.    Okay, and then what was she training her
2     specifically to do in terms of her responsibilities?
3          A.    To eventually take over Teddi's position.
4          Q.    Okay, and other than Teddi and Nidia, were
5     there any other parties or employees that had access to
6     the financials of Excell Auto Group?
7          A.    No.
8          Q.    Okay.  All right.  When Excell was first
9     started in 2000, how did the company obtain the vehicles
10    that it would have for sale?
11               MR. WINDERMAN:  I'm going to object to the
12    form, I don't think it's consistent with his prior
13    testimony.
14               MS. MEHDIPOUR:  That's fine.  It is a
15    341 Meeting.  Let me try --
16               MR. WINDERMAN:  Can you clarify the
17    question?
18               MS. MEHDIPOUR:  Let me try and rephrase the
19    question.
20    BY MS. MEHDIPOUR:
21          Q.    When the company first started, how did you
22    acquire your inventory?
23          A.    Well, we didn't really start off buying
24    cars.  It was a finance company.
25          Q.    Okay.

1            A.    So --

2            Q.    Okay.  All right.  That's fair.

3            A.    When I did start buying cars, you know, when

4    I did start buying cars, had gotten a little line of

5    credit with a company called MAFS, M-A-F-S.

6            Q.    M-A --

7            A.    -- F-S, it stood for Manheim Auto Auction,

8    it was their finance, floor plan/finance company.

9            Q.    Okay, and you had a line of credit with

10   them, and so how would it work, if a customer wanted a

11   specific Ferrari, what would happen?

12           A.    Well, no, we don't -- I just bought cars.

13   Back then we just bought them and put them on the line of

14   credit, and advertised and sold them.

15           Q.    Okay.

16           A.    We sold what we had.

17           Q.    And did that come to change at some point?

18           A.    Yeah, the sales guys, I mean, when they

19   started hiring salespeople, they would do both selling

20   from what was in the store, and they would find cars for

21   customers as well, the sales guys.

22           Q.    Okay.  Did you purchase wholesale?

23           A.    Yes.

24           Q.    And who would you purchase from?

25           A.    There was about a hundred different dealers

Page 40

1  around the country that I would buy from wholesale, if

2  that's what you're referring to.

3      Q.   Yes.

4           And if I wanted a list of who those folks

5  would be, where would I find that?

6      A.   You would not find a list.  It would be --

7  literally you would have to go through all the deals to

8  see the different places that we bought from.  There

9  really wasn't a list.

10     Q.   Okay.  Okay, and did Excell Auto Group have

11 commercial loans?

12     A.   Can you clarify what you mean?

13     Q.   Did you enter into any loan agreements with

14 any institutions?

15     A.   Can you just clarify, like, you're talking

16 about --

17     Q.   Sure.  For example, did you have any loan

18 relationships with banks, like SunTrust, or other lending

19 institutions?

20     A.   Back in 2016 I think.

21     Q.   Okay, and who was that with specifically?

22     A.   Seaside, Seaside Bank.

23     Q.   Okay.  Do you remember, was it a credit

24 line?  How did it work, the lending relationship?

25     A.   It was a credit line.

1          Q.    It was a credit line, okay, and do you

2    remember what your credit line was, in terms of how much

3    at that point?

4          A.    It was seven and a half million.

5          Q.    Okay, and what were you using that credit

6    line for, to buy vehicles?

7          A.    Yes.

8          Q.    All right, and was the money used for

9    anything else?

10         A.    No.

11         Q.    Did you ever use it for expenses of the

12   business that were unrelated to the purchase of vehicles?

13         A.    It was a credit line, it was used for, yes,

14   cars and --

15         Q.    I'm sorry, cars and --

16         A.    Yes, it was used for -- it was a credit

17   line, it was used for cars and for whatever, the business

18   expenses.

19         Q.    Okay, and would those include the repayment

20   of any investors?

21         A.    No.

22         Q.    Okay, and would you use that credit line for

23   personal expenses, do you know?

24         A.    No.

25         Q.    Okay.  You don't know, or the answer is no?

Page 42

1          A.     No.

2          Q.     Did Excell Auto Group ever come to have

3    consignment relationships?

4          A.     Yes.

5          Q.     Okay, and when do you believe that that

6    started, what year?

7          A.     I don't remember.

8          Q.     Okay.  Do you know if it was in the last

9    five years that you used the consignment arrangement?

10         A.     I don't.  I mean, it was -- I don't remember

11   exactly when we started doing that.

12         Q.     Okay.  All right.  Would you -- do you know

13   if within the last five years you used consignments at

14   all?

15         A.     Yes.

16         Q.     Okay, and would you explain to me how that

17   would work?  Describe a consignment for me.

18         A.     Well, I wasn't really involved in the

19   consignments.  So it was more the sales guys brought in

20   the consignments.

21         Q.     Okay, and did you have any say in whether

22   you took a car in on consignment?

23         A.     I didn't have a say, I didn't get involved

24   in it.  The only thing that I would have, which was a

25   blank policy for my sales guys, it was just to make sure

Page 43

1    the car had never been in an accident, that's all.  That

2    was my only say, is that they couldn't bring in a

3    consignment that's been in an accident.

4           Q.    Okay.  So, the sales folks had the ability,

5    as long as they complied with that policy, no car

6    accidents on the consigned cars, they really had the

7    discretion to determine what came in on consignment and

8    what didn't?

9           A.    Yes.

10          Q.    And you mentioned earlier in your testimony

11   that you would keep a spreadsheet so that you had a handle

12   on the inventory.  How were you able to keep an accurate

13   inventory if you weren't involved in that consignment

14   process?

15          A.    Because it didn't matter to me on the

16   consignments because I didn't own them.

17          Q.    Okay, and so at any given point if someone

18   wanted to determine which vehicles were on consignment,

19   how would they do that?

20          A.    Well, the sales guys were -- that's one of

21   the reasons we had the meeting every morning, is so that

22   they could all go back and forth, and everyone knew what

23   was going on as far as inventory, and the sales guys were

24   really good about talking to each other, so they knew what

25   was consignment.

Page 44

1           Q.    So do you believe that they kept a list in

2     their heads as to what would currently be on consignment?

3           A.    Yes.

4           Q.    And are you aware of anyone keeping a

5     written record of what those cars were on consignment?

6           A.    Can you clarify that as far as written

7     records.

8           Q.    Sure.  Not -- we'll get to the actual

9     consignment agreement, but a way to go in and say these

10    five vehicles are on consignment, versus here is my list

11    of what I have for sale that's non-consignment?

12          A.    No.

13          Q.    Okay.  So no written list which would

14    differentiate that, is that right?

15          A.    (No verbal response.)

16          Q.    I'm sorry, I couldn't hear you.

17          A.    No, there wasn't.

18          Q.    Thank you.

19                Okay, and so just getting back to it, could

20    you explain to me how the consignment would work?

21          A.    Well, a customer would bring in the car, and

22    the sales guys would have it inspected to make sure it

23    wasn't in an accident, and the sales guys would determine

24    a price that the customer wanted for the car, and as long

25    as the car passed inspection, and the sales guys, or the

Page 45

1   -- or whoever was up front, as far as receptionist goes,

2   would do the consignment form with the customer, and

3   generally it would be for 30 days, 60 days if we didn't

4   sell it, and then the customer would come pick up the car

5   and take it back.

6           Q.   At the point that someone came in and said

7   consignment, I'd like to see how much I can get for my

8   vehicle, would the car then go on the showroom floor?

9           A.   No, it would go for inspection first.

10          Q.   Okay.  So, that's fair.

11          A.   Yeah, to make sure there was no accident.

12          Q.   Okay.

13          A.   As long as it past inspection --

14          Q.   Where would that inspection happen?

15          A.   At the service shop, Sport and Service.

16          Q.   Okay, that's Excell Auto Sport and Service?

17          A.   Yes.

18          Q.   5471 on Federal Highway, is that the one

19   we're talking about?

20          A.   Not on Federal, it's on --

21          Q.   Dixie, excuse me.

22          A.   Yeah, Dixie Highway.

23          Q.   Okay.  Thank you.

24               And the price would be determined by the

25   customer, and then who prepared -- okay.  Let me back up a

Page 46

1    moment.

2              Were there written consignment agreements to

3    memorialize the relationship?

4         A.    Yes.

5         Q.    Okay, and in terms of the form of that

6    consignment agreement, was that something that an attorney

7    prepared for you?

8         A.    Actually I don't -- I'm not sure who

9    prepared the form, to be honest.

10        Q.    Okay.  Someone would sign a consignment

11   form.  Who would actually come up with that document then,

12   would it be a salesperson?

13        A.    Yes, or --

14        Q.    Okay.

15        A.    -- the young lady up front, the

16   receptionist.

17        Q.    And is that Nidia?

18        A.    No, it would have been, it would have been

19   Mylar, sometimes Alana would do it.

20        Q.    Okay.  Did they have a standard form that

21   you know of that they would use?

22        A.    Yes.

23        Q.    Okay, and the customer would agree upon an

24   amount, and they would accept that or higher, is that

25   right?

Page 47

1          A.    No, they would accept the amount that they
2    wrote on the document.
3          Q.    Okay, and if someone were to offer less
4    money, how would that work?
5          A.    It was the job of the sales guy to contact
6    the consignment individual and present the offer, and if
7    the customer agreed to anything less than what was on the
8    document, the sales guy was required to get in writing via
9    text or email.
10         Q.    Okay, and did you have anything to do with
11   the decisions in terms of the consignments?
12         A.    No, just to make sure that there was no
13   accidents.  I just didn't want the cars to have accidents
14   representing them.
15         Q.    Okay, and where would the consignment
16   agreement be located?  Where would I find consignment
17   agreements?
18         A.    They would have been in the office, in the
19   accounting office.
20         Q.    Okay.
21         A.    But they only would have been there if the
22   cars were on consignment.  If the cars were sold, those
23   agreements would have been put into the deal jacket.  If
24   the customer picked up the car and it didn't sell, they'd
25   just shred the consignment agreement, they didn't keep

1    them, there is no reason to.

2         Q.    Okay.  So if I wanted to go back and

3    determine the consignment arrangement on a particular

4    vehicle that had been sold, I would have no documents to

5    look at it.

6         A.    No, no, they'd be in the deal jacket.

7         Q.    They'd be in the deal jacket, okay.

8         A.    If it was sold, yeah, if it was actually

9    sold.

10        Q.    And would that all be reflected in

11   Dealertrack?

12        A.    No.

13        Q.    Okay.  The form of consignment agreement, do

14   you know if that form ever changed over time?

15        A.    I believe it did change.  I know it changed

16   the one time, but I really wasn't involved in it, so --

17   but I do know they did change it once.

18        Q.    And do you know how they changed it?

19        A.    I do not.

20        Q.    Okay, and we're using the word "they", we're

21   talking about the salespeople or Mylar?

22        A.    No, if any of those documents would have

23   been changed, it would have been Teddi or Nidia.

24        Q.    Okay.  Would that have been in consultation

25   with you?

1           A.     No, they knew actually more about that than

2     I did.   So I trusted them, and they knew what they were

3     doing.

4           Q.     Okay.   Did Excell Auto Group at one point

5     ever come to use private investors?

6           A.     Yes.

7           Q.     Okay, and do you remember what year that

8     started?

9           A.     2011.

10          Q.     And who were -- at that point who was the

11    private investor, do you recall who it was?

12          A.     That was -- 2011, that was Steve Gelb.

13          Q.     How do you spell his last name?

14          A.     G-e-l-b.

15          Q.     B, as in boy, or V, as in Victor?

16          A.     G-e-l-b, as in boy.

17          Q.     Thank you.

18          A.     Steve Gelb.

19          Q.     Okay, and what was the arrangement with

20    Mr. Gelb?

21          A.     I'd have to have those documents to really

22    answer it correctly.

23          Q.     Okay.   What documents would we need to look

24    at in order to refresh your memory about the relationship?

25          A.     There was a contract that was executed back

Page 50

1    then.

2            Q.    Okay.  Was it with Mr. Gelb, personally, or

3    an entity that he owned?

4            A.    It was with an entity.

5            Q.    And do you remember the name of it?

6            A.    Savannah Row.

7            Q.    Okay, and was Savannah Row supposed to lend

8    Excell a lump sum, or were there separate installments, or

9    separate small loans?

10           A.    I've got to -- that was so long ago, I'd

11   have to have those documents.

12           Q.    Okay.  Do you remember in total what you owe

13   Savannah Row?

14           A.    I mean, just to be accurate, I would really

15   want to see the documents so I can be exactly accurate.

16           Q.    Okay.

17                 MR. MOON:  Madam Trustee, just a quick

18   clarification question for you.  You were asking about

19   private investors, and it sounded like you were asking

20   about lending arrangements.  I just was wondering if we

21   can clarify if you're asking about private investors or

22   private lenders.  Thank you.

23                 MS. MEHDIPOUR:  Thank you, Mr. Moon.

24                 Yes, what I want to focus on first are the

25   private investors.

Page 51

1    BY MS. MEHDIPOUR:

2         Q.    Do you -- without the contract or the

3    documents in front of you, are you unable to explain the

4    specific relationship to me, Mr. Zankl?

5         A.    Yes.

6              MR. WINDERMAN:  Yes, and for clarification,

7    we're not sure that the legal consequences of that

8    language between lender and investor has been clarified

9    yet.  We may take the position that all the investors were

10   lenders and acted in a usurious manner.

11   BY MS. MEHDIPOUR:

12        Q.    Mr. Zankl, what was your understanding about

13   what Savannah Row was acting as?

14        A.    A lender.

15        Q.    Okay.  Were the funds that you borrowed from

16   Savannah Row tied to specific vehicles?

17        A.    No.

18        Q.    Okay, and so how would the relationship

19   work, would you determine that you needed a certain amount

20   of funds and then seek those from Savannah Row?

21        A.    Are you talking about in the original, when

22   you first -- I'm not sure what you're asking.

23        Q.    Your first, your first interaction with

24   Savannah Row, why did it come about?

25        A.    He had actually approached me about

Page 52

1    investing.

2            Q.    Mr. Gelb?

3            A.    Yes.

4            Q.    Okay, and what did Mr. Gelb say to you?

5            A.    Just, he wanted to know if he could get

6    involved.

7            Q.    Okay, and do you remember what the proposal

8    was that he made to you?

9            A.    No.

10           Q.    Okay, and what would refresh your

11   recollection in the debtor's books and records about that

12   arrangement?

13           A.    I'd just need the contract.

14           Q.    Okay.  Other than Savannah Row, would you

15   tell me who the other folks were that were private

16   investors in your mind?

17           A.    What do you mean?  Can you clarify what you

18   mean by investor or lender?  I mean, can you clarify what

19   you mean, investor or lender?  I'm not sure.

20           Q.    Well, there certainly is a distinction.  Let

21   me try and ask it a different way.

22                 In your mind how do you believe you would

23   characterize the relationship with folks like Savannah

24   Row?

25           A.    A lender, he was a lender.

1          Q.    You believe they were lenders, okay.

2          A.    Yes.

3          Q.    And did you, in fact, pay Savannah Row back?

4          A.    Can you clarify that?

5          Q.    Sure.

6                Was Savannah Row -- did you make payments on

7    this lending arrangement that you believed you had with

8    them?

9          A.    Yes.

10         Q.    Okay, and how often were those payments

11   made?

12         A.    Every month.

13         Q.    Monthly.

14               And were you paying interest, do you know?

15         A.    It was all interest.

16         Q.    Okay.  Was there a split of profits with

17   Savannah Row?

18         A.    No.

19         Q.    Okay, and what in your mind is your

20   definition of a lender?

21         A.    My definition is someone who lends money and

22   makes interest on it.

23         Q.    Okay, and who were the other parties that

24   were in that same category in your mind, can you give me

25   some other examples?

Page 54

1          A.    I mean --

2          Q.    Was there anyone that you believed was

3    similar in terms of the lending relationship to Savannah

4    Row?

5          A.    Can you give me some examples and I will

6    answer?

7          Q.    Do you remember anyone else approaching you

8    about a similar relationship, where there was an offer to

9    lend money, and you signed an agreement, can you give me

10   another example of an entity that you did that with?

11         A.    Yes, I mean, there are other groups that are

12   on here.

13         Q.    Okay.  Let's talk about one of them, give me

14   an example of one of them.

15         A.    I'm trying to think of the names of the

16   entities.  DCG, I guess.

17         Q.    DCG?

18         A.    I think that's one of them, yeah.

19         Q.    Okay.

20         A.    They had different entities.

21         Q.    All right.  Do you remember how that

22   relationship first came up with DCG?

23         A.    I don't remember exactly how it came up, no.

24         Q.    Okay.  Do you remember how much money they

25   loaned you, or provided to you?

Page 55

1          A.    I'd have to see the documents.

2          Q.    Okay.  Do you know if payments were made to

3    DCG on account of --

4          A.    Yes.

5          Q.    Yes.

6                Okay.  Were those monthly?

7          A.    Yes.

8          Q.    Were they supposed to be interest payments?

9          A.    Yes.

10         Q.    Was there a split of profit with DCG?

11         A.    No.

12         Q.    Okay, and what document memorialized this

13   relationship?

14         A.    It would have been the contracts that we

15   signed.

16         Q.    And those would be located in the debtor's

17   books and records?

18         A.    Yes.

19         Q.    Okay.  What about Mr. Ed Brown?

20               MR. WINDERMAN:  Madam Trustee, when you

21   reach a breaking point, we'd like five minutes.

22               MS. MEHDIPOUR:  Sure, I'm happy to take that

23   now.

24               MR. WINDERMAN:  Okay.  That's fine.  We

25   appreciate it.

Page 56

1              MS. MEHDIPOUR:  Just please remember that

2    there are many people on the phone, and if you're trying

3    to have a private discussion, you should put your computer

4    on mute.

5              MR. WINDERMAN:  We're going to do that, but

6    we don't intend to have a private discussion.

7              MS. MEHDIPOUR:  Thank you.

8              For everyone on the phone, we'll take a five

9    to seven-minute break, and then we'll resume at that

10   point.

11             (Thereupon, a recess was had, after which

12   the following proceedings were had:)

13   BY MS. MEHDIPOUR:

14        Q.   Okay.  Mr. Zankl, you realize you're still

15   under oath?

16        A.   Yes.

17             MS. MEHDIPOUR:  Okay.  Very good.

18             All right.  Just for those parties on the

19   line, I am going to give you an opportunity to ask very

20   specific questions as to your particular arrangements, and

21   so bear with me just a little bit longer.

22             I do think a lot of these questions are more

23   appropriate for a 2004 Examination where Mr. Zankl can

24   have the benefit of being provided with documents as to

25   all of the specifics.

Page 57

1              So, I anticipate probably going maybe

2       another 30 to 45 minutes or so, and then I'm going to open

3       it up to the creditors and parties in interest.

4              Thank you for those of you who are sending

5       me information.  I am recognizing your chats, and for

6       those of you who want to ask questions, remember to send

7       me your name -- I see Mr. Moon did that, your name and who

8       you represent.

9              Okay.  Very good.

10      BY MS. MEHDIPOUR:

11          Q.    All right.  Mr. Zankl, just going back to

12      Savannah Row for a moment, when you testified that in that

13      situation you were not receiving, I believe you said there

14      was no split of profits, and you believed that you were

15      just receiving monthly interest payments.  Do I have that

16      testimony correct?

17          A.    Paying monthly interest payments.

18          Q.    Excuse me, making and paying monthly

19      interest payments, is that correct?

20          A.    Yes.

21          Q.    Okay, and you also testified that the deals

22      were not related to specific vehicles with respect to

23      Savannah Row, is that correct?

24          A.    Yes.

25          Q.    Okay.  So, how did you keep track of the

Page 58

1    funds that you would receive from Savannah Row, is my

2    first question?

3              A.    That would have been in the accounting

4    office.

5              Q.    Okay, and so would most of these come in by

6    wire or check when they were funding?

7              A.    Once again, I would need to see the

8    documents on that, the bank statements and documents.

9              Q.    Okay.  Who would first know about the wire

10   or check being received?

11             A.    The girls in the office, the accounting

12   office.

13             Q.    Okay.  Would that be Teddi or Nidia?

14             A.    Yes.

15             Q.    Would they indicate to you, for example, we

16   have just received a million dollars in by wire from

17   Savannah Row, would that be something that they would do?

18             A.    Yes.

19             Q.    Okay, and then they would record that as

20   they saw fit in the accounting side?

21             A.    Yes.

22             Q.    And I believe you testified earlier that you

23   didn't have any say in how that was recorded?

24             A.    Yes.

25             Q.    Okay.

Page 59

1              MR. DINKIN:  Madam Trustee, this is
2    Mitchell Dinkin, I'm the attorney for Savannah Row.
3              Can you just please clarify on the record
4    that you're speaking about hypotheticals and not specific
5    transactions related to my client?
6              MS. MEHDIPOUR:  Thank you, Mr. Dinkin.  That
7    was completely a hypothetical, yes.
8              MR. DINKIN:  Thank you.
9              MS. MEHDIPOUR:  Very good.
10   BY MS. MEHDIPOUR:
11        Q.    All right, and would those be recorded in
12   Dealertrack, Mr. Zankl, the receipt of funds from someone
13   such as Savannah Row?
14        A.    I believe so, yes, it would be in
15   Dealertrack.
16        Q.    On the accounting side of Dealertrack?
17        A.    I believe so, yes.
18        Q.    Do you know if hard copies of these
19   transactions were also kept?
20        A.    I don't know.
21        Q.    Okay, and who would know?
22        A.    That would have been Nidia and Teddi.
23        Q.    Okay.  How was it determined how much
24   someone like Savannah Row would be paid back?
25        A.    I'd have to have those documents in front of

Page 60

1   me.

2          Q.    Okay, but I'm not asking you about a

3   specific amount, but in general, how would you determine

4   what and when to pay someone like Savannah Row back?

5          A.    Well, it was in the documents, as far as I

6   remember it was in the documents when I paid and how much.

7          Q.    And what documents are you referring to?

8          A.    The ones that were signed when we did the

9   deals.

10         Q.    Who gave the decision as to what would be

11  paid back?

12         A.    Well --

13               MR. WINDERMAN:  I don't understand the

14  question.

15               THE WITNESS:  Yeah, I don't understand.  I

16  don't understand --

17               MS. MEHDIPOUR:  Just one moment.  There is

18  an interference on the line here.

19  BY MS. MEHDIPOUR:

20         Q.    Mr. Zankl, there was an interference on the

21  line here, and I wasn't able to hear anything that you

22  said.

23               My last question was who made the decision

24  as to what would be repaid?

25         A.    It was on the contract, it was on the

1    documents.

2            Q.    If payments were made, would you instruct

3    Teddi or Nidia to make those payments?

4            A.    Well, it was usually set in the documents.

5    If I had the documents in front of me, I could tell you.

6    There is actually due dates.  I don't have them in front

7    of me.

8            Q.    I understand that, but did Teddi and Nidia

9    have the discretion to make these payments, or did you

10   advise them to do it?

11           A.    No, they had the discretion.

12           Q.    So they didn't need to check with you first?

13           A.    No.

14           Q.    And they would be able to determine the

15   amounts that were being paid back on their own?

16           A.    They were established in the contracts.

17           Q.    Okay.  Getting back to DCG Trust, your

18   testimony before our break was that the payments were

19   interest only and not a share of profits, is that correct?

20           A.    Yes.

21           Q.    And were those tied to a specific vehicle?

22           A.    No.

23           Q.    They weren't.

24                 Okay.  Do you recall having entered into a

25   document called a profit participation agreement with

Page 62

1    TCG Trust?

2            A.    I'd have to see it.

3            Q.    And where would copies of any such

4    agreements be kept?

5            A.    They would have been in the office that you

6    referred to before --

7            Q.    Okay, but --

8            A.    -- in the accounting office.

9            Q.    -- as you sit here today, you don't recall

10   whether you had entered into something called profit

11   participation agreements?

12           A.    No, I'd have to see the document.

13           Q.    Okay.  Do you know why investors would be

14   indicating that their investments were tied to certain

15   vehicles?

16           A.    No.

17           Q.    Do you recall seeing anything in the banking

18   or the wire transfers where specific VINs were notated on

19   the wires that were coming in to Excell?

20           A.    No, I never really looked -- I never really

21   went in, that was something the office handled, the banks

22   and stuff, with the bank.

23           Q.    Okay, and as you sit here today, you don't

24   recall whether you had a profit sharing agreement with

25   Ken Goodman and DCG Trust, is that correct?

Page 63

1          A.    Yes.

2          Q.    Okay.  Do you recall, in general, whether

3    there was any private person either in their individual

4    name, the name of a company or trust, where investments

5    were made in specific vehicles?  That's my first question.

6          A.    No, I'd have to -- no, I'd have to see the

7    documents to determine that.

8          Q.    Okay, and the second part of that question

9    is whether you recall any private person, whether in the

10   name of a company or trust, or in their own name, entered

11   into an arrangement with you where they expected a split

12   of profits on the sale of any vehicle?

13         A.    Once again, I would have to just see the

14   documents for the arrangement, I'd have to see them.

15         Q.    Okay, and I'm not referring to anything

16   specific right now.

17               In the history of the company, which started

18   in 2000, do you have any recollection of whether there was

19   profit splitting with respect to any individual vehicles

20   that you sold?

21         A.    No.

22         Q.    You have no recollection or you believe that

23   profits were not split?

24         A.    I mean, we're going back 22 years, I don't

25   have any -- I don't remember exactly over the last

Page 64

1    22 years.

2         Q.    Okay.  Do you remember in the last five

3    years whether you had a profit splitting arrangement with

4    anyone with respect to an individual vehicle?

5         A.    No.

6         Q.    Okay, and with respect to the DCG Trust and

7    Ken Goodman, do you have any knowledge or recollection

8    about providing him with monthly reports?

9         A.    I'd have to see, I'd have to see the

10   documents you're talking about, no.

11        Q.    When investors were repaid, do you have any

12   understanding of why the funds went to companies or

13   businesses versus individuals?

14             MR. WINDERMAN:  We object to the use of the

15   word "investor".

16   BY MS. MEHDIPOUR:

17        Q.    Okay.  Did Excell ever report any interest

18   payments to the IRS?

19        A.    That would be a question for Teddi and

20   Nidia.  I didn't handle that.

21        Q.    So if there was a tax obligation or

22   liability, Teddi or Nidia would be the folks that would

23   deal with that aspect?

24        A.    Yes.

25        Q.    And did they have to come -- let me strike

1   that.

2              Did you have meetings with Nidia or Teddi on

3   a monthly/weekly basis to go over the accounting?

4       A.    Years and years ago, yes.

5       Q.    What year?

6       A.    I'm sorry?

7       Q.    What year?

8       A.    No, I said years and years ago, yes.

9       Q.    Yes, what year?

10      A.    Oh, we stopped having meetings like that

11  probably in 2016, 2017.

12      Q.    Why did those stop?

13      A.    Because Nidia started managing it more, and

14  Teddi was kind of taking a side step.  So Teddi was more

15  about having the meetings than Nidia was, so it just

16  stopped.

17      Q.    Okay.  I'd like to get into, in the interest

18  of time, and respecting the folks who are on the line in

19  terms of wanting to examine Mr. Zankl further, I'd like to

20  get into the relationship between some of the entities in

21  this case.

22              When was Karma of Palm Beach, Inc. formed?

23      A.    I believe -- I don't have the specific date,

24  but it was towards the end of 2020.

25      Q.    Who in -- in the tax returns, who would have

Page 66

1    been issued K-1s?

2                    MR. WINDERMAN:  Unless you can establish

3    that it was an S-corporation, there wouldn't have been any

4    K-1s.

5                    MS. MEHDIPOUR:  Let me ask another question.

6    BY MS. MEHDIPOUR:

7         Q.    Mr. Zankl, who were the owners of Karma of

8    Palm Beach, Inc.?

9         A.    Well, it changed, but when it first started

10   it was 50 percent myself, 50 percent my wife.

11        Q.    Okay, and when did that change?

12        A.    It changed when Mr. Brown got involved, it

13   changed to 25.5 percent for her and I, and 49 percent for

14   him.

15        Q.    And this is a similar change that you

16   testified to earlier as to the ownership structure change

17   in Excell Auto Group?

18        A.    Yes.

19        Q.    And what year did you believe that that

20   ownership structure changed?

21        A.    Towards the end of '20.

22        Q.    And why did it change?

23        A.    Because Mr. Brown invested money into the

24   company.

25        Q.    We'll get to Mr. Brown in a moment.

Page 67

1            Why did you form Karma of Palm Beach, Inc.?

2        A.    Why did I form it?

3        Q.    Correct.

4        A.    Because I was becoming a new car dealer, a

5    new car franchise.

6        Q.    Did the private investors that you had with

7    Excell Auto Group, did they become private investors in

8    Karma of Palm Beach, Inc.?

9            MR. WINDERMAN:  Objection to the word

10   "investors".

11   BY MS. MEHDIPOUR:

12       Q.    Are you able to answer the question,

13   Mr. Zankl?

14       A.    No, they did not.

15       Q.    Thank you.

16            And why didn't that happen?

17       A.    Because the Karmas, in owning a new car

18   franchise, it wasn't -- I didn't want to, and Karma as

19   well, as far as doing that.  So it's very different when

20   it's a new car dealer license and a new car license.

21       Q.    And for those people that don't know, what

22   is an OEM?

23       A.    A manufacturer, it's when you become a

24   manufacturer, new car dealer, you represent a brand.

25       Q.    Does that also go for the private lenders,

1  did they come over as well?

2          A.    No.

3          Q.    Okay.  So the private investors and the

4  private lenders, depending on how in your mind you saw

5  them, none of them came over from Excell into Karma of

6  Palm Beach?

7          A.    No.

8          Q.    Okay.

9          A.    Except for Ed Brown.

10         Q.    Mr. Brown?

11         A.    Yes.

12         Q.    All right, and we're going to get into

13  Mr. Brown's arrangement shortly.

14               Why was Karma of Broward, Inc. formed?

15         A.    That was formed -- that was actually

16  originally the new car license first.  That was formed

17  because that was the location that Karma had given me, was

18  that one, Karma Broward.

19         Q.    And what did you believe that -- did you

20  believe there was another benefit to forming Karma of

21  Broward and, if so, what was it?

22         A.    Well, the benefit, one reason that I did

23  Karma was to become a new car dealer, to secure the banks

24  to do financing for my clients that wanted to buy cars.

25  Karma Broward was the first one, that was the one that I

Page 69

1    was originally given by Karma manufacturer, was Broward.

2    Palm Beach came -- I had to take Karma Palm Beach after

3    the fact.  Broward was the one that I initially got first.

4            Q.    What year was Karma of Broward, Inc. formed?

5            A.    That was formed right around the -- just

6    before Karma Palm Beach.  I don't know the exact date.

7            Q.    Who were the owners of Karma of Broward,

8    Inc.?

9            A.    25.5 percent of mine, 25.5 percent of my

10   wife, and 49 percent of Ed Brown.

11           Q.    And is there a document that memorializes

12   that?

13           A.    Yes.

14           Q.    And what document is that?

15           A.    It's the same contract I was referring to

16   earlier.

17           Q.    Okay, and did Karma of Broward, Inc. start

18   off with that structure?

19           A.    No, it was changed after, after we did that

20   agreement.

21           Q.    Okay.  So were you the initial 100 percent

22   owner of Karma of Broward?

23           A.    No, initially it was 50/50, my wife and I.

24           Q.    Okay.  When you formed Karma of Palm Beach,

25   did Excell Auto Group have inventory?

Page 70

1          A.     Can you clarify that?

2          Q.     You testified that Karma of Palm Beach, Inc.

3     was formed in 2020.  In 2020 did Excell Auto Group have

4     inventory of vehicles?

5          A.     Yes.

6          Q.     Did you transfer the inventory from Excell

7     Auto Group to Karma of Palm Beach, Inc.?

8          A.     Well, there is documents that go with that,

9     but I'd have to see the documents exactly, but different

10    than what you're saying, but, yes.

11         Q.     Can you explain how, please?

12         A.     Well, Excell sold the cars to Karma Palm

13    Beach.

14         Q.     And Karma of Palm Beach paid for them?

15         A.     Yes.

16         Q.     Okay, and where would I find the evidence of

17    that, in what banking?

18         A.     You'd find in the Dealertrack accounting

19    side, as well as the Chase, it should have been Chase, I

20    think, but that would be Teddi and Nidia again.

21         Q.     Was any of the Excell Auto Group inventory

22    transferred to Karma of Broward?

23         A.     I don't believe so.

24         Q.     Okay, and just to briefly get into banking,

25    the schedules that you filed in this case, albeit signed

Page 71

1   by Ms. Zankl, that you've testified that you reviewed for

2   accuracy, do not list any bank accounts in the name of

3   Excell Auto Group.  Why is that?

4          A.    Well, we amended it, I believe.  They should

5   have been amended.

6          Q.    Did you read the amendments that were filed?

7          A.    No.

8          Q.    Okay, and would it surprise you to believe

9   that -- or to find out that under the section that asks

10  for deposit accounts or bank accounts, the answer is still

11  none?

12         A.    Yes, that would surprise me.

13         Q.    Okay.

14                MR. WINDERMAN:  We will make that amendment

15  today, Madam Trustee.

16                THE WITNESS:  Thank you, Mr. Winderman.

17                MR. WINDERMAN:  And you'll acknowledge that

18  we've given you access to and copies of those bank

19  statements?

20                MS. MEHDIPOUR:  I can speak with you off the

21  record, but the questions are for Mr. Zankl during this

22  meeting, not me.

23  BY MS. MEHDIPOUR:

24         Q.    Okay.  I'm looking at the banking for Chase

25  for Excell Auto Group.

Page 72

1            Would you please confirm for me your

2    understanding of how many bank accounts Excell Auto Group

3    has in its name?

4            A.    I'd have to see the computer to pull up the

5    account to be completely accurate.

6            Q.    Okay, but do you know how many Chase bank

7    accounts were in the name of Excell Auto Group, Inc.?

8            A.    If I was going to answer this question, it

9    would be more of a guess.  So, I mean, I really would have

10   to log in and see the accounts to tell you exactly how

11   many.

12           Q.    Okay.  At one point did Excell Auto Group,

13   Inc. bank with BankUnited?

14           A.    Yes.

15           Q.    And do you know if that relationship

16   changed?  Let me rephrase that.

17                 Did the BankUnited bank accounts close that

18   were in the name of Excell Auto Group?

19           A.    Yes.

20           Q.    Do you know what month and year that was?

21           A.    I do not.

22           Q.    As of 2022, so let's say January 1st of

23   2022, were the BankUnited accounts closed?

24           A.    Yes.

25           Q.    Okay.  The Iberiabank accounts that were in

Page 73

1   the name of Excell Auto Group, were those still open as of

2   the petition date on April 8th of 2022?

3          A.    No.

4          Q.    When did those bank accounts close?

5          A.    I don't recall the exact date.

6          Q.    Do you know if they were open in the last

7   year?

8          A.    I don't believe so.

9          Q.    Okay.

10         A.    No, no, no, they weren't.

11         Q.    Other than any accounts that Excell Auto

12  Group has at Chase Bank, are there any bank accounts in

13  the name of Excell Auto Group, Inc. that were opened as of

14  4-8-22?

15         A.    No.

16         Q.    Are there any that you know that are open

17  now, as of today's date, in the name of Excell Auto Group,

18  Inc.?

19         A.    I believe the Chase accounts are still open.

20  I don't think they're closed.

21         Q.    Other than Chase, please.

22         A.    Oh, no.

23         Q.    Does Excell Auto Group, Inc. own any boats?

24         A.    No.

25         Q.    Did Excell Auto Group, Inc. ever own a boat?

Page 74

```
 1           A.    Not to my knowledge, no, no.
 2           Q.    The Midnight Express, I believe it's a -- is
 3    it a 39-footer or a 43-foot that you have?
 4           A.    43.
 5           Q.    Was that vessel ever in the name of Excell
 6    Auto Group, Inc.?
 7           A.    No.
 8           Q.    Was any vessel ever in the name of Excell
 9    Auto Group, Inc.?
10           A.    I don't --
11           Q.    Other than the two Jet Skis?
12           A.    I don't believe so.  I don't believe so.
13                 MS. MEHDIPOUR:  Mr. Reich, would you mind
14    muting your phone, please?  Thank you.
15    BY MS. MEHDIPOUR:
16           Q.    All right.  Does Excell Auto Group, Inc. own
17    any assets outside of the United States?
18           A.    No.
19           Q.    Excuse me?
20           A.    No.
21           Q.    Did Excell Auto Group, Inc. ever own any
22    assets outside of the United States?
23           A.    No.
24           Q.    When you formed Karma of Palm Beach, Inc.,
25    in your opinion what was the reputation of Excell Auto
```

Page 75

1    Group, Inc. in the community?

2         A.    Very good.

3         Q.    Okay, and after you formed Karma of Palm

4    Beach, Inc., did Excell Auto Group continue to advertise

5    on the Internet car sales?

6         A.    After it was formed?

7         Q.    Correct.

8         A.    I believe until -- I'm not sure exactly, but

9    I believe until March of '21, after that it didn't.

10        Q.    Okay.  Did Karma of Palm Beach -- you said

11   until 2021 you believe so?

12        A.    Like March, I think, yeah.

13        Q.    Okay, and in that time period, between the

14   formation of Karma of Palm Beach and 2021, March, did

15   Karma of Palm Beach pay any consideration to Excell Auto

16   Group for the use of the website?

17        A.    I don't know the answer to that.

18        Q.    Okay.  What about for any advertising, was

19   any consideration ever paid to Excell Auto Group?

20        A.    That would be a Teddi/Nidia question.

21        Q.    Okay, and Karma of Palm Beach always

22   operated out of the same location as Excell Auto Group, is

23   that correct?

24        A.    The same building, yes, it had a lease for

25   this other section, yes.

1          Q.    Okay, and the lease for the other section,

2     would you describe that to me?

3          A.    It was just a parcel that was divided and

4     segregated for Karma Palm Beach.

5          Q.    And your landlord at the business premises

6     was 1001 Clint Moore, LLC, is that correct?

7          A.    Yes.

8          Q.    Was this part of the lease that you're

9     referring to, was it in the name of Karma of Palm Beach

10    and the landlord, or did you have an arrangement with

11    Excell Auto Group and Karma of Palm Beach for that lease?

12         A.    I'd have to see the document to tell you

13    exactly.

14         Q.    Okay.  Do you recall the split of how much

15    rent was allocated amongst Karma of Palm Beach and Excell

16    Auto Group?

17         A.    I don't.

18         Q.    Okay.

19         A.    I don't recall.

20         Q.    After Karma of Palm Beach was formed in

21    2020, did Excell Auto Group sell any vehicles at all to

22    customers?

23         A.    Can you say that again, please?

24         Q.    After Karma of Palm Beach was formed in

25    2020, did Excell Auto Group sell any vehicles at all to

Page 77

1    customers?

2            A.    I would have to see the actual accounting

3    through Dealertrack.  I don't believe anything after March

4    of '21 was done out of Excell, but I'd have to reference

5    the accounting software to truly answer that.

6            Q.    Okay.  How would you access the accounting

7    side of it?  I believe your testimony earlier was that you

8    were never provided access to that.

9            A.    Correct.

10           Q.    So how would you access the accounting side

11   of Dealertrack?

12           A.    I would need one of the girls' user ID and

13   password to get in.

14           Q.    Okay, and by the girls you mean Teddi or

15   Nidia?

16           A.    Yes, correct.

17           Q.    Is Karma of Palm Beach currently operating?

18           A.    No.

19           Q.    Is Karma of Broward currently operating?

20           A.    No.

21           Q.    As neither of those entities are currently

22   in bankruptcy, what are your plans for each entity?

23           A.    I'm not sure yet.

24           Q.    How are you personally paying your bills?

25           A.    With the money that is in our checking

Page 78

1    account.

2              Q.    What bank is that with?

3              A.    BB&T.

4              Q.    And what are you doing to earn income right

5    now, if you are?

6              A.    I'm not.

7              Q.    What is Ms. Zankl doing to earn income right

8    now?

9              A.    She's not.

10             Q.    Who is Moshe Farache?

11             A.    He's the landlord that owns the building.

12             Q.    How did you initially meet him?

13             A.    He approached me in 2010 -- I think it was

14   2010 or '11, that he was buying a building, and wanted to

15   know if I wanted to lease the building from him if he

16   bought it.

17             Q.    And is that the 1001 Clint Moore Road

18   location?

19             A.    Yes.

20             Q.    What is Auto Wholesale of Boca Raton?

21             A.    That is one of Moshe's companies.

22             Q.    And what does that business do?

23             A.    I don't really know what it exactly does.

24             Q.    How were you involved with Auto Wholesale of

25   Boca Raton?

Page 79

1          A.    I didn't have any ownership, I wasn't really

2    involved with it.

3          Q.    No personal ownership, correct?

4          A.    No, no.

5          Q.    Okay.  In 2020 through your bankruptcy

6    filing for Excell Auto Group, where did Auto Wholesale of

7    Boca operate?

8          A.    He had an office in Boca, and I don't know

9    the address.

10          Q.    Okay.  How was Excell Auto Group affiliated

11   with Auto Wholesale of Boca Raton?

12          A.    I mean, can you try to clarify that?  I'm

13   not sure what you're --

14          Q.    Did Excell Auto Group, Inc. have any

15   connection, or do any business with Auto Wholesale of Boca

16   Raton?

17          A.    Yes.

18          Q.    And what was that relationship or

19   connection?

20          A.    That was -- like I said, that was Moshe's

21   company, and that was the company that -- I don't know

22   what he did with it, but as far as with Excell, that was

23   the company that -- the money that he had invested in,

24   loaned into Excell went through Auto Wholesale.

25          Q.    Okay.  How much money did he invest or lend

Page 80

1    into Excell Auto Group?

2         A.    I'd have to see the documents to tell you

3    accurately.

4         Q.    Okay, and in your bankruptcy schedules you

5    list him as a creditor.  Do you recall doing that?

6         A.    Yes.

7         Q.    Okay, and do you remember how much you

8    listed him as a creditor for, the amount?

9         A.    I don't, I don't remember what I put, I

10   don't remember.  I'd have to see the document to answer.

11        Q.    You've listed him in your schedules as

12   Excell Auto Group owing $7 million to Auto Wholesale of

13   Boca.  Why did Excell Auto Group owe that money to Auto

14   Wholesale of Boca?

15        A.    Well, that would have been money that Moshe

16   had invested, had lent into the company.

17        Q.    Okay, and when you say into the company, are

18   you referring to Excell Auto Group?

19        A.    Yes.

20        Q.    Did Auto Wholesale of Boca have any

21   relationship arrangement or connection with Karma of Palm

22   Beach?

23        A.    No.

24        Q.    What about Karma of Broward?

25        A.    No.

1          Q.    Okay.  At the end of March 2022, beginning

2     of April 2022, what is your understanding as to why

3     Mr. Farache came to the Excell building?

4          A.    I don't -- I wasn't there.

5          Q.    Okay.  Who was there when Mr. Farache came

6     into the Excell building on or about March 30th, 2022?

7          A.    Well, he came in, my understanding was he

8     came in just about every day.

9          Q.    Okay, and --

10         A.    The last.

11         Q.    Uh-huh.

12         A.    But the whole office was there, the staff.

13         Q.    Okay, and did you at one point understand --

14    or did you at one point discover that your wife,

15    Ms. Zankl, was at the building when Mr. Farache came over,

16    and this is on or about March 30th, 2022?

17         A.    Yes.

18         Q.    Okay, and can you explain to me the purpose

19    of Mr. Farache's, you said daily trips to the building,

20    can you explain to me the purpose of what he was doing?

21         A.    Harassing my wife and the employees.

22         Q.    Okay, and would you elaborate, please, on

23    the harassing behavior, specifically what he was doing?

24         A.    Well, I wasn't there.

25         Q.    Okay.

1           A.     It would be hard for me to say just from

2    what I've been told.

3           Q.     Okay.

4           A.     So, I --

5           Q.     But at certain points during Mr. Farache's

6    visits, when he was exhibiting this behavior to Ms. Zankl,

7    you were in contact with her, is that correct?

8           A.     Yes.

9           Q.     Okay, and what did she convey to you, your

10   wife, about how she was being treated by Mr. Farache?

11          A.     Well, she didn't feel comfortable.

12          Q.     Okay, and --

13          A.     She had requested, in fact, at certain times

14   some of the sales guys to make sure they stayed around

15   her, because she didn't feel comfortable.

16          Q.     Okay.  That was a safety concern?

17          A.     Yes.

18          Q.     Okay.  All right.  At any point did

19   Mr. Farache bring anyone with him during these visits?

20          A.     That, I don't know.

21          Q.     Okay.  Did at any point Mr. Farache or any

22   of his agents threaten any of the employees of Excell or

23   Ms. Zankl?

24          A.     Well, the girls in the office, yes, they had

25   sent messages that they did not feel safe and comfortable

Page 83

1    working at the store, and had asked if I could have a

2    police officer there to protect them.

3           Q.    Okay, and did that, in fact, happen, did a

4    police officer come to the business?

5           A.    They did a few times, but I did not have one

6    sit there like they had requested, because when the girls

7    had sent that, they all quit the next day, they just

8    didn't feel safe.

9           Q.    Okay.  Did Mr. Farache or anyone on his

10   behalf bring any weapons to the building?

11          A.    Not to my knowledge.

12          Q.    Okay.  Was a police report filed with

13   respect to this conduct?

14          A.    I mean, by, myself, yes, but we had

15   instructed the police that the -- but by this time the

16   staff had already quit, but we did instruct the police,

17   yes.

18          Q.    What did Mr. Farache want?

19          A.    That's a great question.  I don't know.

20          Q.    What actions did Ms. Zankl take with respect

21   to the vehicles and Mr. Farache?

22          A.    Can you elaborate a little bit more, please?

23          Q.    Yes, yes.

24                Did there come a point where Ms. Zankl was

25   asked, whether in a threatening manner or not, to sign

Page 84

1   cars over to either Mr. Farache or Auto Wholesale of

2   Boca Raton?

3        A.    Yes.

4        Q.    And do you know why he requested that or

5   demanded that?

6        A.    Because of the -- he wanted to just try to

7   get as much as he could, I believe.  I wasn't there, but

8   he was -- in his mind, I think, I don't know, but to get

9   as much collateral, or take as much as he could just to

10  try to secure his investment.

11       Q.    How did, or how was it determined which

12  vehicles would be signed over to Mr. Farache or Auto

13  Wholesale of Boca?

14       A.    There wasn't, he just took everything.

15       Q.    Okay, and did anyone try to stop him from

16  doing that?

17       A.    The girls were not going to try to stop him

18  or anything.  He just -- they were scared.  I mean --

19       Q.    Okay, and so the employees, in addition to

20  Ms. Zankl, had conveyed to you that they feared for their

21  safety, and that even though you weren't there, the cars

22  had been signed over to Mr. Farache, is that right?

23       A.    Yes.

24       Q.    Okay.  Do you know whose vehicles those --

25  who the owners were of those vehicles that were signed

Page 85

1    over?

2           A.    There was a mix.  The majority of them were

3    owned by either Karma Palm Beach or Karma Broward.

4           Q.    Okay.  Were any of those vehicles owned by

5    Excell Auto Group?

6           A.    No.

7           Q.    Had any of those vehicles previously been

8    owned by Excell Auto Group?

9           A.    No.

10          Q.    And in terms of making the determination

11   about the owners of those vehicles, how did you keep track

12   of the inventory?

13          A.    Well, like I said earlier, I just kept a

14   spreadsheet for myself, but the girls kept the accounting

15   side software of the inventory on Dealertrack.

16          Q.    Okay.  The books and records relating to

17   Excell Auto Group's arrangement or connection with Auto

18   Wholesale are located where?

19          A.    It would have been in the office that we

20   referenced before with the lock on it.

21          Q.    Okay, and did you at one point advise me as

22   the trustee that you believed some of those records had

23   gone missing?

24          A.    Yes.

25          Q.    And what do you think happened to those

1    records?

2           A.    I wasn't there.  I just was -- what I was

3    told, I was just told that Mr. Farache, at one time when I

4    wasn't there, the staff had seen him going in my personal

5    office and going through all my drawers and cabinets and

6    stuff and taking stuff out of my office.

7                 As far as the office with the lock that I

8    was referring to, that's when I told you, when I was there

9    with you going over stuff, the one filing cabinet that

10   Nidia and Teddi and the girls would keep to keep track of

11   all the deals that were sold for the current year, those

12   drawers were completely emptied, when it should have been

13   filled up with every car sold through January 1 until

14   April 1st, but all of those were gone, they were missing.

15          Q.    Okay, and just to clarify for the record,

16   this is the back accounting office with the key pad, and

17   if you were to walk in, the file cabinets on the

18   right-hand-side are the file cabinets that you are

19   referring to?

20          A.    Yes, the black ones, yes, right, when you

21   walk in to the right.

22          Q.    Okay.  Did you ever request the return of

23   those documents?

24          A.    I didn't know they were taken until that day

25   I was in the office with you.  I didn't know they were

Page 87

1    missing, I discovered it that day.

2            Q.    Okay.  All right.  What is the relationship,

3    or was the relationship between Excell Auto Group and M&M

4    Development Consultants, LLC?

5            A.    That was -- that's one of Moshe's other

6    companies.

7            Q.    Okay.  Do you know what the affiliation was

8    between the debtor and that company?

9            A.    I believe that was -- I'd have to see the

10   contracts that we executed, but that was one of his

11   entities.

12           Q.    Okay.  Did Mr. Farache take original titles

13   with him when he was at the business premises the end of

14   March of this year, beginning of April?

15           A.    Yes, yes.

16                 MR. MILLER:  I'm going to just object to

17   your line, you're asking -- he's already said he wasn't

18   present, so there is no foundation.

19                 MS. MEHDIPOUR:  Mr. Miller, thank you for

20   your comments.  I will continue to ask the questions that

21   I see fit and necessary.

22   BY MS. MEHDIPOUR:

23           Q.    In terms of keys, did Mr. Farache take any

24   of the keys with him?

25           A.    He took all of the keys.

Page 88

1          Q.    Okay.  Vehicles, do you know, did
2    Mr. Farache take any vehicles from the premises?
3          A.    He took all of the vehicles from the
4    location, 1001, except for I think one or two Mokes he
5    didn't take, and I think one or two Karmas, but he took
6    everything else.
7          Q.    Okay, and do you know how many vehicles were
8    removed by Mr. Farache or his agents?
9          A.    I don't know the exact number.  Right around
10   -- between 32 and 35 cars, I think.
11         Q.    Okay.  Are you able to explain why there are
12   millions of dollars flowing in and out of Excell to and
13   from Auto Wholesale of Boca?
14         A.    I would need to see what you're referring
15   to, I would need to see the documents to be able to really
16   go over that with you.
17         Q.    Okay.
18         A.    I'd be guessing without the documents.
19         Q.    Okay.  What was the relationship between
20   Excell Auto Group and Farache Family Trust, LLC?
21         A.    That, I don't, I don't recognize.
22         Q.    Okay.
23         A.    I know it's his, but I don't recognize that
24   name as far as any documents or anything, I don't recall
25   that name being used.

Page 89

1          Q.    Okay.  What was the relationship between
2     Excell Auto Group and Excell Auto Sport and Service, Inc.?
3          A.    Excell Auto Sport and Service was the repair
4     facility.  It worked and fixed all of the cars.
5          Q.    Did Excell Auto Group ever have an ownership
6     interest in Excell Auto Sport and Service, Inc.?
7          A.    It never had an ownership, no.
8          Q.    What was the relationship between Excell
9     Auto Group and High Tea Cafe, Inc.?
10         A.    I don't recognize that name.
11         Q.    Okay.  What is BAL Investments?
12         A.    BAL Investments was an investment group.
13         Q.    What was the connection between, or the
14    arrangement between Excell Auto Group and BAL Investments?
15         A.    I'd have to see the contracts to be able to
16    really answer that question.
17         Q.    Did Excell Auto Group ever enter into a line
18    of credit with BAL Investments?
19         A.    Yes, but I'd have to see the contracts to
20    really answer that completely but, yes.
21         Q.    Are you familiar with the name Edward D.
22    Salinis (phonetic)?
23         A.    Not -- no, not off the top, no.
24         Q.    Okay.  Do you have any recollection of a
25    2017 gray Lamborghini ending in VIN 5533?

Page 90

1          A.     I mean, I would need more specifics on that.

2          Q.     Okay.  Who is --

3          A.     (Inaudible.)

4          Q.     Go ahead, please.

5          A.     I said we were doing 4 to 500 cars a year,

6     so it's kind of hard.

7          Q.     And who is the "we" in that statement?

8          A.     Well, the sales guys, not me.

9          Q.     Which company, Excell?

10         A.     When Excell was running, yeah.

11         Q.     Okay.  Who was -- what is Milco Investments?

12         A.     That was one of the entities, one of the

13    lenders.

14         Q.     And specifically what were the financial

15    arrangements between Milco and Excell Auto Group?

16         A.     I'd have to -- I'd have to look at those

17    contracts before I could answer that.

18         Q.     Okay.  Do you have any recollection of how

19    the arrangement worked?

20         A.     I'd have to see the contracts.

21         Q.     Okay.  Do you have any recollection as to

22    whether funds were tied to specific vehicles in that

23    arrangement?

24         A.     No.

25         Q.     Okay.

1          A.     No, but I'd have to see the documents but,

2    no.

3          Q.     Do you have any understanding about how that

4    entity, Milco, was supposed to be paid?

5          A.     I'd have to see the documents.

6          Q.     Did Excell use merchant cash advance

7    companies?

8          A.     Yes.

9          Q.     Who were they?

10         A.     There was a company, Diverse Capital,

11   another company called TVT, another company called Go

12   Fund, another company called Get Back.

13         Q.     Okay, and when did Excell start using the

14   merchant cash advance companies?

15         A.     It would have been in, I want to say I think

16   towards the beginning of '21, I think.  I'm not exactly

17   sure, I'd have to look at the contract.

18         Q.     Okay.  What was the purpose for using funds

19   from the merchant cash advance companies?

20         A.     They were -- I mean, for different things,

21   there wasn't anything specific.

22         Q.     There was no specific purpose?

23         A.     No, the cash wasn't used for any one

24   specific thing, no.

25         Q.     Where were the funds for merchant cash

Page 92

1    advance companies deposited?

2              A.    Into the Excell, the Excell Chase account.

3              Q.    Do you recall the last four digits of the

4    account?

5              A.    I do not.

6              Q.    Okay.  Were any of the funds from the

7    merchant cash advance companies transferred to Karma of

8    Palm Beach or Karma of Broward?

9              A.    I'd have to see the statements to answer

10   that correctly.

11             Q.    Okay.

12             A.    I'd have to see them, and I didn't handle

13   the transfers and stuff.

14             Q.    Who did?

15             A.    I'd have to see the bank statements and

16   stuff.

17             Q.    You don't know who handled the transfers?

18             A.    No, no, I said I'd have to see the bank

19   statements to tell you if any of it was transferred

20   into --

21             Q.    Okay.  Who would have handled the transfers,

22   though?

23             A.    Oh, Nidia or Teddi, when Teddi was there.

24   She wasn't there that much the last two years, but Nidia,

25   Teddi --

Page 93

1          Q.    And --

2          A.    -- also Mylar.

3          Q.    Was that at your direction, the transfers?

4          A.    Not -- no, not all the time, no.

5          Q.    Okay, and you don't recall whether you ever

6    authorized the transfers?

7          A.    I don't.

8          Q.    Okay.  Are you familiar with a gray 2014

9    McLaren P1, with a VIN ending in 0085?

10         A.    I mean, I know a '14 P1, I just don't

11   remember the VIN number.

12         Q.    Okay.  Did you or Ms. Zankl ever own a 2014

13   McLaren?

14         A.    We didn't own it.  It was a leased vehicle.

15         Q.    Okay, and you did come into possession of

16   that vehicle by virtue of a lease?

17         A.    Of a lease, yeah.

18         Q.    Do you still have this vehicle?

19         A.    No.

20         Q.    When did you dispose of it?

21         A.    I'd have to look at the documents for the

22   sales.  I don't want to give you the wrong date.  I don't

23   know the exact date.

24         Q.    How was it disposed of, sell, trade-in,

25   returned?

Page 94

1          A.    I believe it was sold.

2          Q.    Okay.  Do you know who it was sold to?

3          A.    I don't.

4          Q.    Do you know when?

5          A.    I don't, I'd have to look at the sales, I

6    don't know exactly what date, no.

7          Q.    Okay.  After it was sold, did you ever come

8    into possession of that vehicle again?

9          A.    We actually sold the vehicle, if I remember,

10   twice.

11         Q.    Okay.

12         A.    Since the last time we sold it, no, we never

13   took possession of it again.

14         Q.    So when are the two years that you sold the

15   vehicle?

16         A.    I would have to see those, I'd have to see

17   the Dealertrack.  I can't remember exactly what dates or

18   when it was sold.

19         Q.    Was the debtor ever involved in any

20   transaction with this particular vehicle?

21         A.    I believe the first time, yes, but I'd have

22   to see the documents.

23         Q.    Okay.  On or about December 31st of '21, did

24   you and/or Ms. Zankl purchase a 2021 Ferrari 812 GTS?

25         A.    What was the date?  I'm sorry.

Page 95

1          Q.    On or about December 31st of 2021.

2          A.    Yes.

3          Q.    And how did you get the financing to buy

4    this Ferrari?

5          A.    Through a bank.

6          Q.    Which bank?

7          A.    Woodside Credit.

8          Q.    When you obtained the financing through

9    Woodside Credit, do you recall entering into some

10   paperwork with them, specifically a retail installment

11   sale contract?

12         A.    I'd have to see that contract to talk about

13   it.  Yes, I'd have to see it.

14         Q.    Did you at any point, or Ms. Zankl,

15   represent that you were trading in the gray 2014 McLaren

16   P1?

17         A.    No.

18         Q.    Going back to the -- an unrelated line of

19   questioning.  Do you have any safe deposit boxes?

20         A.    Under Excell?

21         Q.    Let's start there, sure.

22         A.    No, not to my knowledge, no.

23         Q.    Okay.  How about in any of the Karma

24   entities?

25         A.    No.

1          Q.    Okay.  What about personally?

2          A.    No.

3          Q.    Have you ever had any safe deposit boxes

4    personally?

5          A.    Under -- for me, no.

6          Q.    Okay.  Do you know if Ms. Zankl has?

7          A.    I believe so, but I'm not sure.

8          Q.    All right.  What about the entities, have

9    any of the entities, Karma of Broward, Karma of Palm

10   Beach, Excell Auto Group, ever had a safe deposit box?

11         A.    No.

12         Q.    And when we talked about Mr. Farache earlier

13   and Auto Wholesale, and what transpired when Ms. Zankl was

14   signing over cars, do you recall when we discussed that

15   earlier?

16         A.    Yes.

17         Q.    Why weren't you there?

18         A.    I was sick.

19         Q.    Okay.  Are you familiar with an entity by

20   the name of Chapford Specialty Finance, LLC?

21         A.    Yes.

22         Q.    And was the debtor, Excell Auto Group, Inc.,

23   ever affiliated with that entity?

24         A.    I'd have to -- yes, I believe so, yes.

25         Q.    Do you know how?

1          A.    I'd have to see the paperwork if there was.

2          Q.    Okay.  Do you recall just a few months ago,

3    in February of 2022, having the debtor execute a

4    promissory note with that entity for an advance of a

5    million dollars on a transaction involving a 2019 green

6    Lamborghini?

7          A.    I'd have to see the contract.

8          Q.    And as you sit here today, you don't have

9    any recollection of that transaction?

10          A.    I just -- to answer anything about it I'd

11   have to see the contract, the documents --

12          Q.    Okay.

13          A.    -- to be able to answer it.

14          Q.    And if you were in Dealertrack, would you be

15   able to get that information?

16          A.    No, Dealertrack, no.

17          Q.    Where would you get that information?

18          A.    It would have been in that accounting

19   office, the paperwork would have been there.

20          Q.    Okay.  Would that be in deal jackets or

21   somewhere else?

22          A.    I'm not sure where they would have kept it,

23   but I know it was in that office.

24               MS. MEHDIPOUR:  Okay.  Just one moment,

25   please.

Page 98

1                    Okay.  I could go on for another week, and I

2     don't think that's appropriate.

3                    So, I -- thank you, Mr. Zankl.  I'm going to

4     open up the floor to any creditors or parties in interest

5     who would like to ask questions at this time, and looking

6     at the chat sessions here, I have Mr. Moon, with Chapford

7     Specialty Finance.  Mr. Moon, would you like to ask

8     questions?

9                    MR. MOON:  Yes, I would.  Thank you, Madam

10    Trustee.

11                   MS. MEHDIPOUR:  Very good.

12                         EXAMINATION

13    BY MR. MOON:

14         Q.    Mr. Zankl, greetings.  My name is

15    James Moon, I represent Chapford Specialty Finance.  You

16    just heard some questions from the trustee about that, and

17    you represented that you knew who it was.

18                   Could you explain, how did you come to know

19    about Chapford Specialty Finance?

20         A.    I believe I was introduced to them from a

21    gentleman, his name is Frank.

22         Q.    Frank what?

23         A.    I think his last name is O'Donnell

24    (phonetic).

25         Q.    Is he with a specific company, or is he just

1    a person that you know?

2             A.    No, I believe it's his company, and he just

3    calls it Built Moore (phonetic).

4             Q.    And what does Built Moore do?

5             A.    I don't -- they do a lot of -- they work

6    with car dealers, I'm not exactly sure what he does, but

7    he works with car dealers.  I think a lot of different

8    aspects he does for car dealerships.

9             Q.    Okay, and how would you describe your

10   relationship between Excell Auto Group and Chapford?  And

11   I'll refer to Chapford Specialty Finance as just Chapford

12   for ease.

13            A.    I'm sorry, say that again.

14            Q.    How would you describe the relationship

15   between Excell Auto Group and Chapford?

16            A.    I'm not really sure what you mean.

17            Q.    What was the relationship between Excell

18   Auto Group and Chapford?

19            A.    It really didn't have a relationship.

20            Q.    Did you enter into agreements with Chapford?

21            A.    We did enter into an agreement, yes.

22            Q.    What kind of an agreement?

23            A.    I'd have to see it to be able to really

24   answer the question.

25            Q.    Do you have a recollection, without looking

1    at a document, as to what kind of agreement that you

2    signed?

3           A.    No, I'd have to see that contract.

4           Q.    No idea?

5           A.    No, I have to see the contract.

6           Q.    When was the last time you had contact with

7    a representative of Chapford?

8           A.    It's probably been two to three weeks,

9    probably.

10          Q.    You've spoken with somebody from Chapford

11   within two to three weeks?

12          A.    I think, if I remember correctly.

13          Q.    Okay, and you don't recall entering into a

14   loan and security agreement with Chapford?

15                MR. WINDERMAN:  He's already answered that

16   question.  He can answer it, form it in as many ways as he

17   can, the answer is without seeing the document he can't

18   answer.

19                MR. MOON:  Thank you, Counsel.

20   BY MR. MOON:

21          Q.    Now that I'm referring specifically to a

22   loan and security agreement, does that refresh your

23   recollection as to whether you entered into one with

24   Chapford?

25          A.    I would -- I need to see that contract.

1          Q.    You do recall that you entered into a
2    contract, don't you?
3          A.    Yes, but I don't recall exactly, and I need
4    to see the contract to go into any exact information.
5          Q.    Did you read the agreement before you signed
6    it?
7          A.    I believe so.
8          Q.    Did you understand the terms of the
9    agreement before you signed it?
10         A.    I'd have to read it again to answer that
11   question.
12         Q.    You don't know at the time that you signed
13   whether you understood the terms?
14         A.    Oh, I'm sure I did, but I'm just saying I
15   can't answer any questions without having it in front of
16   me.
17         Q.    Was there collateral associated with the
18   loan?
19         A.    I'd have to see the documents.
20         Q.    Do you recall a 2019 Lamborghini Aventador,
21   last four of the VIN 8766, that was associated with that
22   loan?
23         A.    I'd have to see the contract.
24         Q.    You don't recall a green Aventador with the
25   Number 63 on the side of it?

1          A.    Once again, I'd have to see those contracts

2     to make sure I'm answering it correctly.

3          Q.    Do you have any independent recollection of

4     ever seeing a 2019 Aventador, that was green, with the

5     Number 63 on the side of it?

6          A.    Yeah, I have seen a few of them over the

7     years.

8          Q.    Where did you last see one?

9          A.    Probably a month ago.

10         Q.    Where did you see it?

11         A.    It was actually at Karma Palm Beach.

12         Q.    Why was it at Karma Palm Beach?

13         A.    It would have been for sale.

14         Q.    Who made the decision to put that car at

15    Karma Palm Beach?

16         A.    It was -- I would have to look and see, go

17    back and look and see exactly who purchased it for the

18    store.

19         Q.    So, you don't know, as you sit here today,

20    whether Excell Auto Group or Karma of Palm Beach purchased

21    that vehicle?

22         A.    I'd have to see the exact document to see

23    that.

24         Q.    Do you recollect that Chapford has a

25    perfected purchase money security interest in that

Page 103

1    vehicle?

2            A.    I'd have to see the contracts that you're

3    referencing.  I don't have it in front of me.

4            Q.    Where is the vehicle now?

5            A.    I don't know.

6            Q.    Why don't you know?

7                  MR. WINDERMAN:  Madam Trustee, I'm going to

8    begin to object, these aren't 341 questions.

9                  If you want to take a 2004, he should take a

10   2004.

11                 MS. MEHDIPOUR:  Mr. Winderman, I'm not the

12   judge in the case, but Mr. Moon can clearly ask about any

13   assets and liabilities that are connected to Excell Auto

14   Group.

15                 So, unless you're instructing him not to

16   answer, Mr. Moon can continue.

17                 THE WITNESS:  I don't know where the vehicle

18   is.

19   BY MR. MOON:

20           Q.    When did you last know where the vehicle

21   was?

22           A.    Probably the last week in March.

23           Q.    Did you ever direct that that vehicle be

24   transferred to Karma of Palm Beach?

25           A.    No.

1          Q.    So you have no idea why it happened to be at

2    Karma of Palm Beach?

3          A.    For sale, you mean?

4          Q.    I'm asking who made the decision to put that

5    car at Karma of Palm Beach?

6          A.    That was a car that was purchased, so that

7    came in for sale.

8          Q.    So you're saying the car was purchased?

9          A.    Yeah, that's how it ended up being there.

10          Q.    By somebody other than Karma of Palm Beach,

11    is that what you're saying?

12          A.    No, I'm not saying that.

13          Q.    Okay.  Well, I'm not understanding what

14    you're trying to tell me.  You said that the car was there

15    for sale --

16          A.    Yes.

17          Q.    -- and that it was purchased.  Who purchased

18    the car?

19          A.    I would need to see the documents for my

20    store to tell you exactly who purchased it.

21                UNIDENTIFIED:  Unbelievable.

22    BY MR. MOON:

23          Q.    And you have no idea where the vehicle is

24    now?

25          A.    My landlord, Moshe Farache, took the

Page 105

1    vehicle.  I don't know what he did with it or where it's

2    at, but he took it out of the store.

3         Q.    Why do you think that Mr. Farache took the

4    vehicle?

5         A.    You'd have to ask him that question.  He

6    took every vehicle that was in that store.

7         Q.    Are you aware that Mr. Farache signed an

8    affidavit that he filed in Broward court, and that he

9    listed every vehicle that he took, and that the Aventador

10   that I'm talking to was not on that list?

11        A.    He did take it, so he lied on the list, he

12   did take it.

13        Q.    To your knowledge has the appearance of the

14   car been changed in any way?  Has it been painted,

15   wrapped, anything like that?

16        A.    Not to my knowledge.

17        Q.    Ms. Mehdipour asked you about dealer

18   agreements with Karma.  Do you recall entering into those

19   dealer agreements for either Karma of Palm Beach or any

20   other entity?

21        A.    As far as, what do you mean?

22        Q.    Did you sign a dealer agreement with Karma

23   on behalf of either Karma of Palm Beach or any other

24   entity?

25        A.    Yeah, we had dealer agreements for Karma

1    Palm Beach and Karma Broward, yes.

2              Q.    Do you recall ever signing an agreement with

3    Karma Automotive Distribution, LLC, in which you signed it

4    on behalf of Excell Auto Group, doing business as Karma of

5    Palm Beach?

6              A.    No.

7              Q.    You don't recall that?

8              A.    No.

9              Q.    Okay.  Why did the debtor file for

10   bankruptcy?

11             A.    Financial issues.

12             Q.    What financial issues?

13             A.    It owed money, they couldn't pay it back.

14             Q.    When did you first consider filing for

15   bankruptcy?

16             A.    April 8th.

17             Q.    April 8 is the first time you considered

18   filing for bankruptcy?

19             A.    Yes.

20             Q.    When did you first consult an attorney about

21   filing for bankruptcy?

22             A.    April 7th, I think.

23             Q.    Okay, and on your schedules you listed

24   Chapford as an unsecured creditor.  Why?

25             A.    Because if it was listed that way, then

1    that's what it was considered.

2         Q.    That's not really clear.  I'm asking you why

3    did you list it as an unsecured creditor?

4         A.    I just said, if it was listed that way,

5    that's because that's what we determined it was.

6         Q.    Who is "they"?

7         A.    Myself.

8         Q.    "They" confers plural, who is the other part

9    of "they"?

10        A.    Well, when I went over the documents, or

11   went over anything with my attorney, the same thing.

12            MR. MOON:  I'm not asking for you -- for

13   anything that you discussed with your attorney.

14            Okay.  Madam Trustee, in the interest of

15   saving time, and I know there are a lot of other creditors

16   that want to speak, I'll reserve any further questions I

17   have for a 2004.

18            Thank you.

19            MS. MEHDIPOUR:  Thank you, Mr. Moon.

20            MR. WINDERMAN:  Can we take five minutes in

21   between -- well, let me ask you, how many other creditors

22   want time?

23            MR. MILLER:  I do.

24            MS. MEHDIPOUR:  Mr. Miller, we have -- based

25   on who has sent me a chat, this is who I have as my list,

1   Mr. Moon is done.

2                   Ms. Roberts, do you have questions?

3                   MS. ROBERTS:  Just a statement.

4                   MS. MEHDIPOUR:  Okay.  If you'll please

5   continue to hold.

6                   Mr. Pack, do you have questions?  I'm just

7   trying to coordinate timing.  Mr. Pack, will you have

8   questions?

9                   MR. KREHL:  This is Jessy Krehl.  I'm in

10  Mr. Pack's office.  At this time we don't have questions.

11  We're probably going to move forward just with discovery.

12                  MS. MEHDIPOUR:  Thank you.

13                  So right now I have Mr. Miller.

14                  Mr. Goodman and DCF, do your attorneys care

15  to ask any questions?

16                  MR. GOODMAN:  We reserve that right for a

17  2004.

18                  MS. MEHDIPOUR:  Okay.  So other than

19  Mr. Miller, have I missed anyone?

20                  MR. SHRAIBERG:  Nicole, it's Brad Shraiberg.

21  I would like to --

22                  MS. MEHDIPOUR:  Mr. Shraiberg.

23                  MR. SHRAIBERG:  -- ask a few questions.

24                  MS. MEHDIPOUR:  Okay.  So we have Mr. Miller

25  and Mr. Shraiberg, and is there anyone else before we take

1    a quick recess?

2              MR. DINKIN:  Yes, this is Mitchell Dinkin

3    for Savannah Row.  I just have a brief question or two.

4              MS. MEHDIPOUR:  Okay.  Thank you,

5    Mr. Dinkin.

6              Anyone else?

7              MS. DRISCOLL:  Yes, Theresa Driscoll on

8    behalf of Integrated Vehicle Leasing.  I just have a few

9    questions for Mr. Zankl.

10             MS. MEHDIPOUR:  Thank you.

11             Anyone else?

12             (No verbal response.)

13             MS. MEHDIPOUR:  I have four people, and so

14   we'll take a five to seven-minute recess and come back,

15   and then we'll start with -- we'll start with the

16   additional creditors' examination.

17             Thank you.

18             MR. WINDERMAN:  Thank you.

19             (Thereupon, a recess was had, after which

20   the following proceedings were had:)

21             MS. MEHDIPOUR:  Okay.  This is Trustee

22   Nicole Mehdipour.  Good morning.  We are back on the

23   record.

24             Mr. Zankl, would you please confirm that you

25   understand you're still under oath?

Page 110

1                        THE WITNESS:  Yes, I do.

2                        MS. MEHDIPOUR:  Okay.  Very good.

3                        All right.  Mr. Dinkin, would you like to

4     proceed?

5                        MR. DINKIN:  Yes, very briefly.  Thank you,

6     Madam Trustee.

7                              EXAMINATION

8     BY MR. DINKIN:

9          Q.    Mr. Zankl, my name is Mitchell Dinkin, and I

10    represent Savannah Row.

11               You testified earlier, and briefly as to the

12    debtor's banking relationships, although none had been

13    formally filed with your schedules.  Are you familiar with

14    a banking entity known as Optimum Bank?

15         A.    Optimum Bank, I believe I've heard of them.

16         Q.    Okay, and did the debtor have any type of

17    deposit account, or any other banking relationship with

18    Optimum Bank in the past two years?

19         A.    No.

20         Q.    Did you or Mrs. Zankl have any type of

21    banking relationship with Optimum Bank in the past two

22    years?

23         A.    No.

24         Q.    Then how are you familiar with them?

25         A.    I just have heard the name.  I think they're

1    a bank here in Florida, I'm not sure.

2         Q.    Okay.  Did the debtor transfer $250,000 from

3    Chase to Optimum Bank on March 3rd of this year?

4         A.    I would have to see the actual statements to

5    be able to really answer that question.

6         Q.    So it is indeed possible?

7              MR. WINDERMAN:  Object, everything is

8    possible.

9    BY MR. DINKIN:

10        Q.    Mr. Zankl?

11        A.    Yes, I'd have to see the documents, I'd have

12   to see the bank statements.

13        Q.    From which bank?

14        A.    Well, it depends when you're asking.

15        Q.    Okay.  So it is possible that the debtor

16   transferred from Chase to Optimum 250,000 on March 3rd?

17        A.    I'd have to see it, but, yes, it's possible.

18              MR. DINKIN:  Fair enough.  Nothing further,

19   Madam Trustee.

20              UNIDENTIFIED:  Nicole, you're on mute.

21              MS. MEHDIPOUR:  Oh, dear, I'm sorry, thank

22   you so much.

23              Ms. Driscoll, would you like to ask any

24   questions?

25              MS. DRISCOLL:  Yes, thank you.

Page 112

1              MS. MEHDIPOUR:  Very good.

2                        EXAMINATION

3    BY MS. DRISCOLL:

4         Q.   Good afternoon, Mr. Zankl.  My name is

5    Theresa Driscoll.  I'm an attorney for Integrated Vehicle

6    Leasing, and Integrated is located here in New York where

7    I am.

8              Have you ever done business with Integrated

9    Vehicle Leasing?

10        A.   I believe so, yes.

11        Q.   Are you familiar with a 2020 Mercedes-Benz

12   Sprinter 3500?

13        A.   Yes.  I mean, I know what it is, yes.

14        Q.   Okay.  Well, a specific 2020 Mercedes-Benz

15   Sprinter 3500, VIN ending in 0329?

16        A.   No, I wouldn't know specifically, but I know

17   what a Sprinter is, yes.

18        Q.   Okay.  In the history of Excell Auto's

19   business, did you or your wife, on behalf of Excell Auto,

20   lease or sign any agreements for the lease of a 2020

21   Mercedes-Benz Sprinter 3500?

22        A.   We did lease, we did lease Mercedes

23   Sprinters, yes.  We did, yes.

24        Q.   Okay.  Do you recall having an agreement

25   being signed by your wife in December 2020, specifically

1    December 23, 2020, for a certain 2020 Mercedes-Benz

2    Sprinter 3500, with a VIN ending 0339?

3          A.    No, I'd have to see the actual lease

4    contract but, I mean, I do know we leased them, but

5    without seeing that particular one to reference it, I

6    would want to see it.

7          Q.    Okay, and what would -- like, just

8    generally, what would be the purpose of leasing that type

9    of vehicle in or around the time that we're discussing,

10   December -- late December 2020?

11         A.    We had the Sprinters.  I mean, the Sprinters

12   had a purpose for the store.  We allowed our clients to

13   use them as, like, a complimentary thing.  When they did

14   business with the store, we provided the Sprinter for them

15   to use.  It was a perk that we gave the customers, they

16   got to use them.

17         Q.    Okay, and was it customary for your wife to

18   sign agreements on behalf of Excell?

19         A.    I mean, I would really need to see the

20   document to be able to answer that.

21         Q.    Do you recall (inaudible) --

22         A.    I need to see the lease.

23         Q.    Okay.  Fair enough.

24               Do you know where the specific 2020

25   Mercedes-Benz Sprinter 3500 is located today?

Page 114

1          A.    I do not.

2          Q.    Okay.  Let's go back to the office that you

3    testified, your personal office at Excell Auto's business

4    location, on 1001 Clint Moore Road, I think you had

5    testified that there was a keypad lock on the door, is

6    that correct?

7          A.    Well, that wasn't my personal office.  That

8    was the accounting office.

9          Q.    Okay.

10         A.    And it did have a keypad lock, yes.

11         Q.    Okay.  Is it in that office that the file

12   cabinet that you noticed was empty when you were with the

13   trustee, is that where those records were?

14         A.    Yes.

15         Q.    Okay, and who had access to that keypad, who

16   knew the code?

17         A.    Nidia knew the code, Mylar, Teddi.  I mean,

18   I don't know if they gave the code to anybody else, but I

19   know those three people had the code.

20         Q.    But Mr. Farache didn't have the code?

21         A.    I don't know if they gave it to him or not,

22   I don't know.

23         Q.    Do you have knowledge as to whether or not

24   this 2020 Mercedes-Benz Sprinter 3500 that I'm speaking

25   of, that's subject to a lease of my client, Integrated

1    Vehicle Leasing, if that was transferred to Karma of Palm

2    Beach?

3         A.    I'd have to see the contract.  If it was

4    under Excell, no, it can't transfer.  You've got to -- you

5    can't transfer that.  So, but I'd have to see the contract

6    to answer it.

7         Q.    Okay, and then who would be able to explain

8    why payments were being made by Karma of Palm Beach from a

9    Chase account to my client in respect to this vehicle in

10   or about March of 2022?

11        A.    That would be the girls in the office who

12   did all the payables, Nidia or Teddi.

13        Q.    And when you say the office, Karma of Palm

14   Beach or Excell Auto?

15        A.    Karma, I mean Karma Palm Beach, in the

16   accounting office where they did all the payables and the

17   receivables.

18        Q.    What is the status of vehicles and business

19   records right now as we sit here for Karma of Palm Beach?

20        A.    The trustee actually has all the records.

21        Q.    Of that entity, even though it's not

22   currently in bankruptcy, is that correct?

23        A.    Correct.

24        MS. DRISCOLL:  Okay.  I have no further

25   questions today.  Thank you.

Page 116

1          MS. MEHDIPOUR:  Thank you, Ms. Driscoll.

2          All right.  Mr. Shelomith.

3          MR. SHELOMITH:  Yes, one moment.  Let me

4    just turn my camera back on.

5          MS. MEHDIPOUR:  Certainly.

6          MR. SHELOMITH:  Thank you.

7                    EXAMINATION

8    BY MR. SHELOMITH:

9          Q.    Good morning, Mr. Zankl.  My name is

10   Zach Shelomith.  I represent Woodside Credit, LLC, and I

11   just have a few questions.

12              How did you come to know Woodside Credit?

13         A.    We started to do finance deals with them

14   probably 10 years ago or more.

15         Q.    And when you say "we", who are you

16   specifically referring to?

17         A.    Excell Auto.

18         Q.    Okay, and earlier this morning the trustee

19   asked you questions regarding a 2021 Ferrari, the last

20   four digits of VIN is 1176.  Do you recall being asked

21   those questions?

22         A.    Yes.

23         Q.    Now, that vehicle was purchased in your

24   individual name?

25         A.    Yes.

1        Q.    As well as your wife's name?

2        A.    Yes.

3        Q.    Do you know the whereabouts of that vehicle

4   today?

5        A.    I do not know where it's at right this --

6   no, not today.

7        Q.    And did you ever take possession of the

8   vehicle?

9        A.    Yes.

10        Q.    And when was the last time you saw the

11   vehicle?

12        A.    Probably the beginning of March, maybe, the

13   end of February, beginning of March.

14        Q.    And where was the vehicle when you last saw

15   it?

16        A.    At Karma Palm Beach.

17        Q.    And why was the vehicle at Karma Palm Beach?

18        A.    Well, it was there for advertising and

19   marketing purposes, it was there.

20        Q.    And what was the purpose of your acquisition

21   of this vehicle?

22        A.    The purpose was, that was something I did

23   once in a while with Woodside Credit, is I would get a

24   vehicle that we wanted to use for marketing, and events,

25   and shows, and we'd use it for four, five months and then

1    we'd sell it.

2          Q.    Okay.  So this particular vehicle was not

3    purchased for your personal use?

4          A.    No.

5          Q.    And when you say it was used for marketing

6    and other purposes, is that marketing and other purposes

7    for Excell, or Karma, or both entities?

8          A.    No, just Karma.

9          Q.    Okay, and was the vehicle ever sold or

10   transferred to Excell Auto Group?

11         A.    No.

12         Q.    Was the vehicle ever sold or transferred to

13   Karma?

14         A.    No.  Well, yeah, Karma Palm Beach bought the

15   car originally.

16         Q.    When you say "Karma bought the car", Karma

17   bought the car from you, or Karma bought the car and then

18   transferred it to you?

19         A.    Karma bought the car from a dealer and then

20   transferred it to me.

21         Q.    Okay, and is the vehicle currently still in

22   your name?

23         A.    No.  I don't know, actually.

24         Q.    Well, what is your recollection as to the

25   title or registration of the vehicle after you acquired

1    it?

2         A.    Well, after we bought it, after my wife and

3    I bought it, we actually had a client that wanted to buy

4    the car, after we had bought it, and that's -- we had

5    planned on keeping it for four to five months, and then we

6    had somebody come in that made a crazy offer and wanted to

7    buy it, so he bought it.

8         Q.    Okay.  Do you know the name of that

9    individual?

10        A.    I don't off the top of my head, I don't.

11   It's in my records, but I don't know it right off the top

12   of my head.

13        Q.    If I said the name was Frank Evans, would

14   that refresh your recollection?

15        A.    I believe so, yes.

16        Q.    Okay, and when you said he made a crazy

17   offer, do you recall how much that offer was?

18        A.    No, I'd have to look at the bill of sale,

19   but it was a good offer, that's why we did it, otherwise

20   we planned on keeping it for four to five months.

21        Q.    Okay, and did you make any representations

22   or other statements to Woodside as to the current

23   possession or title of the vehicle?

24        A.    No.

25        Q.    When was the last time you spoke to someone

Page 120

1    from Woodside?

2            A.    Probably, I'd say the end of March, maybe,

3    the very beginning of April.

4            Q.    And can you briefly explain the context of

5    that conversation?

6            A.    I remember them just calling me, asking me

7    about that car, that particular car, where it was, because

8    at that time we had sold the car to Frank, but my landlord

9    had taken the title to the car.  That was one of the

10   titles he took.

11           Q.    Okay.  When you say your "landlord", are you

12   speaking of Mr. --

13           A.    Farache.

14           Q.    -- Farache?

15                 Okay.  So, but do you have any reason to

16   believe that Mr. Farache is in possession of this vehicle?

17           A.    I don't know if Mr. Evans has it or if Moshe

18   has it.  I know Moshe has the title, because that's one of

19   the titles he took.

20           Q.    Okay, and did you do any other business with

21   Mr. Evans?

22           A.    Yes, he bought cars from us over the years.

23           Q.    Okay.  More than 10 cars?

24           A.    No, no.

25                 MR. SHELOMITH:  Okay.  All right.  Thank you

Page 121

1    for answering those questions.  I will reserve the right

2    to ask further questions at the Rule 2004 Examination.

3                    Thank you.

4                    MS. MEHDIPOUR:  Thank you, Counsel.

5                    All right.  Mr. Shraiberg.

6                    MR. SHRAIBERG:  Thanks, Ms. Mehdipour.

7                              EXAMINATION

8    BY MR. SHRAIBERG:

9         Q.    Good morning, or -- yes, still good morning.

10               Question for you, do you know who Wing Lake

11   Capital is?

12        A.    Yes.

13        Q.    Who is Wing Lake Capital?

14        A.    They're a lending, I think they're an MCA

15   lending company, I think.  I think they also go by

16   Franklin, I think.

17        Q.    They were formerly known as Franklin.

18               Did you -- did Excell take out a loan with

19   Franklin?

20        A.    Yes.

21        Q.    Do you know how much that was for?

22        A.    I'd have to look at the actual contract to

23   be able to tell you the exact number.

24        Q.    Was it for $6 million?

25        A.    I'd have to see the contract to be able to

1   tell you the exact number.  I don't want to guess.

2          Q.   Did you personally guarantee that loan?

3          A.   I'd have to look at those documents just to

4   make sure before I answer it.

5          Q.   You don't know if you personally guaranteed

6   a $6 million loan?

7          A.   I've got to look at those documents to be

8   able to -- I just don't want to answer incorrectly.  So,

9   I'd like to -- I would need to see the documents to be

10  able to tell you.

11         Q.   Did your wife also personally guarantee that

12  loan, or did she personally guarantee that loan?

13         A.   I would need to have those documents in

14  front of me to answer you a hundred percent.

15         Q.   You stated earlier that the landlord came in

16  and took all of the debtor's inventory prior to the filing

17  of the bankruptcy.

18         A.   Yes.

19         Q.   Out of the inventory that it took, did

20  Excell own any of the inventory free and clear of any

21  liens?

22         A.   Excell didn't own any of the cars.

23         Q.   When was the last time Excell owned a car,

24  or a car was titled in its name?

25         A.   I'd have to look at my records and have

Page 123

1    access to them to be able to give you that specific date.

2    It would have been some time in '21, but I don't -- I'd

3    have to have my records to really answer that.

4            Q.    Did it own any cars in its name in October

5    of '21?

6            A.    I'd have to have my records to be able to

7    answer that a hundred percent.

8            Q.    You say to answer it one hundred percent.

9    Do you know a timeframe, when was the last time that

10   Excell owned any inventory in its name?

11           A.    Once again, I mean, I really would need

12   access to be able to tell you that.  I don't want to

13   answer it without knowing.  I need to see my stuff to be

14   able to answer that.

15           Q.    The last time that it -- well, how about at

16   the beginning of the year, in January of 2021, did Excell

17   own any inventory in its own name?

18           A.    Yes, I can tell you yes to that.

19           Q.    In the beginning of the year, January

20   of 2021, did Excell own any inventory free and clear

21   outright, no liens encumbering it?

22           A.    Yes, I can answer that, but I would need my

23   documents to tell you how much, or the dollar amount, or

24   how many cars but, yes, I do believe that it did.

25           Q.    At the time it took out a loan with Franklin

Page 124

1    Capital, did the company represent to Franklin Capital
2    that its inventory was owned by Excell?
3         A.    I would have to see the contracts with
4    Franklin Capital to really be able to answer that for you.
5         Q.    Do you know how long ago you entered into
6    the contract with Franklin Capital?
7         A.    No.
8         Q.    Was it years ago?
9         A.    No, no, it wasn't years ago, but I don't
10   know the exact date.
11        Q.    Was it in 2021?
12        A.    I'd have to see the document.  I think it
13   was, yeah, but I'd have to see the document.
14        Q.    Was it in November of 2021?
15        A.    I'd have to have the contracts in front of
16   me just so I can answer it correctly.
17        Q.    You don't remember taking out a $6 million
18   loan in November of 2021?
19        A.    I would just need to see -- I want to be
20   specific.  I would need to see the contracts to be able to
21   answer that question, if it's in November of '21.
22        Q.    You stated you don't know the exact amount
23   that you took out, the exact amount of the loan with
24   Franklin.  Do you know for a fact, though, that it was
25   over $5 million?

1          A.    I'd have to reference the contract just to

2    be accurate on that a hundred percent.

3          Q.    Was it more than $4 million?

4          A.    I'm comfortable saying it was over

5    $4 million, yes, but I would need to see the contract to

6    be able to answer exactly what it was.

7          Q.    Let's use the number 4 million.  Would that

8    have been your largest loan at the time you took it out?

9          A.    No.

10         Q.    What was your largest loan then?

11         A.    I already testified to that, that would have

12   been with the Seaside Bank.

13         Q.    For how much?

14         A.    That was seven and a half.

15         Q.    And at the time you took out the loan with

16   Franklin, you owed Seaside Bank seven and a half million

17   dollars?

18         A.    No.

19         Q.    Wasn't Franklin your largest lender at the

20   time you took out their loan?

21         A.    Oh, at the time, I don't -- no.

22         Q.    Who was?

23         A.    I'd have to see my document to be able to

24   answer that for you.  I don't want to guess.  I don't

25   think that they were.

1          Q.    So if you're saying you don't think that

2     they were, who do you think was?

3          A.    I would just have to have my document so

4     that I could answer it.  I mean, you're asking me

5     questions.  I need -- I don't have them in front of me.

6          Q.    Did you have any other lenders at the time

7     you took out the loan with Franklin?

8          A.    Yes.

9          Q.    Have you heard of a company called HighBar

10    Capital?

11         A.    Yes.

12         Q.    Who is HighBar Capital?

13         A.    They're like Wing Lake, they're an MCA.

14         Q.    Do you know when you took out a loan with

15    HighBar Capital?

16         A.    No.

17         Q.    Was it before or after you took out a loan

18    with Franklin?

19         A.    I don't remember, I'd have to see the

20    documents to answer the date.  I don't recollect.

21         Q.    Did you service the HighBar Capital loan?

22         A.    What does that mean?

23         Q.    Did you make any payments to HighBar Capital

24    after receiving funds from them?

25         A.    Yes.  No, we didn't receive funds.  I didn't

Page 127

1    receive any funds from HighBar.

2         Q.    You received nothing from HighBar?

3         A.    No.

4         Q.    So, who -- have you -- so, who did you

5    receive -- who from, you stated that they were a lender.

6         A.    Right, it was a company called Spin Capital.

7    Spin Capital transferred their loan to HighBar.  HighBar

8    didn't distribute any money at all.

9         Q.    Did you make a 1.3 -- you, being Excell,

10   make a $1.3 million payment to HighBar Capital in the

11   first few weeks of February of 2022?

12        A.    You mean one payment of $1.3 million?

13        Q.    Correct.

14        A.    No.

15        Q.    Were there a group of payments that totalled

16   $1.3 million to HighBar Capital within the first two weeks

17   of February?

18        A.    Yes.

19        Q.    And what were those payments for?

20        A.    Interest.

21        Q.    And that's interest on your Spin Capital

22   loan?

23        A.    Yes.

24        Q.    When did Excell start having financial

25   issues?

1          A.    I'd have to go back and really look and see,

2     you know, with the records when.  It's hard for me to

3     pinpoint a date, but I'd have to go back and look.

4          Q.    Was it in 2020?

5          A.    No.

6          Q.    When was the first time Excell took out a

7     loan with an MCA lender?

8          A.    I'd have to look at the actual contracts,

9     but any date that I'm going to tell you would be a guess.

10    It was the end of '20 or beginning of '21, but I'd have to

11    look at the dates.

12              MR. SHRAIBERG:  For now I have no further

13    questions.  I'll reserve for the 2004 Exam.

14              Thank you.

15              MS. MEHDIPOUR:  Thank you, Mr. Shraiberg.

16              Ms. Roberts, do you care to ask any

17    questions?

18              MS. ROBERTS:  Yes, thank you, Ms. Mehdipour.

19                        EXAMINATION

20    BY MS. ROBERTS:

21         Q.    Mr. Zankl, you have not had me listed as a

22    creditor, as well as you didn't have Aaron with

23    Greenbucket or Popin (phonetic) until this morning.  Why

24    have you not recognized me as a creditor?

25              MR. WINDERMAN:  Excuse me, is that you,

1    individually?

2              MS. ROBERTS:  Me, individually.

3              MR. WINDERMAN:  Okay.

4              MS. ROBERTS:  Yes, Lillian, L-i-l-l-i-an

5    R-o-b-e-r-t-s.

6              MR. WINDERMAN:  Do you have her address?

7              THE WITNESS:  I don't.

8              MR. WINDERMAN:  Can we have your address,

9    please?

10             MS. ROBERTS:  6360 Northwest 42nd Avenue,

11   Coconut Creek, Florida 33073, a creditor for $500,000 from

12   2015, that is guaranteed on a promissory note by Scott, by

13   Mr. Zankl and Mrs. Zankl, and another 300,000 that is

14   remaining, owed from 2018.

15             MR. WINDERMAN:  Okay.  Go ahead and ask your

16   questions.

17             MS. ROBERTS:  Thank you.

18   BY MS. ROBERTS:

19        Q.    Scott -- Mr. Zankl, what's the reason behind

20   not listing me as a creditor?

21        A.    No reason, I actually just forgot.  There

22   was no reason.

23        Q.    Okay.

24             MR. WINDERMAN:  We will amend the schedules.

25             MS. ROBERTS:  Thank you.

1   BY MS. ROBERTS:

2        Q.    Is the casino investment that you spoke of

3   several times with me as I was helping you to obtain

4   financing in places, is that casino investment a personal

5   investment or through Excell Auto?

6        A.    Personal.

7        Q.    Personal.

8              And, Scott -- Mr. Zankl, what is -- how much

9   is your personal wealth?

10       A.    I would have to put it together for you.  I

11  don't know it off the top of my head.

12       Q.    Is it greater than $30 million?

13       A.    No.

14       Q.    How much is the casino investment worth?

15       A.    It's not worth anything as of today.

16       Q.    Why is that?

17       A.    Because it's not -- one, it's not open, it's

18  got a very small facility open and, two, they don't have

19  their official approval yet, to what they're doing as far

20  as how it's going to be run.  So, today's value, it's

21  worth nothing.

22       Q.    You had on occasion shared with me that it

23  was worth $40 million, 40 million-plus dollars.  What was

24  that based on?

25       A.    That was probably over a year ago, and that

1    was based on information that I was getting from the

2    management team from the casino, based on what their

3    projections were, but that was over 14 years.  That wasn't

4    the value at that time.  That was just based on what the

5    projections were over 14 years, and that was over a year

6    ago.

7          Q.    Did you set out with this as a Ponzi scheme,

8    or was this a business that got away from you?

9          A.    It was a business that got away from me.

10               MS. ROBERTS:  Okay.  Thank you,

11   Ms. Mehdipour.  I reserve the right for further

12   questioning, please.

13               MS. MEHDIPOUR:  Thank you, Ms. Roberts.

14               Mr. Krehl.

15               MR. KREHL:  Thank you, Madam Trustee.  This

16   is Jessy Krehl, K-r-e-h-l, with Pack Law.  We represent

17   certainly entities that are owned by Bob Shah, S-h-a-h.

18               I just want to cite for clarity of the

19   record, that we do take issue with many of the answers

20   we've heard from the debtor today and we will be pursuing

21   2004 discovery, with a full reservation of rights.

22                          EXAMINATION

23   BY MR. KREHL:

24          Q.    But just as a couple of gating questions,

25   Mr. Zankl, and I guess it is officially good afternoon

Page 132

1    now.  As a baseline question, and without reference to any

2    specific transaction (inaudible) more than one lender

3    using the same vehicle as underlying collateral for two

4    different loans?

5            A.    I'm sorry, what's that?  I didn't -- was

6    that a question?

7            Q.    Yes.

8                  (Inaudible) -- there are occasions --

9            A.    I can't hear you.

10           Q.    -- where you --

11                 MR. WERNICK:  Nicole, we can't hear him.  I

12    don't know if --

13                 MR. KREHL:  Am I audible?  Hello.

14                 MR. WERNICK:  No, can't hear you.

15                 MR. KREHL:  Hello?

16                 MR. WERNICK:  No, I can't hear you.

17                 MR. KREHL:  I'm not audible?

18                 MS. MEHDIPOUR:  Yes, Mr. Krehl, first of

19    all, it's Ms. Mehdipour or Trustee Mehdipour, and --

20                 MR. KREHL:  You can't hear?

21                 MS. MEHDIPOUR:  -- second.  Mr. Krehl, it

22    looks like there might be an Internet connection issue on

23    your end.  We're having a lot of feedback.

24                 Maybe if we give it a moment it will come

25    through a little clearer.

Page 133

1          MR. KREHL:  Am I coming through clearly now?

2          MS. MEHDIPOUR:  You are now.  Thank you.

3          MR. KREHL:  Okay.  My apologies.  I think I

4  it must have been the incorrect microphone.

5  BY MR. KREHL:

6          Q.    The question was whether there were

7  occasions on which you or the debtor, Mr. Zankl, had

8  gotten loans with the same vehicle as underlying

9  collateral from two different lenders, or multiple

10 different lenders?

11         A.    No.

12         Q.    Okay.  There were no occasions of that, and

13 can you please explain, just briefly, the sorts of general

14 procedures, not a transaction specific, but the general

15 procedures that you would undergo when getting a loan from

16 a lender to ensure that different collateral was being

17 used and that, you know, the same vehicle was not the

18 underlying collateral for more than one loan?

19         A.    I'd have to see the contracts because the

20 lenders --

21         Q.    Just general, general procedures, if you

22 were having a lender come and there was going to be

23 vehicles (inaudible) underlying collateral, what were the

24 types of things for the debtor to make sure that all

25 security interest were above board, no specifics.

Page 134

1          A.    I couldn't really -- you broke up, I

2    couldn't hear part of that question.

3          Q.    Did the debtor have any procedures to make

4    sure that when it was entering into a lender arrangement,

5    any underlying collateral was not already collateralized

6    on a different loan, general procedures, not a specific

7    transaction.

8          A.    No.

9          Q.    What was that?

10          A.    No, the lender -- no, the lenders that were

11    secured, they filed UCCs.

12          Q.    On the doctor's side, when entering into

13    these arrangements, did the debtor have anything on the

14    debtor's side to make sure that the underlying collateral

15    was not already collateralized on a different loan?

16          A.    I'd have to see the documents.

17          Q.    So there were no procedures the debtor had

18    to make sure when entering into a new loan that that

19    collateral was not already encumbered, the debtor did not

20    have any procedures?

21          A.    Well, individual cars were never

22    individually collateralized.  So, there is -- there wasn't

23    really a way to track that.  They weren't -- so I'd have

24    to see the actual contracts because each debtor was

25    different, but individual cars were not.

1      Q.    Understood.  So, yes, so as I understand

2  you, it would have been transaction specific, there were

3  not baseline procedures that the debtor followed to make

4  sure that there was not duplication of collateral for

5  multiple lenders.

6              MR. WERNICK:  We're having a hard time

7  hearing on our end.

8              THE WITNESS:  I can't hear anything he's

9  saying.  It's, like, very garbly, like, I just, I can't

10 hear.

11 BY MR. KREHL:

12     Q.    Yes.  I apologize for any microphone issues

13 that I'm having.  I do believe that you've answered the

14 question, though, with respect to general procedures, is

15 that correct?  You're saying there may have been

16 transaction-specific procedures, but there were not

17 general debtor procedures to (inaudible) ensure that

18 individual loans were not collateralized by the same

19 collateral on multiple occasions.

20     A.    Once again, I'm having a hard time hearing

21 him.

22              MR. KREHL:  Madam Trustee, am I audible to

23 you?

24              MS. MEHDIPOUR:  It's breaking up quite a

25 bit.  So, I'm unable to hear the full question as well.

Page 136

```
 1                Do you want to give it maybe one more shot?

 2                MR. KREHL:  I apologize, I'm not sure.

 3                Yes, Madam Trustee, thank you.

 4   BY MR. KREHL:

 5        Q.   Just, the baseline key inquiry that I'm

 6   trying to drive at is whether or not the debtor had

 7   general procedures, not to an individual transaction, to

 8   make sure when entering into a loan agreement that any

 9   collateral was not already collateralized under a separate

10   loan agreement?

11        A.   And, once again, I have to see the

12   individual contracts to be able to answer that question.

13                MR. KREHL:  Okay.  Yes, if it was

14   transaction specific, that answers my question.

15                Thank you, sir.

16                MS. MEHDIPOUR:  You're done, right?

17                MR. KREHL:  Oh, yes, my apologies,

18   Madam Trustee, that's the end of our questioning.

19                MS. MEHDIPOUR:  Thank you, Counsel.

20                Mr. Miller.

21                MR. MILLER:  Thank you, Madam Trustee.

22                     EXAMINATION

23   BY MR. MILLER:

24        Q.   Mr. Zankl --

25                MR. MILLER:  First of all, Madam Trustee,
```

Page 137

```
 1   we're going to -- I just want to let you know, as to my
 2   clients' -- the testimony by Mr. Zankl, my clients dispute
 3   it in reference to whatever he testified to, because there
 4   is no basis for it, and we object to that.
 5              However, I'm going to ask some questions.
 6   BY MR. MILLER:
 7        Q.   Mr. Zankl, did the Excell premises have
 8   camera systems?
 9        A.   I'm sorry, can you say that one more time?
10              MR. WERNICK:  Madam Trustee (inaudible)
11   announce who Mr. Miller represents, as he did at the
12   beginning, could we hear that again so that we're clear.
13              MR. MILLER:  I did already at the beginning
14   of the matter --
15              MR. WERNICK:  I know.
16              MR. MILLER:  I announced.
17              MR. WERNICK:  I know, but if you can repeat
18   it?  We have 40 different people on the line, Mr. Miller.
19   Thank you.
20              MR. MILLER:  Well, I would hope you took
21   notes.  I'm trying to get this ended quickly.  I already
22   announced Auto Wholesale of Boca.
23   BY MR. MILLER:
24        Q.   And with that said, again, did the premises
25   have cameras?
```

Page 138

1          A.    Yes.

2          Q.    Okay, and was the -- were the recordings

3    kept in an iPod system, or was it in a hardware system?

4          A.    I don't know.

5          Q.    Who would know that?

6          A.    The gentleman who actually set up the

7    cameras.

8          Q.    Mr. Zankl, have you reviewed those cameras,

9    the recordings?

10         A.    As far as -- what do you mean?

11         Q.    Have you recent -- have you in the past six

12   months reviewed any of the recordings?

13         A.    On a live feed, yes, not going back.

14         Q.    Okay.  As a matter of fact, you had your --

15   had Mr. Winderman reach out to Ms. -- to the trustee to

16   advise somebody was in the premises at the time the

17   trustee was there, correct?

18         A.    Yes, that was a live feed, yes.

19         Q.    Okay.  When you say it's a live feed, how

20   are you -- do you access it on your phone or a computer?

21         A.    You can actually do it, I think, either way.

22         Q.    Okay, and so you have a password and a code

23   to get into that system?

24         A.    Yes.

25         Q.    And do you know who the IT people were, or

Page 139

1    the people that installed the camera system?

2            A.    I'd have to get the actual information, it's

3    in one of the files.

4            Q.    Okay.  How long would it take you to get

5    that?

6            A.    Actually, the trustee has it.

7            Q.    Is it your testimony you've given the

8    trustee the ability to access the recordings and the

9    camera system of Excell?

10           A.    Yes.

11           Q.    Okay.  Earlier you testified when asked

12   about when you first met or conferred with counsel, any

13   attorney for purposes of considering the filing of

14   bankruptcy.  Do you recall that testimony?

15           A.    Yes.

16           Q.    Was that a yes?

17           A.    I'm sorry, say that again.

18           Q.    Do you recall testifying already regarding

19   the first time you met or conferred with an attorney for

20   purposes of considering filing bankruptcy for Excell?

21           A.    Yes.

22           Q.    You don't recall that at the beginning of

23   this 341?

24           A.    No, I do recall.  You asked me, I said, yes,

25   I do recall, yes.

Page 140

1          Q.    Okay.  Your testimony was, the earliest was

2     April 7th, isn't that correct?

3          A.    Yes, I believe so, yes.

4          Q.    But isn't it a fact that you had met before

5     that with the law firm of Furr & Cohen?

6          A.    I don't think I met with them before the

7     7th.  It might have been the same day.

8          Q.    So if Furr & Cohen had submitted an

9     affidavit to the bankruptcy court indicating the date of

10    your meeting, that was a date prior to April 7th, that

11    would be an error on their part?

12         A.    No, it would be an error on my part.  It

13    wouldn't be on theirs, I'm sure.

14         Q.    Okay.  So Furr & Cohen is probably correct

15    on the date they met with you then, right?

16         A.    Yeah, I would say so.

17         Q.    Okay.  Now, what was the purpose of that

18    meeting with Furr & Cohen, was it to put the company into

19    bankruptcy, or for you, or you and your spouse to consider

20    filing bankruptcy and get information on that?

21              MR. WINDERMAN:  We're going to assert

22    attorney/client privilege.  We don't see any basis for

23    that question with regard to the Zankls individually.

24    BY MR. MILLER:

25         Q.    I'm not asking, I'm not asking for what

Page 141

1    their conference -- what they discussed.  I'm asking for

2    the substance.  I'm entitled to the substance.

3    BY MR. MILLER:

4            Q.    What was your --

5                 MR. WINDERMAN:  No, you're not entitled.

6                 MR. MILLER:  Stop.

7                 MR. WINDERMAN:  You're not entitled to the

8    substance when the substance would reveal the

9    conversation.

10                MR. MILLER:  No, Mr. Winderman, I'm entitled

11   to know what the basis of the meeting was.

12                MR. WINDERMAN:  And the answer is you're not

13   going to find out here.

14                MR. MILLER:  No, I don't want you

15   testifying.  I don't want you testifying.

16                MR. WINDERMAN:  You're not going to find

17   out.  I've invoked the privilege.  We're refusing to

18   answer the question.

19                MR. MILLER:  You're here for the debtor,

20   correct, Mr. Winderman?

21                MR. WINDERMAN:  I'm here to object to your

22   useless question.

23                MR. MILLER:  No, my question is are you here

24   for the debtor or for Mr. Zankl and Mrs. Zankl?

25                MR. WINDERMAN:  Move on, Counsel.

Page 142

```
1                    MR. MILLER:  No.  You need to tell us who
2     you represent.
3                    MR. WINDERMAN:  Move on.  I don't have to --
4     I've already announced it.  Didn't you write it down?
5                    MR. MILLER:  Wait a minute, I'm trying --
6     you know, Mr. Winderman, you're just being ridiculous, so
7     let's get to the next --
8     BY MR. MILLER:
9          Q.    Mr. Zankl --
10                   MR. WINDERMAN:  Ask your question.
11                   MR. MILLER:  Stop.
12    BY MR. MILLER:
13         Q.    Mr. Zankl, does Mr. Winderman represent you
14    individually?
15         A.    He represents Excell Auto.
16         Q.    Okay.  Is there an attorney in the room that
17    represents you individually?
18         A.    Yes.
19         Q.    Who is that?
20         A.    Right here, Aaron.
21         Q.    Aaron what?
22         A.    Wernick.
23         Q.    Okay.  Now my question again, did you meet
24    with Furr & Cohen for purposes of a personal bankruptcy?
25                   MR. WINDERMAN:  And I'm going to assert
```

Page 143

1    attorney/client privilege.

2              MR. MILLER:  You're not his lawyer.  You

3    don't get to --

4              MR. WINDERMAN:  I don't care.  I don't have

5    to be his attorney for this purpose to assert the

6    privilege.

7              MR. MILLER:  Yes, you do, you have to.

8              MS. MEHDIPOUR:  Excuse me, excuse me.

9              MR. MILLER:  Mr. Wernick, are you going to

10   object?

11             MS. MEHDIPOUR:  Gentlemen.  Gentlemen, just

12   a moment, just a moment.

13             First of all, while there is no court

14   reporter here, to have a clear record let's make sure we

15   don't speak over each other, please.

16             And, Mr. Winderman, if you are asserting

17   that the debtor, Mr. Zankl, is not going to answer, then

18   please state that clearly on the record.

19             Mr. Miller, please, go ahead.

20   BY MR. MILLER:

21        Q.   Okay.  Once again, Mr. Zankl, I'm asking,

22   did you meet with Furr & Cohen for purposes of a personal

23   bankruptcy?  I'm not asking if you did it for Excell.  I'm

24   asking if you met for purposes of a personal bankruptcy?

25             MR. WERNICK:  I'd like to take a break,

Page 144

1   please.

2                   MR. MILLER:  What's that?

3                   MR. WERNICK:  I'd like to take a break.

4                   MR. MILLER:  No, you don't get to confer

5   with the witness while there is a pending question.

6                   MR. WERNICK:  I'm not going to coach the

7   witness.  I mean, he can decide -- the problem is that we

8   have two different lawyers in the room, and two different

9   entities, and I'm trying to figure out where Mr. Miller's

10  questioning is going towards.

11                  MR. MILLER:  I'm going to ask the question

12  again.

13  BY MR. MILLER:

14       Q.    Mr. Zankl, did you or your wife meet with

15  Furr & Cohen for purposes of considering or discussing a

16  personal bankruptcy?

17                  I'm not asking if you told him, I got

18  X-million dollars in debt, or I've got this asset here.

19  Was the purpose of that meeting for your personal

20  bankruptcy?

21                  MR. WERNICK:  And this is a Meeting of

22  Creditors, Mr. Miller.  So --

23                  MR. MILLER:  And this is appropriate to ask

24  it because there is a filing in the bankruptcy court

25  regarding this matter.  That's what we're asking --

1             MR. WERNICK:  Obviously --

2             MR. MILLER:  Are you instructing the

3    witness?  Counselor, are you instructing the witness not

4    to answer the question?

5             MR. WERNICK:  I'm not.  Obviously the

6    witness --

7             MR. MILLER:  Okay.

8             MR. WERNICK:  -- knows that there is an

9    attorney/client privilege, and he can answer in a way

10   that --

11            MR. MILLER:  Are you asserting the

12   privilege, Mr. -- no, Counsel, are you directing your

13   client not to answer the question?

14            MR. WERNICK:  I mean, Mr. Zankl can answer

15   the question, he can waive the privilege, or he can keep

16   the privilege, that is up to him.

17            MR. MILLER:  There is no privilege.  No, you

18   guys really --

19            MR. WERNICK:  He's obviously not going to

20   reveal --

21   BY MR. MILLER:

22        Q.   Mr. Zankl --

23            MR. WERNICK:  -- any discussion that he's

24   had --

25            MR. MILLER:  I don't want to have a debate

Page 146

1   with you, Counsel.  I want the question answered.

2   Everybody here wants to know, and they're entitled to

3   know, did Mr. Zankl meet with Furr & Cohen for the

4   purposes of personal bankruptcy consideration?

5   BY MR. MILLER:

6           Q.    Mr. Zankl, did you meet with Furr & Cohen

7   for that purpose?

8           A.    I honestly don't even remember if it was --

9   it was a blur.  I know we met with them, but I don't

10  remember what we actually talked about, if it was for me,

11  personally, or the businesses, I don't remember.

12          Q.    Mr. Zankl, is that your wife with the smile

13  on her face sitting to your left?

14          A.    Yes.

15          MR. MILLER:  Okay.  Just let the record

16  reflect she had a smirk on her face when you answered.

17  BY MR. MILLER:

18          Q.    So you don't recall the purpose of the

19  meeting at Furr & Cohen?

20          MR. WERNICK:  I'll object (inaudible) --

21  what someone was -- their look on their face.

22          MR. MILLER:  Look, if you're going to make

23  an objection, don't make a speaking objection.  I don't

24  need to teach you that.

25  BY MR. MILLER:

1          Q.    So, again, Mr. Zankl, you --

2                MR. WERNICK:  (Inaudible.)

3    BY MR. MILLER:

4          Q.    Mr. Zankl, your testimony is that you don't

5    recall the reason you met with Furr & Cohen, is that

6    correct?

7          A.    No, I don't recall the particular

8    discussions, if I talked at all about me, myself,

9    personally, or if it was over the business, that, I don't

10   remember.

11         Q.    Was your wife present during that meeting?

12         A.    Yes.

13         Q.    Was anyone else present during that meeting?

14         A.    I believe there was another gentleman in the

15   room, but I don't remember his name.

16         Q.    Was he with you or with the firm of

17   Furr & Cohen?

18         A.    No, with the firm.

19         Q.    And who at the firm do you recall meeting

20   with?

21         A.    I think I met with Mr. Cohen, and I don't

22   remember the other gentleman's name.

23         Q.    Did you meet Robert Furr?

24         A.    Yes.

25         Q.    Mr. Zankl, you testified Ed Brown is a

Page 148

1    co-owner of Excell, correct?

2           A.    Yes.

3           Q.    Whose dealer number, whose license plate

4    dealer number is PJO15M?

5           A.    No idea without seeing -- behind the plate

6    it tells you who that belongs to.  I would not know

7    without seeing the plate.

8           Q.    Okay.  Well, I just read the name to you.  I

9    just want -- number to you.  I just want to know, is that

10   an Excell dealer plate?

11          A.    I'll answer it again, Mr. Miller.  Without

12   seeing the physical plate, there is a sticker behind it

13   that references what store the plate belongs to.

14          Q.    How many --

15          A.    And without that plate, I wouldn't know.

16          Q.    How many dealer plates did Excell have?

17          A.    That would be a question that would be

18   answered by one of the girls in my office, Alana would

19   answer that.  I don't know exactly how many plates.

20          Q.    How many automobiles do you have in your

21   household?

22          A.    How many do I have at my house?

23          Q.    Did you not understand?

24                MR. WERNICK:  What's the question?

25                THE WITNESS:  No, I didn't answer it.

Page 149

1                    Go ahead, ask it again.

2    BY MR. MILLER:

3         Q.    I said how many automobiles do you have in

4    your household?

5         A.    Three.

6         Q.    Okay, and were any of those three

7    automobiles at any point in time owned by, or in the

8    custody of Excell?

9         A.    No.

10        Q.    Okay.  Do any of those automobiles have any

11   dealer plates that belong to Excell?

12        A.    No.

13        Q.    Do you know what cars Mr. Brown is currently

14   in possession of and operating?

15        A.    No.

16        Q.    If I told you that we believe that he has in

17   his possession a 2021 white Lamborghini Urus, serial

18   number ending 2270 in his possession, do you recall him

19   ever driving that?

20        A.    Yes.

21        Q.    Okay, and have you seen him recently with

22   that automobile at the country club?

23        A.    No.

24        Q.    Anywhere else?

25        A.    No.

1          Q.    Does he also have in his possession a white
2     2021 Rolls-Royce Cullinan, serial number ending 4097?
3          A.    I don't know for sure.
4          Q.    Didn't you give him those two automobiles
5     the end of March, beginning of April 2022?
6          A.    No.
7          Q.    Do you have a bank account at Bank of
8     America ending 3954?
9          A.    No.
10         Q.    Does your spouse?
11         A.    No.
12         Q.    Do any businesses affiliated with you?
13         A.    No.
14         Q.    Do you know why you deposited a check for
15    $700,000 on March 28th into that account from Excell?
16         A.    Into a Bank of America?
17         Q.    That's what I asked.
18         A.    No.
19         Q.    Who is NBNS Management?
20         A.    I don't know.
21         Q.    Have you ever heard of them?
22         A.    Doesn't ring a bell.
23         Q.    Okay.  Mr. Zankl, do you or your wife have
24    any foreign bank accounts?
25         A.    No.

1          Q.    Have you banked, or any entities affiliated

2    with you, or any trusts affiliated with you, in Lisbon,

3    Portugal or in the nation of Portugal?

4          A.    No.

5          Q.    Do you have an account, whether you, with

6    your spouse or without, or any entity affiliated with you,

7    with which you bank?

8          A.    No.

9          Q.    Is that a no?

10          A.    No.

11          Q.    Okay.  Do you recall transferring a million

12    dollars to a trust in Lisbon, Portugal, within the past

13    six months?

14          A.    No, I'd have to see the bank statement.

15          Q.    Okay.  What was your wife's role at Excell?

16          A.    As I testified earlier, she came in January,

17    and was revamping all the procedures and policies, and the

18    HR for the company.

19          Q.    Mr. Zankl, was there a period of time that

20    you were absent in the beginning of this year from the

21    Excell premises?

22          A.    In March.

23          Q.    From what date to what date?

24          A.    I think it was, like, March 15th, I think,

25    or the 14th of March.

Page 152

1          Q.    Just one day?

2          A.    No, that's the last day I was in there.

3          Q.    So, you weren't present the dates of

4    April 2nd and April 3rd, 2022?

5          A.    No, I was in there -- I was gone from

6    March 15th, I think, and then I was there the evening of

7    April 1st, and then I was there two more times, three more

8    times in April when I met with the trustee.

9          Q.    Okay, and do you recall the Boca police

10   department being at the Excell premises the 1st of April

11   of 2022?

12         A.    I wasn't there to see the police there, but

13   I was told they were there.

14         Q.    Well, weren't you present to hand a check to

15   a gentleman that would not give up the car he was sitting

16   in the whole time he was in the premises while the police

17   were there?

18         A.    I wasn't there, no.

19         Q.    You don't recall handing him a check for --

20         A.    No, I wasn't there.  I wasn't there.

21         Q.    Let me finish.

22               Do you recall handing a gentleman a check

23   for $250,000 to get out of the car?

24         A.    Nope.

25         Q.    Did you --

Page 153

1              A.      I wasn't there.

2              Q.      Did you instruct somebody to give that

3    gentleman a $250,000 check to get out of the car?

4              A.      Which gentleman are you referring to?

5              Q.      I'm asking, do you write checks for $250,000

6    so much that you can't recall that?

7              A.      I don't write checks, first of all.

8              Q.      Do you recall instructing anyone at Excell

9    to hand a gentleman a check for $250,000 in the first week

10   of April 2022?

11             A.      No.

12             Q.      How much money did Excell borrow from

13   various creditors between January 1st, 2022 and the date

14   it filed bankruptcy?

15             A.      I'd have to look at the contracts and see.

16             Q.      Would it be safe to say it was in excess of

17   $25 million?

18             A.      I'd have to see the contracts to see.

19             Q.      So if you received -- if Excell received

20   $25 million in that period of time, what happened to that

21   money, where did it go?

22             A.      I'd have to see the contracts to see how

23   much it borrowed.

24             Q.      Do you recall borrowing money from an entity

25   by the name of -- somebody that you borrowed money from on

1    January 6th of 2022, that recorded a UCC-1, do you recall

2    that company?

3             A.    No.

4             Q.    Okay.  Do you recall borrowing money from

5    TBF on or about January 25th, 2022 for Excell?

6             A.    No.  I'd have to see the contract to be able

7    to tell you a specific date.

8             Q.    Well, do you recall borrowing from so many

9    different people you can't remember them in that

10   three-month period?

11            A.    No, just, I want to answer it correctly, so

12   if I had the contracts I could give you the exact answer.

13   I don't want to guess.

14            Q.    Mr. Zankl, did you ever instruct any

15   employees of Excell to immediately, or as quickly as

16   possible, transfer automobiles from Excell to Karma of

17   Broward or Karma of Palm Beach?

18            A.    No.

19            Q.    Do you recall -- do you communicate by email

20   with your staff?

21            A.    Not a lot, mostly verbal, but sometimes

22   emails, yes.

23            Q.    Okay, and do you recall writing -- who was

24   Alana?

25            A.    Alana, she was one of the girls that handled

Page 155

1    contracts and (inaudible) and stuff.

2        Q.    Do you recall writing an email to Alana on

3    March 31st, 2022, to immediately move 14 different

4    automobiles from Excell, and transfer them to Karma?

5        A.    No.

6        Q.    Does anyone else have access to your email,

7    that they can just write these emails on their own for

8    you?

9        A.    Not that I'm aware of, but I'm sure that it

10   can be done, but not that I'm aware of.

11       Q.    How is it that you intended to give -- I'm

12   looking at all these UCC-1 you had reported, you were

13   borrowing money, representing to these creditors that they

14   were going to get inventory securing their loans, and

15   counsel just before me just asked, were you giving up the

16   same inventory to multiple lenders.  Was that possible,

17   did that happen?

18       A.    Without seeing the contracts to specifically

19   see what the contract said, it would be -- I can't answer

20   that without seeing the contract.

21       Q.    Mr. Zankl, when was the last time you

22   traveled outside of the United States?

23       A.    November, I believe, of last year.

24       Q.    Was that with Ed Brown?

25       A.    No.

1          Q.    Do you recall your trip with Ed Brown?

2          A.    Which one?

3          Q.    Well, the one you guys went on, the yacht

4     trip together, do you remember that?

5          A.    Once again, which one?

6          Q.    Well, the most recent one.

7          A.    Yes.

8          Q.    When was that?

9          A.    I think it was in February or March of last

10    year.

11         Q.    And does -- do you and Mr. Brown have any

12    other corporations -- corporate interests together where

13    you each have an ownership interest, whether it's a joint

14    venture, or corporation, an LLC, or anything like that, a

15    partnership?

16         A.    There is a finance company that -- he

17    doesn't have an ownership in, but there is an Excell

18    Finance Company.

19         Q.    What's the name of that company?

20         A.    I just said it, Excell Finance.

21         Q.    Do you have a college background?

22         A.    I'm sorry?

23         Q.    Did you go to college?

24         A.    Yes.

25         Q.    Did you graduate?

```
1              A.    Yes.

2              Q.    What degree did you get?

3              A.    Marketing, advertising, minor in criminal

4     law.

5              Q.    Did your wife graduate from college?

6              A.    Yes.

7              Q.    What degree did she get?

8              A.    Business, marketing.

9                    MR. MILLER:  All right.  I'm going to

10    reserve for a 2004 Examination, Madam Trustee.  It's been

11    a long day, I guess, for everybody, and I don't want to go

12    on because, as you said, this could take weeks.

13                   Thank you for your time.

14                   MS. MEHDIPOUR:  Mr. Miller, thank you.

15                   Mr. Harvey.

16                   MR. HARVEY:  Yes, Madam Trustee.  Thank you.

17                   MS. MEHDIPOUR:  Thank you.

18                        EXAMINATION

19    BY MR. HARVEY:

20             Q.    Mr. Zankl, do you recall my client, BAL

21    Investments, LLC?

22             A.    Yes.

23             Q.    Okay.  When did you first come to do

24    business in any form with BAL Investments?

25             A.    I don't -- I mean, I don't remember the -- I
```

1    don't recall the exact date.  I don't recall the exact

2    date.

3         Q.    More than two years ago?

4         A.    No, it would not have been more than two

5    years ago, no.

6         Q.    And how did the business relationship with

7    BAL Investments start, what kind of transactions were you

8    entering into together?

9         A.    I'd have to really see the contract to

10   answer that question.

11        Q.    How would you refer to BAL Investments,

12   would you refer to them as a private lender?

13        A.    They were a lender, yes.

14        Q.    So any testimony you've given here today in

15   reference generally to private lenders, would that apply

16   to BAL Investments?

17        A.    Without seeing the contact, I'd have to see

18   their specific contract.

19        Q.    Is it your testimony here today that you did

20   not enter into any agreements where a specific car was

21   identified as collateral with a private lender, such as

22   BAL Investments?

23        A.    I'd have to look at the contract that I had

24   with them to be able to answer that question.

25        Q.    In your amended schedules filed last night,

1    you listed BAL Investments as a creditor for $5 million.

2    Are you aware of that?

3              A.    Yes.

4              Q.    Okay, and to your recollection what does

5    that 5 million represent?

6              A.    I'd have to have that contract to be able to

7    tell you exactly.

8              Q.    Do you know how many contracts you entered

9    into with BAL Investments?

10             A.    No, I'd have to have that -- I'd have to

11   have the contract, but I don't.

12             Q.    Do you recall entering into a $2 million

13   line of credit with BAL Investments?

14             A.    No, I don't recall that.

15             Q.    So, then do you not recall personally

16   guaranteeing that line of credit as well?

17             A.    Without seeing that -- I'd have to see the

18   documents before I could answer that question.

19             Q.    Do you recall at any point in time ever

20   personally guaranteeing loans that are the subject of the

21   Creditors' Meeting here today?

22             A.    Without seeing the actual contract -- I'd

23   have to see the actual contract to answer that.  I don't

24   want to answer it incorrectly.

25             Q.    So, your answer then is you have no

Page 160

1    recollection of ever guaranteeing a loan that's been

2    discussed here today?

3            A.    No, that's not what I'm saying.  I'm saying

4    for anything specific, I would have to see the contract.

5    I don't want to answer a question without knowing for

6    sure, and I would need to see the contract.

7            Q.    Well, sir, I'm not talking specific.  In

8    general, in reference to any creditor referenced here

9    today, and referenced in your filings, including those

10   amended schedules as of last night, have you ever

11   personally guaranteed a loan represented with those

12   creditors?

13           A.    I'm sure that there was some personally

14   guaranteed, but I can't reference a specific one without

15   seeing the contract.

16           Q.    Do you recall personally executing any

17   agreement with BAL Investments?

18           A.    Do I recall doing anything with them?

19           Q.    Personally executing loan documents with

20   BAL Investments?

21           A.    Yes, I do.  Yes, I mean, I did sign

22   documents with them.  I just would need the document to be

23   able to answer any questions relating to the documents or

24   the terms of the deal.

25           Q.    Do you recall whether you executed those

Page 161

1    documents by hand, or whether or not you used a software

2    such as DocuSign?

3           A.    That, I don't recall.

4           Q.    Do you recall in what capacity you signed

5    those documents?

6           A.    I'm not sure what you mean by "capacity".

7           Q.    Okay.  Did you sign them in your individual

8    capacity?

9           A.    I don't recall.  I don't, I don't recall.

10          Q.    Okay.  If someone were to sign on behalf of

11   Excell Auto (inaudible) --

12          A.    No, not always.

13          Q.    Was there a specific reason why you or

14   someone else with Excell Auto would sign a particular

15   agreement?

16          A.    I mean, I would sign, or Teddi had

17   authorization to sign, Nidia had authorization to sign.

18   It would be one of us who would sign.  I mean, Alana had

19   authorization to sign on behalf of Excell Auto.  I mean,

20   they all had authorization.

21          Q.    Is there any particular factor that dictated

22   who signed on behalf of Excell Auto?

23          A.    No.

24          Q.    Did anyone with authority to sign on behalf

25   of Excell Auto have to come to you, or your wife, or

1    Ed Brown for authority to enter into an agreement?

2           A.    No.

3           Q.    Was it a tiered structure, as far as

4    authority to sign and bind Excell Auto -- actually, let me

5    rephrase that.

6           A.    No.

7           Q.    Let me rephrase that.

8                 If there was an agreement for under

9    $2 million, did only certain sales people have authority

10   to enter into that agreement?

11          A.    Without seeing the specific contract, I

12   wouldn't be able to answer that.

13          Q.    Generally speaking, in reference to any

14   sales, or any transactions entered into with Excell Auto,

15   did all employees have the same signing authority?

16          A.    I would have to see the particular situation

17   of what you're referencing.  It's -- your blanket, it's

18   such a wide question.  I'd have to know exactly what the

19   contract was, or what it was pertaining to.

20          Q.    That's not what I'm asking, sir.  I'm not

21   asking the specifics of a contract.  I'm saying general

22   procedures, did everyone at Excell Auto have the same

23   authority to sign and bind Excell Auto to a particular

24   loan agreement?

25          A.    Are you talking about a loan?  I mean, what

Page 163

1    are you referencing?

2              Q.    I just said a loan agreement, sir.

3              A.    I didn't hear that, I apologize.

4                    No, it would -- for loan agreements, they

5    would be signed -- that would be signed by me, as far as a

6    loan agreement.

7              Q.    Okay.  Did the employees of Excell Auto have

8    signing authority for the sales of cars in Excell Auto's

9    name?

10             A.    Yes.

11             Q.    Did separate employees have signing

12   authority for any loan transactions entered into on behalf

13   of Excell Auto?

14             A.    Well, it depends, what do you mean by "loan

15   transaction"?

16             Q.    How would you define it?

17             A.    Well, a loan transaction, is Excell

18   borrowing money, or if it's a loan transaction of when a

19   customer came in and bought a car, and we did the

20   financing for the customer, that's also a loan

21   transaction.

22             Q.    All right.  In either of those two

23   categories, was there separate signing authority for

24   Excell Auto amongst the employees?

25             A.    Yes.

Page 164

1          Q.    Okay.  How was that signing authority split
2     amongst the employees?
3          A.    If it was reference to an individual vehicle
4     being sold, anybody could sign the documents when it came
5     to that, as far as anyone in the office, the girls.
6          Q.    When it came to binding Excell Auto to
7     liability on a loan, no matter the source of that loan,
8     who had that authority?
9          A.    That would vary, I'd have to see the
10     contract.
11          Q.    And how would it vary?
12          A.    Based on the contract.
13          Q.    What factors denominate a contract as being
14     separate, or categorically separate from another contract?
15          A.    There really wasn't, it just, it would
16     depend on the contract.
17          Q.    And what factor makes it dependent upon the
18     contract?
19          A.    Well, it's hard for me to say that without
20     seeing the contract.
21          Q.    Did you read every single loan agreement
22     that you signed?
23          A.    No.
24          Q.    Going back to BAL Investments specifically,
25     do you recall an increase of a credit line with

1   BAL Investments incurring in late 2021?

2        A.    I would need to see that contract to answer

3   that question.

4        Q.    Would it refresh your recollection if I told

5   you that pursuant to the lawsuit filed in state court on

6   behalf of my client, that you entered into an agreement

7   with BAL Investments to extend and modify a line of credit

8   agreement from an initial $2 million up to $5 million?

9        A.    I would need to see the contract to be able

10  to answer that question a hundred percent.

11       Q.    Would you have any way or means of disputing

12  that my client fully funded the $5 million line of credit?

13       A.    I would need to see the actual contract, and

14  I would need to be referencing in my bank statements to

15  make sure of that before I answered it.

16       Q.    And which bank statements would those be?

17       A.    Chase.

18       Q.    Do you recall ever entering into

19  transactions with BAL Investments where a specific car was

20  nominated for use of the funds lent under that agreement?

21       A.    I would have to see the actual contract

22  you're referencing so that I could answer it for you.  I'm

23  not going to guess here.  I need to see the contract.

24       Q.    Did you read all the agreements that Excell

25  Auto entered into with BAL Investments?

1          A.    You just asked me that earlier.  No.

2          Q.    And actually I did not, sir, but thank you.

3                Okay.  Did you rely upon someone else to

4    read the agreements and provide any sort of summation or

5    bullet points for you?

6          A.    No.

7          Q.    And on what basis did you sign the

8    documents?

9          A.    I'm not sure what you mean by that.

10         Q.    Sure, I'll rephrase.

11               Do you recall whether BAL Investments sent

12   you documents to sign?

13         A.    I'm -- that's why we're here, yes, I'm sure

14   I signed them, yes.

15         Q.    Okay.  Well, specifically my question is,

16   did BAL Investments send the documents to you directly?

17         A.    That, I don't -- I don't know for sure if

18   they did or didn't.  I don't know, I don't remember if

19   they were signed DocuSign, or if it was signed on paper, I

20   don't recall.

21         Q.    Mr. Zankl, did you primarily deal with

22   BAL Investments, LLC on behalf of Excell Auto, or was

23   there someone else who had -- that handled those

24   communications?

25         A.    It would have been me.

1      Q.    Okay.  Was your wife involved as well?

2      A.    No.

3      Q.    Do you have any recollection whether or not

4   your wife signed on behalf of Excell Auto?

5      A.    I'd have to see the documents to be able to

6   answer that question a hundred percent.

7      Q.    Okay.  In addition to your $5 million line

8   of credit that I was asking you about, do you have any

9   recollection of any profit sharing agreement with

10  BAL Investments?

11     A.    Without seeing those documents I cannot

12  answer the question a hundred percent.  I just would like

13  to have the contracts so I can answer, reference it.

14     Q.    In general practice, did Excell Auto enter

15  into profit sharing agreements where a specific automobile

16  was not nominated or discussed in that agreement?

17     A.    Can you rephrase that question?

18     Q.    Sure.

19          When you entered into agreements where

20  profits from the sale of an automobile would be split, or

21  shared, or otherwise nominated, at least in part, for a

22  payment to the lender, did those agreements always include

23  a specific identification of an automobile from which

24  those funds would emanate?

25     A.    No, no.

1          Q.     If a specific vehicle was not nominated in a

2     profit sharing agreement, how would you determine the

3     source of the funds to be paid back to the lender?

4          A.     Without seeing the contract -- each contract

5     was different.  I'd have to see their specific contract to

6     be able to answer that question for you.

7          Q.     Did the inventory aspect of the Dealertrack

8     software have any notifications, identifiers, or otherwise

9     to let you know that the inventory was being booked for a

10    deal, that it was already pledged somewhere else for sale?

11         A.     No.

12                MR. HARVEY:  Madam Trustee, I have no more

13    questions, but reserve for the 2004 Examination.

14                MS. MEHDIPOUR:  Thank you, Mr. Harvey.

15                Mr. Shraiberg.

16                MR. SHRAIBERG:  Thank you, meritorious

17    defense Al trustee.  I just have one -- kind of a set of

18    questions with regard to some of your answers, both to

19    what was just stated to Mr. Harvey, as well as to me

20    earlier.

21                         EXAMINATION

22    BY MR. SHRAIBERG:

23         Q.     Both of us had asked whether you, your wife,

24    and any of the affiliate companies have guaranteed our

25    clients' loans.  Do you remember that?

Page 169

1          A.    I remember the questions, yes.

2          Q.    And your answer was, and I wrote it down, I

3    would have to see the documents to answer that

4    100 percent, correct?

5          A.    Yes.

6          Q.    Do you remember signing your bankruptcy

7    schedules in this matter?

8          A.    Yes.

9          Q.    And before you signed your bankruptcy

10   schedules, you reviewed the information within them,

11   correct?

12         A.    Yes.

13         Q.    You made sure that the information was, in

14   fact, true and correct?

15         A.    Yes.

16         Q.    And then when you signed it, you signed it

17   under penalty of perjury, correct?

18         A.    Yes.

19         Q.    Just like today you're testifying, you're

20   testifying under penalty of perjury, correct?

21         A.    Yes.

22         Q.    And you take that oath seriously, correct?

23         A.    Yes.

24         Q.    And at the time you signed your bankruptcy

25   schedules, you were represented by counsel, correct?

Page 170

1          A.     Yes.

2          Q.     And before signing, you had the ability to

3     ask counsel questions with regard to any of the questions

4     within the schedules, correct?

5          A.     I mean, yes and no.

6          Q.     You didn't have the ability to speak with

7     counsel prior to signing your bankruptcy schedules?

8          A.     Well, I answered you yes.  Yes, we did, and,

9     no, we didn't, because our time got cut short to fill them

10    out.  That's why we rushed to get them done, and that's

11    why they weren't completely filled out, and that's why

12    we've had to amend them, is because we thought we had an

13    extra 10 days, but when my attorney got back from out of

14    town, we only had one day.

15         Q.     So at the time you signed your bankruptcy

16    schedules originally, you knew they weren't true and

17    correct?

18         A.     No, not that they weren't true and correct,

19    that I knew that I'd be able -- that we'd be able to amend

20    them to add stuff, not to change anything that was

21    currently on there, but to amend them, is what I was told.

22         Q.     And, in fact, you have amended your

23    bankruptcy schedules, correct?

24         A.     Yes.

25         Q.     And I think that was last night, literally?

Page 171

1          A.     No, we amended them prior to last night as

2     well.  We've been amending them throughout the process.

3          Q.     But now, between the original schedules and

4     the amendment, they're true and correct, right?

5                MR. WINDERMAN:  No, we're going to amend

6     them further based on the information that's come up at

7     the 341, as we've indicated.

8                MR. SHRAIBERG:  What specifically?  I think

9     I may recall one instance of not listing a creditor.  Was

10    there something else?

11               MR. WINDERMAN:  I think there are three.  I

12    think it's OLP, Greenbucket and Lillian --

13               THE WITNESS:  Roberts.

14               MR. WINDERMAN:  -- Roberts.

15    BY MR. SHRAIBERG:

16         Q.     Okay, and other than listing --

17               MR. WINDERMAN:  And to list the Chase bank

18    accounts, the trustee is correct, they're not listed, and

19    we're going to list them.  Hopefully that will all get

20    done today.

21    BY MR. SHRAIBERG:

22         Q.     And because you take your oath seriously, as

23    you've testified to, and you knew that you were signing

24    the schedules and the amendments under penalty of perjury,

25    and assuming that you didn't just list the information

Page 172

```
 1    from memory, you looked at certain documents to come up
 2    with -- to fill out your bankruptcy schedules, correct?
 3            A.    No.
 4            Q.    You didn't?
 5            A.    We didn't have access to the documents.  For
 6    some of the stuff that we filled out, we did not have
 7    access to get into the building to get our documents.
 8            Q.    What documents did you not have access to to
 9    -- did you not have access to?
10            A.    One of the questions was sales revenue or
11    revenue, I think, for Excell, I did not have access to be
12    able to pull that up, and without going into the business
13    to get access to the systems, I could not get that
14    information without it.
15                  Another question on the statements was did
16    Excell transfer any property in the last 24 months.  I
17    could not answer that question without getting to my
18    documents, and I didn't have access to them.
19                  The bank accounts, I did have access to
20    those, but then they were taken away, so I didn't have
21    access to them.
22                  I think that's about it.
23            Q.    Nothing else?
24                  MR. WINDERMAN:  Well, I don't think that's
25    entirely correct.  We're still, I think, in the process of
```

Page 173

1    identifying inventory and --

2              THE WITNESS:  Oh, yeah, inventory, thank

3    you.  I didn't have access to the inventory files to be

4    able to properly do that.

5    BY MR. SHRAIBERG:

6         Q.    Anything else?

7         A.    I'm not sure if there is anything else.  I'm

8    not sure if there is anything else.  I don't believe so.

9    I mean, there is one instance where I was actually at the

10   store with the trustee, and just going through the files I

11   found three receivables to Excell that I completely even

12   forgot about, because they were very old, but just by

13   going through the files, I was able to discover those, and

14   we added those on to the statements, but I didn't have

15   those on the original statements because I didn't have

16   access to my office, which those I just discovered, just

17   found them, money that was actually owed back to Excell.

18        Q.    But all the information that you're

19   referring to, your books and records for Excell, you did

20   have access to after you filed, correct?

21        A.    No, I did not.

22        Q.    Haven't you turned this information over to

23   the trustee already?

24        A.    Well, she had taken possession of it.  I

25   requested -- after we filed bankruptcy, we requested

Page 174

1    access to get my files on numerous, numerous occasions,

2    but we didn't get in to get the files to be able to do it.

3           Q.    What did you review to fill out your

4    schedules after (inaudible) --

5           A.    On which occasion.

6           Q.    Yes, you filled out your bankruptcy

7    schedules and they're pretty detailed.  You list most of

8    your creditors, you think it was all but three, and you

9    list the balances owed to each of those creditors.

10                What did you review to get that information?

11          A.    On those particular contracts on there, I

12   had some of the contracts for some of the people that I

13   was able to pull up and be able to get the numbers off of

14   those.

15          Q.    So is it safe to say that if you have the

16   number, you had the contract?

17          A.    Yeah, I was able to pull some of them, not

18   all of them, though.

19          Q.    My question was, if they're listed on your

20   schedules with a balance owed, does that mean you had a

21   copy of their contract?

22          A.    No.

23          Q.    So what did you review to get those

24   balances, and those -- and that information?

25          A.    Well, like I just said, I had some of the

Page 175

1    contracts, but I didn't have all of them.

2          Q.    So how are they listed with a balance on

3    your bankruptcy schedules if you didn't have the

4    contracts?

5          A.    Because I answered, I put the numbers down

6    there, that was the -- I didn't have access to get all of

7    the information.  Like I said, my attorney was gone.  He

8    came back on a Monday, and we thought we had the whole

9    rest of the week to do the schedules, but we only had to

10   the end of business on Monday to turn them in, and I had

11   not had access to any of my documents or statements or

12   anything, but I had to get the schedules turned in that

13   Monday by 5 o'clock.

14              So what I was told, and to this day I'm

15   still being told, is that it's typical when you do these

16   statements, is that you can amend them, you're allowed to

17   amend them, you're allowed to make changes to them, is

18   what I was instructed, and I had a timeframe to get them

19   in by 5 o'clock that day, when I originally thought I had

20   the whole week to do it, and I did the best I could to

21   list everything on those statements to my knowledge, the

22   best that I could do it without having the physical

23   documents, and as -- throughout the time we've done it,

24   we've been making amendments as I've been able to get

25   access to the documents, we've been amending those.

1          Q.    All my question is, if you have now listed a

2     creditor, either initially or through your amendment that

3     was filed last night, does that mean you've looked at a

4     copy of their contract --

5          A.    No, it does not.

6          Q.    -- to put that information on the schedules?

7                Was your answer no?

8          A.    No, I have not reviewed -- because some of

9     the contracts I don't have, they're in the files.  The

10    trustee took everything out of the accounting office, and

11    those contracts were in there.  Those contracts were in

12    there.

13         Q.    So --

14         A.    So some of them are a certain dollar amount,

15    but have been paid back principal.  So the amount may not

16    be to the penny, without having a full amortization

17    schedule.

18         Q.    I'm asking --

19         A.    If you are asking me to have it to the

20    penny, my question (sic) to you is no, because I don't

21    have an amortization schedule to be able to do that.  If

22    I'm doing it to the best of my knowledge, yes, and like I

23    said, I did not have access to my stuff to be able to do

24    it.

25         Q.    I'm not asking, I'm not asking what the

1    actual balances are for any particular creditor.  All I'm

2    asking is what you reviewed to put the information down on

3    your bankruptcy schedules.

4              A.    And I'm going to say it again, I didn't have

5    access to --

6                    MR. WINDERMAN:  He wants to know what you

7    reviewed, not what you didn't review.

8                    THE WITNESS:  I don't remember exactly what

9    I reviewed.

10                   MR. WINDERMAN:  Then say --

11                   THE WITNESS:  I mean, I'm going through a

12   lot of stuff right now, so I remember exactly what I

13   reviewed.

14                   MR. WINDERMAN:  Then that's the answer.

15   BY MR. SHRAIBERG:

16             Q.    I'll give you an example.  I believe

17   Mr. Harvey's client was BAL Investments, is that correct?

18             A.    Yes, I believe so.

19             Q.    Notice the amount of his client's claim at

20   an even $5 million.  To get that number, does that mean

21   you reviewed --

22             A.    No.

23             Q.    What did you review to get that number --

24             A.    I --

25             Q.    -- and to get their address, to get their

Page 178

1   information?

2        A.   I answered, I answered the dollar amount on

3   that piece of paper to the best that I could recall,

4   because I didn't have access to the documents.

5        I can answer the question any which way you

6   want, it's going to be the same answer.  I didn't have

7   access to the documents, so I did it to the best of my

8   knowledge.

9        Q.   Similarly, you list my client, Wing Lake,

10   with a balance of an even $5,900,000.  Do you know what

11   you reviewed to get their address, their name, and the

12   amount owed?

13        A.   With their address, I believe I Googled the

14   address to get the address.

15        Q.   How about the amount owed?

16        A.   The amount owed, I took my best estimate of

17   what I thought that I owed.  I didn't have the document.

18        Q.   So is the information within your bankruptcy

19   schedules all a guess?

20        A.   I don't -- listen, I don't think it's

21   qualified as a guess, no, I didn't just pull a number out

22   of my hat.  What I'm saying is that I took the number that

23   I put on there, that I thought the closest to what the

24   dollar amount was.

25        You represent a company that, you know, I

1    made monthly payments to of principal and interest.  So

2    that principal payment would have decreased what I owed

3    them.  The number that I put on the schedule I believe is

4    higher than what I truly owe them, but I don't know the

5    exact number.

6           Q.    Would you be able to go through your

7    bankruptcy schedules and tell us which ones -- which

8    information is accurate and which one is a guess?

9           A.    Not a guess.  I'll say it again, it's an

10   estimate that I am putting on that I believe it's very,

11   very close to what the number is.

12              I mean, a guess, I could say it's

13   $2 million.  I mean, it's -- I'm putting on there what I

14   believe is as close as possible.

15              Your creditor, the person you represent may

16   say it's a different dollar amount.  I might say it's a

17   different dollar amount.

18              Are you asking what the specific contract

19   reads from the time we did the deal, or based on after

20   making four or five payments to them?  Because for me to

21   get the exact payoff amount for my statement to be a

22   hundred percent accurate, I'd have to get a payoff from

23   your bank, from your lender to give it to me.

24              So anything I put on there is going to be,

25   what you would say is a guess, because without me getting

Page 180

1    a payoff from your lender, that number wouldn't be

2    accurate.  Am I right?

3         Q.    What other information on your bankruptcy

4    schedules and the Statement of Financial Affairs --

5         A.    I asked you a question.  Am I right?

6         Q.    Please let me ask my questions.

7               What other information within your

8    bankruptcy schedules and your Statement of Financial

9    Affairs, which were both signed under penalty of perjury,

10   is not accurate?

11        A.    Without going line by line, I could not

12   answer that question.

13        Q.    I believe that -- do you have Docket

14   Entry 36 in front of you?  That's your bankruptcy

15   schedules.

16        A.    I don't have any --

17              MR. WINDERMAN:  We don't have any documents.

18   You don't bring documents to a 341.

19              MR. SHRAIBERG:  Your bankruptcy schedules?

20              MR. WINDERMAN:  Yes.  If the trustee wanted

21   to examine them, she would have.

22              This is all going to get fleshed out at the

23   2004.  I don't know why you're spinning your wheels at

24   this point.  You'll get your opportunity.  You'll produce

25   your documents, and you'll find out what the exact amounts

Page 181

1   are.

2                   MS. MEHDIPOUR:  Mr. Shraiberg --

3                   MR. WINDERMAN:  He's not --

4                   MS. MEHDIPOUR:  Mr. Shraiberg, I'm happy to

5   share on the screen the schedules that were amended at

6   Docket Entry 78, if you'd like to continue asking any

7   questions.

8                   MR. SHRAIBERG:  Oh, thank you,

9   Madam Trustee.

10                  Actually, I think we should -- yeah, that

11  would be perfectly fine.

12                  MS. MEHDIPOUR:  Okay.

13                  MR. SHRAIBERG:  Thank you.

14                  MS. MEHDIPOUR:  Is everyone able to see

15  these schedules?

16                  MR. SHRAIBERG:  I see it perfectly.

17                  MS. MEHDIPOUR:  Okay.  I'll scroll for you

18  if you would like me to.

19                  MR. SHRAIBERG:  Thank you.

20                  MS. MEHDIPOUR:  I'm happy to do that,

21  Mr. Shraiberg.

22  BY MR. SHRAIBERG:

23         Q.   Mr. Zankl, these are your amendments, the

24  amendment to your bankruptcy schedules.  Do you recognize

25  them?  It says Docket Entry 78 across the top, Page 1 of

1    31.

2            A.      I need to get closer to see it.

3                    Yes, I see it.

4            Q.      Now, this is the actual amendment to your

5    bankruptcy schedules, correct?

6            A.      I don't know.

7                    MR. WINDERMAN:  We'll stipulate that they

8    were the amendments that were filed last night.

9    BY MR. SHRAIBERG:

10           Q.      And these amendments, you were not under the

11   same time crunch that you previously testified to with

12   regard to your original schedules, correct?

13           A.      Not a time crunch, but I did not have access

14   to the documents until just recently.

15                   MR. SHRAIBERG:  Madam Trustee, can you jump

16   to Page 31?

17                   MS. MEHDIPOUR:  Certainly.

18   BY MR. SHRAIBERG:

19           Q.      Do you see Part 14 on Page 31 of 31 of

20   Docket Entry 78, do you see that signature and declaration

21   section?

22           A.      Am I supposed to be looking for my

23   signature?

24           Q.      Do you see this section?

25                   MR. WINDERMAN:  We'll stipulate that he

1   didn't physically sign the document, that because of the

2   time it was typed in.

3   BY MR. SHRAIBERG:

4        Q.   Did you authorize your attorney to sign on

5   your behalf?

6        A.   Yes.

7        Q.   There isn't a wet signature from you any

8   place?  You never physically signed this document?

9        A.   It looks to me like it's typed in there,

10   that's typed, can you see it?  It looks like it's typed.

11            MR. WINDERMAN:  And the declaration was, the

12   declaration was filed just now, and it was physically

13   signed.

14   BY MR. SHRAIBERG:

15        Q.   So, you had signed these amendments under

16   penalty of perjury, correct?

17        A.   Yes, that's what you keep saying, yes.

18        Q.   Well, I don't want to keep saying it.  I'm

19   asking you if you have signed these amendments?

20        A.   Yes, you've asked me that question four or

21   five times, yes.

22            MR. SHRAIBERG:  All right.  If you can go

23   back to Page 1?

24            Thank you.

25   BY MR. SHRAIBERG:

1        Q.    Mr. Zankl, you didn't file any type of a

2    declaration with these schedules stating that the

3    information may not be accurate, correct?

4        A.    I don't know if I did that or didn't do

5    that.

6        Q.    You don't know?

7        A.    No.

8        Q.    Part 1, it says cash and cash equivalent,

9    does the debtor have any cash or cash equivalent, you said

10   no.  Is that a guess, or is that true?

11       A.    No, that's true, Brad Salado (phonetic),

12   yes, that's true.

13       Q.    Part 2, deposits and prepayments,

14   Question 6, does the debtor have any deposits or

15   prepayments, you checked no.  Is that a guess or is that

16   accurate?

17       A.    That was put in there, it wasn't a guess,

18   but it was answered, the question in there.  That's

19   something that has not been amended, but I would -- to

20   answer that question a hundred percent, the accounting

21   stuff, I don't believe that there is any deposits or

22   prepayments from Excell.  I know years ago there would

23   have been for Excell, but I don't believe after '21 there

24   is deposits or prepayments, no.

25       Q.    So you say you don't believe.  What would

Page 185

1    you look at to know for certain?

2        A.    The accounting software in Dealertrack.

3        Q.    And you don't have access to this?

4        A.    No, sir, I don't.

5        Q.    Do you have any written communication to the

6    trustee requesting access so you can fill out your

7    bankruptcy schedules accurately and truthfully?

8        A.    Yes, we do.

9        Q.    Did you file any type of a caveat with the

10   Bankruptcy Court stating that this is to the best of your

11   knowledge because there is a lack of documentation?

12       A.    I would have to ask my attorney that.  I

13   didn't file anything, no.

14       Q.    And you certainly didn't sign anything

15   before you signed these schedules under penalty of

16   perjury, correct?

17       A.    I don't believe so.

18       Q.    You don't believe so or, no, you did not?

19       A.    I'm answering the question, I don't believe

20   I did.  I don't know for sure.

21            MR. SHRAIBERG:  So, if we can go to Page 2,

22   please?

23            MS. MEHDIPOUR:  Mr. Shraiberg, sure.  I gave

24   you control, you should be able to --

25            MR. SHRAIBERG:  Oh, thanks.

Page 186

1            MS. MEHDIPOUR:  So you can navigate through.

2    Let me know if it works.  There you are, excellent.

3            MR. SHRAIBERG:  Did it work?  It's not --

4    oh, now it's working, perfect.

5    BY MR. SHRAIBERG:

6        Q.    Part 3, accounts receivable.  Does the

7    debtor have any accounts receivable?  You answered yes.

8    Was that a guess, or is that accurate?

9        A.    I don't know, it has -- Excell does have

10   receivables, yes.

11       Q.    I didn't hear you, what?

12       A.    It has receivables, yes.

13       Q.    Question 11, 90 days old or less, you listed

14   zero.  Is that a guess or is that accurate?

15       A.    No, that actually -- over 90 days old,

16   doesn't it have -- what is that, 140 --

17       Q.    It says 90 days old or less?

18       A.    Is that Number 11?

19       Q.    11A?

20       A.    Well, it does have receivables.  As far as

21   the age of the receivables, I know that the Excell Auto

22   Sport and Service, its receivables are older than 90 days,

23   and it's just over a million dollars, but that's on here

24   somewhere.

25       Q.    Request 11B, you wrote over 90 days old, you

1    put the exact number of $148,000.  So, that number is not

2    accurate?

3            A.    No, that's not accurate.

4            Q.    And, once again, this is the amendment to

5    your bankruptcy schedules, correct?

6            A.    I think it is.  I'm not sure if this is or

7    isn't.  I think it is.

8            Q.    Docket Entry 78, Page 2 of 31.  If your

9    receivables are over a million dollars, why did you list

10   them at 148,000?

11           A.    Well, there should be another section on

12   here.  I know it was listed.  Is there another receivable

13   section on here?

14           Q.    Let me ask it a different way.  Do you know

15   what an account receivable is?

16           A.    Yes, it's money owed.

17           Q.    When asked for a list of accounts receivable

18   over 90 days old, you put the face amount at $148,000.

19   Did you understand that question?

20           A.    What I'm trying to tell you is there should

21   be another section on here that's got the receivable from

22   the other company, the service shop, that's over -- it's

23   over a million dollars.

24           Q.    Well --

25           A.    I don't see it on here, but that -- I know

Page 188

1   it's on here, I put it on there.

2          Q.    So, 148,000 is wrong, correct?

3          A.    Yes, it should be that, plus the million

4   dollars from the service shop.

5          Q.    But the number -- so then the million

6   dollars from the service shop is an intercompany

7   receivable.  This 148,000, what is that made up of, what

8   is it comprised of?

9          A.    Without seeing the backup, I don't -- I

10  believe that this 148,000 is something that I just

11  discovered, that I referenced earlier when I was in the

12  office with the trustee going through the records, that I

13  came upon three customers that owe Excell money, and I

14  believe that that's what that 148,000 is, is those three

15  customers that I just discovered, I don't know the

16  timeframe.  I mean, I think I was with the trustee, I'd

17  say it was within the last 10 days maybe, I'm not sure

18  exactly, but I discovered this with her in the office, and

19  she reminded me to make sure that I put it on the

20  schedules, which we did.

21         Q.    There are three customers that owe Excell

22  money, is that a guess, or is that the exact amount?

23         A.    No, no, that's the amount.

24         Q.    And the total face amount is $148,000, or is

25  that a guess?

1          A.     No, that's the amount, because actually the

2     trustee has the files that show exactly what's owed.

3          Q.     Part 4, investments, does the debtor own any

4     investments?  You checked no.  Is that a guess, or is that

5     accurate?

6          A.     No, that's accurate.

7          Q.     Part 5, Page 3 of 31, does the debtor --

8     inventory, excluding agriculture assets, Question 18, does

9     the debtor own any inventory, you checked, no.  Was that a

10    guess or is that accurate?

11         A.     That's accurate.

12         Q.     I'm sorry?

13         A.     That's accurate.

14         Q.     Part 6, farming and fishing-related assets,

15    Question 27.  Does the debtor own or lease any farming or

16    fishing-related assets, you checked, no.  Is that

17    accurate, or was that a guess?

18         A.     That's accurate.

19         Q.     Part 7, office furniture, fixtures,

20    Question 38, does the debtor own or lease any office

21    furniture, fixtures, equipment, or collectibles, you

22    checked, no.  Is that a guess, or is that accurate?

23         A.     No, that should be accurate.

24         Q.     It should be accurate?

25         A.     Yes, because at one time it did, but at the

Page 190

1    time of the filing of the bankruptcy, there were things

2    that were in Excell, furniture and fixtures that Karma

3    bought.  So it should have been -- the answer should be

4    no, that should be correct.

5         Q.   Is the sale of the furniture, fixtures and

6    equipment that you just referenced listed on your

7    bankruptcy schedules as a sale to Karma?

8         A.   No, I don't see anywhere to put that on

9    here.

10        Q.   Do you remember giving that information to

11   your attorney?

12        A.   Not the dollar amount but, yes, I did tell

13   -- yes, because I didn't know the dollar amount either.

14        Q.   You don't know what the dollar amount was?

15        A.   No, that would have been the girls in the

16   office.

17        Q.   Did you ask one of the girls in the office?

18        A.   No, because they -- I didn't have any

19   contact with them when I filled this out.

20        Q.   But you were filing your schedules under

21   penalty of perjury.

22        A.   Well, the employees didn't get their last

23   two weeks of pay, so they weren't communicating with me

24   and answering their phone.  So I didn't have access, a way

25   of finding that out.

Page 191

1          Q.   Earlier you testified that you didn't know

2    the balance of certain creditors, you gave your best

3    guess, correct?

4               MR. WINDERMAN:  He didn't call it a guess,

5    and I'm beginning to get tired of you calling things

6    guesses when you know that they're not.  It's a bad faith

7    question on your part.

8    BY MR. SHRAIBERG:

9          Q.   What would you like me to use, Mr. Zankl?

10              MR. WINDERMAN:  He's already testified as to

11   what he did.

12              MR. SHRAIBERG:  I'm asking Mr. Zankl.

13   BY MR. SHRAIBERG:

14         Q.   Mr. Zankl, what word would you like me to

15   use to substitute for the word "guess"?

16         A.   Best recollection.  I mean, I really don't

17   know what word to use.

18         Q.   Perfect.

19              You used your best recollection to come up

20   with the number, the amount that was owed to particular

21   creditors if you don't have the exact balance, correct?

22         A.   Yes.

23         Q.   Why didn't you use your best recollection as

24   to what you sold the FF&E to an insider company for?

25         A.   Well, I'm looking at this Question Number 7,

Page 192

```
1    what you're referring to is, does the debtor own or lease
2    any office furniture, fixtures, equipment, or
3    collectibles.  It doesn't reference there, did I sell it
4    or transfer it.  It just asks if it owns it.  At the time
5    of the filing --
6           Q.    Well, we'll get to that question.  All I
7    asked was does it list anywhere on your schedules whether
8    you had that sale?
9           A.    I'm answering Number 38, you asked me the
10   question, did it own or lease any office furniture,
11   fixtures, equipment, or collectibles, the answer is no, on
12   Number 38, that is true.
13          Q.    Fair enough.  We'll get there when we get
14   there.
15                Part 8, machinery, equipment and vehicles,
16   Question 46, does the debtor own or lease any machinery,
17   equipment or vehicles.  You answered, yes.  Is that your
18   best recollection, or is that true?
19          A.    No, that's true.
20          Q.    Question 47 -- oh, I'm sorry, general
21   description, net book value of the debtor's interest,
22   valuation method used, and current value, that's blank.
23   Why?
24          A.    Because there isn't -- there is not a -- the
25   question is net book value of debtor's interest, it's not
```

Page 193

1    available, I don't how to -- I wouldn't know where to find

2    the net book value.  I wasn't just going to put a number

3    in there.  There is no way for me to find the book value.

4            Q.    You're not going to put a book value of

5    what?  The first question is the general description.

6            A.    No, no, you said Question 47, right?

7            Q.    46, you'll see it says general description,

8    include year, make, model and identification number.

9            A.    Well, it says it right down there,

10   Number 47.

11           Q.    Okay.  For 47.1, 2 and 3, which is what you

12   list for automobiles, vans, trucks, and motorcycles, is

13   that a best recollection, or is that, after it, as to all

14   the company owned at the time of filing?

15           A.    Yes, that should be accurate, yes.

16           Q.    Question 48, watercraft, trailers, motors

17   and related accessories, you list two Jet Skis.  Is that a

18   best recollection, or is that accurate?

19           A.    The Jet Skis are correct.

20           Q.    Current value of $20,000, is that best

21   recollection, or is that accurate?

22           A.    No, I mean, that's just -- I don't think --

23   they're used Jet Skis.  That was just a valuation that I

24   got from a -- actually from a Jet Ski dealership, that

25   said what they would pay for them.

Page 194

1          Q.    Which one?

2          A.    I'm sorry?

3          Q.    Which one?

4          A.    What do you mean, which one?

5          Q.    What Jet Ski dealership did you get a

6     valuation of $20,000 from?

7          A.    Riva Motor Sport.

8          Q.    I didn't hear you?

9          A.    Riva Motor Sport.

10         Q.    R-i-v-a?

11         A.    Yes.

12         Q.    Do you remember who you spoke with there?

13         A.    No, I don't.

14         Q.    How did you come up with the current

15    debtor's value -- the value of the debtor's interest as to

16    Question 47, for the three items listed there?

17         A.    On the Peterbilt and the box truck, I called

18    a place where we bought the vehicles from to get an

19    estimation on what they would pay for the vehicles.

20         Q.    Who did you call -- you're breaking up?

21         A.    The company that we bought the trucks from.

22         Q.    Who was that?

23         A.    It's called TLC.

24         Q.    Where are they located?

25         A.    Pompano Beach, Florida.

Page 195

1          Q.     Who did you speak with there?

2          A.     I don't recall the guy's name.  I think his

3    name is Mike.  I don't recall.

4          Q.     2019 Mercedes Sprinter, that's a truck?

5          A.     It's a -- yeah, it's a Mercedes-Benz

6    Sprinter, it's a -- it is a, it's a truck, it's a large

7    SUV that carries people and stuff.

8          Q.     Skipping down, aircraft and accessories, you

9    list none.  Is that a best recollection, or is that true?

10         A.     That's true.

11         Q.     Question 50, other machinery, fixtures, and

12   equipment, you list service shop equipment.  Is that a --

13   well, and it has a value of $1 million.  How did you come

14   up with the $1 million number?

15         A.     We actually have a receivable, which I think

16   my attorney, we sent it over last night to update it,

17   which it's only updated through 7 of '21.  It's more than

18   that now, that we sent over last night, but it's in our

19   accounting software, on the Dealertrack side, it shows

20   exactly what's owed back to itself from the service shop.

21   It's in the accounting software, and it's all in the bank

22   statements, too.

23         Q.     I don't understand that answer.

24                How did you come up with the value of the

25   service shop equipment at exactly $1 million?

Page 196

1          A.    Because that's the money that Excell has

2    bought equipment, tools, computers, equipment for the

3    shop, as well as money that Excell loaned to the service

4    shop as well on top of that.

5          Q.    What's the loan part, this is a list of hard

6    assets.  What do you mean by, when you gave a loan?

7          A.    Well, it's all the money that's owed from

8    the service shop back to Excell.

9          Q.    So this is a receivable?

10         A.    That's what it is, isn't it?

11               MR. WINDERMAN:  That's the million dollar

12   receivable that he was talking about.  We really didn't

13   know how to classify it.  He has an ownership interest --

14   or Excell has an ownership interest in the hard assets

15   that are at the auto body shop, and we questioned whether

16   we should establish it as a receivable, or as a hard asset

17   ownership.  We're happy to take either interpretation that

18   the trustee would want to take if she pursues the -- when

19   she pursues the claim.

20   BY MR. SHRAIBERG:

21         Q.    Okay.  Other than a million dollar

22   intercompany receivable, does the debtor own any other

23   machinery, fixtures, or equipment?

24         A.    No, just that.

25         Q.    Question 52, there is a deprecation schedule

Page 197

1  available for any of the property listed in Part 8, and

2  you listed, no.  Is that a best recollection, or is that

3  true?

4          A.    No, that part is true.

5          Q.    53, has any of the property listed in Part 8

6  been appraised?  You said, no.  Is that a best

7  recollection, or is that true?

8          A.    No, that's true.

9          Q.    Part 9, real property, you list, none.  Is

10 that accurate -- I'm sorry, is that a best recollection,

11 or is that true?

12                And for the record it says, does the debtor

13 own or lease any real property?  You said, none.

14         A.    When you reference real property, you're

15 meaning, like, real estate, that's what that means, real

16 property?  Yes, it didn't own any real property.  It did

17 have a lease.

18         Q.    So, 54 is not true, correct?

19         A.    It had a lease with 1001 Clint Moore Road.

20         Q.    My question is, Question 54 is not accurate,

21 correct?

22         A.    No, we're going to have to amend that.

23                MR. WINDERMAN:  It no longer has a lease.

24 How would you like us to amend it?

25 BY MR. SHRAIBERG:

Page 198

1        Q.    Part 10, tangible and intellectual property,

2   Question 59, does the debtor have any interest in any

3   tangible or intellectual property?  You said, no.  Is that

4   a best recollection, or is that true?

5        A.    That's true.

6        Q.    Excell doesn't have a customer list or a

7   mailing list?

8        A.    I mean, that's a great question.  I wasn't

9   part of the -- I mean, I don't know the answer to that,

10  actually.  The customer list, mailing list, I don't know

11  if the girls kept that.

12       Q.    How about a website, a domain name and a

13  website?

14       A.    It doesn't anymore, no, it was shut down.

15       Q.    At the time of filing did it have a web --

16       A.    No, it was shut down.  No, it was shut down.

17       Q.    But it doesn't have a domain name?

18       A.    I don't believe so anymore, no.  When we

19  shut it down, I don't think so.

20       Q.    Do you keep any of your customers' personal

21  identifiable information?

22       A.    An example, as far as what?

23       Q.    Well, you didn't list anything.  My question

24  is, is that answer true and correct?  You had an attorney

25  representing you at the time you filled out these

Page 199

1    schedules.  Do you not know what that means?

2           A.    Which one are you referring to?

3           Q.    Question 67, which is at the top of Page 7

4    of 31 of Docket Entry 78.

5           A.    Does your list of records include personally

6    identifiable information of customers.  Yes, we had -- we

7    are required for the DMV to hold files for seven years.

8           Q.    But you didn't list that you possess that

9    information, did you?

10          A.    Well, actually I didn't have possession of

11   it.

12          Q.    That's not what the question asks.

13          MR. WINDERMAN:  Is that a question?

14   BY MR. SHRAIBERG:

15          Q.    Correct?

16          A.    I'm sorry, what?

17          Q.    That question doesn't ask whether you are in

18   possession of that list.  It says does the debtor's list

19   or records include personally identifiable information of

20   customers, correct?

21          A.    There was records, yes, they were in the

22   building, yes.

23          Q.    And you didn't inform the court that you had

24   that information, correct?

25          MR. WINDERMAN:  That's incorrect.

Page 200

1                    MR. WERNICK:  It's not marked no or yes,
2       there is nothing there.
3                    MR. WINDERMAN:  All those documents were in
4       the possession of the trustee from day one of this
5       bankruptcy.
6                    MR. SHRAIBERG:  I'm talking about the
7       bankruptcy schedules, sir.  It's not listed in your
8       bankruptcy schedules.
9                    MR. WINDERMAN:  We're working on them.
10      We'll get them right yet.
11                   MR. SHRAIBERG:  Mr. Winderman, please let
12      the witness answer.
13                   MR. WINDERMAN:  Why don't you move along?  I
14      mean, it's almost 2 o'clock.  You've had more time than
15      the trustee at this point.  You had an opportunity to ask
16      questions before.  At this point if he has to go through
17      every single one of his schedules, we're going to be here
18      all night.
19                   MR. FURR:  Just for the --
20                   MS. MEHDIPOUR:  Mr. Winderman,
21      Mr. Winderman.
22                   MR. WINDERMAN:  Yes, Ms. Trustee.
23                   MS. MEHDIPOUR:  You received a $25,000 fee
24      to file that Chapter 7 case.  These schedules --
25                   MR. WINDERMAN:  That's correct.

Page 201

1              MS. MEHDIPOUR:  These schedules should have

2    been in order, accurate, and correct when they were filed

3    on the 8th of April.

4              Mr. Shraiberg will continue down this line

5    of questioning.

6              MR. MILLER:  Just for the record,

7    Madam Trustee, I agree, I believe Mr. Shraiberg should be

8    allowed to continue to go along this line.  He's doing a

9    very good job, and I'm a creditor, I represent creditors,

10   I am here to listen.

11             MR. MOON:  And I'll third that, please,

12   proceed.

13             MS. MEHDIPOUR:  Thank you.

14             MR. SHRAIBERG:  Thank you.

15   BY MR. SHRAIBERG:

16        Q.    Part 11, all other assets, Question 70, does

17   the debtor own any other assets that have not yet been

18   reported on this form?  You checked, no.  Is that your

19   best recollection, or is that true?

20        A.    The only thing -- well, the leases I didn't

21   have.  I mean, I was out of the building.  That would be

22   the only thing, but it doesn't have a lease anymore, that

23   would be the only thing, the lease in the building, but

24   it's not -- it wasn't there after April 8th, the company,

25   when I filled this out, I wasn't allowed access, so --

Page 202

1   but, no, there is nothing else.

2          Q.    Question 74, you list an overpayment to Spin

3   Capital/HighBar, do you see that?

4          A.    Yes.

5          Q.    Do you have a right to sue anyone else?

6          A.    I'm sorry?

7          Q.    Does the company have a right to sue anyone

8   other than Spin Capital and HighBar?

9                MR. WINDERMAN:   Other than the receivables

10  already listed?

11  BY MR. SHRAIBERG:

12         Q.    Sure.

13         A.    Well, this says been filed, right?

14         Q.    Nope, it says specifically whether or not a

15  lawsuit has been filed.

16         A.    And your question is if Excell has any other

17  rights to sue anybody else, is that what you're saying?

18         Q.    Correct.

19         A.    Yes, there would be other lawsuits that

20  Excell could file after filling this out.  Yes, there

21  could be.

22                MR. WINDERMAN:  Are there?

23                THE WITNESS:  Are there?  There is not any

24  current lawsuits that Excell has filed against anybody,

25  but there --

BY MR. SHRAIBERG:

Q. This is an important question. Is it possible for you to go closer to the microphone?

MR. WINDERMAN: The microphone is over here.

Can you make the screen a little bit larger? That's why he's moved away from the microphone.

MR. SHRAIBERG: I won't ask him -- yes, that's fine, but I won't ask him about this document at the moment.

BY MR. SHRAIBERG:

Q. You said that there is an ability for this company to sue someone other than HighBar. What other causes of action? It doesn't matter if they brought them, or if it's brought the cause of action yet or not, who else can this company sue? Would do you believe has wronged this company?

A. Well, the current receivables that are owed that we discovered, that Excell could sue those for sure.

Q. Anyone else?

A. Yes, some of the people, yeah, some of the guys that I'm in debt to, I could sue them.

Q. For what and who?

A. Well, I'm not a lawyer, so I don't know for sure.

Q. Who do you think? We're not asking for your

1    legal opinion.

2          A.    I'm not going to guess, so let's move on.

3          Q.    Well, it looks like you guessed for some of

4    the other questions.  This is an actual question on your

5    bankruptcy schedules, you listed only one party that this

6    company has a right to sue.

7                MR. WINDERMAN:  That's not true.  We have

8    listed the receivables.

9                MR. SHRAIBERG:  The question, causes of

10   action against third parties, it's Question 74, whether or

11   not a lawsuit has been filed?  And by the way, if this is

12   not clear, Question 75 will wrap it all together, which is

13   listed, which nothing is listed to, other contingent and

14   unliquidated claims or causes of action of every nature,

15   including counterclaims of the debtor, and rights to

16   setoff claims.

17   BY MR. SHRAIBERG:

18         Q.    So my question is, you've only listed one,

19   Spin Capital/HighBar.  I don't know if that's the best

20   recollection, or if that is an actual true statement.  Who

21   else can this company sue?  Who do you believe?

22         A.    That's the best recollection.

23         Q.    Just one, nothing else?

24         A.    I'm not a lawyer, so I don't know who I can

25   sue or I can't sue.

Page 205

```
 1              Q.    Clients come to lawyers saying, I think I've
 2     been wronged, do I have any right to be sued -- to sue
 3     someone?  We, all the lawyers here are asking you right
 4     now, do you think you have the ability of suing someone?
 5              A.    I mean, you can sue anybody, I guess, right?
 6              Q.    Right.  Who do you think you could sue?
 7                    MR. WINDERMAN:  On behalf of Excell Auto.
 8                    THE WITNESS:  I could say anybody.
 9     BY MR. SHRAIBERG:
10              Q.    For what, start listing?
11              A.    I don't have anyone specific.
12                    MR. WINDERMAN:  Then the answer is you don't
13     know.
14                    THE WITNESS:  I don't have anyone specific.
15     BY MR. SHRAIBERG:
16              Q.    So there is nobody else to the best of your
17     recollection?
18              A.    I don't have anyone specific to mention at
19     this time.
20              Q.    When you say "specific", what is confusing
21     you?
22                    MR. WINDERMAN:  There is nothing confusing
23     him.
24                    MR. SHRAIBERG:  I have a question pending.
25                    MR. WINDERMAN:  He answered your question.
```

Page 206

1               MR. SHRAIBERG:  There is a question pending.

2      BY MR. SHRAIBERG:

3               Q.    You said "nothing specific".  What's

4      general, give me a premise.

5               A.    I don't know.

6               Q.    So does that mean nothing?

7               A.    No, I don't know at this time.  It could

8      change tomorrow, it could change in an hour, I don't know.

9               Q.    So, then is the answer to Question 74

10     inaccurate?

11              A.    Well, it's accurate at this time, when I

12     filled it out.

13                    Are you stating that if when I filled this

14     out I could never, ever sue anybody after that?

15              Q.    I'm asking you.

16              A.    That's what I'm asking, at the time this was

17     filled out, that answer was correct.

18                    THE WITNESS:  I need to take a break.

19                    MR. WINDERMAN:  Give me five minutes,

20     Bradley, is that okay?

21                    MR. SHRAIBERG:  That's fine.

22                    THE WITNESS:  I'm taking a break.

23                    MR. WINDERMAN:  Just so you know, I have a

24     hard stop at 2:30.

25                    MS. MEHDIPOUR:  Thank you, Mr. Winderman,

1    we're aware of that.

2                   MR. WINDERMAN:  Okay.  I didn't know if he

3    was.  I know you are.

4                   (Thereupon, a recess was had, after which

5    the following proceedings were had:)

6                   MS. MEHDIPOUR:  Okay.  Good afternoon.

7                   I understand there is just a few more

8    minutes left here.

9                   Mr. Zankl, would you confirm for me that you

10   understand that are you still under oath?

11                  THE WITNESS:  Yes, I am.

12                  MS. MEHDIPOUR:  Okay.  Thank you.

13                  Mr. Shraiberg, go ahead.

14                  MR. SHRAIBERG:  Thank you.

15                  I'm going to wrap up going through the

16   schedules and the Statement of Financial Affairs after one

17   more thing that I'd like to look at.

18   BY MR. SHRAIBERG:

19        Q.    Your amendments that you filed last night

20   did not amend your entire bankruptcy schedules.  It only

21   amended a few of them.

22                  One that wasn't amended was Schedule --

23   excuse me, Schedule H, a list of your co-debtors, which is

24   found at Page 19 of 36, of Docket Entry 36.

25                  Now, you may recall during my original

Page 208

1    presentation, and Mr. Harvey's presentation, you were

2    asked a question as to whether you personally --

3    personally guaranteed our client's loans.  Do you remember

4    that?

5            A.    I remember the question, yeah.

6            Q.    And you were also asked whether your wife

7    personally guaranteed those loans as well, correct?

8            A.    Yes.

9            Q.    And whether the affiliate Karma companies

10    personally guaranteed -- or corporately guaranteed those

11    loans, do you remember that?

12            A.    Yes.

13            Q.    And your answer to both of us is, I don't

14    know, I would have to see the documents to answer that one

15    hundred percent, correct?

16            A.    Yes.

17            Q.    And, once again, the original schedules that

18    you filed, just like your amendments, were done so under

19    penalty of perjury, correct?

20            A.    Yes.

21            Q.    And you reviewed the information within the

22    schedules prior to signing them, correct?

23            A.    Well, these amended ones, I -- yes.

24            Q.    That's a yes?

25            A.    Yes.

Page 209

1         Q.    And even the original ones, you reviewed

2    them before signing them, correct?

3         A.    Yes.

4         Q.    And even the original schedules, you had

5    access to an attorney to ask any questions to, correct?

6         A.    Correct.

7         Q.    And you would be able to ask those questions

8    before signing, correct?

9         A.    Yes.

10        Q.    If you'd look at Page 19 of 36 of Docket

11   Entry 36, which are your original bankruptcy schedules, do

12   you see that?  It's on the screen, it says Schedule H,

13   co-debtors.  Do you see the document?  That's all I'm

14   asking.

15        A.    Yes, yes, I see the document.

16        Q.    And this is Schedule H that you signed under

17   penalty of perjury, that you stated that the information

18   within it is true and accurate under penalty of perjury?

19        A.    Yeah.

20        Q.    And this schedule asks that you list any

21   debt where there is a guarantor or another obligor on that

22   debt or obligation, correct?

23              And I'm not trying to trick you.  You can

24   see it as to Question Number 1, does the debtor have any

25   co-debtors, you answered, yes, right?

Page 210

1            A.    Yes.

2            Q.    And you listed a co-debtor, and that would

3    be with regard to the creditor Auto Wholesale Boca, right?

4            A.    Yes, it's on there.

5            Q.    And you stated that both you and your wife

6    personally guaranteed that debt, correct?

7            A.    Yes.

8            Q.    As well as Karma of Palm Beach, Inc.,

9    correct?

10           A.    Yes.

11           Q.    Now, just to be clear, because the name of

12   the creditor, Auto Wholesale of Boca, is only listed as to

13   you, personally.  Next to Karma Palm Beach, which is found

14   at Line 2.2, and Kristin, at Line 2.3, that creditor is

15   not carried down.  Do you see that?

16           A.    Yes, I do.

17           Q.    Is it safe to assume, though, that that is

18   the creditor for the three of you jointly and severally?

19           A.    Yes.

20           Q.    But on this list of co-debtors -- on this

21   list of co-debtors that was done under penalty of perjury,

22   you list no other creditors, correct?

23           A.    Correct.

24           Q.    So, by definition you have not personally

25   guaranteed any other debts, correct?

1          A.    Well, to the best of the information I had

2     when I did this, that's what I put.

3          Q.    Oh, so this is best of recollection as well,

4     not accurate?

5          A.    It's the best recollection I have, yes,

6     without the documents.

7          Q.    How come under this penalty of perjury,

8     under your schedules, you were willing to be best of

9     recollection, but today in the 341, you have to be one

10    hundred percent certain?

11          MR. WINDERMAN:  Argumentative at best.

12    You'll have your chance at a 2004.

13    BY MR. SHRAIBERG:

14          Q.    Please answer the question.

15          A.    The difference is, once again, like I said,

16    when this was filled out, this was filled out from the

17    original day that it was filled out, and I was told that

18    it's a process, the normal process, it's normally done

19    that these can be amended and updated throughout the

20    process, and that that's a normal practice.  I don't know

21    for sure but that's what I've been told, it's normal to be

22    able to update your schedules if there is an error, if

23    there is something you did by mistake, whatever, that you

24    can update them.

25               Today, when you're asking me the questions,

Page 212

1    I don't have a chance to update or change that.  So I want

2    to be a hundred percent accurate when I'm answering the

3    questions today.

4              When I did this, I was instructed that I

5    could amend it or change it, it was allowed.  I can't

6    change my answer today when you ask me a question.  So I

7    want to be a hundred percent accurate.

8              MR. SHRAIBERG:  I have no further questions

9    today.  I'll reserve the rest for the 2004.

10             MS. MEHDIPOUR:  Thank you, Mr. Shraiberg.

11             At this time I am going to conclude the

12   meeting.  I thank all of you for attending, and there will

13   be communication from my office as to the coordination of

14   a 2004 Exam.  So thank you all.  Mr. Zankl, thank you.

15             MR. MOON:  Madam Trustee?

16             MS. MEHDIPOUR:  Yes, Mr. Moon, please.

17             MR. MOON:  Just a question about the

18   recording.

19             MS. MEHDIPOUR:  Yes.

20             MR. MOON:  I'm sure a lot of us are going to

21   want a copy of it.

22             MS. MEHDIPOUR:  Yes.

23             MR. MOON:  Just let us know, I guess, when

24   that's available.

25             MS. MEHDIPOUR:  Absolutely, I will do so.

Page 213

1              Thank you, Mr. Moon.

2              MR. MOON:  Thank you.

3              MS. MEHDIPOUR:  All right.  Have a nice

4  (inaudible) --

5              UNIDENTIFIED:  Thank you.

6              MS. MEHDIPOUR:  -- everyone.  Thank you.

7              MR. SHRAIBERG:  Have a great weekend.

8

9

10

11              (Thereupon, the 341 Meeting of Creditors was

12  concluded.)

13

14

15

16

17

18

19

20

21

22

23

24

25

Page 214

1

2                        CERTIFICATION

3

4    STATE OF FLORIDA        :

5    COUNTY OF MIAMI-DADE     :

6

7              I, Cheryl L. Jenkins, RPR, RMR, Shorthand

8    Reporter and Notary Public in and for the State of Florida

9    at Large, do hereby certify that the foregoing Section 341

10   Meeting of Creditors was transcribed by me from a digital

11   recording made on the date and at the place as stated in

12   the caption hereto on page 1; that the foregoing

13   computer-aided transcription is a true record to the best

14   of my ability of said proceedings.

15             WITNESS my hand this 27th day of May, 2022.

16

17

18             _____

19             CHERYL L. JENKINS, RPR, RMR

20             Court Reporter and Notary Public
          in and for the State of Florida at Large
21             Commission #HH 170910
               December 27, 2025

22

23

24

25