**IN THE UNITED STATES BANKRUPTCY COURT**
**FOR THE SOUTHERN DISTRICT OF FLORIDA**
**WEST PALM BEACH DIVISION**

| | |
|---|---|
| IN RE: | Case No. 22-12790-EPK |
| EXCELL AUTO GROUP, INC., | Chapter 7 |
| Debtor. | |

**MOTION FOR ENTRY OF AN ORDER**
**MODIFYING THE AUTOMATIC STAY TO THE EXTENT APPLICABLE**

> **Hearing Requested Before September 20, 2022**
>
> Movant respectfully requests a hearing before September 20, 2022 on the relief requested to advance an argument in a matter pending in the New Jersey appellate division stemming from an Excell creditor's attempt to replevin a vehicle sold to movant by non-debtor, Karma Palm Beach, LLC. Movant requests a hearing before this date to properly prepare its arguments on appeal.

Luxury Lease Company ("LLC"), by and through undersigned counsel, move the Court for entry of an Order (the "Motion") finding that the automatic stay imposed by 11 U.S.C. § 362 does not apply to a direct, non-generalized alter ego argument advanced by LLC on appeal in an action pending in the Appellate Division of the Superior Court of New Jersey– Bergen County styled *Chapford Specialty Finance, LLC v. Luxury Auto Collection, LLC, et al.,* Docket No. AM-0742-21 (the "NJ Appeal"). In support of the Motion, LLC states as follows:

**Jurisdiction, Venue, Core Matter, Statutory and Procedural Predicate**

1.      This Court has jurisdiction over the parties and subject matter pursuant to 28 U.S.C. §§ 157 and 1334.

2.      Venue is proper pursuant to sections 28 U.S.C §§ 1408 and 1409.

3.      This is a core proceeding pursuant to 28 U.S.C. §157(b)(2).

4.      The statutory basis for this Motion is section 362 of Title 11 of the United States Code, 11 U.S.C. §§ 101 *et seq.* (the "Bankruptcy Code").   The procedural predicate for the

requested relief sought herein is Rule 4001 of the Federal Rules of Bankruptcy Procedure (the "Bankruptcy Rules") and Rule 4001-1 of the Local Rules of the United States Bankruptcy Court for the Southern District of Florida.

**Background**

5.     On April 8, 2022 (the "Petition Date") Excell Auto Group, Inc. ("Excell" or "Debtor") filed a voluntary petition for relief under chapter 7 of the Bankruptcy Code. Trustee was appointed thereafter.

6.     Prior to the petition date LLC purchased Lamborghini Aventador SVJ 63, VIN ZHWUM6ZD5KLA08766 (the "Vehicle") from Karma Palm Beach LLC ("Karma PB"). LLC is currently in possession of Vehicle in New Jersey.

7.     Unbeknownst to LLC, prior to the Karma PB/LLC transaction, Excell purportedly transferred Vehicle to Karma PB for no consideration.

8.     Also unbeknownst to LLC, Chapford purports to hold a lien on the Vehicle pursuant to a UCC-1 filed against Excell.

9.     In furtherance of enforcing tis lien, Chapford brought an action in NJ state court to replevy the Vehicle – thereby initiating the action pending in Superior Court of New Jersey Law Division – Bergen County styled *Chapford Specialty Finance, LLC v. Luxury Auto Collection, LLC, et al*., Docket No. BER-L-2856-22 (the "NJ Action").

10.     LLC countersued seeking a declaration of its rights in the Vehicle as superior to Chapford.

11.     The Court presiding over the NJ Action (the "NJ Court") conducted a hearing on the competing petitions. At the conclusion of the hearing, it issued a memorandum opinion finding that LLC was a buyer in the ordinary course, but that pursuant to section 9-320 of the UCC, LLC

did not take the Vehicle free of Excell's creditors. Attached as Exhibit "1" is a true and correct copy of the NJ Court's memorandum opinion.

12.    The NJ Court ignored several basic principles of commercial law in reaching the foregoing conclusion and LLC is presently seeking appeal from the ruling.

13.    On appeal, the NJ Appeals Court granted a preliminary stay of the replevin order and is considering a permanent stay (pending the outcome of the appeal). LLC believes that its initial brief on the underlying merits of the appeal is due in the next thirty (30) days.

14.    As part of its argument on appeal, LLC intends to argue that even assuming the NJ Court's interpretation of section 9-320 of the UCC is correct (it is not), for purposes of this transaction (and only this transaction), Karma PB is the alter ego of Excell (the "Alter Ego Argument").

15.    Specifically, LLC intends to argue the following facts concerning the Karma PB/LLC transaction that were either advanced by Chapford in the NJ Action or learned in Rule 2004 discovery conducted by Chapford in this bankruptcy case:

a.    Chapford argued that it entered into a Loan and Security Agreement with Excell on February 18, 2022, for $1,900,000, to obtain floor plan financing, of which Excell still owed $1,100,000.

b.    Pursuant to this agreement, Chapford argued that Excell granted Chapford a security in all of Excell's inventory.

c.    Chapford asserted Excell used the floor plan financing to purchase the Vehicle.

d.    Subsequently, Excell then "sold" the Vehicle to Karma PB.

e.    Chapford admitted Karma PB was the record title holder of the Vehicle at the time LLC purchased the Vehicle from Karma PB.

f.  The Vehicle purchase documentation delivered from Karma PB to LLC, including the title and bill of sale, did not reflect the Chapford lien on the Vehicle.

g.  Specifically, the title did not contain any lien information.  Rather, under the "1st Lienholder" designation on the Title, it stated "None."

h.  However, the Karma PB documents concerning the Vehicle (the "deal jacket") reflected money was owed to Chapford as lien holder as exhibited by a Post-it note on the cover stating, "Floored w/Chapford".

i.  Excell and Karma are owned by the same individuals, Kristen and Scott Zenkl.

j.  Nidia Leiva, the office manager for Excell, testified that the Vehicle purchase transaction between Excell and Karma PB was intercompany, meaning Karma PB and Excell would show on their accounts payable and receivable the transaction but no actual funds were exchanged between the entities.

k.  Alana Bailey testified that she worked for both Excell and Karma PB and that her duties for Excell and Karma were exactly the same.  These duties included title and tag work for customers. Ms. Bailey testified that she signed the bill of sale between Excell and Karma PB for the Vehicle on behalf of Excell as well as the bill of sale and title to transfer ownership from Karma PB to LLC, but this time on behalf of Karma. Ms. Baily further testified that Excell created the deal jacket containing all documents concerning the three transactions.

l.  Besides sharing deal jackets for this transaction, Karma PB and Excell shared email addresses and signature blocks on email correspondence with LLC.  For example, LLC would not complete its purchase until it received a copy of the title from Karma PB.  The copy of the title in Karma PB's name was actually forwarded from

Ms. Bailey at Excell to Scott Zenkl.   Ms. Bailey's signature block for this transaction shows both companies on her signature bock.

16.     The net effect of a ruling on the Alter Ego Argument in favor of LLC would mean that LLC, as a buyer in the ordinary course, would take the Vehicle free of Chapford's purported lien.

17.     The argument is limited to the Karma PB/LLC transaction and is remedial only; i.e., it is not seeking a claim against the Excell bankruptcy estate, but merely an alternative argument as to why LLC has superior interest to Chapford in the Vehicle stemming from a transaction involving exclusively non-debtors (Karma PB and LLC).

18.     Prior to the filing of this Motion, undersigned counsel conferred with Trustee regarding the relief requested and Trustee advised that she does not consent and that she was concerned regarding the preclusive effect of such LLC's argument on the bankruptcy estate. LLC attempted to resolve the issue, but as of the date of this filing, no agreement has been reached.

**Relief Requested**

19.     LLC seeks an Order from this Court granting it relief from the automatic stay, to the extent it applies, to permit it to advance the Alter Ego Argument in the NJ Appeal.

20.     To address concerns raised by the Trustee in connection with the proposed relief, LLC requests that any Order granting such relief clarify that such relief is limited to the Karma PB/LLC transaction such that any ruling in the NJ Action or NJ Appeal not have any estoppel effect on this bankruptcy estate. LLC proposes the following language which has been entered by Courts in this District in similar scenarios: "The automatic stay is modified, to the extent applicable, to permit LLC to advance the Alter Ego Argument as to the Karma PB/LLC transaction only in the NJ Appeal and NJ Action; provided, however, that no finding, conclusion, relief, order,

or judgment obtained by LLC in the NJ Action or NJ Appeal shall have any collateral estoppel, *res judicata*, or any other preclusive or binding effect on the Debtor's estate."

## Basis for Relief Requested

### A.  The Stay Does Not Apply to the Alter Ego Argument or the Non-Debtor Parties

21.     As a preliminary matter, and as a general rule, "the automatic stay protection does not apply in all cases; there are statutory exemptions, and there are non-statutory exceptions." *Dominic's Restaurant of Dayton, Inc. v. Mantia*, 683 F.3d 757, 760 (6th Cir. 2012).

22.     First, it is axiomatic that the automatic stay does not extend to non-debtors. *See Saxby's Coffee Worldwide, LLC v. John Larson et al. (In re Saxby's Coffee Worldwide, LLC)*, 440 B.R. 369, 378 (Bankr. E.D. Pa. 2009) ("The automatic stay of the Bankruptcy Code, 11 U.S.C. § 362(a), applies only to a debtor and may not be invoked by entities such as sureties, guarantors, co-obligors, or others with a similar legal or factual nexus to the ... debtor.")(internal citations and quotations omitted). Nor does the automatic stay prevent actions from proceeding against non-debtor co-defendants of the debtor, either. *See, e.g. Maritime Elect. Co. v. United Jersey Bank*, 959 F.2d 1194, 1205 (3d Cir.1991); *Teachers Ins. & Annuity Ass'n v. Butler*, 803 F.2d 61, 65 (2d Cir.1986) ("It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass non-bankrupt co-defendants."); *Marcus, Stowell & Beye Government Securities, Inc. v. Jefferson Investment Corp.*, 797 F.2d 227, 230 n. 4 (5th Cir.1986) ("The well established rule is that an automatic stay of judicial proceedings against one defendant does not apply to proceedings against co-defendants.").

23.     Here, the automatic does not apply to either the NJ Action, the NJ Appeal, or the Alter Ego Argument. The claims asserted involve non-debtors (Chapford and LLC) and claims to non-estate property (the Vehicle). The Alter Ego Argument is limited in its scope and application.

It does not seek to impose a claim against the Excell bankruptcy estate. Given the proposed limitation and clarification that it shall not have any estoppel effect on the estate, there is no conceivable impact on the Excell bankruptcy estate.

24.     Moreover, the Alter Ego Argument advanced by LLC in the NJ Appeal is a direct claim (as opposed to a generalized one) stemming from the Zankls' fraudulent conduct in the Karma PB/LLC transaction. Therefore, it is not one belonging exclusively to the trustee or the estate. *See Baillie Lumber Co. v. Thompson (In re Icarus Holdings, LLC)*, 391 F.3d 1315, 1317 (11th Cir.2004) ("*Icarus I*") ("in order to bring an exclusive alter ego action under section 541, a bankruptcy trustee's claim should (1) be a general claim that is common to all creditors and (2) be allowed by state law."); *Baillie Lumber Co., LP v. Thompson (In re Icarus Holdings, LLC)*, 413 F.3d 1293, 1295 (11th Cir.2005) ("*Icarus II*") (holding that automatic stay is implicated when alter ego claim is property of the estate). Because the Alter Ego Argument advanced by LLC is direct, as opposed to generalized, the claim is not subject to the automatic stay. *Id*.; s*ee also Brown v. Luboff (In re: Sigma–Tech Sales, Inc.)*, 2016 WL 4224090 (Bankr. S.D. Fla. 2016). Again, the Alter Ego Argument to be advanced by LLC on appeal is not a harm general to creditors of Excell, but rather, specific to the transaction between Karma PB and LLC. *See* ¶ 15, *supra*. Therefore, the claim is not one belonging to the estate and the automatic stay is not implicated.

**B. Cause Exists to Modify the Stay, if Applicable**

25.     If the stay is implicated, parties may seek relief from the stay for cause. Pursuant to section 362(d) of the Bankruptcy Code --

> On request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under section (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay—
> (1) for cause, including the lack of adequate protection of an interest in property of such party in interest;

11 U.S.C. § 362(d).

26.     "Cause" under Bankruptcy Code section 362, is not specifically defined anywhere in the Bankruptcy Code.  By not defining the term, Congress charged the courts with determining what constitutes "cause" to grant relief from the automatic stay.  "The courts have interpreted the language of § 362(d)(1) to include a broad set of circumstances constituting 'cause' for stay relief." *In re Mack*, 347 B.R. 911, 915 (Bankr. M.D. Fla. 2006).  Moreover, the decision to grant relief from the automatic stay is within the discretion of the courts. *See In re Dixie Broad., Inc.*, 871 F.2d 1023, 1026 (11th Cir. 1989).

27.     "Whether cause exists to grant stay relief must be determined on a case by case basis based upon the totality of the circumstances in each particular case. [citations omitted] The 'decision to lift the stay . . . may be reversed only upon a showing of abuse of discretion." *Mack*, 347 B.R. at 915.

28.     As other Courts have noted, where an action is pending prepetition, "Congress envisioned circumstances 'where it would be more appropriate to permit proceedings to continue in their original place of origin when no great prejudice to the bankruptcy estate will result.'" *In re Citrus Tower Blvd. Imaging Center, LLC*, 460 B.R. 334, 339 (Bankr. N.D. Ga. 2011) (quoting *In re Makarewicz*, 121 B.R. 262, 264 (Bankr. S.D. Fla. 1990) and citing S.Rep. No. 989, 95TH CONG., 2ND SESS. 50, U.S.Code Cong. & Admin. News 1978, pp. 5787, 5836).

29.     Here, cause exists to modify the stay, if applicable, to permit LLC to pursue the Alter Ego Argument. Because it is limited in its scope and application, the argument has no perceivable impact on the estate. There is no prejudice to the estate, either. LLC is not seeking to hold the estate liable for any debts of Karma PB stemming from the transaction. Rather, LLC is merely seeking to uphold the benefit of its bargain with the non-debtor entity, Karma PB, as a

buyer in the ordinary course. Finally, if successful on appeal, the relief LLC seeks in the NJ Action is purely equitable in nature. It seeks a declaration that its rights in the Vehicle are superior to that of non-debtor Chapford.

30.     LLC conferred with Trustee prior to the filing of this Motion. The Trustee raised concerns that the relief requested might have preclusive effects on this estate. In order to address these issues, LLC proposes to include the language set forth above in any Order granting the relief requested. LLC will, of course, continue to discuss the matter with Trustee's counsel.

WHEREFORE, for all the foregoing reasons, LLC respectfully requests that the Court enter an Order (i) granting the Motion, (ii) modifying the automatic stay, to the extent it applies, to permit LLC to pursue the Alter Ego Argument in the NJ Appeal and, if necessary, the NJ Action, and (iii) grant such further and other relief as the Court deems just and proper under the circumstances.

Dated: August 26, 2022.

Respectfully submitted,
**STEARNS WEAVER MILLER WEISSLER ALHADEFF & SITTERSON, P.A.**
Museum Tower, Suite 2200
150 West Flagler Street
Miami, Florida 33130
Phone:          (305) 789-3200
Facsimile:      (305) 789-3395

By:  */s/ Eric J. Silver*
        ERIC J. SILVER, ESQ.
        Florida Bar No. 57262
        esilver@stearnsweaver.com
        *Counsel for Benidt Investments/Slinger, LLC*

# EXHIBIT 1

```
                                   SUPERIOR COURT OF NEW JERSEY
                                   LAW DIVISION: CIVIL PART
                                   BERGEN COUNTY
                                   DOCKET NO.: BER-L-2856-22
                                   A.D. # _____
```

CHAPFORD SPECIALTY          )
FINANCE, L.L.C.             )
                           )          TRANSCRIPT
          Plaintiff,       )              OF
                           )            MOTION
      vs.                  )
                           )
LUXURY AUTO COLLECTION,    )
L.L.C., ET AL.,            )
                           )
          Defendants.      )

                    Place: Bergen County Justice Center
                           (Heard Via Zoom)

                    Date: August 12, 2022

BEFORE:

     HONORABLE PETER G. GEIGER, J.S.C.

TRANSCRIPT ORDERED BY:

     ANTHONY E. BUSH, ESQ., (Eckert Seamans)

APPEARANCES:

     JOHN S. MAIRO, ESQ., (Porzio Bromberg & Newman,
     P.C.)
     Attorney for Plaintiff

     ANTHONY E. BUSH, ESQ., (Eckert Seamans)
     Attorneys for defendants

                    Transcriber:  Nitsa Carrozza
                    PHOENIX TRANSCRIPTION
                    796 Macopin Road
                    West Milford, NJ 07480
                    (862)248-0670

                    Audio Recorded
                    Recording Opr: Patrick O'Connor

I N D E X

|                                          | PAGE  |
|------------------------------------------|-------|
| Colloquy re: Housekeeping................ | 3,57  |

ORDER TO SHOW CAUSE:

|                  | PAGE  |
|------------------|-------|
| ARGUMENTS:       |       |
| BY: Mr. Mairo    | 6,37  |
| BY: Mr. Bush     | 21,48 |

|                  | PAGE  |
|------------------|-------|
| THE COURT:       |       |
| Decision         | 51    |

51

1    Lease -- why Chapter (indiscernible) is not applicable

2    here.  They just haven't addressed it.

3          And in terms of whether we're a good faith

4    purchaser for value (indiscernible) Luxury Lease.  We

5    contend that Luxury Lease certainly was a good faith

6    purchaser for value.  They say there's a question of

7    fact preventing the Court from granting our

8    application.  They didn't bother to take any discovery

9    of us in New Jersey, they could, they still can.

10         So that's really the gist of it and why we

11   think that Your Honor should grant the application but

12   it's our application.  But if Your Honor is not

13   inclined to grant the application and allow for limited

14   discovery, we would not be opposed to that either but

15   we would not want an open-ended fishing season with one

16   another, relatively tight time frame.  Any alleged

17   factual disputes can be resolved timely.

18         THE COURT:  All right, thank you, Mr. Bush.

19   The Court has presented to counsel and does so here

20   with respect to the law regarding injunctive relief.

21   The Court has presented in this oral argument and

22   presents now that the seminal case of Crowe versus

23   DeGioia, 90 N.J. 126, 1982 case, is in fact the seminal

24   case.

25         And in Crowe, the New Jersey Supreme Court

1  established four essential criteria that applicants

2  must demonstrate when seeking preliminary injunctive

3  relief: that immediate and irreparable harm will result

4  in the absence of preliminary injunction, that the

5  legal rights underlying the applicant's claims are

6  well-settled, that there is a reasonable probability of

7  success on the merits and a balancing of the relative

8  hardships to the parties weighs in favor of granting

9  the sought relief.  And that the party seeking

10  injunctive relief has the burden to prove each of those

11  Crowe factors by clear and convincing evidence and the

12  Court cites Garden State Equality versus Dow, 216 N.J.

13  314, 2013 case.

14       The courts have, in this state, long

15  recognized that a consideration of a movant's right to

16  injunctive relief is clear and that the doubt -- and

17  doubtless and it lies in the fact that the injunction

18  is a drastic remedy and that is recognized.  The

19  important issue though is that the courts have long

20  recognized that there are exceptions as to where the

21  subject matter of the litigation would be destroyed or

22  substantially impaired if an injunction did not issue.

23       And the courts in some instances have taken a

24  less rigid view of the Crowe factors and that all

25  factors favor injunctive relief when an injunction is

53

1    merely designed to preserve the status quo but

2    irreparable harm.  The threat of immediate and

3    irreparable harm is a necessary precondition to the

4    relief that's being sought and injunctive relief of any

5    sort should not be entered except when necessary to

6    prevent substantial and immediate irreparable harm.

7         And the issue before this Court as it relates

8    to the vehicle and the security interest that this

9    Court finds that Chapford did perfect a security

10   interest pursuant to Article 9.  The vehicle, the

11   Lamborghini in this case, was encumbered with

12   Chapford's lien.  That is clearly presented to this

13   Court.

14        There was no security interest created by

15   Karma's actions here.  Karma being the seller of the

16   vehicle to Luxury.  And the Court finds that the

17   security interest created by Chapford is controlling in

18   this instance as it relates to the vehicle.  There is a

19   secured interest in the vehicle that remained with the

20   vehicle and Chapford, in the eyes of this Court, are a

21   secured creditor that complied with Article 9 of the

22   UCC.  There's nothing presented to this Court to show

23   otherwise.

24        Again, the security interest was not created

25   by Karma.  The seller of the vehicle to Luxury and

54

1   Karma having obtained the vehicle from Excell.  The --

2   the -- as it relates to the issue, the vehicle may not

3   be or was not part of the assets and not part of the

4   banking statements of Excell.

5        The transaction was not even shown by the

6   Excell records of the exchange of funds for the

7   vehicle.  But nevertheless, the Court does find that

8   the Plaintiff here, Chapford, is in fact entitled to

9   possession of the vehicle, of the Lamborghini vehicle,

10   based on the loan documents.  That is what's before the

11   Court and again, I want the record to be clear, the

12   Court finds nothing presented to this Court that

13   indicates that Chapford's security interest was not

14   perfected appropriately or in accordance with UCC

15   Article 9 requirements.

16        The order to show cause on behalf of Chapford

17   in this case is, in fact, granted.  The order to show

18   cause on -- presented to the Court and made to the

19   Court by Luxury is denied.  This Court finds that the

20   Chapford security interest is a first priority security

21   interest in this specific vehicle.  Again, the Court

22   cannot stress enough, there is nothing before the Court

23   to show otherwise.

24        As a result, the defendants are restrained

25   from using, selling or transporting the subject vehicle

55

1    to any other location or use it to secure another

2    vehicle as a trade-in or anything along those lines.

3    This Court will issue a writ of replevin as it relates

4    to the seizure and possession of the 2019 Lamborghini

5    vehicle that bears the 63 number on the side panel of

6    the vehicle.

7         The defendants have actual possession, Luxury

8    has possession, acknowledged possession, of the vehicle

9    and there's no need for them to obtain it from third-

10    parties as they are in possession of the vehicle but

11    the Court will issue the writ of replevin allowing the

12    Plaintiff to and in this case Chapford to obtain

13    possession of the vehicle.  The -- as part of that,

14    this Court authorizes the New Jersey DMV to issue a

15    certificate of ownership as it relates to the vehicle.

16         The Court, in denying the application of

17    Luxury in this matter is that, while counsel has

18    acknowledged that there is no mandated or required --

19    requirement of a purchaser to conduct a UCC search,

20    this is not an ordinary vehicle.

21         This is a -- the Court will classify it as a

22    unique vehicle, maybe one of a kine, however there has

23    been documentation as part of this oral argument, one

24    of 63 vehicles produced, in production or was in

25    production and now, perhaps, only 62 of these vehicles

56

1    remain.  It is a unique vehicle and perhaps the

2    purchaser should have conducted such a search because

3    it was such a unique vehicle or item.

4        The -- Luxury is a buyer in the ordinary

5    course of business here.  The -- the issue of

6    discovery, it is the opinion of this Court that

7    discovery would not or discovery of Luxury

8    representatives, again, would not in any way change

9    anything as it relates to the security interest that

10   was perfected by Chapford and this Court finds, again,

11   that there is a clear, unequivocally clear, that

12   Chapford has a secured interest in the vehicle and

13   should remain or should be in possession of the

14   vehicle.

15       They are a secured creditor that complied

16   with Article 9 and again, I can't stress enough, there

17   is nothing before this Court to shed any doubt on that

18   fact.  And as a result of that fact, the Court is

19   denying the Defendant's order to show cause.  Luxury

20   will not be or is not declared the true and lawful

21   owner of the vehicle as they do not have an interest in

22   the vehicle that is superior to Chapford's interest.

23   And as a result, are not entitled to title of the

24   vehicle or have title issued by New Jersey Motor

25   Vehicle Commission.

57

1          That is the decision of this Court.  Both

2     counsel have done a -- what I find to be a superb job

3     with respect to their presentations, their oral

4     presentations but also their written presentations to

5     this Court.  But that is the decision of this Court.

6     This Court will issue the appropriate form of order and

7     the appropriate writ of replevin shortly, that will be

8     accessed and presented to counsel.  I want to thank

9     counsel, Mr. Mairo, Mr. Bush, thank you gentlemen, have

10    a good rest of the day and a good, safe weekend.

11          MR. BUSH:  Your Honor, Your Honor?

12          MR. MAIRO:  Thank you, Your Honor.

13          THE COURT:  Yes?  Mr. Bush, let me hear Mr.

14    Bush.

15          MR. BUSH:  Your Honor, if I may make one

16    request.

17          THE COURT:  You may, Mr. Bush, go ahead, sir.

18          MR. BUSH:  Your Honor?

19          THE COURT:  Yes.

20          MR. BUSH:  If I may make one request before

21    we get off the phone?

22          THE COURT:  Sure.

23          MR. BUSH:  I would request a stay of

24    enforcement of the order in light of (indiscernible)

25    pending an emergent appeal.

58

1    THE COURT: Mr. Mairo? Mr. Mairo?

2    MR. MAIRO: We would oppose that -- yes, Your

3    Honor, we would oppose that. We believe, you know, the

4    order can be entered by the Court and we should be able

5    to proceed with a writ of replevin. If Mr. Bush wants

6    to file something, he can file something and then I

7    guess we would have an opportunity to respond but I see

8    no basis for anything to be stayed at this juncture.

9    THE COURT: Mr. Bush?

10    MR. BUSH: Your Honor, we're not asking for

11    staying entry of the order, just enforcement of the

12    order.

13    THE COURT: And a stay as to how long?

14    MR. BUSH: Enforcement of the -- in order for

15    us to file an emergent appeal which we would be able to

16    do within the next couple days.

17    THE COURT: I will stay the order, Mr. Bush.

18    I will stay the order for seven days.

19    MR. BUSH: Thank you, Your Honor.

20    THE COURT: The parties are guided

21    accordingly. Again, thank you gentlemen, thank you

22    both. We'll go off the record, 10:35, thank you.

23    MR. BUSH: Thank you.

24    (Proceeding concluded at 10:34:04 a.m.)

25

59

## CERTIFICATION

I, Nitsa Carrozza, the assigned transcriber, do
hereby certify the foregoing transcript of proceedings
on CourtSmart, from timestamp 09:01:47 a.m. to 10:34:04
a.m., is prepared to the best of my ability and in full
compliance with the current Transcript Format for
Judicial Proceedings and is a true and accurate non-
compressed transcript of the proceedings, as recorded.

/s/ Nitsa Carrozza                    AD/T 639
      Nitsa Carrozza                  AOC Number


Phoenix Transcription LLC             08/15/2022
      Agency Name                        Date

# EXHIBIT 2

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Anthony E. Bush, Esq. (N.J. Attorney ID No. #003761990)
*Physical Address:*     2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:*     P.O. Box 5404, Princeton, NJ 08543
Telephone:  (609) 392-2100
Facsimile:  (609) 392-7956
abush@eckertseamans.com
***Attorneys for Defendants, Luxury Lease Company, LLC, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East***

| | |
|---|---|
| CHAPFORD SPECIALTY FINANCE, LLC<br><br>       Plaintiff,<br><br>v.<br><br>LUXURY AUTO COLLECTION, LLC a/k/a LUXURY AUTO COLLECTION EAST; LUXURY LEASE PARTNERS LLC, ABC CORPS. 1-10; and JOHN DOES -10<br><br>       Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.: BER-L-2856-22<br><br><br>Civil Action<br><br>**DEFENDANTS/COUNTERCLAIMANTS' NOTICE OF MOTION IN SUPPORT OF THEIR MOTION FOR RECONSIDERATION** |

**To:**     John S. Mairo, Esq.
           Porzio, Bromberg & Newman, P.C.
           100 Southgate Parkway
           Morristown, NJ 07962

**PLEASE TAKE NOTICE** that on Friday, September 9, 2022, at 9:00 a.m., or as soon thereafter as counsel may be heard, the undersigned attorneys for defendants/counterclaim plaintiffs, Luxury Lease Company, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East, will apply to the Bergen County Superior Court, 10 Main Street, Hackensack, New Jersey, 07601 for an Order granting their motion for reconsideration of this court's August 16, 2022 Orders (1) granting Plaintiff, Chapford Specialty Finance, LLC's ("Plaintiff" or "Chapford") request for a pre-judgment order and writ of replevin of a 2019

Lamborghini Aventador SVJ 63, VIN ZHWUM6ZD5KLA08766 (the "Vehicle") and ordering the New Jersey Motor Vehicle Commission ("NJMVC") to issue a certificate of ownership of the Vehicle consistent with the sale conducted by Chapford as first lien holder and (2) denying LLC's order to show cause seeking declaratory relief that it is the lawful owner of the Vehicle free and clear of all liens and encumbrances and also ordering the NJMVC to issue a certificate of ownership of the Vehicle to LLC;

Movant(s) shall rely upon its memorandum of law and certification of counsel filed with its Motion and any oral argument if heard;

Pursuant to R. l:6-2(d), the undersigned:

( )    Waives oral argument and consents to disposition on the papers;

(√)    Requests oral argument;

( )    Requests oral argument only if opposition papers are timely filed or the Court is inclined to deny this application;

A proposed form of Order is attached.

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Attorneys for Defendant *Luxury Lease Company, LLC and Summit Auto Sales*

Respectfully,

*/s/ Anthony E. Bush*

Dated:  August 22, 2022          ANTHONY E. BUSH, ESQ.

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Anthony E. Bush, Esq. (N.J. Attorney ID No. #003761990)
*Physical Address:* 2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:* P.O. Box 5404, Princeton, NJ 08543
Telephone:   (609) 392-2100
Facsimile:   (609) 392-7956
abush@eckertseamans.com
***Attorneys for Defendants, Luxury Lease Company, LLC, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East***

| | |
|---|---|
| CHAPFORD SPECIALTY FINANCE, LLC <br><br> Plaintiff, <br><br> v. <br><br> LUXURY AUTO COLLECTION, LLC a/k/a LUXURY AUTO COLLECTION EAST; LUXURY LEASE PARTNERS LLC, ABC CORPS. 1-10; and JOHN DOES -10 <br><br> Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.: BER-L-2856-22 <br><br><br> Civil Action <br><br><br> **DEFENDANTS/COUNTERCLAIMANTS' BRIEF IN SUPPORT OF ITS MOTION FOR RECONSIDERATION** |

## I.   PRELIMINARY STATEMENT

Defendants/Counterclaimants,  Luxury Lease Company, LLC, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East ("LLC") submit this brief in support of their motion for reconsideration of this court's August 16, 2022 Orders (1) granting Plaintiff, Chapford Specialty Finance, LLC's ("Plaintiff" or "Chapford") request for a pre-judgment order and writ of replevin of a 2019 Lamborghini Aventador SVJ 63, VIN ZHWUM6ZD5KLA08766 (the "Vehicle") and ordering the New Jersey Motor Vehicle Commission ("NJMVC") to issue a certificate of ownership of the Vehicle consistent with the sale conducted by Chapford as first lien holder and (2) denying LLC's order to show cause seeking

declaratory relief that it is the lawful owner of the Vehicle free and clear of all liens and encumbrances and also ordering the NJMVC to issue a certificate of ownership of the Vehicle to LLC.

In finding for Chapford, the trial court determined Chapford's lien on the Vehicle passed to LLC because Karma of Palm Beach, Inc. ("Karma") did not create the security interest; thereby, the protections afforded to good faith purchasers in N.J.S.A. 12A:9-320 did not apply.  Despite this, the court declared LLC was a good faith purchaser for value, and that LLC was not under an obligation to perform any extra diligence, i.e. a UCC search, to determine whether Chapford perfected a security in the Vehicle prior to LLC's purchase.

Respectfully, this court made an error when it failed to consider N.J.S.A. 12A:2-430, despite LLC raising this statutory argument in its original and reply briefs in support of its own Order to Show Cause on Verified Counterclaims for declaratory judgment to find it the Vehicle's rightful owner.  LLC argued in its briefs and at oral argument that N.J.S.A. 12A:2-430 allows for entities to pass voidable title to other entities free of any security interests.  Neither party disputes Karma never paid Excell Auto Group, Inc. ("Excell") for the Vehicle despite other purchase formalities occurring, including Excell transferring title in name to Karma.  The transferred title did not note Chapford's first party lien on the Vehicle.  Both these actions made the title voidable.

Separately, this court erred when it found N.J.S.A. 12A:9-320 did not apply to LLC's purchase in light of evidence asserted in the moving papers, including Chapford's Oppositions and LLC's reply brief, that Excell and Karma transacted business as if they were one, making them the same entity as a matter of law for purposes of this transaction.  The transaction between Karma and LLC under an alter ego remedy was actually between Excell and LLC.  Because Excell

2

transferred the Vehicle to LLC, the exception in <u>N.J.S.A.</u> 12A:9-320 should apply, and LLC should take the Vehicle free of Chapford's lien as a matter of law.

## II.    **STATEMENT OF FACTS**

1.       On May 25, 2022, Chapford filed an Order to Show Cause with Verified Complaint seeking replevin of the Vehicle and ordering the NJMV to issue a certificate of ownership of the Vehicle consistent with Chapford as first lien holder.  (Chapford OTSC Trans ID: LC2022024434).

2.       Chapford stated it entered into a Loan and Security Agreement with Excell on February 18, 2022, for $1,900,000, to obtain floor plan financing, of which Excell still owed $1,100,000.  (Chapford OTSC Trans ID: LC2022024434, Brief P.2).

3.       Pursuant to this agreement, Excell granted Chapford a security in all of Excell's inventory.  (Chapford OTSC Trans ID: LC2022024434, Brief P.2).

4.       Chapford asserted Excell used the floor plan financing to purchase the Vehicle. (Chapford OTSC Trans ID: LC2022024434, Brief P.2-3).

5.       Subsequently, Excell purchased the Vehicle and then "sold" it to Karma.

6.       Plaintiff admitted Karma was the record title holder of the Vehicle at the time LLC purchased the Vehicle from Karma. (LLC Counterclaim Trans ID: LCV2022293519, Exhibits A and B to Verified Counterclaim).

7.       The Vehicle purchase documentation delivered from Karma to LLC, including the title and bill of sale, did not reflect the Chapford lien on the Vehicle.  (LLC Counterclaim Trans ID: LCV2022293519, Exhibits A and B to Verified Counterclaim).

8.       Specifically, the title did not contain any lien information.  Rather, under the "1st Lienholder" designation on the Title, it stated "None."  (LLC Counterclaim Trans ID: LCV2022293519, Exhibits A and B to Verified Counterclaim).

9.     However, the Karma documents concerning the Vehicle (the "deal jacket") reflected money was owed to Chapford as lien holder as exhibited by a Post-it note on the cover stating, "Floored w/Chapford".  (LLC OTSC Reply Trans ID: LCV20222889610 Bush Cert. ¶3).

10.    The fact Excell and Karma are owned by the same individuals, Kristen and Scott Zenkl, is undisputed.

11.    Nidia Leiva, an employee of Excell, was deposed on June 30, 2022 in the related Bankruptcy proceeding (In Re: Excell Auto Group, Inc., Case No.: 22-12790-EPK, pending in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division).

12.    Chapford attached her deposition transcript to its Opposition to LLC's Order to Show Cause.  (Chapford Opp to LLC OTSC Trans ID: LCV20222810103, Levia Dep).

13.    Leiva, the office manager for Excell, admitted at her deposition that the Vehicle purchase transaction between Excell and Karma was intercompany, meaning Karma and Excell would show on their accounts payable and receivable the transaction **but no actual funds were exchanged between the entities**.  (Chapford Opp to LLC OTSC Trans ID: LCV20222810103, Levia Dep P.32).

14.    Alana Bailey was also deposed on July 9, 2022.  Chapford attached her deposition transcript to its Opposition to LLC's Order to Show Cause.  (Chapford Opp to LLC OTSC Trans ID: LCV20222810103, Bailey Dep).

15.    Bailey admitted in her deposition she worked for both Excell and Karma.  (Chapford Opp to LLC OTSC Trans ID: LCV20222810103, Bailey Dep P.22).

16.    Bailey also stated her duties for Excell and Karma were exactly the same.  These duties included title and tag work for customers.  (Chapford Opp to LLC OTSC Trans ID: LCV20222810103, Levia Dep P.22-23).

4

17.     Bailey testified that for the first four and a half years she worked with the entities, Excell paid her wages.  However, the last year of her employment Karma began paying. (A true and correct copy of an excerpt of Bailey's Deposition Transcript is attached to Anthony Bush's Certification, Exhibit B, P.18).

18.     Bailey also signed the bill of sale between Excell and Karma for the Vehicle on behalf of Excell.  Chapford Opp to LLC OTSC Trans. ID: LCV20222810103, Bailey Dep., pgs. 75-76 and 79.  Bailey then signed the bill of sale and title to transfer ownership from Karma to LLC, but this time on behalf of Karma.  Id. and See also a true and correct copy of Bailey dep. Excerpts attached to the Bush Cert. at Exhibit B pg. 54, 55, 79, and 88-89.

19.     Baily testified that the deal jacket containing all documents concerning all three transactions , Excell's purchase, Excell's subsequent sale to Karma and then Karmas sale to LLC, was created by Excell.   See a true and correct copy of excerpts of Bailey dep. attached to the Bush Cert. at Exhibit B, pg. 45-50.

20.     Besides sharing a single deal jacket for multiple transactions, Karma and Excell shared email addresses and signature blocks on email correspondence.  For example, as noted in the Verified Counterclaim, LLC would not complete its purchase until it received a copy of the title from Karma.  The copy of the title in Karma's name from Karma was actually forwarded from Alana Bailey at Excell to Scott Zenkl.  Bailey's signature block shows both companies on her signature bock. (LLC Counterclaim Trans. ID.: LCV202222253519 at Exh. B).

21.     Bailey testified that she did not know if Excell transacted business in 2022 prior to filing for bankruptcy.  Chapford Opp. To LLC OTSC Trans. ID. LCV202228100103, Bailey Dep. p. 23.

22.     LLC Opposed Chapford's Order to Show Cause along with filing its own Order to Show Cause with Verified Counterclaim on June 20, 2022.  (LLC OTSC Trans ID: LCV20222312567).

23.     LLC's Opposition brief argued <u>N.J.S.A.</u> 12A:2-403 applied to this transaction. Specifically, it argued LLC was a good faither purchaser for value.  LLC further argued even if Excell or Karma possessed voidable title, LLC would still take the Vehicle free of Chapford's lien. (LLC OTSC Trans ID: LCV20222312567 Brief P.11-19).

24.     LLC's Opposition brief also argued LLC should receive the benefit of the exception under <u>N.J.S.A.</u> 12A:9-320.  (LLC OTSC Trans ID: LCV20222312567 Brief P.11).

25.     On August 12, 2022, the trial court heard oral argument on both Orders to Show Cause.

26.     The court provided an oral opinion following oral argument.  (A true and correct copy of August 12, 2022 Oral Transcript attached to Anthony Bush's Certification ¶).

27.     Your Honor held LLC in its transaction with Karma was a "buyer in the ordinary course of business."  (See Transcript P.56)

28.     The opinion also held LLC was not under an obligation to do a UCC-1 search on the Vehicle.  (See Transcript P.55-56).

29.     Your Honor also agreed Excell never paid Karma for the Vehicle. (See Transcript P.54).

30.     Your Honor ultimately held that the exception under <u>N.J.S.A.</u> 12A:9-320 that would allow the Vehicle to pass from LLC without Chapford's lien did not apply as Excell, not Karma, created the security interest.  (See Transcript P.53-54).

6

### III.   LEGAL STANDARD

A motion for reconsideration is governed by Rule 4:49-2, which states:

> Except as otherwise provided by R. 1:13-1 (clerical errors) a motion for rehearing or reconsideration seeking to alter or amend a judgment or order shall be served not later than 20 days after service of the judgment or order upon all parties by the party obtaining it. The motion shall state with specificity the basis on which it is made, including a statement of the matters or controlling decisions which counsel believes the court has overlooked or as to which it has erred, and shall have annexed thereto a copy of the judgment or order sought to be reconsidered and a copy of the court's corresponding written opinion, if any.

The twenty-day time period applies to motions seeking reconsideration on final orders. Rusak v. Ryan Automotive, L.L.C., 418 N.J. Super. 107, 117 n.5 (App. Div. 2011). Here, Your Honor's August 16, 2022 Order has the practical effect of extinguishing claims by virtue of granting pre-judgment final disposition of property.

"Reconsideration is a matter within the sound discretion of the Court, to be exercised in the interest of justice." D'Atria v. D'Atria, 242 N.J.Super. 392, 401 (Law. Div. 1990). Reconsideration can be sought when "1) the Court has expressed its decision based upon a palpably incorrect or irrational basis, or 2) it is obvious that the Court either did not consider, or failed to appreciate the significance of probative, competent evidence." Ibid.

### IV.   LEGAL ANALYSIS

#### A. Karma Passed Voidable Title To LLC Free Of Chapford's Lien

The issue here is what provision of the UCC prevails when N.J.S.A. 12A:9-320 and N.J.S.A. 12A:2-403 are in conflict. See White, Summers & Hillman, UNIFORM COMMERCIAL CODE § 4:35 (6th ed. 2021) (stating "[p]ossible conflict between § 2-430 and sections like § 9-320 is considerable; so beware"). Your Honor found N.J.S.A. 12A:9-320 did not apply but failed

7

to consider whether <u>N.J.S.A.</u> 12A:2-403 extinguished Chapford's lien as to LLC.  LLC raised this

point in its original moving papers and raises it again here.

<u>N.J.S.A.</u> 12A:2-403 states:

> (1) A purchaser of goods acquires all title which the transferor had or
> had power to transfer except that a purchaser of a limited interest
> acquires rights only to the extent of the interest purchased. A person with
> voidable title has power to transfer a good title to a good faith purchaser
> for value. When goods have been delivered under a transaction of
> purchase the purchaser has this power even though
> (a) the transferor was deceived as to the identity of the purchaser, or
> (b) the delivery was in exchange for a check which is later dishonored,
> or
> (c) it was agreed that the transaction was to be a "cash sale", or
> (d) the delivery was procured through fraud punishable under the
> criminal law.
> (2) Any entrusting of possession of goods to a merchant who deals in
> goods of that kind gives the merchant power to transfer all rights of the
> entruster to a buyer in ordinary course of business.
> (3) "Entrusting" includes any delivery and any acquiescence in retention
> of possession regardless of any condition expressed between the parties
> to the delivery or acquiescence and regardless of whether the
> procurement of the entrusting or the possessor's disposition of the goods
> have been such as to be theft under the criminal law.
> (4) The rights of other purchasers of goods and of lien creditors are
> governed by the Chapters on Secured Transactions (Chapter 9) and
> Documents of Title (Chapter 7).

In an identical factual scenario to this matter, the New Jersey Appellate Division found an

individual purchaser who purchased a vehicle from a dealership who received voidable title from

a prior dealer took free from the prior dealer's financing company's security interest.  <u>Focarino v.</u>

<u>Travelers Pers. Ins. Co.</u>, A-4780-14, 2017 N.J. Super. Unpub. LEXIS 1022 (App. Div. April 25,

2017) (A true and correct copy of this case attached to Anthony Bush's Certification as Exhibit

C.)  In <u>Focarino</u>, the Plaintiff purchased a Bentley from Emporio Motor Group, L.L.C. (Emporio).

<u>Id.</u> at *1.  The Plaintiff purchased through a trade-in with cash supplement.  <u>Id.</u> at *1-2.  The

Plaintiff  never received the title from Emporio for the Bentley, and he asked to rescind the

8

transaction, but Emporio refused as it already sold the trade-in.  Id. at *2.  The Plaintiff later learned

for the first time that the Bentley was subject to a lien held by Toyota Motor Credit Corporation

(Toyota).  Ibid.

Emporio obtained the Bentley from James Martin (Martin) via a trade and sale.  Ibid.  As

part of this transaction, Emporio agreed to pay-off Toyota's lien on the Bentley, but Emporio never

paid off the lien.  Id. at *2-3.  Martin filed a theft claim with his insurer, Fidelity.  Id. at *3.  Fidelity

paid off the Toyota lien as part of the theft claim.  Ibid.  Fidelity then obtained the Bentley's title

from Toyota.  Ibid.

The Plaintiff then filed an Order to Show Cause with verified Complaint to restrain Fidelity

from repossessing the vehicle and sought Fidelity to transfer the Bentley's title to the Plaintiff's

name.  Ibid.  Fidelity filed a counter-claim seeking declaratory judgment declaring it the rightful

owner of the Bentley.  Ibid.

The trial judge Ordered Fidelity to turn the title over of the Bentley to the Plaintiff,

determining Martin was the true owner of the Bentley because he possessed and controlled it

despite Toyota's security interest.  Id. at *4.  Specifically, the trial court relied on N.J.S.A. 12A:2-

403(1), finding Martin had delivered the Bentley to Emporio with the intent that Emporio would

become the owner, thus giving Emporio "voidable title to the Bentley."  Ibid. (emphasis added).

Because Emporio held "voidable title, it had the ability to transfer the title."  Ibid.  The trial court

held "despite the interest that Fidelity claimed in the vehicle, a good faith purchaser for value, such

as [the Plaintiff], could cure a voidable title and prevail against other claims, including those by

Martin or Fidelity, thereby 'obtain[ing] clear title free from any claims by third parties."  Id. at *5.

(emphasis added).

The Appellate Division affirmed through an analysis of N.J.S.A. 12A:2-403(1), reasoning the section was applicable to all forms of "purchase[s]." Id. at *7. And that under this provision, "the sale to a good faith purchaser for value cures the defects in the seller's voidable title." Ibid. (quoting Touch of Class Leasing v. Mercedes-Benz Credit of Can., Inc., 248 N.J.Super. 426, 437 (App. Div.), certif. denied, 126 N.J. 390 (1991)).   The court then distinguished "void title" form "voidable title" finding

> voidable title passes to those who lie in the middle of the spectrum that runs from best-faith buyer at one end to robber at the other.  These are buyers who commit fraud, or are otherwise guilty of naughty acts (bounced checks), but who conform to the appearance of a voluntary transaction.
>
> [Ibid. (quoting James J. White, et al., Uniform Commercial Code, § 4:33 at 381 (6th ed. 20212)).]

The Appellate Division ultimately held "[w]here the goods have been obtained through a transaction of purchase and thus, the subsequent seller has voidable title, the title defects can be cured 'through the sale to a good faith purchaser for value[, which] gives the good faith purchaser clear title, free from any claims of third parties.'" Id. at *8-9 (quoting Touch of Class, 248 N.J. Super. at 438) (emphasis added).  Given such, the Plaintiff owned the Bentley free and clear as a good faith purchaser from Emporio, the holder of a voidable title passed to it from Martin.  Id. at *11.

Here, like the Plaintiff in Focarino, Your Honor has already declared LLC a good faith purchaser of value.  Because Karma held voidable title, it could and did pass that title free of Chapford's interest.  This outcome is easier to comprehend when one replaces the Focarino parties with our parties; Fidelity as the lien holder is Chapford, Martin as the original purchaser is Excell, Emporio as the swindler is Karma, and the Plaintiff end purchaser is LLC.  Just like the Plaintiff

in <u>Focarino</u>, LLC should take free and clear of any third-party interests pursuant to <u>N.J.S.A.</u> 12A:2-403.

Florida has come to the same conclusion in a case with a substantially similar fact pattern to our case and <u>Focarino</u>. <u>Carlsen v. Rivera</u>, 382 So.2d 825 (Fla. Dist. Ct. App. 1980). In <u>Carlsen</u>, a leasing agency leased a Mercedes Benz to McEnroe. <u>Ibid.</u> The leasing agency knew McEnroe owned a car dealership. <u>Ibid.</u> McEnroe then fraudulently obtained title to the Mercedes by placing the title in the name of his auto dealership. <u>Ibid.</u> McEnroe then sold the Mercedes to Expo Rent-a-Car, Inc. (Expo), and Expo was able to obtain a facially valid title based on McEnroe's fraudulent registration. <u>Ibid.</u> Expo then sold the car to Marlin Imports, Inc. (Marlin). <u>Ibid.</u> Marlin then sold the car to an individual, Carlsen, who obtained a title free of the leasing agency's interest. <u>Ibid.</u>

The leasing agency brought a replevin action against Carlsen and the other parties were all brought in through respective third-party complaints. <u>Ibid.</u> The trial court found McEnroe stole the vehicle by fraudulently obtaining the title, and therefore, McEnroe never had ownership or title to transfer and as such, the leasing agency was entitled to the Mercedes. <u>Id.</u> at 825-26.

The Appellate Division reversed, citing <u>F.S.A.</u> § 672.403, which mirrors the language of <u>N.J.S.A</u> 12A:2-403. <u>Id.</u> at 826. The court determined McEnroe obtained voidable title to the Mercedes because he lawfully obtained possession of the vehicle through a lease. <u>Ibid.</u> The court then determined McEnroe was a merchant given he was in the business of selling goods—cars. <u>Ibid.</u> In making these findings, the court ultimately held the "purpose of the Uniform Commercial Code [2-403] is to protect the buyer in the ordinary course of business and thus to eliminate impediments to the free flow of commerce." <u>Ibid.</u> <u>See</u> <u>Barco Auto Leasing Corp. v. Holt</u>, 228 N.J. Super. 77, 87 (App. Div. 1988) (citing <u>Carlsen</u> favorably); <u>Adams v. City Nat. Bank & Trust</u>

Co. of Norman, 565 P.2d 26 (Okla. 1994) (holding a bank's security interest in a vehicle was eliminated following the vehicle's sale to a good faith purchaser).

Here, LLC was a good faith buyer with no duty to perform a UCC-1 search on the Vehicle (even if it did perform the search, it would have been revealed nothing as the title LLC possessed had Karma as the record owner with no first lien holder). Excell passed voidable title to Karma when Karma failed to pay Excell for the Vehicle, and when Excell and/or Karma failed to identify Chapford as a lien holder on the Title. These facts were raised by LLC in its original moving papers and at oral argument. New Jersey jurisprudence recognizes even if the exception in N.J.S.A. 12A:9-320 does not apply, the good faith purchaser provision in N.J.S.A. 12A:2-403 does. When Karma passed voidable title to LLC, Chapford's lien was extinguished as related to LLC.

### B. Applying N.J.S.A. 12A:9-320, LLC Takes Title Free of Chapford's Security Interest as Karma And Excell Are Alter Egos.

LLC also argued in its original papers that N.J.S.A. 12A:9-320 does apply to this transaction. This court failed to appreciate the unity of interest and control between Karma and Excell so that they cannot be said to be two separate entities for purposes of this transaction. When alter egos are applied here, the security interest was created by the "buyer's seller"—Excell. The facts which support this alternate legal argument were discovered through Chapford's efforts in the related bankruptcy case and referenced throughout the original moving papers—particularly in Leiva and Bailey's depositions.

N.J.S.A. 12A:9-320 states:

> (a) Buyer in ordinary course of business. Except as otherwise provided in subsection (e), a buyer in ordinary course of business, other than a person buying farm products from a person engaged in farming operations, takes free of a security interest created by the buyer's seller,

even if the security interest is perfected and the buyer knows of its existence.

(b) Buyer of consumer goods. Except as otherwise provided in subsection (e), a buyer of goods from a person who used or bought the goods for use primarily for personal, family, or household purposes takes free of a security interest, even if perfected, if the buyer buys:

(1) without knowledge of the security interest;

(2) for value;

(3) primarily for the buyer's personal, family, or household purposes; and

(4) before the filing of a financing statement covering the goods.

(c) Effectiveness of filing for subsection (b). To the extent that it affects the priority of a security interest over a buyer of goods under subsection (b), the period of effectiveness of a filing made in the jurisdiction in which the seller is located is governed by <u>12A:9-316(a)</u> and (b).

(d) Buyer in ordinary course of business at wellhead or minehead. A buyer in ordinary course of business buying oil, gas, or other minerals at the wellhead or minehead or after extraction takes free of an interest arising out of an encumbrance.

(e) Possessory security interest not affected. Subsections (a) and (b) do not affect a security interest in goods in the possession of the secured party under <u>12A:9-313</u>.

"Alter-ego liability is not a separate cause of action; it is a remedy." <u>N.J. Dep't of Envtl. Rot. Vo Occidental Chem/ Corp.</u>, No. ESX-L-9868-05, 2015 N.J. Super. LEXIS 230, *25 (Law Div. Jan. 13, 2015) (A true and correct copy of this case attached to Anthony Bush's Certification as Exhibit D.)  "Under the alter ego theory, a corporation is not just connected through ownership, but rather, it is legally considered to be the same entity as the second corporation." <u>Columbus LTACH Mgmt., LLC v. Quantum LTACH Holdings, LLC</u>, No. 16-6510, 2018 U.S. Dist. LEXIS 92735, at *13 (D.N.J. May 31, 2018) (citing <u>FDASmart, Inc. v. Dishman Pharm. &  Chems. Ltd.</u>, 448 N.J. Super. 195, 203-04 (App. Div. 2016)).  "The alter ego theory is based on the doctrine of piercing the corporate veil." <u>FDASmart</u>, 448 N.J. Super. at 203.  To pierce the corporate veil, a party must show: "(1) the subsidiary was dominated by the parent corporation, and (2) adherence to the fiction of separate corporate existence would perpetrate a fraud or injustice, or otherwise circumvent the law." <u>Ibid.</u>

### a. Prong One

In analyzing the dominance of one corporation over another, the court considers factors "such as 'common ownership, financial dependency, interference with a subsidiary's selection of personnel, disregard of corporate formalities, and control over the subsidiary's marketing and operational policies.'" Id. at 204 (quoting Pfundsten v. Omnicom Group Inc., 285 N.J. Super. 245, 254-55 (App. Div. 1995).

In OTR Assoc. v. IBC Serv., Inc., 353 N.J. Super. 48, 50 (App. Div. 2002), an analogous fact pattern to this matter, the Plaintiff owned a shopping mall that leased space to a corporation, Samyrna, Inc. (Samyrna), to a Blimpie franchise. The franchise agreement was between Samyrna and a parent company, known as International Blimpie Corporation (Blimpie Corp.). Ibid. Blimpie was the sole owner of a subsidiary named IBC Services, Inc. (IBC), created for the sole purpose of holding the lease on premises occupied by franchises. Ibid. IBC was the entity that entered into the leasing agreement with the Plaintiff. Ibid. IBC then sublet the space to Samyrna. Ibid.

Smyrna defaulted on the lease and the Plaintiff sued Blimpie Corp. and IBC (through an additional entity) for unpaid rent. Id. at 51. The Plaintiff succeeded at trial in obtaining judgment against Blimpie Corp. and IBC. Ibid. Blimpie Corp. appealed the judgments, arguing no liability as to Blimpie Corp. Ibid.

The Appellate Court affirmed. Ibid. The court began by stating alter ego theories apply in contractual settings, and "[i]t is where the corporate form is used as a shield behind which injustice is sought to be done by those who have control of it that equity penetrates the [corporate] veil." Ibid. (internal quotations and citations omitted) (alterations in original).

14

Blimpie Corp. conceded the only reason it formed IBC was to hold the lease.  Ibid.  IBC maintained zero assets except the lease.  Id. at 53.  The court found IBC did not have its "own employees or office staff."  The court further found Blimpie Corp., not IBC, controlled all the leases held by its subsidiaries at its headquarters in Georgia.  Ibid.  Blimpie Corp. and IBC also shared employees, with the president of IBC also being Blimpie Corp. corporate counsel.  Ibid.  Blimpie Corp. also admitted its administrative assistants oversee the lease holds.  Ibid.  Blimpie Corp. further stated IBC did not make a profit.  Ibid.

The undisputed evidence showed Blimpie Corp. dominated IBC.  Ibid.  The court then turned to whether Blimpie Corp. abused its corporate privileges by using IBC to commit a fraud or injustice.  Ibid.  The court again held yes, reasoning IBC held itself out as Blimpie Corp., as exemplified by IBC's correspondences with the Plaintiff that were on Blimpie Corp. stationary.  Id. at 54.  The court reasoned if the Plaintiff knew IBC was a shell corporation, it would have proceeded with more caution.  Ibid.

The court ultimately concluded IBC was created for the single purpose of insulating Blimpie Corp. from any liability if the franchisee defaulted, and, although IBC might have corporate formalities, "in every functional and operation sense, the subsidiary had no separate identity." Id. at 56.[1]

Many of the enumerated badges articulated in FDASmart to identify whether business entities are alter egos are present here; specifically, that Karma and Excell share the same ownership and Karma and Excell disregarded corporate formalities.  OTR enumerated certain

---

[1]  Florida applies a substantially similar analysis.  See Mayer v. Eastwood, Smith & Co., 164 So. 684, 687 (Fla. 1935) (stating "[t]he overwhelming weight of authority is to the effect that courts will look through the screen of corporate entity to the individuals who compose it in cases in which the corporation was a mere device or sham to accomplish some ulterior purpose, or is a mere instrumentality or agent of another corporation or individual owning all or most of its stock, or where the purpose is to evade some statute or to accomplish some fraud or illegal purpose").

factors that are helpful when determining whether a corporate entity disregarded certain formalities and committed an injustice. Those factors were the use of the same letterhead by the two companies, the sharing of employees between the entities, administrative staff of one company performing tasks for the other, and one entity not making a profit.

Here, there is no dispute Karma and Excell share the same ownership. Further, there can be no dispute that the proofs to date show Karma and Excell recognized no boundary between the two entities. Just like Blimpie Corp. and IBC, Karma and Excell shared office staff. They also shared letter head. And, on this Vehicle's deal between Karma and Excell, Karma forwent any profit owed it from the sale.

Moreover, Karma and Excell operated as if there was no difference between the companies. Karma and Excell shared the same deal jacket with all relevant documents despite them being two separate entities. (The deal jacket contained three separate transactions involving the same vehicle, i.e. Excell's initial purchase, Excell's sale to karma and Karma's sale to LLC.) Bailey, a Karma and Excell employee, signed the bill of sale when Excell sold the Vehicle to Karma. She then signed the bill of sale when Karma sold the Vehicle to LLC. The two parties only registered the sale between Karma and Excell on paper. Bailey also testified that Excell and Karma both paid her wages same. She also testified that her job duties under both entities were the exact same and that Excell might have stopped conducting business in 2002 prior to filing for bankruptcy and at the moment she was signing documents on Excell's behalf as if it were functioning in connection with this Vehicle.

### b. Prong Two

The fraud perpetrated by Karma and Excell by acting as two separate entities is best described by this factual scenario. When Excell sold the Vehicle to Karma, it could remove

Chapford's lien on the title, Karma as Excell could then resell the Vehicle without paying out on Chapford's loan.   LLC was subject to an injustice by this scheme because it could not reap the benefits of <u>N.J.S.A.</u> 12A:9-320 due to Karma and Excell's nefarious conduct.

Karma is Excell and Excell is Karma for purposes of the transactions involving this Vehicle.   Because Karma and Excell are indistinguishable, they are the same entity.  As the same entity, the exception under <u>N.J.S.A.</u> 12A:9-320 applies, and the Vehicle must pass to LLC free of Chapford's lien.

## V.    <u>CONCLUSION</u>

For the foregoing reasons, this court should grant LLC's motion for reconsideration; thereby, granting LLC's Order to Show Cause that declares LLC the owner of the Vehicle free of any security interests and orders the New Jersey Motor Vehicle Commission to issue a title recognizing LLC as the Vehicle's rightful owner and vacating its prior order granting a pre-judgement  order and writ of replevin.

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Attorneys for Defendants *Luxury Lease Company, LLC and Summit Auto Sales*

Respectfully,

*/s/ Anthony E. Bush*
ANTHONY E. BUSH, ESQ.

Dated:  August 23, 2022

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Anthony E. Bush, Esq. (N.J. Attorney ID No. #003761990)
*Physical Address:*    2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:*    P.O. Box 5404, Princeton, NJ 08543
Telephone:  (609) 392-2100
Facsimile:  (609) 392-7956
abush@eckertseamans.com
***Attorneys for Defendants, Luxury Lease Company, LLC, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East***

| | |
|---|---|
| CHAPFORD SPECIALTY FINANCE, LLC<br><br>Plaintiff,<br><br>v.<br><br>LUXURY AUTO COLLECTION, LLC a/k/a LUXURY AUTO COLLECTION EAST; LUXURY LEASE PARTNERS LLC, ABC CORPS. 1-10; and JOHN DOES -10<br><br>Defendants. | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.: BER-L-2856-22<br><br>Civil Action<br><br>**ORDER GRANTING DEFENDANTS/COUNTERCLAIMANTS' MOTION FOR RECONSIDERATION** |

**THIS MATTER**, having been opened to the Court by Eckert Seamans Cherin & Mellot, LLC, attorneys for defendants/counterclaim plaintiffs, Luxury Lease Company, improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East (collectively "Counterclaim Plaintiffs"), on its motion for reconsideration; and the court having reviewed the submissions of the parties if any and oral argument if heard; and for good cause having been shown:

**IT IS** on this __ day of _____, 2022;

**ORDERED:**

1.  This court's August 16, 2022 Order granting Chapford Specialty Finance LLC's Order to Show Cause is invalidated;

2.  Counterclaim Plaintiff Luxury Lease Company is the true and lawful bona fide owner of a 2019 Lamborghini Aventador, VIN: ZHWUM6ZD5KLA08766 ("the "Vehicle");

3.  Chapford Specialty Finance LLC's security interest in the Vehicle is unenforceable against Counterclaim Plaintiffs; and

4.  Counterclaim plaintiff Luxury Lease may apply to the New Jersey Motor Vehicle Commission to issue a title to the Vehicle to Counterclaim Plaintiff Luxury Lease Company, pursuant to N.J.S.A. 39:10-16 without any reference to Chapford Specialty Finance LLC's security interest;

**IT IS FURTHER ORDERED** that a copy of this Order shall be served upon all counsel of record and the New Jersey Motor Vehicle Commission within five (5) days of the date of this Order.

_____
Hon. Peter G. Geiger, J.S.C.

Opposed _____

Unopposed _____

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Anthony E. Bush, Esq. (N.J. Attorney ID No. #003761990)
*Physical Address:*     2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:*     P.O. Box 5404, Princeton, NJ 08543
Telephone:   (609) 392-2100
Facsimile:   (609) 392-7956
abush@eckertseamans.com
*Attorneys for Defendants, Luxury Lease Company, LLC, improperly plead as Luxury Lease*
*Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as*
*Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East*

| | |
|---|---|
| CHAPFORD SPECIALTY FINANCE, LLC | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.: BER-L-2856-22 |
| Plaintiff, | |
| v. | Civil Action |
| LUXURY AUTO COLLECTION, LLC a/k/a LUXURY AUTO COLLECTION EAST; LUXURY LEASE PARTNERS LLC, ABC CORPS. 1-10; and JOHN DOES -10 | **CERTIFICATION IN SUPPORT OF DEFENDANTS/COUNTERCLAIMANTS' MOTION OF RECONSIDERATION** |
| Defendants. | |

I, Anthony E. Bush, Esq., of full age, hereby certifies as follows:

1.   I am an attorney in the State of New Jersey and a member of Eckert Seamans Cherin &

Mellot, LLC, which represents Defendants/Counter-Claimants, Luxury Lease Company, LLC,

improperly plead as Luxury Lease Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto

Collection East improperly plead as Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection

East, (collectively "LLC") in the above-captioned action.  As such, I am personally familiar with

the facts set forth herein.

I make this Certification in support of Defendants/Counter-Claimants' Motion for

reconsideration of the court's  August 16, 2022 Orders, granting Plaintiff, Chapford Specialty

Finance, LLC's ("Plaintiff" or "Chapford") request for a pre-judgment order and writ of replevin

of a 2019 Lamborghini Aventador SVJ 63, VIN ZHWUM6ZD5KLA08766 (the "Vehicle") and ordering the New Jersey Motor Vehicle Commission ("NJMVC") to issue a certificate of ownership of the Vehicle consistent with the sale conducted by Chapford as first lien holder and denying LLC's own order to show cause decalring it to be the lawful owner of the vehicle free of all liens.

2. Attached as Exhibit "A" is a true and correct copy of the transcript of the the August 12, 2022 of the oral opinion of the court following argument on both parties orders to show cause.

3. Attached as Exhibit "B" is a true and correct copy of an excerpt from Alana Bailey's Deposition Transcript P.18, 45-50, 54, 55,79 and 88-89 taken by Plaintiff in, In Re: Excell Auto Group, Inc. Case No.: 22-12790 EPK, pending in the United States Bankruptcy Court, Southern District of Florida, West Palm Beach Division.

4. Attached as Exhibit "C" is a true and correct copy of Focarino v. Travelers Pers. Ins. Co., A-4780-14, 2017 N.J. Super. Unpub. LEXIS 1022 (App. Div. April 25, 2017). Defendants/Counter-Claimants are not aware of any contrary decisions.

5. Attached as Exhibit "D" is a true and correct copy of N.J. Dep't of Envtl. Rot. Vo Occidental Chem/ Corp., No. ESX-L-9868-05, 2015 N.J. Super. LEXIS 230, *25 (Law Div. Jan. 13, 2015). Defendants/Counter-Claimants are not aware of any contrary decisions.

I certify that the foregoing statements made by me are true. I am aware that if any of the foregoing statements made by me are willfully false, I am subject to punishment.

By: /s/ Anthony E. Bush

Dated: August 22, 2022                 ANTHONY E. BUSH, ESQ.

# EXHIBIT "A"

```
                                    SUPERIOR COURT OF NEW JERSEY
                                    LAW DIVISION: CIVIL PART
                                    BERGEN COUNTY
                                    DOCKET NO.: BER-L-2856-22
                                    A.D. # _____
```

CHAPFORD SPECIALTY )
FINANCE, L.L.C. )
 ) TRANSCRIPT
     Plaintiff, ) OF
 ) MOTION
   vs. )
 )
LUXURY AUTO COLLECTION, )
L.L.C., ET AL., )
 )
     Defendants. )

                    Place: Bergen County Justice Center
                           (Heard Via Zoom)

                    Date: August 12, 2022

BEFORE:

    HONORABLE PETER G. GEIGER, J.S.C.

TRANSCRIPT ORDERED BY:

    ANTHONY E. BUSH, ESQ., (Eckert Seamans)

APPEARANCES:

    JOHN S. MAIRO, ESQ., (Porzio Bromberg & Newman,
    P.C.)
    Attorney for Plaintiff

    ANTHONY E. BUSH, ESQ., (Eckert Seamans)
    Attorneys for defendants

                    Transcriber:  Nitsa Carrozza
                    PHOENIX TRANSCRIPTION
                    796 Macopin Road
                    West Milford, NJ 07480
                    (862)248-0670

                    Audio Recorded
                    Recording Opr: Patrick O'Connor

2

<u>I N D E X</u>

                                                    <u>PAGE</u>
Colloquy re: Housekeeping.........................3,57

<u>ORDER TO SHOW CAUSE:</u>

<u>ARGUMENTS:</u>                                        <u>PAGE</u>
BY: Mr. Mairo                                        6,37
BY: Mr. Bush                                         21,48

<u>THE COURT:</u>                                        <u>PAGE</u>
Decision                                            51

51

Lease — why Chapter (indiscernible) is not applicable
here.  They just haven't addressed it.

And in terms of whether we're a good faith
purchaser for value (indiscernible) Luxury Lease.  We
contend that Luxury Lease certainly was a good faith
purchaser for value.  They say there's a question of
fact preventing the Court from granting our
application.  They didn't bother to take any discovery
of us in New Jersey, they could, they still can.

So that's really the gist of it and why we
think that Your Honor should grant the application but
it's our application.  But if Your Honor is not
inclined to grant the application and allow for limited
discovery, we would not be opposed to that either but
we would not want an open-ended fishing season with one
another, relatively tight time frame.  Any alleged
factual disputes can be resolved timely.

THE COURT:  All right, thank you, Mr. Bush.
The Court has presented to counsel and does so here
with respect to the law regarding injunctive relief.
The Court has presented in this oral argument and
presents now that the seminal case of Crowe versus
DeGioia, 90 N.J. 126, 1982 case, is in fact the seminal
case.

And in Crowe, the New Jersey Supreme Court

52

1     established four essential criteria that applicants

2     must demonstrate when seeking preliminary injunctive

3     relief: that immediate and irreparable harm will result

4     in the absence of preliminary injunction, that the

5     legal rights underlying the applicant's claims are

6     well-settled, that there is a reasonable probability of

7     success on the merits and a balancing of the relative

8     hardships to the parties weighs in favor of granting

9     the sought relief.  And that the party seeking

10    injunctive relief has the burden to prove each of those

11    Crowe factors by clear and convincing evidence and the

12    Court cites Garden State Equality versus Dow, 216 N.J.

13    314, 2013 case.

14          The courts have, in this state, long

15    recognized that a consideration of a movant's right to

16    injunctive relief is clear and that the doubt -- and

17    doubtless and it lies in the fact that the injunction

18    is a drastic remedy and that is recognized.  The

19    important issue though is that the courts have long

20    recognized that there are exceptions as to where the

21    subject matter of the litigation would be destroyed or

22    substantially impaired if an injunction did not issue.

23          And the courts in some instances have taken a

24    less rigid view of the Crowe factors and that all

25    factors favor injunctive relief when an injunction is

1    merely designed to preserve the status quo but

2    irreparable harm.  The threat of immediate and

3    irreparable harm is a necessary precondition to the

4    relief that's being sought and injunctive relief of any

5    sort should not be entered except when necessary to

6    prevent substantial and immediate irreparable harm.

7          And the issue before this Court as it relates

8    to the vehicle and the security interest that this

9    Court finds that Chapford did perfect a security

10    interest pursuant to Article 9.  The vehicle, the

11    Lamborghini in this case, was encumbered with

12    Chapford's lien.  That is clearly presented to this

13    Court.

14          There was no security interest created by

15    Karma's actions here.  Karma being the seller of the

16    vehicle to Luxury.  And the Court finds that the

17    security interest created by Chapford is controlling in

18    this instance as it relates to the vehicle.  There is a

19    secured interest in the vehicle that remained with the

20    vehicle and Chapford, in the eyes of this Court, are a

21    secured creditor that complied with Article 9 of the

22    UCC.  There's nothing presented to this Court to show

23    otherwise.

24          Again, the security interest was not created

25    by Karma.  The seller of the vehicle to Luxury and

54

1    Karma having obtained the vehicle from Excell.  The

2    the -- as it relates to the issue, the vehicle may not

3    be or was not part of the assets and not part of the

4    banking statements of Excell.

5         The transaction was not even shown by the

6    Excell records of the exchange of funds for the

7    vehicle.  But nevertheless, the Court does find that

8    the Plaintiff here, Chapford, is in fact entitled to

9    possession of the vehicle, of the Lamborghini vehicle,

10   based on the loan documents.  That is what's before the

11   Court and again, I want the record to be clear, the

12   Court finds nothing presented to this Court that

13   indicates that Chapford's security interest was not

14   perfected appropriately or in accordance with UCC

15   Article 9 requirements.

16        The order to show cause on behalf of Chapford

17   in this case is, in fact, granted.  The order to show

18   cause on -- presented to the Court and made to the

19   Court by Luxury is denied.  This Court finds that the

20   Chapford security interest is a first priority security

21   interest in this specific vehicle.  Again, the Court

22   cannot stress enough, there is nothing before the Court

23   to show otherwise.

24        As a result, the defendants are restrained

25   from using, selling or transporting the subject vehicle

55

to any other location or use it to secure another
vehicle as a trade-in or anything along those lines.
This Court will issue a writ of replevin as it relates
to the seizure and possession of the 2019 Lamborghini
vehicle that bears the 63 number on the side panel of
the vehicle.

The defendants have actual possession, Luxury
has possession, acknowledged possession, of the vehicle
and there's no need for them to obtain it from third-
parties as they are in possession of the vehicle but
the Court will issue the writ of replevin allowing the
Plaintiff to and in this case Chapford to obtain
possession of the vehicle.  The -- as part of that,
this Court authorizes the New Jersey DMV to issue a
certificate of ownership as it relates to the vehicle.

The Court, in denying the application of
Luxury in this matter is that, while counsel has
acknowledged that there is no mandated or required --
requirement of a purchaser to conduct a UCC search,
this is not an ordinary vehicle.

This is a -- the Court will classify it as a
unique vehicle, maybe one of a kine, however there has
been documentation as part of this oral argument, one
of 63 vehicles produced, in production or was in
production and now, perhaps, only 62 of these vehicles

56

1 remain.  It is a unique vehicle and perhaps the

2 purchaser should have conducted such a search because

3 it was such a unique vehicle or item.

4   The -- Luxury is a buyer in the ordinary

5 course of business here.  The -- the issue of

6 discovery, it is the opinion of this Court that

7 discovery would not or discovery of Luxury

8 representatives, again, would not in any way change

9 anything as it relates to the security interest that

10 was perfected by Chapford and this Court finds, again,

11 that there is a clear, unequivocally clear, that

12 Chapford has a secured interest in the vehicle and

13 should remain or should be in possession of the

14 vehicle.

15   They are a secured creditor that complied

16 with Article 9 and again, I can't stress enough, there

17 is nothing before this Court to shed any doubt on that

18 fact.  And as a result of that fact, the Court is

19 denying the Defendant's order to show cause.  Luxury

20 will not be or is not declared the true and lawful

21 owner of the vehicle as they do not have an interest in

22 the vehicle that is superior to Chapford's interest.

23 And as a result, are not entitled to title of the

24 vehicle or have title issued by New Jersey Motor

25 Vehicle Commission.

57

1          That is the decision of this Court.  Both

2    counsel have done a -- what I find to be a superb job

3    with respect to their presentations, their oral

4    presentations but also their written presentations to

5    this Court.  But that is the decision of this Court.

6    This Court will issue the appropriate form of order and

7    the appropriate writ of replevin shortly, that will be

8    accessed and presented to counsel.  I want to thank

9    counsel, Mr. Mairo, Mr. Bush, thank you gentlemen, have

10   a good rest of the day and a good, safe weekend.

11          MR. BUSH:  Your Honor, Your Honor?

12          MR. MAIRO:  Thank you, Your Honor.

13          THE COURT:  Yes?  Mr. Bush, let me hear Mr.

14   Bush.

15          MR. BUSH:  Your Honor, if I may make one

16   request.

17          THE COURT:  You may, Mr. Bush, go ahead, sir.

18          MR. BUSH:  Your Honor?

19          THE COURT:  Yes.

20          MR. BUSH:  If I may make one request before

21   we get off the phone?

22          THE COURT:  Sure.

23          MR. BUSH:  I would request a stay of

24   enforcement of the order in light of (indiscernible)

25   pending an emergent appeal.

58

THE COURT:  Mr. Mairo?  Mr. Mairo?

MR. MAIRO:  We would oppose that -- yes, Your Honor, we would oppose that.  We believe, you know, the order can be entered by the Court and we should be able to proceed with a writ of replevin.  If Mr. Bush wants to file something, he can file something and then I guess we would have an opportunity to respond but I see no basis for anything to be stayed at this juncture.

THE COURT:  Mr. Bush?

MR. BUSH:  Your Honor, we're not asking for staying entry of the order, just enforcement of the order.

THE COURT:  And a stay as to how long?

MR. BUSH:  Enforcement of the -- in order for us to file an emergent appeal which we would be able to do within the next couple days.

THE COURT:  I will stay the order, Mr. Bush.  I will stay the order for seven days.

MR. BUSH:  Thank you, Your Honor.

THE COURT:  The parties are guided accordingly.  Again, thank you gentlemen, thank you both.  We'll go off the record, 10:35, thank you.

MR. BUSH:  Thank you.

(Proceeding concluded at 10:34:04 a.m.)

59

1                            CERTIFICATION

2

3          I, Nitsa Carrozza, the assigned transcriber, do

4     hereby certify the foregoing transcript of proceedings

5     on CourtSmart, from timestamp 09:01:47 a.m. to 10:34:04

6     a.m., is prepared to the best of my ability and in full

7     compliance with the current Transcript Format for

8     Judicial Proceedings and is a true and accurate non-

9     compressed transcript of the proceedings, as recorded.

10
11     /s/ Nitsa Carrozza                    AD/T 639
12          Nitsa Carrozza                   AOC Number
13
14
15     Phoenix Transcription LLC              08/15/2022
16          Agency Name                       Date
17

# EXHIBIT "B"

1

```
1                   UNITED STATES BANKRUPTCY COURT
                    SOUTHERN DISTRICT OF FLORIDA
2                     WEST PALM BEACH DIVISION


3
      IN RE:
4
      EXCELL AUTO GROUP, INC.,
5
                                    CHAPTER 7
6       Debtor.                     CASE NO. 22-12790-EPK

7     _____/

8
          IN THE CIRCUIT COURT OF THE 11TH JUDICIAL CIRCUIT
9               IN AND FOR MIAMI-DADE COUNTY, FLORIDA

10    CHAPFORD SPECIALTY FINANCE,
      LLC,
11                                  CASE NO:
        Plaintiff,                  SUPERIOR COURT OF NEW JERSEY
12                                  LAW DIVISION - BERGEN COUNTY
      vs.                           DOCKET NO: BER-L-2856-22
13
      LUXURY AUTO COLLECTION, LLC,
14    a/k/a LUXURY AUTO COLLECTION
      EAST; LUXURY LEASE PARTNERS
15    LLC, ABC CORPS. 1-10; and
      JOHN DOES - 10,
16
        Defendant.
17    _____/

18
                      DEPOSITION OF ALANA BAILEY
19
                    (Conducted Via Videoconference)
20

21    DATE TAKEN:          July 9, 2022

22    TIME:                9:04 a.m. to 12:30 p.m.

23                         Pages 1 - 170
```

24

25

2

1    PURSUANT TO:    Notice by counsel for
2                  Chapford Specialty for purposes of
                    discovery, use at trial or such
3                  other purposes as are
                    permitted under the Florida Rules
4                  of Civil Procedure

5    BEFORE:        Denise Smith Byer, RPR, FPR
                    Notary Public, State of
6                  Florida

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

3

1  APPEARANCES:

2  JAMES C. MOON, ESQUIRE
   Meland Budwick, P.A.
3  200 S. Biscayne Boulevard
   Suite 3200
4  Miami, Florida 33131
       Attorney for Creditor Chapford Credit Opportunities
5  Fund LP

6  HARRY WINDERMAN, ESQUIRE
   Weiss, Handler & Cornwell, P.A.
7  2255 Glades Road
   Suite 205E
8  Boca Raton, Florida 33431
       Attorney for Creditor Excell Auto Group, Inc., and
9  Karma of Palm Beach and Karma of Broward, Inc.

10 ALAN R. CRANE, ESQUIRE
   Furr & Cohen P.A.
11 2255 Glades Road
   Suite 419A
12 Boca Raton, Florida 33431
       Special Counsel for United States Bankruptcy Trustee
13
   ANTHONY BUSH, ESQUIRE
14 Eckert Seamans Cherin & Mellott, LLC
   Gateway IV, Suite 401
15 100 Mulberry Street
   Newark, New Jersey 07102
16     Attorney for Creditor Luxury Lease and Summit Auto
   Sales
17
   MARC BRANDES, ESQUIRE
18 Kurkin Forehand Brandes LLP
   18851 NE 29th Avenue
19 Suite 303

```
         Miami, Florida 33180
20           Attorney for Creditor Luxury Lease

21       JOHN MAIRO, ESQUIRE
         CHRISTOPHER MAZZA, ESQUIRE
22       Porzio, Bromberg & Newman
         100 Southgate Parkway
23       P.O. Box 1997
         Morristown, New Jersey 07962
24           Attorneys for Chapford Specialty Finance and Chapford
         Credit Opportunities
25
```

4

```
1        APPEARANCES:  (Continued)

2        JASON S. RIGOLI, ESQUIRE
         Furr and Cohen, P.A.
3        2255 Glades Road
         Suite 419A
4        Boca Raton, Florida 33431
             Attorney for United States Bankruptcy Trustee
5
         JERRELL A. BRESLIN "JERRY", ESQUIRE
6        Baron, Breslin & Sarmiento
         The DuPont Building
7        169 E. Flagler Street
         Suite 700
8        Miami, Florida 33131
             Attorney for FVP Opportunity Fund, IIIC, LP
9
                          I N D E X
10
```

```
         DIRECT EXAMINATION BY MR. MOON           9
11       CROSS-EXAMINATION BY MR. BUSH          149
         CERTIFICATE OF OATH                    167
12       CERTIFICATE OF REPORTER                168
         READ & SIGN LETTER                     169
13       ERRATA PAGE                            170
```

```
14

15

16

17
```

13     Q.   Anyone else?

14     A.   Scott.

15     Q.   Okay.  Would Kristen?

16     A.   Maybe.  Kristen was not involved until

17  the very end.

18     Q.   Okay.  When Excell Auto or Karma of Palm

19  Beach seeked to purchase a car, would you have any

20  involvement with doing due diligence on the car

21  that they're seeking to purchase?

22     A.   No.

23     Q.   Do you have any knowledge of whether

24  Luxury Lease was made aware that this Lamborghini

25  was financed with a loan from Chapford on

45

1  February 18th, 2022?

2     A.   I don't know that.

3     MR. MOON:  Okay.  Madam Reporter, please

4     mark as Exhibit 8 for identification this

5     document, which I will represent for the

6     record is Bates-stamped Trustee 6332.

7     (Exhibit 8 was marked for identification.)

8  BY MR. MOON:

9     Q.   Ms. Bailey, I'm showing you what's been

10  marked as Exhibit 8.  There's going to be multiple

11      documents in it, but I would just ask you as we're

12      looking at the first couple of pages, do you

13      understand what we're looking at?  Do you

14      recognize it?

15           A.   I do.

16           Q.   And what is it?

17           A.   A deal jacket for a sale.

18           Q.   Okay.  And now I'm going to be nice to

19      all of us and flip around when I can what we're

20      looking at.

21                Let's just go page by page.  But what

22      does this front page tell us?

23           A.   When a salesman tells me to print a deal,

24      I grab one of those folders and write the bare

25      minimum information and then proceed with printing

                                              46


1       paperwork.  So that's the deal jacket for a car

2       sold.

3            Q.   Is this your handwriting (indicating) --

4            A.   It is.

5            Q.   -- on the deal jacket?

6            A.   It is.

7            Q.   So you wrote this?

8            A.   Yes.

9      Q.   Do you recall writing it?

10     A.   I don't.

11     Q.   Okay.  Did you write a lot of these deal

12  jackets?

13     A.   A lot.

14     Q.   Okay.  So let's take a look at the next

15  page.

16         What am I seeing here?

17     A.   That is an inventory file.

18     Q.   And do you create these inventory files?

19     A.   I do not.

20     Q.   Who does?

21     A.   That looks like Nidia's handwriting or

22  Mayara.

23     Q.   Okay.  And who is Mayara?

24     A.   I believe she was considered Nidia's

25  assistant.

47

1     Q.   And that's Mayara Cardoso?

2     A.   Yes.

3     Q.   Okay.  Do you know what purch EAG interco

4  means?

5     A.   That would mean we purchased it from

6  Excell Auto Group interco, which I don't know what

7      that is.

8          Q.    Okay.  Do you know why this yellow -- or

9      this pink Post-It here, it says floored with

10     Chapford, why that is on this folder?

11         A.    That is a form of note-taking for

12     accounting of where we got it or if money is owed

13     or -- that would be accounting's notes.

14         Q.    Okay.  And so when this says, "floored

15     with Chapford," if you read that, what does that

16     mean to you, specifically?

17         A.    From my experience in the field, we took

18     a loan for the car and then are making payments,

19     is to my best knowledge.

20         Q.    So is it accurate to say that this deal

21     jacket that you created gets another folder put

22     inside of it that has information as we see that

23     says it's floored with Chapford?

24         A.    The -- it would -- when the -- the sale

25     is complete with signed paperwork and money and

                                                    48


1      all documents and driver's license and all that,

2      that first page folder gets married up with that

3      second page inventory file --

4          Q.    And who put --

5        A.    -- to become one deal.

6        Q.    And who puts these documents together?

7        A.    Accounting, Nidia or Mayara.

8        Q.    Okay.  Looking now at Trustee 8, and on

9    the back of it is Trustee 9.  What am I looking at

10   here?

11       A.    A copy of a title.

12       Q.    And so say I've never read a title

13   before.  What is this telling me?

14       A.    It's telling you that Karma of Palm Beach

15   is the owner, and it is reassigned as a --

16   indicated as a sale to Luxury Lease Company.

17       Q.    And what date was that done?

18       A.    It does not say.  It should be in the

19   sale date.  Seller must enter sold date.  Under

20   the address.

21       Q.    Why does it say issued here for 3/22,

22   then?  What does that mean?

23       A.    That is when the title was issued into

24   Karma of Palm Beach's name.

25       Q.    Okay.  But are you saying that the sale

                                                    49


1    occurred before this title was issued?

2        A.    You wouldn't be able to tell by looking

```
 3      at that title copy.
 4          Q.   Okay.  And this section over here that
 5      says lien release, what is that information for?
 6          A.   If there was a lien, it would be listed
 7      under first lienholder, under registered owner.
 8      And that is where the lienholder would sign off it
 9      if there was a lien.
10          Q.   So is this saying that as of March 22nd,
11      on this Lamborghini that we've talked about, the
12      8766, that there's no lien on the vehicle as of
13      March 22nd --
14          A.   It -- if there --
15          Q.   -- is that what it's saying?
16          A.   Correct.  If there was, it would be
17      listed down in the middle of the title copy under
18      first lienholder.
19          Q.   Okay.  And when you say middle of the --
20      is that this document -- oh, here (indicating)?
21          A.   Correct.
22          Q.   So who puts this information here that
23      there is no lienholder?
24          A.   It would be provided to the DMV with a
25      title app.  A title application is the only thing
```

50

20    a lien on it?

21        A.   They wouldn't accept it.

22        Q.   Okay.  But that's only -- that's only if

23    they're made aware that there's a lien, correct?

24        A.   The only knowledge they would have is if

25    it's on the title or on the record.  The records

54

1    are in the system for DMVs.

2        Q.   Okay.

3        A.   Verbal liens would -- they would not know

4    about.

5        Q.   Okay.  And in your experience, are

6    ver- -- do you have verbal liens in car deals?

7        A.   I -- no.

8        Q.   Yeah.  Okay.  All right.

9        So let's go down to the bottom part where

10   it says -- and let me blow it up because I'm sure

11   it's a little hard to see.

12        Here we see transfer of title by seller.

13   This must be completed at the time of sale.

14   That's what that says, right?

15        A.   Yeah.  Yes.

16        Q.   Does that mean that a sale is occurring

17   on March 22nd, 2022 or --

18          A.    No.

19          Q.    Okay.  So this could be filled out before

20      or after the time of sale?

21          A.    Yes.  Absolutely.

22          Q.    Okay.  And when we're looking at this

23      here, do you know whether this was filled out

24      before or after the sale of this vehicle to Luxury

25      Lease?

                                                    55


1           A.    I do know that it had to have been filled

2       out after 3/22.

3           Q.    Okay.  And who filled out this

4       information that says Luxury Lease Company?

5           A.    That's my handwriting.

6           Q.    Okay.  And then this is your signature,

7       correct?

8           A.    Correct.

9           Q.    And it's -- but it's in different ink.

10      Does this suggest that you signed this at a

11      different time or run out of ink or what

12      happened?

13          A.    No.  I probably just maybe signed a

14      copy.

15          Q.    Why would you sign a copy?

20    A.   Yes.

21    Q.   And it says:  The seller covenants with

22  the purchaser that he is the true -- "he," look at

23  that, that's sexist -- that they are the true and

24  lawful owner of said described automobile above,

25  and that the same is free from all encumbrances,

79

1  that he has good right and full power to sell the

2  same as aforesaid and that he will warrant and

3  defend the same against the lawful claims and

4  demands of other persons.

5        Do you see that?

6    A.   Yes.

7    Q.   So you're signing on behalf of Excell

8  Auto Group this wholesale order, right, as seller?

9    A.   Correct.

10    Q.   So Excell Auto is basically telling the

11  purchaser, Karma of Palm Beach, that this vehicle

12  is not subject to encumbrances, right --

13    A.   Right.

14    Q.   -- or how would you be reading that?

15    A.   I honestly have never read that.

16    Q.   I bet you will now.

17        Okay.  So you see there where this is --

2       Q.   Okay.

3       A.   If I did sign the check, it would

4   definitely be under Scott's direction, and I

5   always had a text message to go with it.

6       Q.   Okay.  So just going back to this

7   exhibit.  You recognize that as Scott's actual

8   signature, correct?

9       A.   It looks like it, yes.

10      Q.   You didn't sign his signature for him on

11  this check, right?

12      A.   I don't think so.

13      Q.   Okay.  We're back on Exhibit 8.  This is

14  the deal jacket.  Now we're looking at Trustee 30.

15  Can you see this document okay?

16      A.   Yes.

17      Q.   What is this document?

18      A.   That is a bill of sale from Karma to

19  Luxury Lease.

20      Q.   Okay.  And what's the date of this

21  document?

22      A.   March 3rd, 2022.

23      Q.   Okay.  So I know nothing about car deals.

24  What is this telling me?

25      A.   That Karma of Palm Beach sold that

88

1    vehicle to Luxury Lease on March 3rd.

2        Q.   Okay. What else does the document tell

3    me?

4        A.   That it was sold for 1,100,000 with a

5    McLaren trade allowance of $1,074,255.02.

6        Q.   Okay. And is that your signature down

7    there for dealer representative?

8        A.   Yes.

9        Q.   So do you recall this transaction where

10    Luxury Lease traded in a McLaren for the

11    Lamborghini on this document you signed?

12        A.   I -- I don't. It would have -- there

13    would have been two scenarios. Scott would have

14    told me to load the deal exactly like this and

15    print the bill of sale or he would have loaded the

16    deal and told me to print the bill of sale.

17        Q.   Okay. So do you have any independent

18    recollection of this McLaren that was being traded

19    in?

20        A.   The only recollection I have of a

21    McLaren P1 is we sold to a customer -- actually I

22    don't. I just remember the P1 because of the high

23    price. And I believe we sold one at some point to

24    someone.

25      Q.   Okay.  Well, we'll get there.

89

1           So let's just take a look for a minute at

2      this trade-in that we're talking about.  The P1

3      McLaren, and we show the VIN number last four

4      0085.  Do you see that?

5      A.   Yes.

6      Q.   And does this stock number reflect

7      anything to you?

8      A.   That's just for inventory in the system.

9      Q.   And does this number reflect that it's

10     the first time in inventory, second time in

11     inventory?  What would this tell you looking at

12     it?

13     A.   Well, six digits is usually the first

14     time.  But that could mean that it's the first

15     time in Karma's inventory.

16     Q.   Okay.

17     A.   He was moving cars from Excell to Karma a

18     lot.

19     Q.   Do you know why he was doing that?

20     A.   I don't.

21     Q.   Okay.  Do you know where this McLaren

22     came from?

# EXHIBIT "C"

Cited

As of: August 22, 2022 4:19 PM Z

## Focarino v. Travelers Pers. Ins. Co.

Superior Court of New Jersey, Appellate Division

November 15, 2016, Argued; April 25, 2017, Decided

DOCKET NO. A-4780-14T3

**Reporter**

2017 N.J. Super. Unpub. LEXIS 1022 *; 92 U.C.C. Rep. Serv. 2d (Callaghan) 623; 2017 WL 1456967

KENNETH FOCARINO, Plaintiff-Respondent, v. TRAVELERS PERSONAL INSURANCE COMPANY, (FIDELITY AND GUARANTY INSURANCE UNDERWRITERS, INC. IMPROPERLY PLEADED AS TRAVELERS INSURANCE), Defendant-Appellant.

**Notice:** NOT FOR PUBLICATION WITHOUT THE APPROVAL OF THE APPELLATE DIVISION.

PLEASE CONSULT NEW JERSEY *RULE 1:36-3* FOR CITATION OF UNPUBLISHED OPINIONS.

**Prior History:** [*1] On appeal from the Superior Court of New Jersey, Chancery Division, Bergen County, Docket No. C-96-15.

## Core Terms

voidable title, good faith purchaser, seller, good title, certificate of title, purchaser, lease

**Counsel:** Jacqueline S. Peña argued the cause for appellant (Law Offices of William E. Staehle, attorneys; Jeffrey W. Mazzola, of counsel; Mr. Mazzola and Ms. Peña, on the briefs).

Jason L. Bittiger argued the cause for respondent (Bittiger Elias & Triolo, P.C., attorneys; Mr. Bittiger, of counsel and on the brief; Michael C. Feinberg, on the brief).

**Judges:** Before Judges Espinosa and Suter.

## Opinion

PER CURIAM

Fidelity and Guaranty Insurance Underwriters, Inc.

(Fidelity)[1] appeals a May 22, 2015 order of the Chancery Division, which required Fidelity to transfer the title of a 2005 Bentley Continental GT (the Bentley) to plaintiff Kenneth Focarino (Focarino). We affirm the order and well-reasoned decision of Judge Robert Contillo.

On July 1, 2014, Focarino purchased the Bentley from Emporio Motor Group, L.L.C. (Emporio) for $74,215 by paying cash and by trading in his Mercedes. He did not receive a certificate of title for the Bentley that day, but filled out an Application for Certificate of Ownership that Emporio was to submit to the Motor Vehicle Commission (the MVC) for the certificate of title. When Focarino did [*2] not receive the title or registration, he made repeated inquiry of Emporio, only to be told there were "problems" with the vehicle's title. With the sixty-day temporary registration nearing its expiration date and having not received a title or registration for the Bentley, Focarino asked Emporio to rescind the purchase and return the Mercedes. Emporio refused, advising the Mercedes had been sold at auction.

In September 2014, Focarino filed a Business Licensing Services customer complaint with the MVC and contacted the local police. He also requested an emergency title for the Bentley from the MVC, but was denied because of an outstanding lien on the vehicle held by the Toyota Motor Credit Corporation (Toyota). This was the first Focarino was made aware there was a lien of any kind on the Bentley. Focarino tried negotiating with Toyota to obtain title to the Bentley, but was not successful.

Emporio had obtained the Bentley on June 23, 2014, when James Martin (Martin), who is not a party to this litigation, traded it for an Aston Martin. As a condition of that trade and sale, Emporio agreed to pay off Toyota's lien on the Bentley. However, Martin came to realize

---

[1] Fidelity was improperly named in the complaint as Travelers Personal Insurance Company.

BER-L-002856-22 08/22/2022 7:11:47 PM Pg 34 of 53 Trans ID: LCV20223042621
Case 22-12790-EPK Doc 233 Filed 08/26/22 Page 78 of 100

Page 2 of 4

2017 N.J. Super. Unpub. LEXIS 1022, *2

Emporio had not paid [*3] the lien as promised after he received notice from Toyota that he had defaulted on his loan for the Bentley. When he could not gain clarification from Emporio, Martin filed a report with the police, complaining the Bentley was stolen, and also filed a theft claim with his insurer, Fidelity. Fidelity accepted Martin's theft claim, and on December 18, 2014, paid Toyota $62,802.65 to satisfy the lien and $18,196.35 to Martin. Toyota provided Fidelity the certificate of title for the Bentley.

In April 2015, Focarino filed an order to show cause and verified complaint in the Chancery Division to restrain Fidelity from repossessing the vehicle, and to require Fidelity to transfer the Bentley's title to him based on his "unencumbered interest." Fidelity answered and filed a counterclaim for declaratory judgment, asserting it was "the rightful and legal owner of the Bentley." Pending the return date, the trial court entered temporary restraints that maintained the status quo by prohibiting Fidelity from repossessing the vehicle and by requiring Focarino to secure the vehicle.

On May 22, 2015, the return date of the order to show cause,[2] Judge Contillo ordered Fidelity to transfer the Bentley's [*4] certificate of title to Focarino. In Judge Contillo's comprehensive written decision, he identified the issue as whether Focarino "has the right to title of the Bentley through his purchase of the Bentley from Emporio, or, [Fidelity] has the right to title of the Bentley through its payment to Martin and Toyota." The court reasoned that the issue "narrows down to the extent of Emporio's interest in the Bentley at the time it sold the Bentley to [Focarino]." Judge Contillo found "Martin was the true owner of the Bentley" because he was "in possession and control of [it]," rejecting Fidelity's notion that Toyota's security interest gave it true ownership. Thus, "Martin was the owner of the Bentley when he delivered it to Emporio." Relying on *N.J.S.A. 12A:2-403(1)* of the New Jersey Uniform Commercial Code (U.C.C.), *N.J.S.A. 12A.1-101 to 12-26*, because Martin had "delivered the Bentley to Emporio (the subsequent seller) with the intent that Emporio become the owner of the goods," Emporio "acquired the Bentley though a

transaction of purchase with Martin . . . , thus giving Emporio voidable title to the Bentley."

Judge Contillo then found, because Emporio possessed a voidable title, it had the ability to transfer title. Further, [*5] despite the interest that Fidelity claimed in the vehicle, a good faith purchaser for value, such as Focarino, could cure a voidable title and prevail against other claims, including those by Martin or Fidelity, thereby "obtain[ing] clear title free from any claims by third parties." The court found there was "no evidence that [Focarino] had any knowledge of the lien on the Bentley at the time he purchased [it]," and "no evidence that he should have known of the lien." The court held that "upon [Focarino's] purchase of the Bentley, [Focarino] received good and clear title." Subsequently, Judge Contillo denied Fidelity's motion for a stay pending appeal, and ordered Fidelity to deliver the Bentley's certificate of title to Focarino, which has been done.

Fidelity appealed, contending the trial court erred because Emporio never possessed legal title to the vehicle and thus could not transfer title to Focarino. Fidelity asserts there was no completed "transaction of purchase" as contemplated in the U.C.C., and that plaintiff has relied on irrelevant case law. Furthermore, Fidelity asserts that as a wrongdoer, Emporio could not convey good title to the Bentley.

Where we are tasked with interpreting [*6] a statutory provision, the scope of our review is de novo. *Cypress Point Condo. Ass'n v. Adria Towers, L.L.C., 226 N.J. 403, 415, 143 A.3d 273 (2016)* ("When no issue of fact exists, and only a question of law remains, [an appellate court] affords no special deference to the legal determinations of the trial court." (citing *Manalapan Realty, L.P. v. Twp. Comm. of Manalapan, 140 N.J. 366, 378, 658 A.2d 1230 (1995))*. We are to construe statutes "sensibly and consistent with the objectives that the Legislature sought to achieve." *Nicholas v. Mynster, 213 N.J. 463, 480, 64 A.3d 535 (2013)* (citing *DiProspero v. Penn, 183 N.J. 477, 492, 874 A.2d 1039 (2005))*.

Our analysis is informed first by a review of the relevant section of the U.C.C. and case law. *Section 403* provides in relevant part:[3]

---

[2] The parties agreed, because the facts were not disputed, that the court could summarily decide Fidelity's declaratory judgment action, thereby resolving which party owned the Bentley and was entitled to its title. The parties also agreed that Focarino was not aware of the lien on the Bentley at any time before being advised about it by Toyota, and Fidelity was not aware of Focarino's purchase of the Bentley at any time before it paid Toyota and received the title.

[3] The corresponding section of the Model Uniform Commercial Code describes the situation as one in which "delivery was procured through fraud punishable as larcenous under the criminal law." *U.C.C. § 2-403(1)(d)* (Am. Law Inst. & Unif. Law

2017 N.J. Super. Unpub. LEXIS 1022, *6

(1) A purchaser of goods acquires all title which the transferor had or had power to transfer except that a purchaser of a limited interest acquires rights only to the extent of the interest purchased. A person with voidable title has power to transfer a good title to a good faith purchaser for value. When goods have been delivered under a transaction of purchase the purchaser has this power even though

(a) the transferor was deceived as to the identity of the purchaser, or

(b) the delivery was in exchange for a check which is later dishonored, or

(c) it was agreed that the transaction was to be a "cash sale", or

(d) the delivery was procured through fraud punishable under the criminal law.

[*N.J.S.A. 12A:2-403(1).*]

The section is "applicable [*7] to a person taking by any form of 'purchase' as defined by this Act." *N.J.S.A. 12A:2-403*, comment 1. "[S]ubsection (1) provides specifically for the protection of the good faith purchaser for value in a number of specific situations which have been troublesome under prior law." *Ibid. N.J.S.A. 12A:2-403(1)* "provides that the sale to a good faith purchaser for value cures the defects in the seller's voidable title." *Touch of Class Leasing v. Mercedes-Benz Credit of Can., Inc., 248 N.J. Super. 426, 437, 591 A.2d 661 (App. Div.), certif. denied, 126 N.J. 390, 599 A.2d 166 (1991).* That is not the case where title is void. The sale to a good faith purchaser for value "cannot cure void title." *Ibid.*

In distinguishing a void title from a voidable title, a comparison is drawn "between a thief, who wrongfully takes goods against the will of the owner and has void title, and a swindler, who fraudulently induces the owner to deliver goods voluntarily and has voidable title." *NXCESS Motor Cars, Inc. v. JPMorgan Chase Bank, N.A., 317 S.W.3d 462, 468 (Tex. App. 2010) petition for review denied, No. 10-0508, 2010 Tex. LEXIS 652, (Tex. Sept. 3, 2010),* (citation omitted). Generally,

voidable title passes to those who lie in the middle of the spectrum that runs from best-faith buyer at one end to robber at the other. These are buyers who commit fraud, or are otherwise guilty of

naughty acts (bounced checks), but who conform to the appearance of a voluntary transaction . . . .

[1 James J. White, [*8] et al., *Uniform Commercial Code*, § 4:33 at 381 (6th ed. 2012).]

In *O'Keeffe v. Snyder, 83 N.J. 478, 416 A.2d 862 (1980),* involving an allegation that artwork had been stolen, the Court recognized the distinction. "[T]he U.C.C. permits a person with voidable title to transfer good title to a good faith purchaser for value in certain circumstances." *Id. at 489.* However, a "thief acquired no title and could not transfer good title to others regardless of their good faith and ignorance of the theft." *Id. at 488.*[4]

For a person with voidable title to goods to transfer good title to a good faith purchaser for value, the goods, even though delivered through fraud, must be delivered under a transaction of purchase. *N.J.S.A. 12A:2-403(1)(d)*; see *Touch of Class, supra, 248 N.J. Super. at 438* ("For the seller to acquire even voidable title, he must obtain delivery of the goods through 'a transaction of purchase.'"). We have explained that the phrase transaction of purchase "is generally limited to those situations in which a third party delivers goods to a subsequent seller, intending for the subsequent seller to become the owner of the goods." *Ibid.* Where the goods have been obtained through a transaction of purchase and thus, the subsequent seller has voidable title, the title defects can be cured "through the sale to a good faith purchaser [*9] for value[, which] gives the good faith purchaser clear title, free from any claims of third parties." *Ibid.*

Here, the trial court found, and no one has disputed, that Focarino was not aware of the lien held by Toyota when he purchased the Bentley from Emporio. At oral argument on the return date, counsel for Fidelity referred to Focarino as an "innocent purchaser." Fidelity has not disputed on appeal that Focarino is a good faith purchaser for value under the U.C.C.[5]

---

Comm'n 1988). The words "as larcenous" were removed from our version of the statute in 1994 because larceny is not recognized as a criminal offense in New Jersey. *L. 1994, c. 114, § 5.*

[4] The rule that a thief cannot provide good title has ancient origins as noted by Justice Handler in his dissent in *O'Keeffe,* having been recognized by Lord Blackstone. *Id. at 513* (Handler, J., dissenting).

[5] While the phrase "good faith purchaser for value" is not defined under the U.C.C., the U.C.C. defines "good faith" generally as "honesty in fact and the observance of reasonable commercial standards of fair dealing." *N.J.S.A. 12A:1-201(b)(20).*

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 36 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 80 of 100

Page 4 of 4

2017 N.J. Super. Unpub. LEXIS 1022, *9

We agree with Judge Contillo that Emporio obtained voidable title to the Bentley through its transaction with Martin because that was a transaction of purchase. As we said in *Touch of Class, supra, 248 N.J. Super. at 438,* it is the intent of the original seller, Martin, to enter into a valid transaction that determines whether a "transaction of purchase" has occurred and not the intention of the subsequent seller, in this case Emporio. Martin intended Emporio to own the Bentley in exchange for his new vehicle, conditioned on the payment of the lien held by Toyota.

The security interest held by Toyota in the Bentley did not change the transaction of purchase. There can be "more than one 'owner' of a vehicle." *Verriest v. INA Underwriters Ins. Co., 142 N.J. 401, 408, 662 A.2d 967 (1995).* "[T]he true owner is the person who maintains 'possession and [*10] control of the automobile.'" *Id. at 409* (citations omitted). When Martin, who indisputably possessed and controlled the Bentley, delivered it to Emporio, he intended Emporio to become the owner subject to paying the lien. He was not prohibited from transferring his ownership because of Toyota's lien.

Fidelity focuses on the fraud committed by Emporio, contending that the Bentley was stolen, but the U.C.C. expressly contemplated the situation where "delivery was procured through fraud punishable under the criminal law." *N.J.S.A. 12A:2-403(1)(d).* This is not a situation such as *O'Keeffe* where paintings were purloined. In that case, the thief had no title to pass even to innocent buyers. Here, Emporio did not forcibly coerce Martin into transferring possession of the Bentley, but rather fraudulently induced the transfer by falsely promising that it would pay off the lien on the Bentley and provide Martin with good title on his new vehicle.

Nor is this a case factually similar to *Touch of Class* where a lessee, who subsequently tried to sell the vehicle he leased, did not obtain the vehicle by a transaction of purchase. We held that this lease was a "true" lease and not a lease for security. *Touch of Class, supra, 248 N.J. Super. at 435.* Because the lease was not a [*11] transaction of purchase, the lessee "did not even possess voidable title at the time of the sale to [the good faith purchaser]." *Id. at 438.*

We are satisfied that a "transaction of purchase" occurred when Martin entered into what was believed to be a valid transaction with Emporio. Fidelity has referred to this as a "good faith sale from [Martin]." Although Martin had the right to rescind the transaction with

Emporio, that right expired upon the sale of the vehicle to Focarino, who was a good faith purchaser for value.

Therefore, we agree with Judge Contillo that Emporio acquired the Bentley from Martin through a "transaction of purchase" because Martin wanted Emporio to own the vehicle subject to paying off the lien. The transaction of purchase gave Emporio a voidable title. The voidable title allowed Emporio, despite its alleged fraud, to sell the vehicle to a good faith purchaser for value, Focarino. Focarino then took the vehicle free and clear of any claims by third parties, including Fidelity, which had paid Toyota's lien under its policy of insurance with Martin. Thus, Focarino is the "rightful and legal owner" of the Bentley.

Affirmed.

---

End of Document

# EXHIBIT "D"

Ⓐ  Neutral
As of: August 22, 2022 4:20 PM Z

## N.J. Dep't of Envtl. Prot. v. Occidental Chem. Corp.

Superior Court of New Jersey, Law Division, Essex County

January 13, 2015, Decided

Docket No. ESX-L-9868-05 (PASR) Civil Action

**Reporter**
2015 N.J. Super. LEXIS 230 *

New Jersey Department of Environmental Protection, The Commissioner of the New Jersey Department of Environmental Protection and the Administrator of the New Jersey Spill Compensation Fund, Plaintiffs, vs. Occidental Chemical Corporation, Tierra Solutions, Inc., Maxus Energy Corporation, Repsol YPF, S.A., YPF S.A., YPF Holdings, Inc., and CLH Holdings, Inc., Defendants, and Maxus Energy Corporation and Tierra Solutions, Inc., Third-Party Plaintiffs, vs. 3M Company, et al., Third Party Defendants.

## Core Terms

alter-ego, parties, settlement, allegations, cross-claim, declaratory judgment, cross claim, subsidiary, transfers, courts, cause of action, retroactivity, egos, site, retroactive application, civil conspiracy, fraudulent transfer, tortious interference, take place, environmental, contractual, curative, breach of fiduciary duty, aiding and abetting, legislative intent, unjust enrichment, four year, reconsideration, discovery, entities

## Case Summary

### Overview

HOLDINGS: [1]-The Special Master recommended that ten cross claims be dismissed as untimely because the fraudulent transfer claims were beyond the limitations period set forth in *N.J.S.A. § 25:2-31* as the company did not file its motion to amend its answer within four years of the transfer dates and it failed to file the motion within a year of the SEC filings that gave it notice of the transfers; [2]-The Special Master recommended that the unjust enrichment claims, fiduciary claims, tortious interference claims, civil conspiracy claims, and alter ego claims be dismissed as untimely since the company should have had notice of the transfers that supported its fiduciary claims when they were publicly announced,

which should have triggered diligence on its part.

### Outcome

Special Master set forth his recommendations.

## LexisNexis® Headnotes

Civil Procedure > ... > Defenses, Demurrers & Objections > Motions to Dismiss > Failure to State Claim

Civil
Procedure > ... > Pleadings > Complaints > Requirements for Complaint

Civil Procedure > Pleading & Practice > Pleadings > Rule Application & Interpretation

*HN1*[⬆] **Motions to Dismiss, Failure to State Claim**

In reviewing motions to dismiss, New Jersey courts take all the facts in the plaintiff's complaint and treat them as if they are true. In addition, all reasonable inferences from those facts are drawn in the plaintiff's favor. The Court is not concerned with the ability of the plaintiff to prove the allegation, but rather, only whether the facts suggest a cause of action. To that end, dismissal motions are rarely granted, and when warranted, are often granted without prejudice to allow the plaintiff to amend the complaint. However, when it is clear the allegations do not provide a legal basis for relief and that discovery would be futile, the motion should be granted.

Civil Procedure > Preliminary

Michael Alberico

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 39 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 83 of 100

Page 2 of 16

2015 N.J. Super. LEXIS 230, *230

Considerations > Federal & State
Interrelationships > Choice of Law

Torts > Procedural Matters > Conflict of Law

*HN2*[⬆] **Federal & State Interrelationships, Choice of Law**

As the forum state, New Jersey uses its own choice-of-law rules to determine which state's substantive laws govern a claim. The first step is to see whether a conflict actually exists. If so, courts presume that the law of the state where the injury occurred will govern. But the presumption can be overcome. The key is to determine which state has the most significant relationship to the parties and the injury.

Civil Procedure > ... > Federal & State
Interrelationships > Choice of Law > Significant
Relationships

Torts > Procedural Matters > Conflict of
Law > Significant Relationships

*HN3*[⬆] **Choice of Law, Significant Relationships**

In choosing a most-significant-relationship test, the New Jersey Supreme Court suggests four non-exclusive factors a court should consider choosing the appropriate law for a tort claim, including: (a) The place where the injury occurred, (b) The place where the conduct causing the injury occurred, (c) The domicile, residence, nationality, place of incorporation and place of business of the parties, and (d) The place where the relationship, if any, between the parties is centered. The test is qualitative, not quantitative.

Business & Corporate
Law > Corporations > Corporate
Formation > Corporate Existence, Powers &
Purpose

*HN4*[⬆] **Corporate Formation, Corporate Existence, Powers & Purpose**

The laws of the state of incorporation generally govern internal corporate disputes.

Governments > Legislation > Interpretation

Governments > Legislation > Effect &
Operation > Prospective Operation

*HN5*[⬆] **Legislation, Interpretation**

It is well established that New Jersey courts favor prospective application of statutes. The rationale for this general rule is fundamental fairness: It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair. There is general consensus among all people that notice or warning of the rules that are to be applied to determine their affairs should be given in advance of the actions whose effects are to be judged by them. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible as to law which has not been made.

Governments > Legislation > Interpretation

Governments > Legislation > Effect &
Operation > Retrospective Operation

*HN6*[⬆] **Legislation, Interpretation**

Only in three limited circumstances will courts apply a statute retroactively. Retroactive application is appropriate when 1) the legislature either expressly provides for retroactivity or impliedly requires retroactivity to make the statute workable or to give it the most sensible interpretation; 2) the statute is ameliorative or curative; or 3) the parties' expectations warrant retroactive application. But even when one of these exceptions are met, courts will still refuse to apply the statute retroactively if doing so would create a manifest injustice. In other words, if a manifest injustice will arise by applying the statute retroactively, it will only be applied prospectively.

Governments > Legislation > Interpretation

Governments > State & Territorial
Governments > Legislatures

Governments > Legislation > Effect &
Operation > Prospective Operation

*HN7*[⬆] **Legislation, Interpretation**

Governments > Legislation > Interpretation

Michael Alberico

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 40 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 84 of 100

Page 3 of 16

2015 N.J. Super. LEXIS 230, *230

In looking at whether the exceptions to the presumption of prospective application apply to a statute, the first question is whether there is an unequivocal expression of contrary legislative intent. In discerning legislative intent, courts look first to the plain terms of the statute. If the statute is clear and unambiguous on its face and admits of only one interpretation, courts need delve no deeper than the act's literal terms to divine the Legislature's intent.

Governments > Legislation > Interpretation

Governments > State & Territorial Governments > Legislatures

HN8[ ] Legislation, Interpretation

In resolving questions of statutory construction, the judicial function is to effectuate the intent of the Legislature. Courts must examine the statute's history and purpose to ascertain the Legislature's underlying intent. The goal is to seek an interpretation that will make the most consistent whole of the statute. In doing so, the Court may consider statements which are prepared in conjunction with the bill. However, these statements are not binding.

Governments > Legislation > Effect & Operation > Amendments

Governments > State & Territorial Governments > Legislatures

HN9[ ] Effect & Operation, Amendments

The curative exception includes curative acts which are made necessary by inadvertence or error in the original enactment of a statute or in its administration. Under the curative exception, an amendment to a statute can be given retroactive effect if the amendment is designed merely to carry out or explain the intent of the original statute. This often occurs when the statute is unclear or misinterpreted. Such application is consistent with the general rule that statutes are ordinarily prospective unless the Legislature indicates otherwise. The New Jersey Supreme Court has described the purpose of a curative amendment as merely to remedy a perceived imperfection in or misapplication of a statute. The amendment explains or clarifies existing law and brings it into harmony with what the Legislature originally intended.

Civil Procedure > ... > Pleadings > Heightened Pleading Requirements > Fraud Claims

HN10[ ] Heightened Pleading Requirements, Fraud Claims

Fraud must be specifically pled, and conclusory allegations are insufficient to meet this requirement. Vague allegations about moving human capital, technical resources and know-how, and remaining valuable energy assets and exploration opportunities do not meet this standard.

Evidence > Judicial Notice > Adjudicative Facts > Public Records

HN11[ ] Adjudicative Facts, Public Records

Under New Jersey law, a court may take judicial notice of SEC filings. Notably, the statute uses the word transfer. That is, the actions must be brought within four years after the transfer was made or the obligation was incurred. N.J.S.A. § 25:2-31(a). Alternatively, the action can be brought within one year after the transfer or obligation was or could reasonably have been discovered by the claimant. The statute sets the time period to run from the date of the transfer, not the date that the claimant realizes the possibly fraudulent nature of the transfer. In interpreting a statute, courts look first to the plain language of the enactment, which is the best indicator of its meaning.

Governments > Legislation > Interpretation

HN12[ ] Legislation, Interpretation

In interpreting a statute, courts look first to the plain language of the enactment, which is the best indicator of its meaning.

Torts > ... > Statute of Limitations > Begins to Run > Actual Injury

Torts > Business Torts > Commercial Interference > Contracts

Michael Alberico

2015 N.J. Super. LEXIS 230, *230

*HN13*[⬇] **Begins to Run, Actual Injury**

In Texas, a cause of action for tortious interference with contract carries with it a two-year limitations period. Tex. Civ. Prac. & Rem. Code § 16.003.

> Torts > ... > Statute of Limitations > Begins to Run > Actual Injury

> Torts > ... > Concerted Action > Civil Conspiracy > Elements

*HN14*[⬇] **Begins to Run, Actual Injury**

In Texas, the statute of limitations for conspiracy is two years.

> Business & Corporate Law > Corporations > Shareholder Actions > Actions Against Corporations

> Governments > Legislation > Statute of Limitations > Time Limitations

> Governments > Legislation > Statute of Limitations > Tolling

*HN15*[⬇] **Shareholder Actions, Actions Against Corporations**

Fiduciary claims in Delaware are subject to a three-year limitations period. *Del. Code Ann. tit. 10, § 8106.* They accrue on the date the wrongful act took place. Granted, the statute may be tolled in appropriate circumstances. The statute of limitations ceases to be tolled when the plaintiff is put on inquiry notice of the alleged wrongs. A plaintiff has inquiry notice when, given all of the facts, a person exercising reasonable diligence should have discovered his injury.

> Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Piercing the Corporate Veil

*HN16*[⬇] **Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Alter-ego liability is not a separate cause of action; it is a remedy. Before invoking the doctrine, a plaintiff must

first establish an independent basis to hold the corporation liable. Moreover, the cause of action for corporate alter egos accrues simultaneously with the direct action against the corporation.

> Civil Procedure > Judicial Officers > Judges > Discretionary Powers

> Civil Procedure > ... > Declaratory Judgments > State Declaratory Judgments > Scope of Declaratory Judgments

*HN17*[⬇] **Judges, Discretionary Powers**

While a declaratory judgment is not precluded where another remedy is available, the relief can be denied where another remedy would be more effective or appropriate. Whether such relief is appropriate and should be granted rests in the sound discretion of the court.

> Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Alter Ego

*HN18*[⬇] **Piercing the Corporate Veil, Alter Ego**

A corporation is a separate entity from its shareholders. One of the main reasons for incorporation is to insulate shareholders from individual liability for the debts and other obligations incurred by the corporation. In fact, even in cases where a subsidiary is wholly owned by a parent corporation, limited liability will normally exist. This, of course, assumes that the parent company did not participate in the transaction leading to liability.

> Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Piercing the Corporate Veil

*HN19*[⬇] **Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Despite the general rule affording limited liability to shareholders, there are times when New Jersey courts will pierce the corporate veil and impose liability nonetheless. If a subsidiary is a mere instrumentality of the parent corporation, courts will look further before automatically limiting the liability of the parent. This will

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 42 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 86 of 100

Page 5 of 16

2015 N.J. Super. LEXIS 230, *230

only be the case where the parent dominates the subsidiary to the point where the two companies have no separate existence (i.e., they become alter egos). As noted by the Third Circuit, dominance is more than mere control of the subsidiary's stock or finances. Rather, it is complete domination of the subsidiary by the parent.

Business & Corporate Law > ... > Shareholders > Shareholder Duties & Liabilities > Piercing the Corporate Veil

HN20[⏚]  **Shareholder Duties & Liabilities, Piercing the Corporate Veil**

Some of the factors that will weigh in favor of piercing the corporate veil include: gross undercapitalization, failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders. While control is one of the considerations, it is not dispositive. It is to be expected that a corporation seeking to acquire majority ownership of another will seek to achieve control. The key is dominance. In fact, even when a parent has day-to-day involvement in the activities of the subsidiary, it may not reach the point of dominance.

Business & Corporate Law > ... > Shareholder Duties & Liabilities > Piercing the Corporate Veil > Sham Corporations

HN21[⏚]  **Piercing the Corporate Veil, Sham Corporations**

Even where a parent company dominates a subsidiary, limited liability can still remain intact. If two corporations are alter egos, the parent may not be held liable for the actions of the subsidiary unless the parent (or stockholder) uses the company as a vehicle for achieving fraud or injustice or to otherwise circumvent the law. Evasion of tort liability has never, in itself, been sufficient basis to disregard corporate separateness. The key is to show that the parent used the subsidiary to commit some type of fraudulent or illegal activity. Even in the face of domination of the corporation by its owners, abuse is still a prerequisite. The hallmarks of that abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof.

Civil Procedure > Judgments > Relief From Judgments > Altering & Amending Judgments

Civil Procedure > Appeals > Appellate Jurisdiction > Interlocutory Orders

HN22[⏚]  **Relief From Judgments, Altering & Amending Judgments**

Under R. 4:42-2, interlocutory orders are subject to revision through entry of final judgment in the sound discretion of the court in the interest of justice. R. 4:42-2. In analyzing whether the interest of justice warrants reconsideration, a court is not bound by the stringent constraints imposed when considering relief from a final judgment under R. 4:50-1. Thus, if it is just to do so, a court in the exceptional case may consider evidence not presented the first time around (assuming, of course, that the evidence is properly before the court).

**Counsel:** [*1] Chadbourne & Parke, LLP for movants, YPF S.A., YPF Holdings, Inc., YPF International S.A. (f.k.a. YPF International Ltd.), and CLH Holdings (Thomas J. Hall, attorney).

Weil, Gotshal & Manges LLP for movants, Repsol, S.A. (Diane P. Sullivan, attorney).

Drinker, Biddle & Reath, LLP for movants, Tierra Solutions, Inc. and Maxus Energy Corporation (William L. Warren, attorney).

Archer & Greiner and Gable Gotwals for respondent, Occidental Chemical Corporation (William J. Stack, Phil Cha, Lindsay A. Brown, Oliver S. Howard, Scott R. Rowland, and Amelia A. Fogleman, attorneys).

**Judges:** Before Hon. Marina Corodemus, J.S.C., retired, Special Master.

**Opinion by:** Corodemus

# Opinion

**Special Master Recommendation and Opinion**

2015 N.J. Super. LEXIS 230, *1

**Corodemus**, J.S.C. (retired), Special Master.

This opinion addresses the issues raised in the motions to dismiss various cross claims asserted by Occidental Chemical Corporation (OCC). For the reasons that follow, the motions are granted in part and denied in part.

### Background

This matter has an extensive procedural and factual history. The litigation itself began in December 2005 when the State of New Jersey Department of Environmental Protection (DEP) and two other state entities sued the defendants for cleanup [*2] costs and damages arising from pollution in the Newark Bay Complex. According to the plaintiffs, the pollution was caused at least in part by hazardous-chemical discharges into the Passaic River by a chemical plant located at 80 and 120 Lister Avenue in Newark (known as the Lister site). The chemicals, which included dioxin, were allegedly produced at the site during the 1950s and 1960s. According to the plaintiffs, however, the discharges continued until sometime into the 1970s. Finally, in 1983, the DEP learned about the contamination and ordered the then-owner to take measures to stop the further contamination.

Diamond Shamrock Corporation, who the parties refer to as "Old Diamond Shamrock," purchased the site in 1967. In 1983, Old Diamond Shamrock underwent a corporate reorganization, with Maxus Energy Corporation being incorporated as its parent. About three years later, Tierra Solutions, Inc. (another Maxus subsidiary) purchased the Lister site from Old Diamond Shamrock. About a month later, OCC (acting through an affiliate) purchased Old Diamond Shamrock, and as part of that transaction, Maxus agreed to indemnify OCC for certain environmental liabilities, which include those [*3] associated with the Lister site.

In 1986, when the parties signed the share purchase agreement (SPA) associated with the sale, their agreement identified the Lister site and the contamination of the Passaic River as a potential liability covered by the indemnification provision. In fact, the SPA even refers to the Lister site as "Superfund" site. The Lister site, however, was not the only environmentally problematic site associated with the sale. As OCC noted in 1994 SEC filings, environmental agencies had notified it of environmental problems at about 76 former Diamond Shamrock properties, with OCC indicating that Maxus had "retained all liability" for

the sites. This did not mean, however, that Maxus readily agreed to indemnify OCC when disputes arose over which chemical company was responsible for contamination. Between 1995 and 2002, OCC sued Maxus three times (twice in Texas and once in Ohio) to enforce the SPA.

YPF entered the scene in 1995 when it purchased Maxus through a leveraged buyout.[1] About a year later, YPF and Maxus started restructuring, and as part of the restructuring, Maxus began to sell many of its assets to YPF-related entities (and others). In its cross claims (discussed [*4] below), OCC alleges that the restructuring was designed to leave Maxus undercapitalized and insolvent. It also alleges a more sinister goal: to strand the environmental liabilities in Maxus, while leaving it with the inability to pay its obligations under the SPA. To do this, according to OCC, the defendants conspired to "covertly transfer Maxus's valuable oil and gas assets to other entities in the [defendant's] corporate structure, thereby isolating Maxus's environmental liabilities in companies unable to meet those obligations."

OCC has identified eight transactions that form the basis for its claims against YPF, Maxus, and Repsol, S.A. (which purchased YPF in 1999). The transactions began in 1995 and ended in 1999. Of the eight, only one occurred while Repsol owned YPF (the last). Notably, each transaction was disclosed in contemporaneous filings with the Securities Exchange Commission. The last transaction, which took place in 1999, was disclosed to the SEC—and therefore became public—on June 2, 2000. Many of the transactions were also the subject of media accounts, which were printed at about the same time as the transactions took place.

### The Cross Claims

As noted above, the DEP [*5] filed suit in late 2005. In fall 2006 limited jurisdictional discovery took place, and it is during this discovery that OCC says it first became aware of what Repsol, YPF, and Maxus were doing. Up until this time, Maxus was defending OCC, as required by the indemnification provision (which includes a defense obligation). When OCC demanded separate

---

[1] This opinion refers to the various YPF entities generically as "YPF" unless otherwise noted. Similarly, unless the context demonstrates otherwise, references to "Maxus" include "Tierra," and references to "DEP" or the "state" include all plaintiffs.

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 44 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 88 of 100

Page 7 of 16
2015 N.J. Super. LEXIS 230, *5

counsel (apparently asserting the need to file cross claims), Maxus refused the request, which prompted OCC to hire counsel on its own. OCC's new attorneys first moved to amend its answer to assert cross claims against Repsol, YPF, and Maxus (and their related entities named as defendants) on June 29, 2007. The Court granted the motion in October 2008 (in the meantime denying Repsol and YPF's motion to dismiss based on lack of personal jurisdiction).

The cross claims contain twelve counts:

• Count One — seeks a declaratory judgment on Maxus's duty to indemnify.

• Count Two — seeks a declaratory judgment on alter-ego liability against all the cross-claim defendants

• Count Three — claims a breach of contract by all the cross-claim defendants (including alter-ego liability for those other than Maxus)

• Count Four — claims tortious interference by [*6] Repsol and YPF

• Count Five — claims fraudulent transfers by Repsol and YPF

• Count Six — claims unjust enrichment of Repsol and YPF

• Count Seven — seeks contractual indemnification from all cross-claim defendants (including alter-ego liability by those other than Maxus)

• Count Eight — seeks contribution under the Spill Act from all cross-claim defendants

• Count Nine — seeks statutory contribution from all cross-claim defendants

• Count Ten — claims a civil conspiracy and aiding and abetting a civil conspiracy by all cross-claim defendants

• Count Eleven — makes derivative claims for breach of fiduciary duty against YPF, YPFH, YPFI, and Repsol

• Count Twelve — makes derivative claims for aiding and abetting breach of fiduciary duty against YPF, YPFH, YPFI, and Repsol

### Resolved Issues

In the ten years since the DEP filed its complaint much has happened. For the purpose of this motion, several developments are especially noteworthy. First, the Court fund that OCC, Maxus, and Tierra are liable under the Spill Act, with OCC's liability springing from its purchase of Old Diamond Shamrock. The Court also found that Maxus and Tierra must indemnify OCC to the extent

required by the SPA. Tierra's liability [*7] is premised on alter-ego status.

Several parties have also settled. Repsol, YPF, and Maxus settled with the state for $130 million, and OCC has a consent judgment in which it settles with the state for $190 million. The third-party claims are also resolved. This leaves only one issue unsettled: OCC's cross claims. Repsol, YPF, and Maxus have now moved dismiss these claims, arguing that OCC missed the applicable statutes of limitations for certain claims and that certain cross claims fail to state a claim as a matter of law. In addition, Repsol moves to reconsider an order by Judge Goldman denying its motion to dismiss for lack of personal jurisdiction.

### Analysis

#### A. Standard of Review.

HN1[ ] In reviewing motions to dismiss, New Jersey courts take all the facts in the plaintiff's complaint and treat them as if they are true. In addition, all reasonable inferences from those facts are drawn in the plaintiff's favor. *Geyer v. Faiella, 279 N.J. Super. 386, 652 A.2d 1245 (App. Div. 1995), certif. denied, 141 N.J. 95, 660 A.2d 1194 (1995).* "[T]he Court is not concerned with the ability of [the] plaintiff[] to prove the allegation," but rather, only whether the facts suggest a cause of action. *Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989).*

To that end, dismissal motions are rarely granted, and when warranted, are often granted without prejudice [*8] to allow the plaintiff to amend the complaint. *Callahan v. Stanley Works, 306 N.J. Super. 488, 703 A.2d 1014 (Law Div. 1997).* However, when it is clear the allegations do not provide a legal basis for relief and that discovery would be futile, the motion should be granted. *J.D. ex. rel. Scipio-Derrick v. Davy, 415 N.J. Super. 375, 397, 2 A.3d 387 (App. Div. 2010).*

#### B. Choice of Law

Before getting to the substance of the parties' arguments, the Special Master must first decide which states' laws apply to which claims. HN2[ ] As the forum state, New Jersey uses its own choice-of-law rules to determine which state's substantive laws govern a claim. *See Veazey v. Doremus, 103 N.J. 244, 510 A.2d*

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 45 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 89 of 100

Page 8 of 16

2015 N.J. Super. LEXIS 230, *8

*1187 (1986)*. The first step is to see whether a conflict actually exists. *Id. at 248*. If so, courts presume that the law of the state where the injury occurred will govern. *P.V. v. Camp Jaycee, 197 N.J. 132, 144, 962 A.2d 453 (2008)*. But the presumption can be overcome. *Id. at 140-41*. The key is to determine which state has the most significant relationship to the parties and the injury. *Id.*

*HN3*[↑] In choosing a most-significant-relationship test, the Supreme Court followed the *Restatement (Second) of Conflict of Laws* (1971). The *Restatement* suggests four nonexclusive factors a court should consider choosing the appropriate law for a tort claim, including:

(a) The place where the injury occurred,

(b) The place where the conduct causing the injury occurred,

(c) The domicile, residence, nationality, place of incorporation [*9] and place of business of the parties, and

(d) the place where the relationship, if any, between the parties is centered.

*Id. at 141* (quoting *Restatement, supra,* § 145(2)). The test is qualitative, not quantitative. *Id. at 143*.

The parties disagree on some—but not all—of the choice-of-law issues. They apparently agree that the derivative claims should be decided based upon Delaware law, as Maxus is incorporated there. This makes sense, because *HN4*[↑] the laws of the state of incorporation generally govern internal corporate disputes. *Brotherton v. Celotex Corp., 202 N.J. Super. 148, 154, 493 A.2d 1337 (Ch. Div. 1985)*. Thus, Delaware law controls the fiduciary claims in Count Eleven and Count Twelve. The parties also do not challenge the fact that their forum-selection clause in the SPA controls any contractual claims. *See Schmidt v. Celgene Corp., 425 N.J. Super. 600, 606, 42 A.3d 892 (App. Div. 2012)*.

The parties depart, however, on the tort claims, statutory claims, and related claims. Thus, the Special Master must analyze these claims under the significant-interest test. In doing so, the facts suggest that Texas law is the appropriate law to look to in addressing OCC's tortious interference claims (Count Four), unjust enrichment claims (Count Six), and civil conspiracy claims (Count Ten). This is true for several reasons. First, both Maxus and OCC are corporations with their principal place of business [*10] in Texas. They are also the two parties that signed the SPA, which

underlies the basis for OCC's liability. Texas is the place where the contractual relationship between the two parties is centered. Two other parties also have their principal place of business in Texas: YPFH and CLH. All these facts suggest that Texas has the most significant relationship with the parties and their dispute.

Granted, OCC points to New Jersey, saying this state has the most significant relationship with the litigation and correctly pointing out how the contamination occurred in New Jersey and how New Jersey has an interest in cleaning up its contaminated waters. But this argument misses the mark. Yes, New Jersey has an interest in battling corporate polluters. OCC's claims for tortious interference, unjust enrichment, and civil conspiracy against Maxus, YPF, and Respsol, however, do not advance that interest. In other words, OCC's claims do not affect New Jersey's ability to vindicate the interests of its citizens. Rather, the claims involve contractual indemnification and one party's efforts to enforce its rights via a variety of legal theories. When one looks at the relationships and interests involved, [*11] they invariably lead back to Texas. As a result, that state's laws should apply.

The parties also disagree over which state's laws apply to the fraudulent-transfer claim. OCC and YPF point to New Jersey law, recognizing that OCC is bringing its claim under a New Jersey statute. Repsol, however, argues that Texas law applies, and in a footnote, YPF notes that Texas law actually "may be more appropriate because OCC alleges (i) a harm occurring in Texas; (ii) caused to OCC, a corporation with its principal place of business in Texas, and (iii) allegedly arising from its relationship and agreements with Maxus, another corporation with its principals place of business in Texas..." These claims were brought under New Jersey law, and each of the parties assume New Jersey law applies. Because OCC invokes New Jersey law, this opinion analyzes the issue under New Jersey law. Notably, however, the result would be the same even if Texas law applied.

## C. OCC's Fraudulent Transfer Claims Are Untimely

The first substantive issue this opinion addresses is whether OCC has timely asserted its fraudulent-transfer claims, which are in Count Five of the cross claims, but which also form the factual basis for [*12] several other claims. The answer is no. The claims are untimely.

To understand the basis for this finding, one must look

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 46 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 90 of 100

Page 9 of 16

2015 N.J. Super. LEXIS 230, *12

not only to the claims themselves, but to New Jersey's history with the statute involved. OCC brought its claim under New Jersey's statute regulating fraudulent conveyances, which adopts the Uniform Fraudulent Transfer Act. *See N.J.S.A. 25:2-20 to 2-34*. Until November 18, 2002, the act read as follows:

A cause of action with respect to a fraudulent transfer or obligation under this article is extinguished unless action is brought:

a. Under subsection a. of *R.S.25:2-25*, within four years after the transfer was made or the obligation was incurred or, if later, within one year after the transfer or obligation was *or could reasonably have been* discovered by the claimant;

b. Under subsection b. of *R.S.25:2-25* or subsection a. of *R.S.25:2-27*, within four years after the transfer was made or the obligation was incurred; or

c. Under *subsection b. of R.S.25:2-27*, within one year after the transfer was made or the obligation was incurred.

P.L. 1988, c. 74 § 1. A 2002 amendment removed the italicized language. The question, then, is whether the pre-amendment or post-amendment language applies to OCC's claims, which involve fraudulent transfers taking [*13] place between 1995 and 1999.

*HN5*[↑] It is well established that New Jersey courts favor prospective application of statutes. *Gibbons v. Gibbons, 86 N.J. 515, 521, 432 A.2d 80 (1981)* (citing multiple cases dating back to 1942 to support this proposition). The rationale for this general rule is fundamental fairness:

It is a fundamental principle of jurisprudence that retroactive application of new laws involves a high risk of being unfair. There is general consensus among all people that notice or warning of the rules that are to be applied to determine their affairs should be given in advance of the actions whose effects are to be judged by them. The hackneyed maxim that everyone is held to know the law, itself a principle of dubious wisdom, nevertheless presupposes that the law is at least susceptible of being known. But this is not possible as to law which has not been made.

*Id. at 522* (citing 2 Sutherland, *Statutory Construction*, § 41.02 at 247 (4th ed. 1973), as quoted in *Weinstein v. Investors Savings, 154 N.J. Super. 164, 167, 381 A.2d*

53 (App. Div. 1977)).

*HN6*[↑] Only in three limited circumstances will courts apply a statute retroactively. *Id. at 522*. Retroactive application is appropriate when 1.) the legislature either expressly provides for retroactivity or impliedly requires retroactivity to make the statute workable or to give it the most sensible interpretation; [*14] 2.) the statute is ameliorative or curative; or 3.) the parties' expectations warrant retroactive application. *Id.; Lombardo v. Revlon, Inc., 328 N.J. Super. 484, 490, 746 A.2d 475 (App. Div 2000)*. But even when one of these exceptions are met, courts will still refuse to apply the statute retroactively if doing so would create a "manifest injustice." *Gibbons, 86 N.J. at 523; Street v. Universal Marine, 300 N.J. Super. 578, 581, 693 A.2d 535 (App. Div. 1997)*. In other words, if a manifest injustice will arise by applying the statute retroactively, it will only be applied prospectively. *Id.*

*HN7*[↑] In looking at whether the exceptions to the presumption of prospective application apply to *N.J.S.A. 25:2-31*, the first question is whether there is an "unequivocal expression of contrary legislative intent." *Dewey v. R.J. Reynolds Tobacco Co., 121 N.J. 69, 95, 577 A.2d 1239 (1990)*. In discerning legislative intent, courts look first to the plain terms of the statute. *Phillips v. Curiale, 128 N.J. 608, 608 A.2d 895 (1992); Morristown v. Woman's Club of Morristown, 124 N.J. 605, 610, 592 A.2d 216 (1991)*. If "the statute is clear and unambiguous on its face and admits of only one interpretation, [courts] need delve no deeper than the act's literal terms to divine the Legislature's intent." *State v. Butler, 89 N.J. 220, 226, 445 A.2d 399 (1982)*.

Public Law 2002, chapter 100 states that the amendment is "effective November 18, 2002," which was the day it was adopted. In *Street* the court held that similar language did not represent an "unequivocal expression of legislative intent" that the statute apply retroactively, especially when doing so would divest hundreds [*15] of workers' compensation petitioners of a vested right. *300 N.J. Super. at 581*. That rationale holds true here: If the Legislature intended to divest corporations of the right to repose for corporate transactions, it could certainly have said so. In *Cruz v. Central Jersey Landscaping, Inc., 195 N.J. 33, 48, 947 A.2d 1228 (2008)*, the Court held that "effective immediately" "bespeaks an intent contrary to, and not supportive of, retroactive application." Thus, this language does not require retroactivity.

In similar fashion, the legislative history of *N.J.S.A. 25:1-*

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 47 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 91 of 100

Page 10 of 16
2015 N.J. Super. LEXIS 230, *15

5 offers no support for retroactivity either. *HN8*[ ↑] In resolving questions of statutory construction, the judicial function is to effectuate the intent of the Legislature. *State v. Maguire, 84 N.J. 508, 514, 423 A.2d 294 (1980)*. Courts "must examine [the statute's] history and purpose to ascertain the Legislature's underlying intent." *Brewer v. Porch, 53 N.J. 167, 174, 249 A.2d 388 (1969)*. The goal is to "seek an interpretation that will make the most consistent whole of the statute." *State v. A.N.J., 98 N.J. 421, 424, 487 A.2d 324 (1985)*. In doing so, the Court may consider statements which are prepared in conjunction with the bill. *State v. Sutton, 132 N.J. 471, 483, 625 A.2d 1132 (1993)*. However, these statements are not binding. *Bellinger v. Bellinger, 177 N.J. Super. 650, 653, 427 A.2d 620 (1981)*.

Here, the committee statements present no obstacle to prospective-only application. Rather, they simply declare the Legislature's intent to "eliminate[] the need [for creditors] to conduct [*16] unnecessary annual asset searches during the term of every loan that goes into default." *See* Sponsor Statement, P.L. 2002, c. 100. The sponsor statement, as well as the committee reports that mimic sponsor statement, do not express a preference either for or against retroactive application. The Legislature chose to impose a less onerous standard on creditors, but nothing in the legislative history suggests that the Legislature was seeking to divest the rights of those businesses that already believed their transfers were free from challenge.

Nor does the implied intent of the statute justify retroactive application to make the statutory scheme workable. The Legislature set an effective date that provides a bright-line demarcation: Transfers before November 18, 2002 and those after that date. As the Court explained in *Kopczynski v. County of Camden, 2 N.J. 419, 424, 66 A.2d 882 (1949)*, "[a] cardinal rule in the interpretation of statutes is that words in a statute ought not to have a retrospective operation unless they are so clear, strong and imperative that no other meaning can be annexed to them, or unless the intent of the legislature cannot otherwise be satisfied." If the Legislature had wanted to give the amendments to *N.J.S.A. 25:2-31* retroactive application, [*17] it could have easily done so. It did not. Absent that, retroactive application would only be warranted if failure to do so would thwart the legislative goals. That too is not the case, as courts can easily apply the amendment to transfers arising after its effective date without defeating the intent of the legislation. Thus, the first exception to prospective application is inapplicable.

The next question, then, is whether the statute is ameliorative or curative. *See Gibbons, 86 N.J. at 523*. The definitions of these terms were discussed at length in *Kendall v. Snedeker, 219 N.J. Super 283, 530 A.2d 334 (App.Div.1987)*. There, Justice Long (then sitting in the Appellate Division) described the ameliorative exception to prospective application as being limited to criminal cases. *Id. at 286-87*. As such, it has no application here.

The curative exception is similarly inapplicable. *HN9*[ ↑] It generally includes "curative acts [which] are made necessary by inadvertence or error in the original enactment of a statute or in its administration." *Id. at 287* (quoting Sutherland, *Statutory Construction*, § 41.11 at 410 (4th ed.1973)). Under the curative exception, an amendment to a statute can be given retroactive effect if the amendment is designed merely to carry out or explain the intent of the original statute. *Id.; Street, 300 N.J. Super. at 582-83*. This [*18] often occurs when the statute is unclear or misinterpreted. *Id.; Sarasota-Coolidge Equities II, LLC v. S. Rotondi & Sons, Inc., 339 N.J. Super. 105, 114-15, 770 A.2d 1264 (App. Div. 2001)*. Such application is consistent with the general rule that statutes are ordinarily prospective unless the Legislature indicates otherwise. *Gibbons, 86 N.J. at 520; Schwartz v. Director, Division of Taxation, 20 N.J. Tax 59 (2002)*

The Supreme Court has described the purpose of a curative amendment as "merely to 'remedy a perceived imperfection in or misapplication of a statute.' The amendment explains or clarifies existing law and brings it into 'harmony with what the Legislature originally intended.'" *Matter of D.C., 146 N.J. 31, 51, 679 A.2d 634 (1996)*, (quoting *Schiavo v. John F. Kennedy Hosp., 258 N.J. Super. 380, 385, 609 A.2d 781 (App.Div.1992)*, *aff'd, 131 N.J. 400, 620 A.2d 1050 (1993)*).

Here, the curative exception does not apply, as the new legislation "eliminates" an obligation originally enshrined in the statute, namely, the need to bring an action within one year of the date a transfer could reasonably have been discovered." Based on the Legislature's decision to remove this language, it was seeking to change the statute, not merely carry out or explain the original intent of the statute. In short, *N.J.S.A. 25:1-5(h)* is neither ameliorative nor curative; therefore, the second exception to prospective-only application does not apply.

The third and final exception that would warrant retroactivity relates to the expectations of the parties.

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 48 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 92 of 100

Page 11 of 16

2015 N.J. Super. LEXIS 230, *18

Here, neither party had any expectations that [*19] would be defeated by prospective-only application. To the contrary, retroactive application would defeat the expectations of the parties to the transfer, who had a right to repose either four years after the transfer or a year after the transfer was discoverable. To allow the change to produce a never-ending reach-back period would potentially dislodge the security of those who long ago believed they had achieved the repose granted by the statute. Cf., *CTS Corp. v. Waldburger, 134 S. Ct. 2175, 2182-83, 189 L. Ed. 2d 62 (2014)* (comparing the effects of a statute of repose to a "fresh start"). It would be odd to think that the Legislature intended such an unfair consequence. Thus, not only do the expectations of the parties preclude retroactive interpretation, equity thwarts this type of interpretation too.

Based on this analysis, the Special Maser holds that retroactive application of the amendment to *N.J.S.A. 25:2-31* should be eschewed. That being the case, the next question is whether OCC filed its claims within four years of each transfer, and if it has not, whether it filed them "within one year after the transfer or obligation was or could reasonably have been discovered by" OCC.[2]

The operative date for filing OCC's claims is June 29, 2007, the date it filed its [*20] motion to amend the complaint. The transfers themselves took place between 1995 and 1999, and the last one was announced publicly on June 2, 2000 in an SEC filing.[3] There should be no dispute that OCC did not file its cross claims within four years of the transfers themselves, because it

would have had to file them in 2003 rather than in 2007.

The real question is whether OCC filed its cross claims within a year of when the company could have reasonably discovered them. This is a bit trickier. *HN11*[↑] Under New Jersey law, a court may take judicial notice of SEC filings. *New Century Fin. Services, Inc. v. Oughla, 437 N.J. Super. 299, 323-24, 98 A.3d 583 (App. Div. 2014)*. Notably, the statute uses the word "transfer." That is, the actions must be brought "within four years after the transfer was made or the obligation was incurred." *N.J.S.A. 25:2-31(a)* (emphasis added). Alternatively, the action can be brought "within one year after the *transfer* or obligation was or could reasonably have been discovered by the claimant." (Emphasis added). The statute sets the time period to run from the date of the transfer, not the date that the claimant realizes the possibly fraudulent nature of the transfer. *HN12*[↑] In interpreting a statute, courts look first to the plain language of the enactment, which is the best indicator of [*21] its meaning. *State v. Revie, 220 N.J. 126, 104 A.3d 221, 2014 WL 7150901 at *3 (2014)*. Thus, whether OCC's claims survive turn upon when the company could have reasonably discovered the transfer, not the transfer's possibly fraudulent nature. If the Legislature had intended the latter, it could have easily said so in plain language. It did not.

As noted earlier, OCC failed to file its motion to amend its answer within four years of the transfer dates. In addition, it failed to file the motion within a year of the SEC filings that gave it notice of the transfers. Moreover, as noted in the background section to this opinion, OCC and Maxus engaged in litigation between 1995 and 2002, which means that OCC was aware that Maxus was failing to honor its indemnification obligations. A reasonable creditor in OCC's position would have monitored Maxus and the related entities to protect its interests. Cf., *SASCO 1997 NI, LLC v. Zudkewich, 166 N.J. 579, 767 A.2d 469 (2001)* (noting how a reasonable commercial lender has an obligation to perform asset searches on the guarantor after the loan goes into default).

OCC did not act as a reasonable creditor would have. If it acted as a reasonably, it would have learned about the transfers at issue when they were announced in SEC filings, and it would have brought its claims within one year. [*22] It did not. As a result, the claims are barred by the statute of repose in *N.J.S.A. 25:2-31*. The same result occurs under the Texas statute. See *Tex. Bus. & Com. Code Ann. § 24.010(a)(1)*. The Texas statute uses the same discovery-rule-type language as

---

[2] There is no discovery period for claims based on constructive fraudulent transfers, which must be brought within four years of the transfer date. These claims are patently stale under both New Jersey and Texas law. *See N.J.S.A. 25:2-31(b)*; *accord, Tex. Bus. & Com. Code Ann. § 24.010(a)(2)*. The Special Master's analysis deals with the allegedly intentional fraudulent transfers.

[3] OCC alleges in paragraph 40 of its cross claims that Repsol created "Repsol E&P USA, Inc." in 2005 so it could strip away any remaining assets in Maxus. While this claim arises during before the statute expired, *HN10*[↑] fraud must be specifically pled, and conclusory allegations are insufficient to meet this requirement. *Hoffman v. Hampshire Labs, Inc., 405 N.J. Super. 105, 115, 963 A.2d 849 (App. Div. 2009)*; *Staples v. Merck & Co., 270 F. Supp. 2d 833, 845 (N.D, Tex. 2003)*. Vague allegations about moving "human capital, technical resources and know-how, and remaining valuable energy assets and exploration opportunities" do not meet this standard.

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 49 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 93 of 100

Page 12 of 16
2015 N.J. Super. LEXIS 230, *22

the pre-2002 New Jersey statute, and as a result, like the New Jersey statute, it bars OCC's claims. *Cf. Zenner v. Lone Star Striping & Paving, L.L.C.,* 371 S.W.3d 311 (Tex. App. 2012) (discussing a creditor's obligation under the Texas law to act reasonably in discovering publicly available information).

**D. OCC's Unjust Enrichment Claims, Fiduciary Claims, Tortious Interference Claims, Civil Conspiracy Claims, and Alter Ego Claims Are Untimely**

In addition to its fraudulent-transfer claims, OCC also brings claims based on unjust enrichment, breach of fiduciary duty, tortious interference with contract, and civil conspiracy (as well as related aiding and abetting claims). There are two reasons why these claims are untimely. First, to the extent OCC is using them to evade the statute of limitations for fraudulent transfers, it should not be permitted to remold its allegations to evade the statute of repose. Second, OCC fails to meet each of the limitations periods associated with these causes of action, and while it tries to invoke the discovery rule, that rule cannot save [*23] the company's stale claims, just as the discovery provision in New Jersey's fraudulent transfer statute does not save the company's claims under that statute.

*HN13*[🔺] In Texas, a cause of action for tortious interference with contract carries with it a two-year limitations period. *Tex. Civ. Prac. & Rem. Code § 16.003* (West); *Elledge v. Friberg-Cooper Water Supply Corp.,* 240 S.W.3d 869, 870 (Tex. 2007) (holding that tortious-interference claims have a two-year limitations period under Texas law). Thus, OCC had two years from the date its claims accrued to file it them. Here, the claims arise from events that occurred between 1995 and 1999. The transactions became public shortly after they took place, with the last one becoming public in 2000. OCC could have, and should have, filed its claims within two years of that date, but it waited until June 29, 2007—long after they should have been filed and long after they should have been discovered.

The same is true for the company's civil-conspiracy claims. *HN14*[🔺] In Texas, "[t]he statute of limitations for conspiracy is two years." *Mayes v. Stewart,* 11 S.W.3d 440, 453 (Tex. App. 2000). The acts that formed the alleged conspiracy all flow from the transfers that took place between 1995 and 1999. They were made public in SEC filings; therefore, it is inconceivable that OCC would argue it was not aware of them.

OCC's fiduciary [*24] claims meet the same fate. As noted earlier, these claims arise under Delaware law because Maxus is incorporated there. *HN15*[🔺] Fiduciary claims in Delaware are subject to a three-year limitations period. *Del. Code Ann. tit. 10, § 8106* (West); *In re Fruehauf Trailer Corp.,* 250 B.R. 168, 184 (D. Del. 2000). They accrue on the date the wrongful act took place. *Id.* Granted, the statute may be tolled in appropriate circumstances. *Id. at 184-89.* Bit "[t]he statute of limitations ceases to be tolled when the plaintiff is put on inquiry notice of the alleged wrongs. [citation omitted]. A plaintiff has inquiry notice when, given all of the facts, a person "exercising reasonable diligence should have discovered his injury." *Id. at 189.*

Here, once again, OCC should have had notice of the transfers that underlie its fiduciary claims (both the direct claims and the aiding-and-abetting claims). They were publicly announced long before OCC filed its claims, and they should have triggered diligence on the company's part. This is especially true when OCC and Maxus were engaged in litigation and when Maxus's obligation to OCC could have run into the billions of dollars. To put it bluntly: OCC did not act diligently to protect its interest; it sat on its rights; and it is now barred from pursuing those rights.

Finally, to [*25] the extent each of these claims are barred, so is alter-ego liability based on them. *HN16*[🔺] Alter-ego liability is not a separate cause of action; it is a remedy. "Before invoking the doctrine, a plaintiff must first establish an independent basis to hold the corporation liable." *In re Casini,* 307 B.R. 800, 811-12 (Bankr. D.N.J. 2004). Moreover, the cause of action for corporate alter egos accrues simultaneously with the direct action against the corporation. *Id. at 811-12.* It is not clear whether Count Two seeks alter-ego liability for claims other than OCC's contract claims, but to the extent it does, the claims are no greater than the underlying cause of action and must be dismissed.

To reiterate: OCC fails to meet the applicable statutes of limitations for its claims against the defendants for tortious interference (Count Four), for fraudulent transfers (Count Five), for unjust enrichment (Count Six), for civil conspiracy and aiding and abetting civil conspiracy (Count Ten), and for breach of fiduciary duty and aiding and abetting breach of fiduciary duty (Count Eleven and Count Twelve). In addition, to the extent these claims are barred by the applicable limitation period, all claims for alter-ego liability tied to them in Count Two are similarly precluded. [*26] Therefore, these claims should be dismissed as a matter of law

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 50 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 94 of 100

Page 13 of 16

2015 N.J. Super. LEXIS 230, *26

with prejudice.

**E. OCC's Alter Ego Declaratory Judgment Claim Should Be Dismissed**

The alter-ego claims in Count Two should also be dismissed in their entirety. This is true because, based on the facts of this case, a declaratory judgment is an inappropriate vehicle for deciding whether this remedy is appropriate. As noted above, to the extent these claims are based on underlying claims that are time barred, they too are time barred. Moreover, the claims alleged by OCC are not appropriate for a declaratory judgment, as they can more adequately be addressed in the context of the counts in the cross claims that survive YPF, Maxus, and Repsol's motions to dismiss. In the context of this litigation, to grant a declaratory judgment on alter-ego liability that is untethered to a specific claim would be inappropriate.

To understand this holding, one must first look to the statute that permits declaratory judgments, because the right to a declaratory judgment is statutory. *See N.J.S.A. 2A:16-50, et seq.* HN17[↑] While a declaratory judgment is not precluded where another remedy is available, the relief "can be denied where another remedy would be more effective or appropriate." [*27] *966 Video, Inc. v. Mayor and Twp. Committee of Hazlet Twp., 299 N.J. Super. 501, 512, 691 A.2d 435 (Law Div. 1995).* (internal quotation and citation omitted) "Whether such relief is appropriate and should be granted rests in the sound discretion of the court." *Id.*

As noted previously, alter-ego liability is not a separate cause of action, but rather, is a remedy. Here, OCC seeks this relief in a separate count, which states:

> 64. Based on the facts alleged herein, including the adopted and incorporated allegations of Plaintiffs' Complaints, all of the Cross-Claim Defendants are alter egos of each other and together constitute a Cohesive Economic Unit.
> 65. Because the Cross-Claim Defendants are alter egos of each other and/or comprise a Cohesive Economic Unit, the other Cross-Claims Defendants have the same contractual obligations as Maxus under the SPA, including but not limited to, the obligation to defend, indemnify, and hold harmless Occidental pursuant to and in accordance with the SPA.
> 66. The Cross-Claim Defendants have denied that they are alters egos of each other and/or comprise a Cohesive Economic Unit. The have also denied that

they are contractually obligated to defend, indemnify, and hold harmless Occidental pursuant to and in accordance with the SPA.

> 67. Occidental has a tangible interest [*28] in obtaining a declaratory judgment on the issue.

A review of this count suggests that OCC seeks a declaratory judgment based on the same underlying causes of action in the counts alleging its contract claims. Thus, this count, when distilled, simply duplicates the relief sought in those already-existing counts. It makes no sense to treat this issue in a separate count of the complaint, especially when the allegations can best be understood in the context of the underlying allegations that form the basis for each contractual cause of action. Thus, Count II should be dismissed, as alter-ego liability can be more effectively and more appropriately be determined when the underlying contract claims in Count Three and Count Seven are decided.[4]

**F. OCC's Contribution Claims Are Barred to the Extent They Are the Subject of the Settlement with the State**

The next issue is whether OCC's contribution claims are barred. *See* Count Eight and Count Nine. According to OCC, it seeks contribution directly from Maxus and Tierra, but it also seeks contribution from YPF (and presumably Repsol) based only on alter-ego liability. Thus, according to OCC, it has direct contribution claims against Maxus and Tierra [*29] both under basic contribution law and the Spill Act.

OCC implicitly concedes, as it must, that contribution is prohibited under the settlement with the State of New Jersey to the extent that the claims constitute a "matter addressed" in the settlement. As noted in the parties' papers, the settlement contains a statutory contribution provision:

> Upon approval by this Court, this Settlement Agreement will constitute a judicially approved settlement of liability to the State of New Jersey within the meaning of *N.J.S.A. 58:10-23.11f.a.(2)(b)* and, within the meaning of *42 U.S.C. § 9613(f)(2)*, and under common law for the Matters Addressed

---

[4] Any claims for alter-ego liability attached to Count Three and Count Seven are not being dismissed. They survive to the extent the underlying claims survive.

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 51 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 95 of 100

Page 14 of 16

2015 N.J. Super. LEXIS 230, *29

identified below, for the purpose of providing protection to the Settling Defendants from contribution actions brought by OCC or by any other person or entity .... (Settlement Agreement ¶ 63).

The statute here is straightforward: It bars contribution claims for matters addressed in an administratively or judicially approved settlement. *See N.J.S.A. 58:10-23.11f.* This is consistent with the case law, which bars similar claims against a settling defendant. *See Young v. Latta, 123 N.J. 584, 591, 589 A.2d 1020 (1991)* ("a settling tortfeasor shall have no further liability to any party beyond that provided in the terms of settlement"). Thus, to the extent of the settlement, the [*30] contribution claims must fail.

This does not end the inquiry though. OCC rightfully points out that the settlement with the State of New Jersey by Maxus and Tierra, YPF, and Repsol does not address all damages and leaves open the possibility of additional damages. As Repsol acknowledges, "future costs for which Repsol does not have contribution is for costs incurred by Plaintiffs in excess of $70.8 million spent in [the] part of the Passaic River outside of the 8.3 mile portion of the River which is the subject of the Focused Feasibility Study." (Repsol Reply Brf. at 24). Therefore, to the extent that liability still exists for these damages, OCC's contribution claims survive. The remainder, however, should be dismissed.

## G. OCC's Contract Claims—and the Associated Alter Ego Claims—Survive

The final set of claims asserted by OCC is contractual. (Count Three and Count Seven). The remaining defendants suggest these claims are premature and that even if they were not, OCC has not alleged sufficient facts to state a claim for alter-ego liability. The Special Master disagrees.

In alleging breach of contract, OCC claims a breach by Maxus when it refused to provide a separate defense under the [*31] SPA and forced OCC to retain separate counsel. This breach is sufficient to trigger a viable claim. As noted earlier in this opinion, the question is whether the allegations in the complaint suggest a cause of action, not whether the allegations can be proven. *See Printing Mart-Morristown v. Sharp Electronics Corp., 116 N.J. 739, 746, 563 A.2d 31 (1989).*

The same is true for OCC's alter-ego allegations in these counts. HN18[↑] A corporation is a separate entity from its shareholders. *Lyon v. Barrett, 89 N.J. 294, 300, 445 A.2d 1153 (1982).* One of the main reasons for incorporation is to insulate shareholders from individual liability for the debts and other obligations incurred by the corporation. *State Dept. of Envt'l Protection v. Ventron Corp., 94 N.J. 473, 500, 468 A.2d 150 (1983).* In fact, even in cases where a subsidiary is wholly owned by a parent corporation, limited liability will normally exist. *Id.* (citing *Mueller v. Seaboard Commercial Corp . 5 N.J. 28, 34, 73 A.2d 905 (1950).* This, of course, assumes that the parent company did not participate in the transaction leading to liability.

HN19[↑] Despite the general rule affording limited liability to shareholders, there are times when New Jersey courts will "pierce the corporate veil" and impose liability nonetheless. If a subsidiary is a "mere instrumentality of the parent corporation," courts will look further before automatically limiting the liability of the parent. *Id. at 500-501.* This will only be the case where the parent dominates the subsidiary [*32] to the point where the two companies have no separate existence (i.e., they become "alter egos"). *Id.; see also, Craig v. Lake Asbestos of Quebec, Ltd., 843 F.2d 145 (3rd Cir. 1988).* As noted by the Third Circuit, dominance is more than mere control of the subsidiary's stock or finances. Rather, it is complete domination of the subsidiary by the parent. *Id. at 150.*

HN20[↑] Some of the factors that will weigh in favor of piercing the corporate veil include:

> gross undercapitalization...'failure to observe corporate formalities, non-payment of dividends, the insolvency of the debtor corporation at the time, siphoning of funds of the corporation by the dominant stockholder, non-functioning of other officers or directors, absence of corporate records, and the fact that the corporation is merely a façade for the operations of the dominant stockholder or stockholders'

*Id.* (citations omitted). While control is one of the considerations, it is not dispositive. "It is to be expected that a corporation seeking to acquire majority ownership of another will seek to achieve control." *Id. at 151.* The key is dominance. In fact, even when a parent has "day-to-day" involvement in the activities of the subsidiary, it may not reach the point of dominance. *Id.* (citing *Ventron, 94 N.J. at 501).*

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 52 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 96 of 100

Page 15 of 16

2015 N.J. Super. LEXIS 230, *32

Indeed, *HN21*[ ] even where a [*33] parent company dominates a subsidiary, limited liability can still remain intact. If two corporations are "alter egos," the parent may not be held liable for the actions of the subsidiary unless the parent (or stockholder) uses the company as a vehicle for achieving fraud or injustice or to otherwise circumvent the law. *See, e.g., Ventron, 94 N.J. at 500; Marascio v. Campanella, 298 N.J. Super. 491, 689 A.2d 852 (App. Div. 1997).* "[E]vasion of tort liability has never, in itself, been sufficient basis to disregard corporate separateness." *Craig, 843 F.2d at 150.* The key is to show that the parent used the subsidiary to commit some type of fraudulent or illegal activity. Even in the face of domination of the corporation by its owners, abuse is still a prerequisite. "[T]he hallmarks of that abuse are typically the engagement of the subsidiary in no independent business of its own but exclusively the performance of a service for the parent and, even more importantly, the undercapitalization of the subsidiary rendering it judgment-proof." *OTR Associates v. IBC Services, Inc., 353 N.J. Super. 48, 52, 801 A.2d 407 (App. Div. 2002).*

Even when judged under these exacting standards, OCC's alter-ego allegations are enough to survive dismissal. The company alleges that the remaining defendants are alter egos and constitute a cohesive economic unit. The gist of the allegation is that OCC believes that [*34] the remaining defendants have abused their corporate status and that, in doing so, they created an injustice. They did this by allegedly stripping Maxus of its assets and isolating only environmental liabilities in that corporation. If you believe OCC, this left Maxus undercapitalized and unable to meet its obligations. The fraud and injustice occurred when these assets were purportedly transferred for less than fair market value. If true, OCC may be able to pierce the corporate veil. The extent of the damages will depend upon the facts, and while the damages may be limited to the value of the assets transferred, the facts as developed in discovery and at trial (if need be), will answer this question.

In short, Count Three and Count Seven state valid claims.

## H. Reconsideration of Judge Goldman's Jurisdiction Decision is Not Warranted

The final issue addressed in this opinion is whether Judge Goldman's jurisdictional decision should be revisited. The answer is no. Judge Goldman authored a comprehensive opinion in which he found alternative bases for jurisdiction. In other words he not only found general jurisdiction, he also found specific jurisdiction, and in doing so, he premised his [*35] findings on extensive facts provided after jurisdictional discovery.

The question, then, is whether it would be appropriate to reconsider the judge's interlocutory decision based upon Repsol's arguments. In deciding this, the Special Master looks to *Rule 4:42-2. See Johnson v. Cyklop Strapping Corp., 220 N.J. Super. 250, 257, 531 A.2d 1078 (App. Div. 1987),* certif. denied, 110 N.J. 196, 540 A.2d 189 (1988). *HN22*[ ] Under that rule, interlocutory orders are subject to revision through entry of final judgment "in the sound discretion of the court in the interest of justice." *R. 4:42-2.*

In analyzing whether the interest of justice warrants reconsideration, a court is not bound by the "stringent constraints" imposed when considering relief from a final judgment under *Rule 4:50-1. Lombardi v. Masso, 207 N.J. 517, 534, 25 A.3d 1080 (2011).* Thus, if it is "just" to do so, a court "in the exceptional case" may consider evidence not presented the first time around (assuming, of course, that the evidence is properly before the court). *Id. at 536-37* (affirming reconsideration of summary judgment where judge decided to grant it *sua sponte* after a proof hearing).

In seeking reconsideration, Repsol first claims that the parties' settlements with the state dislodge jurisdiction because Judge Goldman premised his decision on a finding that Repsol intended to inflict harm on someone in New Jersey (namely, the state) when it allegedly [*36] transferred assets from YPF affiliates to non-YPF affiliates. (Repsol Brf. at 33). This argument overlooks an important fact: Judge Goldman's decision recognizes that these efforts were directed at not just the state, but also at OCC. It is unlikely that Judge Goldman would have changed his decision based on the settlements. This is especially true when Repsol fails to cite a single case where entry into a settlement dislodged otherwise viable jurisdiction.

Repsol's next argument is similarly flawed. On page 35 of its brief, it claims that because plaintiffs slightly altered their allegations, the factual predicate for Judge Goldman's decision evaporated. The specifics are straightforward: The state originally alleged that a $325 million loan from Maxus to Repsol went unpaid and that this showed the two were alter egos. Later facts allegedly showed that the loan actually went to a Repsol affiliate and that it was later repaid via funding provided

BER-L-002856-22   08/22/2022 7:11:47 PM   Pg 53 of 53   Trans ID: LCV20223042621
Case 22-12790-EPK   Doc 233   Filed 08/26/22   Page 97 of 100

Page 16 of 16

2015 N.J. Super. LEXIS 230, *36

to Maxus. While this may be true, the second amended complaint makes several other allegations of Repsol's domination and control that support the judge's conclusion. (See Second Amd. Compl. ¶¶ 72-79). Therefore, the slight change in the pleadings do [*37] not warrant reconsideration.

The final basis upon which Repsol seeks reconsideration is "new" law. As noted previously, Judge Goldman found multiple bases for jurisdiction, including specific jurisdiction based on the Supreme Court's decision in *Calder v. Jones, 465 U.S. 783, 788-89, 104 S. Ct. 1482, 79 L. Ed. 2d 804 (1984)*. (See Goldman Op. at 27-34, discussing the *Calder* "effects test"). The three new Supreme Court cases cited by Repsol do not alter the *Calder* "effects test." *See Daimler, AG v. Bauman, 571 U.S. 117, 134 S. Ct. 746, 187 L. Ed. 2d 624 (2014)*; *Goodyear Dunlop Tires Operations, S.A. v. Brown, 564 U.S. 915, 131 S. Ct. 2846, 180 L. Ed. 2d 796 (2011)*; *J. McIntyre Mach., Ltd. v. Nicastro, 564 U.S. 873, 131 S. Ct. 2780, 180 L. Ed. 2d 765 (2011)*. Therefore, these new cases do not require reconsideration of Judge Goldman's opinion.

### Conclusion

For the reasons argued above, the following claims fail as a matter of law and should be dismissed:

- Count Two — declaratory judgment on alter-ego liability against all the cross-claim defendants (claims for alter-ego liability in Count Three and County Seven survive).
- Count Three — claim for breach of contract against all the cross-claim defendants (including alter-ego liability for those other than Maxus)
- Count Four — claims for tortious interference against Repsol and YPF
- Count Five — claims for fraudulent transfers against Repsol and YPF
- Count Six — claims for unjust enrichment against Repsol and YPF

- Count Eight — contribution claims under the Spill Act against all cross-claim [*38] defendants, to the extent of the settlement only
- Count Nine — contribution claims against all cross-claim defendants, to the extent of the settlement only
- Count Ten — claims for civil conspiracy and aiding and abetting a civil conspiracy against all cross-claim defendants
- Count Eleven — derivative claims for breach of

fiduciary duty against YPF, YPFH, YPFI, and Repsol
- Count Twelve — derivative claims for aiding and abetting breach of fiduciary duty against YPF, YPFH, YPFI, and Repsol

Respectfully submitted,

**Marina Corodemus, J.S.C. (retired)**

Special Master

---

Michael Alberico

**ECKERT SEAMANS CHERIN & MELLOTT, LLC**
Anthony E. Bush, Esq. (N.J. Attorney ID No. #003761990)
*Physical Address:*    2000 Lenox Drive, Suite 203, Lawrenceville, NJ 08648
*Mailing Address:*    P.O. Box 5404, Princeton, NJ 08543
Telephone:  (609) 392-2100
Facsimile:  (609) 392-7956
abush@eckertseamans.com
***Attorneys for Defendants, Luxury Lease Company, LLC, improperly plead as Luxury Lease***
***Partners, LLC and Summit Auto Sales, d/b/a Luxury Auto Collection East improperly plead as***
***Luxury Auto Collection, LLC a/k/a  Luxury Auto Collection East***

| | |
|---|---|
| CHAPFORD SPECIALTY FINANCE, LLC | SUPERIOR COURT OF NEW JERSEY LAW DIVISION – BERGEN COUNTY DOCKET NO.: BER-L-2856-22 |
| Plaintiff, | |
| v. | Civil Action |
| LUXURY AUTO COLLECTION, LLC a/k/a LUXURY AUTO COLLECTION EAST; LUXURY LEASE PARTNERS LLC, ABC CORPS. 1-10; and JOHN DOES -10 | **CERIFICATION OF SERVICE FOR DEFENDANTS/COUNTERCLAIMANTS' MOTION FOR RECONSIDERATION** |
| Defendants. | |

<u>**CERTIFICATION OF SERVICE**</u>

I hereby certify that, on the date set forth below, the within Notice of Motion for

Reconsideration, Brief, Certification of Anthony E. Bush, Esq., and proposed form of Order were

directed for filing, via e-courts to the clerk of the above-captioned court and that copies of the

within pleadings were directed for service upon all counsel by e-courts and regular mail.

John S. Mairo, Esq.
Porzio, Bromberg & Newman, P.C.
100 Southgate Parkway
Morristown, NJ 07962
*Attorneys for Plaintiff*

A courtesy copy was forwarded via e-Courts and FEDEX to:

    Hon. Peter G. Geiger, J.S.C.
    Superior Court of New Jersey
    Bergen County Justice Center
    10 Main Street


    I further certify that the foregoing statements made by me are true.  I am aware that if any

of the foregoing statements made by me are willfully false, I am subject to punishment.


                               *Anthony E. Bush*
                                      Anthony E. Bush

Dated: August 22, 2022