# Exhibit D

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT OF FLORIDA
IN AND FOR PALM BEACH COUNTY, FLORIDA

Kenneth J. Goodman, as Trustee of the
DCG 2008 Irrevocable Wealth Trust,

      Plaintiff,

v.

Scott Zankl and Kristen Zankl,

      Defendants,

_____/

CASE NO.: 50-2022-CA-005035-XXXX-MB

## PLAINTIFF, KENNETH J. GOODMAN, AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST'S VERIFIED MOTION, PURSUANT TO FLA. R. CIV. P. 1.510, AND FLA. STAT. §687.03(4), FOR SUMMARY JUDGMENT AGAINST DEFENDANTS, SCOTT ZANKL AND KRISTEN ZANKL'S FIRST AFFIRMATIVE DEFENSE OF USURY[1]

Plaintiff, Kenneth J. Goodman, as Trustee ("Goodman" or the "Trustee") of the DCG 2008 Irrevocable Wealth Trust ("Plaintiff", "DCG" or the "Trust"), by and through undersigned counsel, hereby moves, pursuant to Fla. R. Civ. P. 1.510, and Fla. Stat. §687.03(4), for summary judgment against, Defendants, Scott Zankl ("Scott") and Kristen Zankl's ("Kristen")(collectively Scott and Kristen shall be referred to as either "Defendants", "Guarantors", or the "Zankls") First Affirmative Defense of usury (the "Usury Defense"), as asserted in their Answer ("Answer") and Affirmative Defense to Plaintiff's Complaint (the "Complaint")[2] to enforce the absolute and unconditional guarantees[3] that the Defendants executed in favor of Plaintiff with respect to the debts owing to Plaintiff from Excell Auto Group, Inc.,

---

[1] Efiled on June 16, 2022 under efiling # 151607119.

[2] Efiled on May 24, 2022 under efiling # 150220626.

[3] Exhibits A & B to the Complaint.

("Excell"), a Florida corporation owned, operated and managed by Defendants, and in support thereof, states the following:

### Excell

1.   Defendants are the owners, officers and directors of Excell, which filed a Chapter 7 bankruptcy on April 8, 2022 (the "Petition Date") under Case No. 22-12790-EPK, in the Bankruptcy Court for the Southern District of Florida (the "Excell Bankruptcy")[4].

2.   Excell is in the business of buying and selling for profit high end luxury automobiles for customers, either off the floor of Excell's showroom, or by locating and brokering the purchase and sale of high end vehicles at Excell's customer's request in the marketplace for such types of vehicles. When Excell sells a vehicle from dealer to deal it's a wholesale purchase (the "Wholesale Program"), and when it sells a vehicle by locating a vehicle for its customer it's a locate purchase (the "Locate Program").

### The Complaint

3.   On May 24, 2022, Plaintiff filed its two count Complaint against Defendants for breach of contract upon their personal absolute and unconditional guarantees of all amounts due and owing from Excell to Plaintiff.[5]

4.   Attached as Exhibits to the Complaint were the following fully executed documents that were delivered to Plaintiff:

### The Guarantees

A.   September 18, 2019 Unconditional Guarantee (Wholesale Program) from Defendants

---

[4] This Court may, and Plaintiff asks this Court to, take judicial notice of the Excell Bankruptcy and its filing and documents for the purposes of this motion under Fla. Stat. §§90.202(5), (6), (7), & (12), as "Official actions of the … judicial departments of the United States", "Records of … any court of record of the United States ….", "Rules of court of any court of record of the United States…", and "Facts that are not subject to dispute because they are capable of accurate and ready determination by resort to sources whose accuracy cannot be questioned".

[5] See fn. 2.

2

absolutely and unconditionally guaranteeing not only the Wholesale Note, but all debts due and owing from Excell to Plaintiff, attached as Ex. A to the Complaint (the "Wholesale Guarantee");

B.  September 18, 2019 Unconditional Guarantee (Locate Program) from Defendants absolutely and unconditionally guaranteeing not only the Locate Note, but all debts due and owing from Excell to Plaintiff, attached as Ex. B to the Complaint (the "Locate Guarantee")(collectively the Wholesale Guarantee and the Locate Guarantee shall be referred to herein as the "Guarantee");

### The Wholesale Note

C.  September 18, 2019 Consolidated Promissory Note (Wholesale Program) from Excell memorializing a loan for monies lent from Plaintiff to Excell in the principal amount of $1,850,000 (the "Wholesale Principal Amount"), with interest accruing annually at 1.85% thereunder (the "Wholesale Interest Rate") with a maturity date of September 20, 2020 (the "Original Wholesale Maturity Date"), attached as Ex. C to the Complaint (the "Wholesale Note");

D.  November 2, 2020 Extension, Modification and Ratification Agreement (Wholesale Program) from Excell and the Guarantors, which modified and extended the Original Wholesale Maturity Date to October 31, 2021 (the "Final Wholesale Maturity Date"), and ratified the Wholesale Note, and the Wholesale Guarantee, by the Guarantors, attached as Ex. D to the Complaint (the "Wholesale Note Extension") (collectively the Wholesale Note, the Wholesale Guarantee and the Wholesale Note Extension shall be referred to herein as the "Wholesale Loan Documents");

### The Locate Note

E.  September 18, 2019 Consolidated Promissory Note (Locate Program) from Excell memorializing a loan for monies lent from Plaintiff to Excell in the principal amount of $1,020,000 (the "Locate Principal Amount"), with interest accruing annually at 1.85% thereunder (the "Locate Interest Rate") (collectively the Wholesale Interest Rate and the Locate Interest Rate shall be referred to herein as the "Notes' Interest Rate"), with a maturity date of May 1, 2020 (the "Original Locate Maturity Date"), attached as Ex. E to the Complaint (the "Original Locate Note");

F.  December 5, 2019 Amended and Restated Promissory Note (Locate Program) from Excell in the principal amount of $1,500,000 (the "Amended Locate Principal Amount"), with interest continuing to accrue annually at the Locate Interest Rate, memorializing not only the Original Locate Note, but an additional advance and loan from Plaintiff to Excell in the principal amount of an additional $480,000, and further extending the Original Locate Maturity Date to May 1, 2020 (the "Amended Locate Maturity Date"), attached as Ex. F to the Complaint (the "Amended Locate Note") (collectively the Wholesale Note and the Amended Locate Note shall be referred to herein as the "Notes");

G.  December 5, 2019 Ratification of the Locate Guarantee from the Guarantors, attached as Ex. G to the Complaint (the "Locate Guarantee Ratification");

H.  November 2, 2020 Extension, Modification and Ratification Agreement (Locate Program) from Excell and the Guarantors, which modified and extended the Amended Locate

Maturity Date to October 31, 2021 (the "Final Locate Maturity Date")(collectively the Final Locate Maturity Date and the Final Locate Maturity Date shall be referred to herein as the "Final Maturity Date"), and ratified the Amended Locate Note, and the Locate Guarantee, by the Guarantors, attached as Ex. H to the Complaint (the "Locate Note Extension")(collectively the Wholesale Note Extension and the Locate Note Extension shall be referred to herein as the Note Extensions, while collectively the Locate Note, the Amended Locate Note, the Locate Guarantee, the Locate Guarantee Ratification and the Locate Note Extension shall be referred to herein as the "Locate Loan Documents", and collectively the Wholesale Loan Documents and the Locate Loan Documents shall be referred to herein as the "Loan Documents").

### Excell Debt Owing to Plaintiff for which Defendants have Guaranteed

5.    Plaintiff filed three Proofs of Claims in the Excell Bankruptcy under Claims Nos. 5, 6 & 17 (collectively the "Proofs of Claims")[6], in the respective amounts of the Amended Locate Principal Amount, the Wholesale Principal Amount, and an additional amount owing from Excell to Plaintiff of a $220,000.00 deposit (the "Deposit Amount") that Scott, on behalf of Excell confirmed to Plaintiff (the "Excell Acknowledgement Letter"), for a total amount due and owing from Excell to it as of the Petition Date, before calculation of interest, of $3,570,000.00 (collectively the "Principal Excell Debt Amount").

6.    Besides the Loan Documents, also attached as Exhibits to the Proofs of Claims were the following fully executed documents that were delivered to Plaintiff:

A.    September 18, 2019 Profit Participation Agreement (Locate Program) between Excell and Plaintiff referenced in the Locate Loan Documents (the "Locate Profit Participation Agreement")[7];

B.    September 18, 2019 Profit Participation Agreement (Wholesale Program) between Excell and Plaintiff referenced in the Wholesale Loan Documents (the "Wholesale Profit Participation Agreement")[8] (collectively the Locate Profit Participation Agreement and the Wholesale Profit Participation Agreement shall be referred to herein as the "Profit Participation Agreements", and collectively the respective Loan Documents and the Profit Participation Agreements shall be referred to herein as the "Transaction Documents"); and,

---

[6] Attached respectively as Exhibits A, B & C to this Summary Judgment Motion.

[7] Attached as an exhibit to Exhibit A hereto.

[8] Attached as an exhibit to Exhibit B hereto.

C.  Excell Acknowledgement Letter, that also included an acknowledgement by Excell of the Principal Excell Debt Amount due and owing to Plaintiff from Excell, including the principal amounts due and owing under the respective Notes, as well as the Deposit Amount[9].

## The Usury Defense

7.  The Usury Defense as plead in ¶4 of Defendants' Answer are Defendants' first, and only, Affirmative Defense to the Complaint in this matter, and states:

> "As a first affirmative defense, Defendants state that Plaintiff's loan is civilly and/or criminally "USURIOUS" pursuant to Chapter 687, including §687.02(1), §687.03, §687.04, §687.05, §687.06, §687.071, §687.08, §687.125, §687.145 and §687.146, Florida Statutes, and subject to the penalties set forth therein, including loss of interest, payment of double interest, and unenforceability of the Loan Agreement in the Florida courts. Interest charged in excess of the legal rate constitutes a usurious loan. The elements of a usurious loan are the following: A. A loan, either expressed or implied; B. An understanding that the money must be repaid; C. In consideration of the loan, a greater rate of interest than is allowed by law is paid or agreed to be paid by the borrower; and D. There is an intent to charge a usurious rate, sometimes referred to as corrupt intent."

8.  Having raised usury as an affirmative defense, Defendants bear the burden of proof on that issue. *Valliappan v. Cruz*, 917 So. 2d 257, 259-60 (Fla. 2005); *Phillips v. Lindsay*, 102 Fla. 935, 136 So. 666, 668 (1931) (stating that "[t]he defense of usury having been set up by the defendants, the burden of proof was on them to establish it"); *Tucker v. Fouts,* 76 So. 130 (Fla. 1917); *Oregrund Ltd. Partnership v. Sheive*, 873 So. 2d 451, 455-57 (Fla. 5th DCA 2004); *Swanson v. Gulf West Intern. Corp.,* 429 So.2d 817 (Fla. 2d DCA 1983).

9.  "He who alleges usury to avoid or to defeat an obligation to pay money must establish his charge by clear and satisfactory evidence." *Dixon v. Sharp*, 276 So.2d 817, 820 (Fla. 1973). When a trial court finds that usury has not been proved, the decision will not be reversed on appeal so long as competent and substantial record evidence supports the finding. *See Donofro v.*

---

[9] Attached as an exhibit to Exhibit C hereto.

*Dick,* 680 So.2d 1039 (Fla. 1st DCA 1996).

10. Although the determination of usury is one for the fact finder, *Oregrund,* 873 So. 2d at 455-57; *Wells v. Freedman,* 342 So.2d 983 (Fla. 3d DCA 1977); where there is no conflict in the material facts, it is one of law for the court. *Rebman v. Flagship First National Bank of Highlands County,* 472 So.2d 1360 (Fla. 2d DCA 1985).

11. The usury statutes are to be read together, and are particularly subject to construction in *pari materia.* Each statute is to be construed so that it is meaningful in all parts. *Wilensky v. Fields,* 267 So.2d 1 (Fla. 1972); *Oregrund,* 873 So. 2d at 455-57; *First Mortgage Corp. of Vero Beach v. Stellmon,* 170 So.2d 302 (Fla. 2d DCA 1964).

12. Plaintiff seeks summary judgment against and upon the Usury Defense under Fla. R. Civ. P. 1.510 since there is no genuine dispute as to any material fact, and Plaintiff is entitled a judgment against, and upon, the Usury Defense as a matter of law. This is because despite Defendant, Scott's testimony at his depositions in this and other actions, that any "profits" paid to Plaintiff by the borrower, Excell, under the agreed upon Transaction Documents, including the Profit Participation Agreements between Plaintiff and Excell, were actually "interest" despite what any of those documents might say to the contrary, Fla. Stat. §687.03(4), nonetheless specifically exempts such payments for profits received from the calculation of interest under Florida's Usury Statute, Fla. Stat. Chapter 687.

13. The clear and unambiguous language contained within each of the Transaction Documents, coupled with the clear and unambiguous language contained within the Florida Usury Statute, demonstrate that the Usury Defense is not a valid legal affirmative defense to the Complaint to enforce the Guarantees in this action.

## The Relevant Terms of the Transaction Documents

14. Each of the Wholesale and Locate Transaction Documents have the same terms, unless specifically differentiated herein.

## The Relevant Terms of the Notes

15. First, the applicable Interest Rate for each of the Notes are reflected in the second paragraph of each, and state in relevant part:

> "***Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this … ("Note") shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note***. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms and conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on … ("Maturity Date"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment." (*Emphasis added*).

16. Second, the Notes reflect in the third paragraph of each that they are executed and delivered in continued conjunction with the Profit Participation Agreements, and state in relevant part:

> "***This Note is executed and delivered in continued conjunction with that certain Profit Participation Agreement ([Either Wholesale or Locate] Program) dated September 18, 2019 between Borrower and Lender ("Locate Program Profit Participation Agreement")***…" (*Emphasis added*).

17. Third, Excell made certain representations, warranties and covenants to Plaintiff as a material inducement for entering into the respective Notes, including that the loan proceeds for each Note will be used exclusively, as indicated and applicable, for the purchase and sale of vehicles in connection with either Excell's Wholesale or Locate Programs, which are set forth in

the fourth paragraph of each of the Notes, and state in relevant part:

> ***"As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following: (1) Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's [Either Wholesale or Locate] Program (as defined in the [Either Wholesale or Locate] Program Profit Participation Agreement),*** ...(4) Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, ***the [Either Wholesale or Locate] Program Profit Participation Agreement*** and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, ***[Either Wholesale or Locate] Program Profit Participation Agreement*** and all such other documents and agreements being sometimes herein collectively referred to as "Documents") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents, (5) The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms, ... and (9) Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender. ..." (*Emphasis added*).

18. Fourth, the conditions of default under each of the Notes are set forth in their respective fifth paragraphs, and state in relevant part:

> "The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; ... (d) The occurrence of any one

8

or more event of default under any of the other the Documents; ... (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; ... and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, .... At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise."

19. Sixth, Plaintiff is entitled to recover its attorney's fees under the eighth paragraph of each of the respective Notes.

20. Seventh, the tenth paragraph of each of the respective Notes, contains a usury savings clause, which state in relevant part:

> "***Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.***" (*Emphasis added*).

9

21. Eighth, in the event of a default under either of the Notes, Plaintiff is entitled to receive an interest rate up to the maximum amount allowable by law, which in this case is 24.99% per annum, as per the eleventh paragraph of each of the Notes, and which state in relevant part:

> "… ***Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida***. …"(*Emphasis added*).

22. Ninth, the Notes are to be construed pursuant to Florida law, contains a severability clause in the event any provision thereunder is deemed invalid or unenforceable, and makes the Notes binding upon the Guarantors, as per the thirteenth paragraph of each of the Notes, which state in relevant part:

> "Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. ***If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note***.  All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, …, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; …."(*Emphasis added*).

23. Tenth, as per the seventeenth, and last, paragraph of the Amended Locate Note, which states in relevant part:

> "To further secure Borrower's performance of all of its obligations under the … Note, and as an inducement to Lender to enter into the loan evidenced by the … Note, Borrower caused Scott … and Kristen … (collectively, "Guarantor") to execute and deliver, that certain [Either Wholesale or Locate Guaranty] under which Guarantor[s] unconditionally guarantees to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under the … Note and the other Documents. To further secure Borrower's performance of all of its obligations under this … Note and the Documents, and as an inducement to Lender to enter into the Loan, Borrower will cause Guarantor[s] to execute and

deliver a ratification of the Original Guaranty, under which Guarantor[s] will unconditionally ratify, confirm and adopt the Original Guaranty as being in full force and effect, and which Original Guaranty will now unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Amended and Restated Note, together with the other Documents"(*Emphasis added*).

### The Relevant Terms of the Guarantees

24. First, each of the Guarantees state in their Preambles that:

> **B.** ***The Note is executed and delivered in conjunction with that certain Profit Participation Agreement ([Either Wholesale or Locate] Program) dated on or about the date hereof, executed by Borrower and Lender ("Profit Participation Agreement").***

> C. The Note, ***the Profit Participation Agreement***, ***this Guaranty***, and any other documents, certifications, affidavits, guaranties, agreements, UCCs, or any other instruments or papers executed by Borrower, Lender, Guarantor, or any other borrower, guarantor, or other party in connection with the Loan, or as security for the repayment of the Loan, together with all modifications and amendments thereto, are referred to herein collectively as the "**Loan Documents**".

> D. ***Guarantor acknowledges that Guarantor will benefit from the Loan and the transactions relating thereto and that Lender would not make the Loan to Borrower unless Guarantor executes and delivers this Guaranty to Lender***."
> (*Emphasis added*),

and ¶1 of each of the Guarantees state that: "The above stated Recitals are true and correct and are incorporated herein by this reference…".

25. Second, ¶2(a)(b) & (e) of each of the Guarantees respectively state in relevant part:

> "***Guarantor absolutely, unconditionally, and irrevocably guarantees and agrees to be liable for the full and indefeasible payment and performance when due (whether in due course or upon acceleration) of the following (all of which are collectively referred to herein as the "Guaranteed Obligations"): (i) all obligations, payments and indebtedness of any kind, nature and description of Borrower to Lender, including, but not limited to, principal, interest, indemnity obligations, fees, costs and expenses, however evidenced, whether as principal, surety, endorser, guarantor or otherwise, arising under the Loan, the Note, or any other Loan Documents, or arising in connection with any other indebtedness owed by Borrower to Lender, whether now existing or hereafter arising, whether arising before, during or after the initial or any renewal term of the Note, modification of the Note, or extension of the Note or after the commencement of***

11

*any case with respect to Borrower under the United States Bankruptcy Code or any similar statute (including, without limitation, the payment of interest and other amounts, which would accrue and become due but for the commencement of such case, whether or not such amounts are allowed or allowable in whole or in part in any such case and including loans, interest, fees, costs, expenses and indemnity obligations related thereto and all other obligations of Borrower or its successors to Lender arising after the commencement of such case), whether direct or indirect, absolute or contingent, joint or several, due or not due, primary or secondary, liquidated or unliquidated, secured or unsecured, and however acquired by Lender; and (ii) all costs, fees, and expenses (including, without limitation, attorneys' fees and legal expenses) incurred by Lender in connection with the preparation, execution, delivery, recording, administration, collection, liquidation, enforcement and defense of Borrower's obligations, liabilities and indebtedness as aforesaid to Lender, the rights of Lender in any collateral or under this Guaranty and all other Loan Documents, whether such costs, fees, or expenses are incurred before, during or after the initial or any renewal term of the Note and the other Loan Documents, modification of the Note and the other Loan Documents, or extension of the Note and the other Loan Documents or after the commencement of any case with respect to Borrower or Guarantor under the United States Bankruptcy Code or any similar statute.*

*This Guaranty is a guaranty of payment and performance and not of collection and Guarantor waives any right it may have to require that any action be brought against Borrower or any other person or entity. In that regard, Guarantor agrees that Lender need not attempt to collect the Guaranteed Obligations from Borrower or any other Obligor (defined below) or to realize upon any collateral, but may require Guarantor to make immediate payment of all of the Guaranteed Obligations to Lender when due, whether by maturity, acceleration or otherwise, or at any time thereafter. Guarantor does hereby agree that if any of the Guaranteed Obligations are not paid or performed by Borrower in accordance with the terms of the Note and the other Loan Documents, then Guarantor shall without demand immediately make such payments or performance. Guarantor hereby acknowledges its approval of the contents, execution and delivery of the Note and the other Loan Documents*....

*The obligations hereunder are independent of the obligations of Borrower to Lender. A separate action or actions may be brought and prosecuted against Guarantor whether action is brought against Borrower or whether Borrower is joined in any such action.*" (*Emphasis added*).

26. Third, ¶3(b) of each of the Guarantees state in relevant part:

"*No invalidity, irregularity or unenforceability of all or any part of the Guaranteed Obligations shall affect, impair or be a defense to this Guaranty, nor shall any other circumstance which might otherwise constitute a defense available to or legal or equitable discharge of Borrower in respect of any of the Guaranteed Obligations, or Guarantor in respect of this Guaranty, affect, impair*

12

> *or be a defense to this Guaranty. …. As to interest, fees and expenses, whether arising before or after the commencement of any case with respect to Borrower under the United States Bankruptcy Code or any similar statute, Guarantor shall be liable therefor, even if Borrower's liability for such amounts does not, or ceases to, exist by operation of law. Guarantor acknowledges that Lender has not made any representations to Guarantor with respect to Borrower or otherwise in connection with the execution and delivery by Guarantor of this Guaranty and Guarantor is not in any respect relying upon Lender or any statements by Lender in connection with this Guaranty."* (*Emphasis added*).

27. Fourth, ¶3(d) of each of the Guarantees state in relevant part:

> *"Except the defense of discharge by payment in full, Guarantor hereby waives any and all legal or equitable defenses or claims against Lender to which Guarantor may be entitled, whether now or in the future, with respect to the Loan Documents and this Guaranty… Guarantor further recognizes and agrees that they knowingly makes this waiver and agrees that the waiver is plain, clear and unambiguous.."* (*Emphasis added*).

28. Fifth, ¶7 of each of the Guarantees state in relevant part:

> "Any payment, voluntary or involuntary, received by Lender from Borrower may be applied to the obligations of Borrower to Lender in whatever order Lender elects, and any payment received from any of Guarantor may be applied to any obligations of Borrower to Lender guaranteed hereunder in whatever order Lender elects."

29. Sixth, ¶9(a), (b), (f) & (g) of each of the Guarantees state in relevant part:

> "Guarantor hereby represents and warrants to Lender as follows: (a) All prior representations made by Guarantor to Lender in connection with the Loan are true and correct in all material respects, (b) Guarantor has full right, power and authority to enter into this Guaranty and any other Loan Documents to which Guarantor is a party and to carry out its obligations hereunder and thereunder,… (f) The Loan confers direct, full, fair, and equivalent benefit on Guarantor, and (g) This Guaranty is a legal, valid and binding obligation of Guarantor, enforceable in accordance with its terms"

30. Seventh, ¶10 of each of the Guarantees state in relevant part:

> *"Guarantor acknowledges that Lender has relied upon Guarantor's representations and warranties herein, has made no independent investigation of the truth thereof and is not charged with any knowledge contrary thereto that may have been received by any officer, director, employee, shareholder, or agent of Lender. Guarantor further acknowledges that Guarantor has not been induced to execute and deliver this Guaranty as a result of, and is not relying upon, any representations, warranties, agreements, or conditions, whether*

*express or implied, written or oral, by Lender or by any officer, director, employee, shareholder, or agent of Lender*." (*Emphasis added*).

31. Eighth, ¶14 of each of the Guarantees describe the events of default thereunder, and state in relevant part:

> "For purposes of this Guaranty "Event of Default" shall mean the occurrence of any of the following events or conditions: (a) *The non-payment or non-performance of any of the Guaranteed Obligations when such payment or performance is due*; (b) *The failure in business, dissolution or termination of existence of Borrower, Guarantor, or any other Obligor*; (c) *Any petition in bankruptcy is filed by or against Borrower, Guarantor, or any other Obligor, or any proceedings in bankruptcy or under any laws or regulations of any jurisdiction relating to the relief of debtors, being commenced for the relief or readjustment of any indebtedness of Borrower, Guarantor, or any other Obligor, either through reorganization, composition, extension or otherwise*; …; and (f) *without limiting any of the foregoing, Borrower defaults in the performance of any of the Borrower's obligations to Lender under the Loan Documents*."(*Emphasis added*).

32. Ninth, ¶15(a) of each of the Guarantees calls for them each to be interpreted pursuant to Florida law.

33. Tenth, ¶17 of each of the Guarantees, like the Notes, contain a usury savings clause, and state in relevant part:

> "*Nothing herein shall be deemed to obligate Guarantor to pay any sum of interest which exceeds the maximum rate of interest which Guarantor may lawfully be required to pay under the laws of the state which govern this instrument or under the applicable laws or regulations of the United States of America. Notwithstanding any other provision of this Guaranty or in any instrument evidencing or securing the Loan, the limitation imposed by this Section shall control and limit the obligations of Guarantor to pay sums of interest guaranteed by this instrument. In the event Guarantor shall pay any sum of interest pursuant to this Guaranty which exceeds such maximum rate, such overcharge shall be applied to reduce any other sum for which Guarantor is obligated hereunder, if such sum is then due and payable, or shall be refunded to Guarantor at the election of Lender*."(*Emphasis added*).

34. Eleventh, ¶21 of each of the Guarantees, like the Notes, contain a severability clause, and state in relevant part:

14

"This Guaranty is intended to be performed in accordance with, and only to the extent permitted by, all applicable laws, ordinances, rules and regulations. *If any provision of this Guaranty or the application thereof to any person or circumstances shall, for any reason and to the extent, be invalid or unenforceable, the remainder of this Guaranty and the application of such provision to other persons or circumstances shall not be affected thereby but instead shall be enforced to the greatest extent permitted by law*."(*Emphasis added*).

35. Twelfth, ¶22 of each of the Guarantees, state in relevant part:

"*Neither this Guaranty nor any provision hereof shall be amended, modified, waived or discharged orally or by course of conduct, but only by a written agreement signed by an authorized officer of Lender....*"(*Emphasis added*).

36. Thirteenth, ¶23 of each of the Guarantees, like the Notes, state in relevant part:

"The parties have participated freely in the negotiation and preparation of this Guaranty, have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Guaranty will not be construed more strongly against either party regardless of which party is responsible for its preparation."

37. Lastly, ¶24 of each of the Guarantees contain merger and integration causes, and state in relevant part:

"*This Guaranty represents the entire agreement and understanding of the parties concerning the subject matter hereof, and supersedes all other prior agreements, understandings, negotiations, term sheets, proposal letters, commitment letters, discussions, representations, warranties, commitments, offers and contracts concerning the subject matter hereof, whether oral or written*." (*Emphasis added*).

## The Relevant Terms of the Profit Participation Agreements

38. First, both of the Profit Participation Agreements contain Preambles which state that:

A. *[Excell] is engaged in the business of the purchase and sale of luxury vehicles, which business includes the operation of a [Either a Wholesale or Locate] Program (as hereinafter defined)*.

15

B.  [Plaintiff], on even date herewith, has loaned to [Excell] the [Principal Loan Amounts] (which, together with any and all renewals and future advances of and/or under the Note (as herein defined) being the "Loan Proceeds), as evidenced by that certain … Note of even date herewith, all as may be renewed, extended, substituted and/or further modified (the "Note").

C.  ***In consideration of the Loan, [Excell] has offered to provide a profit participation interest in the [Either a Wholesale or Locate] Program, in accordance with the terms of this Agreement.*** (*Emphasis added*),

and ¶1 of both the Profit Participation Agreements state that: "The foregoing recitals are true."

39. Second, ¶2(b) and (c) of both the Profit Participation Agreements categorize, define and describe the operation of Excell's respective Wholesale and Locate vehicle purchase and sale programs (defined respectively as the "Wholesale Program" and the "Locate Program", and collectively together as the "Vehicle Purchase and Sale Programs").

40. Third, ¶2(a) of both the Profit Participation Agreements state that Plaintiff is entitled to 50% of Excell's profit it receives from each vehicle purchased and sold from either of its two Vehicle Purchase and Sale Programs ("Plaintiff's Share of the Car Sale Profits"), and that the payment of Plaintiff's Share of the Car Sale Profits to it from Excell is in addition to, and not in lieu of the payment of interest under the Notes, and states in pertinent part:

> "***In connection with [Excell]'s operation of the [Either Wholesale or Locate] Program in accordance with this Agreement, [Excell] will pay to [Plaintiff] 50.00% of the [Either Wholesale or Locate] Vehicle Profit for each [Either Wholesale or Locate] Vehicle (the "Profit Participation"), all in accordance with the terms and conditions of this Agreement. Each Profit Participation will be deemed fully earned by [Plaintiff] in accordance with the hereinafter described terms and conditions of this subsection a., with each fully earned Profit Participation thereafter being due and payable by [Excell] to [Plaintiff] in accordance with Section 2.c.(4) of this Agreement. …. The payment of the Profit Participation is in addition to, and not in lieu or modification of, the payment of all principal, interest, costs, expenses and other fees otherwise due and payable by [Excell] to [Plaintiff] under the Note. ….***" (*Emphasis added*).

41. Fourth, ¶4 of both the Profit Participation Agreements, indicate that the Plaintiff's

16

Share of the Car Sale Profits is contingent and dependent upon the respective success of Excell in the operation of its respective Vehicle Purchase and Sale Programs, and like the Notes, each contain usury savings clauses, and state in relevant part:

> *"[Plaintiff] and [Excell] agree that the payment of the above-described Profit Participation is dependent upon the success of [Excell]'s operation of the [Either Wholesale or Locate] Program, and such payment shall not be included in the calculation of any payments due under the Note. Should the payment of the Profit Participation be classified as the payment of interest resulting in the computation or earning of interest in excess of the maximum legal rate of interest which is legally permitted under applicable law, if any, then any and all such excess shall be and the same is hereby waived by [Plaintiff], and any all such excess shall be automatically credited against and in reduction of the balance due under the Note, and any portion of the excess which exceeds the balance due under the Note then shall be paid by [Plaintiff] to [Excell] with no future liability to [Plaintiff].. ..."* (*Emphasis added*).

42. Fifth, ¶5 of both the Profit Participation Agreements, indicate that Plaintiff's right to receive Plaintiff's Share of the Car Sale Profits does not constitute an ownership interest in all or any portion of Excell, and that as a material inducement to entering into the Profit Participation Agreements that Excell further warrants, represents and covenants that ██████ warranties, representations and covenants contained in the Notes are ratified, confirmed and adopted therein, which state in relevant part:

> "The right to payment of the Profit Participation hereunder does not constitute an ownership interest in all or any portion of the Company. ... as material consideration for, and as an inducement to, [Plaintiff] entering into this Agreement, [Excell] warrants and represents to, and otherwise for the benefit of, [Plaintiff]., and otherwise covenants, as and where applicable, as to the following: ...That all other warranties, representations and covenants of [Excell] in the Note are ratified, confirmed and adopted and otherwise incorporated into this Agreement."

43. Sixth, ¶7(a) of both the Profit Participation Agreements indicate that they are to be construed pursuant to Florida law.

44. Seventh, as similarly indicated in the Notes, ¶7(c) of both the Profit Participation Agreements state in relevant part:

"The parties have participated freely in the negotiation and preparation of this Agreement , have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Agreement will not be construed more strongly against either party regardless of which party is responsible for its preparation.."

45. Eight, under ¶7(e) of both the Profit Participation Agreements, Plaintiff is entitled to the recovery of its attorney's fees.

46. Ninth, ¶7(f) of both the Profit Participation Agreements contain merger and integration clauses, with respect to both them and the corresponding Notes, which state in relevant part:

"***This Agreement, together with the Note, contains all the terms, promises, covenants, conditions and representations made by or entered into by and between [Plaintiff] and [Excell] with respect to the subject matter of this Agreement, and supersedes all prior discussions and agreements, whether written or oral***"(Emphasis added).

47. Lastly, ¶7(g) of both the Profit Participation Agreements, like the Notes, contain severability clauses, which states in relevant part:

"…***If any portion of this Agreement is determined to be unlawful, the remaining portions will remain in full force and effect as if such unlawful portion(s) did not appear herein***." (Emphasis added).

### The Relevant Terms of the Note Extensions

48. First, the Preamble for each of the Note Extensions state in relevant part:

C. In connection with the Loan, [Excell] and [Plaintiff] entered into that certain ***Profit Participation Agreement*** …

D. [Excell] and [Plaintiff] wish to amend the Note and ***Profit Participation Agreement***, and Guarantors wish to ratify, confirm and adopt their duties, responsibilities, liabilities and obligations under the Guaranty, all as hereinafter provided (*emphasis added*),

and ¶1 for each of the Note Extensions state in relevant part. "The above stated Recitals are true and correct and are incorporated herein by this reference. "

49. Second, ¶3 for each of the Note Extensions state in relevant part:

"In partial consideration of [Plaintiff]'s agreement to enter into this Agreement, [Excell] hereby (a) absolutely, unconditionally and irrevocably ratifies, confirms and adopts all of the terms and conditions of, and all of its duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, each of the Note and ***Profit Participation Agreement*** (as amended, modified and ratified by this Agreement) and (b) represents and warrants to, and for the benefit of, [Plaintiff] that (i) each and every warranty, representation, agreement and other covenant of, or made by, [Excell] under the Note, ***Profit Participation Agreement*** and any of the other Loan Documents remain true and correct, in all respects, as of the Effective Date, (ii) [Excell] is not in breach or default under any of the terms and conditions of the Note, ***Profit Participation Agreement*** and/or any of the other Loan Documents and (iii) ***[Excell] does not have any claims or defenses against [Plaintiff] that could give rise to any defense, offset or counterclaim in connection with the enforcement of the Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents (all as amended, modified and ratified by this Agreement).***" (*emphasis added*)

50. Third, ¶4 for each of the Note Extensions state in relevant part:

"In partial consideration of [Plaintiff]'s agreement to enter into this Agreement, Guarantors hereby absolutely, unconditionally, and irrevocably ratify, confirm and adopt all of the terms and conditions of, and all of their duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, the Guaranty (as amended, modified and ratified by this Agreement), and hereby acknowledge and agree that (a) the Guaranty is in full force and effect and (b) the Guaranty and Guarantors shall continue to guarantee, without limitation, all of [Excell]'s duties, responsibilities, liabilities and obligations with respect to the repayment of Loan and performance under the Note and other Loan Documents (all as amended, modified and supplemented by this Agreement and all as may hereafter be further amended, modified, supplemented, extended, renewed and/or restated). Guarantors hereby further represent and warrant to, and for the benefit of, [Plaintiff] that (i) each and every warranty, representation, agreement and other covenant of, or made by, Guarantors under the Guaranty remains true and correct, in all respects, as of the Effective Date, (ii) Guarantors are not in breach or default under any of the terms and conditions of the Guaranty and (iii) ***Guarantors do not have any claims and/or defenses against [Plaintiff] that could give rise to any defense, offset, claim or counterclaim in connection with the enforcement of the Guaranty (as amended, modified and ratified by this Agreement).***" (*emphasis added*).

51. Lastly, ¶6 for each of the Note Extensions state in relevant part:

"…Each Party represents and warrants, on its own respective behalf, that the person signing this Agreement on such Party's behalf is duly authorized to execute and deliver this Agreement, and that this First Agreement constitutes a legal, valid and binding obligation of each such Party. Each Party further represents and warrants, on its own respective behalf, that it has reviewed this Agreement with its legal counsel, or otherwise had an opportunity to review this Agreement with its legal counsel. Therefore, in connection with the foregoing, this Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. …." (*Emphasis added*).

## Florida's Usury Statute

52. Fla. Stat. §687.02(1), cited by Defendants in their Usury Defense, states in pertinent that:

"***All contracts for the payment of interest upon any*** loan, advance of money, line of credit, or forbearance to enforce the collection of any debt, or upon any obligation whatever, ***at a higher rate of interest than the equivalent of 18 percent per annum simple interest are hereby declared usurious. However, if such loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation exceeds $500,000 in amount or value, then no contract to pay interest thereon is usurious unless the rate of interest exceeds the rate prescribed*** in [Fla. Stat. §687.071]." (*emphasis added*).

53. Fla. Stat. §687.03(1), cited by Defendants in their Usury Defense, then further states in pertinent that:

"Except as provided herein, ***it shall be usury and unlawful for*** any person, or for any agent, officer, or other representative of any person, ***to reserve, charge, or take*** for any loan, advance of money, line of credit, forbearance to enforce the collection of any sum of money, or other obligation ***a rate of interest greater than the equivalent of 18 percent per annum simple interest, either directly or indirectly, by way of commission for advances, discounts, or exchange, or by any contract, contrivance, or device whatever whereby the debtor is required or obligated to pay a sum of money greater than the actual principal sum received, together with interest at the rate of the equivalent of 18 percent per annum simple interest. However, if any*** loan, advance of money, line of credit, forbearance to enforce the collection of a debt, or obligation ***exceeds $500,000 in amount or value, it shall not be usury or unlawful to reserve, charge, or take interest thereon unless the rate of interest exceeds the rate prescribed*** in [Fla. Stat. §687.071]. …(*emphasis added*).

54. Fla. Stat. §687.03(3), cited by Defendants in their Usury Defense, then further states in

20

pertinent that:

> "For the purpose of this chapter, *__the rate of interest on any__* loan, advance of money, line of credit, forbearance to enforce the collection of a debt, *__or other obligation to pay interest shall be determined and computed upon the assumption that the debt will be paid according to the agreed terms__*, whether or not said loan, advance of money, line of credit, forbearance to enforce collection of a debt, or other obligation is paid or collected by court action prior to its term, … Moreover, for the purposes of this chapter, a loan, advance of money, line of credit, forbearance, or other obligation *__shall be deemed to exceed $500,000 in amount or value if__*: (a)  *__The outstanding principal indebtedness of such__* loan, advance of money, line of credit, forbearance, or other obligation *__initially exceeds $500,000__*; or (b) The aggregate principal indebtedness of such loan, advance of money, line of credit, forbearance, or other obligation *__may reasonably be expected to exceed $500,000 during the term thereof, notwithstanding the fact that less than that amount in the aggregate is initially or at any time thereafter advanced in one transaction or a series of related transactions__*; or (c) Such loan, advance of money, line of credit, forbearance, or other obligation *__exceeds $500,000 at any time, notwithstanding the fact that such indebtedness is or is not subsequently reduced to less than $500,000 and thereafter additional amounts are advanced in one transaction or a series of related transactions which in the aggregate do not exceed $500,000__*. (*emphasis added*).

55. Fla. Stat. §687.071(2), as made applicable to obligations exceeding $500,000, as stated in Fla. Stat. §§687.02(1) & 687.03(1) & (3), and as cited by Defendants in their Usury Defense, states in pertinent that:

> "Unless otherwise specifically allowed by law, *__any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 25 percent per annum but not in excess of 45 percent per annum, or the equivalent rate for a longer or shorter period of time, whether directly or indirectly, or conspires so to do__*, commits a misdemeanor of the second degree,…" (*emphasis added*).

56. Fla. Stat. §687.071(3), as made applicable to obligations exceeding $500,000, as stated in Fla. Stat. §§687.02(1) & 687.03(1) & (3), and as cited by Defendants in their Usury Defense, further states in pertinent that:

> "Unless otherwise specifically allowed by law, *__any person making an extension of credit to any person, who shall willfully and knowingly charge, take, or receive interest thereon at a rate exceeding 45 percent per annum, or the equivalent rate for a longer or shorter period of time, whether directly or indirectly, or conspires so to do__*, commits a felony of the third degree,…" (*emphasis added*).

21

57. A review of the above statutes reveals that for loans under $500,000, a usurious contract is present if an interest rate exceeds 18%. §§687.02(1) & 687.03(1). But for loans exceeding $500,000 the operative statute is §687.071. That statute provides that loans which have effective interest rates of 25% or more, but less than 45%, and loans exceeding an effective interest rate of 45%, are criminal offenses. §§687.071(2) and (3).

58. Accordingly, under the above cited provisions of the Florida Usury Statute, Fla. Stat. Chapter 687, (i) for transactions in which the principal amount is, or is anticipated to be, or at any time the total obligation exceeds, $500,000.00, the legal non-usurious interest rate on such transactions, is an annual interest rate below 25%, and (ii) for the purposes of calculating said annual rate of interest the obligation to pay interest shall be determined and computed upon the assumption that the debt will be paid according to the agreed terms.

**Florida's Usury Statute, Fla. Stat. §687.03(4), Specifically Exempts Payments Made as part of Profit Participation Agreements from the Calculation of Interest**

59. Furthermore, and most importantly for the purposes of this summary judgment motion, Fla. Stat. §687.03(4), as also cited by Defendants in their Usury Defense, goes on to state in pertinent that:

> "If, as provided in subsection (3), a loan, advance of money, line of credit, forbearance, or other obligation exceeds $500,000, then, for the purposes of this chapter, ***interest on*** that loan, advance of money, line of credit, forbearance, or other obligation ***shall not include*** the value of property charged, reserved, or taken as an advance or forbearance, ***the value of which substantially depends on the success of the venture in which are used the proceeds*** of that loan, advance of money, line of credit, forbearance, or other obligation. ... ***[I]nterests in profits***, ... are examples of the type of property the value of which ***would be excluded from calculation of interest under the preceding sentence***." (*emphasis added*).

60. Florida's Third District Court of Appeal, in a case almost exactly on point, in *Bailey v. Harrington*, 462 So. 2d 861, 862 (Fla. 3d DCA 1985), interpreted Fla. Stat. §687.03(4), and stated

22

in pertinent part:

"The ***note in question charged an interest rate of*** 24.99% ***which was plainly not usurious as the amount of money loaned herein was in excess of $500,000***. §§ 687.03(1), 687.071, Fla. Stat. (1983). The ***profit participation provision of the loan agreement did not***, as the trial court found, ***charge any additional interest on the loan. It provided that the lender was entitled to share in 43% of the profits, if any, from the construction project which the loan financed. This payment cannot constitute additional interest on the loan as it was not payable at all if no profits were realized from the project***. Indeed, no profits were realized as the project entirely failed and all agree that no payment whatever is due under the profit participation provision. ***Moreover, this profit participation provision is expressly authorized by our usury statutes as not constituting additional interest***, § 687.03(4), Fla. Stat. (1983), ***and has long been approved by well-established principles of usury law***. Schwab v. Quitoni, 362 So.2d 297 (Fla. 3d DCA 1978)." (*emphasis added*).

61. The conclusion reached in *Bailey* has been cited approvingly by Florida's Fourth District Court of Appeal in *Kraft v. Mason*, 668 So.2d 679, 684 (Fla. 4th DCA 1996)[10], and by Florida's Fifth District Court of Appeal in *Oregrund*, 873 So. 2d at 455-57[11]. Thereafter, the conclusions on this issue reached in both *Bailey* and *Kraft* were cited approvingly by Florida's Supreme Court in *Valliappan v. Cruz*, 917 So. 2d at 259-60[12]. Furthermore, the United States

---

[10] "***Yet another reason the loan was not usurious is that the money to be paid Mason could be characterized as a bonus to be received for participating in an uncertain transaction. A loan agreement is not usurious when payment depends upon a contingency***. See, e.g., Bailey v. Harrington, 462 So.2d 861 (Fla. 3d DCA), rev. denied, 472 So.2d 1180 (Fla. 1985), and rev. denied sub nom., N-Site Associates v. Harrington, 472 So.2d 1181 (Fla. 1985); Schwab v. Quitoni, 362 So.2d 297 (Fla. 3d DCA 1978). ***Here, when the loan was given, any talk of recovery was pure speculation. Quite possibly, there would be no successful recovery from the antitrust litigation, and Mason might have collected nothing beyond the pay back of the loan. This contingent nature of any "interest" to Mason makes the agreement non-usurious***." (*emphasis added*).

[11] "***Also excluded from the usury statutes are transactions in which a portion of the investment is at speculative risk***. Hurley v. Slingerland, 461 So.2d 282, 283 (Fla. 4th DCA 1985); Diversified Enterprises, Inc. v. West, 141 So.2d 27 (Fla. 2d DCA 1962). ***This principle has been statutorily validated when the venture exceeds $500,000***. See Bailey v. Harrington, 462 So.2d 861 (Fla. 3d DCA 1985)."(*emphasis added*).

[12] "First, Valliappan did not agree to pay a usurious rate of interest. Cruz was the Valliappans' neighbor and friend. He agreed to loan them $150,000 for 45 days to use in a business deal. After the 45 days, he was to receive $150,000 back without contingency and without interest. ***If the business deal went through, that is, if the Valliappans successfully purchased airplane parts and resold them in Malaysia, Cruz would receive an additional $30,000. The parties' agreement created a conditional opportunity for Cruz to share in the profits of the deal. If they realized no profits, the Valliappans were not obligated to remit anything above $150,000. "A loan agreement is not usurious when payment depends upon a contingency***." Kraft v. Mason, 668 So.2d 679, 684 (Fla. 4th DCA

District and Bankruptcy Courts for the Southern District of Florida have also interpreted Fla. Stat. §687.03(4) in the same manner. *In re Transcapital Financial Corporation*, 433 B.R. 900, 907-909 (Bankr. S.D. Fla. 2010)[13]; *Video Trax, Inc. v. NationsBank, N.A.*, 33 F. Supp. 2d 1041, 1055 (S.D. Fla. 1998)[14]; *Markwood Invs. Ltd. v. Neves (In re Neves)*, 638 B.R. 220, 233 (Bankr. S.D. Fla. 2014)[15].

---

1996); *see also Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA 1985); *Schwab v. Quitoni*, 362 So.2d 297 (Fla. 3d DCA 1978)." (*emphasis added*).

[13] "*Florida law is in accord with the basic proposition that a loan or financing agreement will not be deemed to be usurious when repayment is made subject to the occurrence of a contingency. See, e.g., Kraft v. Mason*, 668 So. 2d 679, 684 (Fla. 4th DCA 1996) (citing *Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA 1985)) ("*A loan agreement is not usurious when payment depends upon a contingency.*"); *Valliappan*, 917 So. 2d at 260 (same); *Beausejour Corp. N.V. v. Offshore Dev. Co., Inc.*, 802 F.2d 1319, 1321 (11th Cir. 1986) (citing *Britz v. Kinsvater*, 351 P.2d 986 (Ariz. 1960)) (same); *L'Arbalete*, 474 F. Supp. 2d at 1324 (same).... *A loan agreement is not usurious when payment depends upon a contingency. See, e.g., Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA), *rev. den.*, 472 So.2d 1180 (Fla. 1985), *rev. den. sub nom, N-Site Associates v. Harrington*, 472 So.2d 1181 (Fla. 1985); *Schwab v. Quitoni*, 362 So.2d 297 (Fla. 3d DCA 1978). *Here, when the loan was given, any talk of recovery was pure speculation. Quite possibly, there would be no successful recovery from the anti-trust litigation, and Mason might have collected nothing beyond the payback of the loan. This contingent nature of any "interest" to Mason makes the agreement non-usurious. ... Florida Statute § 687.03(4) merely provides that when a loan or financing arrangement includes as part of the consideration to the lender a transfer of property, the value of which "substantially" depends on the success of the venture being financed (e.g., stock or stock options), such property is not counted in calculating the interest on the loan. By way of example, if a lender loans a start-up company $501,000.00 with a stated interest rate of 12%, but also receives stock or stock options in the start-up venture as a part of the consideration for the financing transaction, then the stock options will not be valued in determining whether the de facto interest rate is actually greater than the stated 12% amount. See Bailey v. Harrington*, 462 So. 2d 861 (*loan in excess of $500,000 with stated interest rate of 24.99% was not usurious — "profit participation" given by lender as additional consideration was not counted in calculating interest under § 687.03(4)*)." (*emphasis added*).

[14]"*Florida courts adhere to Supreme Court precedent, and do not characterize fees received for participating in uncertain transactions as interest for purposes of usury determinations. See, e.g., Kraft v. Mason*, 668 So.2d 679, 684 (Fla. 4th DCA 1996). *Repeatedly, those courts have found that an agreement to pay fees is not usurious when payment depends upon a contingency. See, e.g., Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA), *review denied*, 472 So.2d 1180 (Fla. 1985)." (*emphasis added*).

[15] "*[U]nder Florida law, "[a] loan agreement is not usurious when payment depends upon a contingency.*" *Kraft v. Mason*, 668 So.2d 679, 684 (Fla. 4th DCA 1996) (citing *Bailey v. Harrington*, 462 So.2d 861 (Fla. 3d DCA) *rev. denied* 472 So.2d 1180 (Fla.1985) ). *See also In re Transcapital Fin. Corp.*, 433 B.R. 900, 908 (Bankr.S.D.Fla.2010) ("*The fact that repayment of the loan is contingent upon the result of the horse race renders the transaction non-usurious even though the lender stands to potentially earn a 50% return in a single day*"). *Where the lending party does not know at the outset the total amount it will receive in return for the extension of credit, the ultimate amount received is not conclusive of corrupt intent. Kraft*, 668 So.2d at 684. *See also Velletri v. Dixon*, 44 So.3d 187, 189 (Fla. 2d DCA 2010) ("*Whether a transaction is either civilly or criminally usurious is determined at the inception of the loan*")."(*emphasis added*).

62. The interest rate on each of the loans sought to be enforced against the Guarantors herein are each at an annual rate of interest of a mere 1.85%, far below a rate of 25%, and as such plainly not usurious as the amount of the money loaned was in excess of $500,000.00. The profit participation provisions of each of the loan agreements, including the separate Profit Participation Agreements themselves, do not charge any additional interest on either of the loans. Those Profit Participation Agreements each provide that Plaintiff was entitled to share in 50% of the profits, if any, from the sale of high end luxury vehicles by Excell from either dealer to dealer (the Wholesale Program), or that Excell independently locates in the marketplace to buy and sell for its' customers (the Locate Program).

63. The payments Plaintiff received from Excell over time under these two Profit Participation Agreements for the Wholesale and the Locate Programs do not constitute additional interest on the two loans as they were not payable at all if no profits were realized from any particular sale singularly, or collectively, made under either the Wholesale or Locate Programs, and the profit participation provisions of the two loans, as memorialized in the two Profit Participation Agreements for the Wholesale and the Locate Programs are expressly authorized by Fla. Stat. §687.03(4), as not constituting additional interest.

### The Motion for Summary Judgment

64. Plaintiff moves for summary judgment against, and upon, the Usury Defense to the Complaint under Fla. R. Civ. P. 1.510 based upon the (a) Complaint, and the Exhibits referenced in or attached thereto, (b) the Trustee's verification of this Summary Judgment Motion, (c) Defendants' Answer and Usury Defense, (d) Fla. Stat. §687.03(4), (e) the Transaction Documents, (f) the Excell Acknowledgment Letter, (g) the Proofs of Claim, and the exhibits attached thereto (Ex. A, B & C hereto), and (h) Defendants very own deposition testimony in this case and in the

25

Excell Bankruptcy Case (Ex. D, E & F hereto). Each of the above is hereby incorporated into this Summary Judgment Motion by reference. Plaintiff is entitled to summary judgment as a matter of law against the allegations of the Usury Defense to the Complaint since there is no genuine dispute as to any material fact, and Plaintiff is entitled a judgment as a matter of law.

## Motion for Summary Judgment Standard

65. Fla. R. Civ. P. 1.510(a) states in relevant part that:

> "Motion for Summary Judgment or Partial Summary Judgment. A party may move for summary judgment, identifying each claim or defense-or the part of each claim or defense-on which summary judgment is sought. The court shall grant summary judgment if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law. The court shall state on the record the reasons for granting or denying the motion. The summary judgment standard provided for in this rule shall be construed and applied in accordance with the federal summary judgment standard."

66. Fla. R. Civ. P. 1.510(c)(1) states in relevant part that:

> "A party asserting that a fact cannot be or is genuinely disputed must support the assertion by: (A) citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations (including those made for purposes of the motion only), admissions, interrogatory answers, or other materials; or, (B) showing that the materials cited do not establish the absence or presence of a genuine dispute, or that an adverse party cannot produce admissible evidence to support the fact."

67. Fla. R. Civ. P. 1.510(c)(4) states in relevant part that:

> "An affidavit or declaration used to support or oppose a motion must be made on personal knowledge, set out facts that would be admissible in evidence, and show that the affiant or declarant is competent to testify on the matters stated."

68. A court in considering a motion for summary judgment can go beyond the pleadings. On summary judgment, the trial court's function "is solely to determine whether the record conclusively shows that the moving party proved a negative, that is, 'the nonexistence of a genuine [dispute] of a material fact. *Bryson v. Branch Banking and Trust Co.*, 75 So.3d 783, 785 (Fla. 2d DCA 2011); *Winston Park, Ltd. v. City of Coconut Creek*, 872 So.2d 415, 418 (Fla. 4th DCA 2004)

(quoting *Besco USA Int'l Corp. v. Home Sav. of Am. FSB*, 675 So.2d 687, 688 (Fla. 5th DCA 1996).

69. However, on December 31, 2020, the Florida Supreme Court adopted the federal summary judgment standard. *In re Amendments to Florida Rule of Civil Procedure 1.510*, No. SC20-1490, 2020 WL 7778179 (Fla. Dec. 31, 2020). Fed. R. Civ. P. 56(a) requires summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Florida's Supreme Court amended Florida Rule of Civil Procedure 1.510(c), by (a) replacing the word "issue" with "dispute" in the phrase "genuine 'issue' as to any material fact," to mirror Federal Rule 56(a); and (b) adding, "The summary judgment standard provided for in this rule shall be construed and applied in accordance with the federal summary judgment standard articulated in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)." The difference between the prior Florida standard and the Federal standard is set forth in the below cited and linked article written by Jamie Zysk Isani and Crystal B. Carswell[16].

70. The Florida Supreme Court concluded "the federal summary judgment standard better comports with the text and purpose of rule 1.510 and that adopting that standard is in the best interest of our state." In particular, Florida's Supreme Court explained, "Our goals are simply to improve the fairness and efficiency of Florida's civil justice system, to relieve parties from the expense and burdens of meritless litigation, and to save the work of juries for cases where there are real factual disputes that need resolution."

71. Florida's Supreme Court amended Fla. R. Civ. P. 1.510 to "align Florida's summary

---

[16] https://www.huntonak.com/en/insights/florida-supreme-court-adopts-federal-summary-judgment-standard.html#:~:text=Florida's%20rule%201.510(c)%20requires,there%20is%20no%20genuine%20dispute;

judgment standard with that of the federal courts and of the supermajority of states that have already adopted the federal summary judgment standard.", and gave the amended rule a prospective effective date of May 1, 2021. *In re Amendments to Fla. Rule of Civil Procedure 1.510*, 46 Fla.L.Weekly S95 (Fla. Apr. 29, 2021). "New rule 1.510 takes effect on May 1, 2021. This means that the new rule must govern the adjudication of any summary judgment motion decided on or after that date, including in pending cases". *Cf. Love v. State*, 286 So. 3d 177, 187-88 (Fla. 2019)." *In re Amendments to Fla. Rule of Civil Procedure 1.510* (Fla. 2021). As such, the Federal summary judgment standard adopted by the Florida Supreme Court is applicable to this Summary Judgment Motion, and the old standard and rules are no longer applicable.

72. The amendment adopted by Florida's Supreme Court largely replaces the text of existing Fla. R. Civ. P. 1.510 with the text of Fed. R. Civ. P. 56, and new Fla. R. Civ. P. 1.510(a), and which went on to state that: "The summary judgment standard provided for in this rule shall be construed and applied in accordance with the federal summary judgment standard articulated in *Celotex Corp. v. Catrett*, 477 U.S. 317 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242 (1986); and *Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574 (1986)." *In re Amends. to Fla. Rule of Civ. Pro. 1.510*, 309 So. 3d at 196. These cases are commonly referred to as the *Celotex* trilogy. *In re Amendments to Fla. Rule of Civil Procedure 1.510* (Fla. 2021), thereby making it clear that adopting the federal summary judgment standard means that Florida will now adhere to the principles established in the *Celotex* trilogy.

73. In the broadest sense, those cases stand for the proposition that "[s]ummary judgment procedure is properly regarded not as a disfavored procedural shortcut, but rather as an integral part" of rules aimed at "the just, speedy and inexpensive determination of every action." *Celotex*, 477 U.S. at 327 (quoting Fed. R. Civ. P. 1). More specifically, though, embracing the *Celotex*

trilogy means abandoning certain features of Florida jurisprudence that have unduly hindered the use of summary judgment in our state. *In re Amends. to Fla. Rule of Civ. Pro. 1.510*, 309 So. 3d at 192-93. The key points which the Florida Supreme Court felt was necessary to reiterate.

74. First, those applying new Fla. R. Civ. P. 1.510, as this Court now must do, must recognize the fundamental similarity between the summary judgment standard and the directed verdict standard. *See Anderson*, 477 U.S. at 251 (noting that "the inquiry under each is the same"). Both standards focus on "whether the evidence presents a sufficient disagreement to require submission to a jury." *Id.* at 251-52. And under both standards "[t]he substantive evidentiary burden of proof that the respective parties must meet at trial is the only touchstone that accurately measures whether a genuine issue of material fact exists to be tried." citing, *Thomas Logue & Javier Alberto Soto, Florida Should Adopt the Celotex Standard for Summary Judgments*, 76 Fla. Bar J., Feb. 2002, at 26; *see also Anderson*, 477 U.S. at 255.

75. Second, those applying new Fla. R. Civ. P. 1.510, as this Court now must do, must recognize that a moving part that does not bear the burden of persuasion at trial, such as Plaintiff herein, can obtain summary judgment without disproving the non-movants, the Zankl's Usury Defense. Under *Celotex,* and therefore the new Fla. R. Civ. P. 1.510, such movants, like Plaintiff herein, can satisfy its initial burden of production in either of two ways: "[I]f the nonmoving party must prove X to prevail [at trial], the moving party at summary judgment can either produce evidence that X is not so, or point out that the nonmoving party lacks the evidence to prove X." *Bedford v. Doe*, 880 F.3d 993, 996-97 (8th Cir. 2018). Plaintiff in this Summary Judgment Motion has done both. "A movant for summary judgment need not set forth evidence when the non-movant bears the burden of persuasion at trial." *Wease v. Ocwen Loan Servicing, L.L.C.*, 915 F.3d 987, 997 (5th Cir. 2019). Defendants bear the burden of proof on their Usury Defense, a burden they

29

have failed to, and cannot meet, for the reasons articulated herein.

76. Third, those applying new Fla. R. Civ. P. 1.510, as this Court now must do, must recognize that the correct test for the existence of a genuine factual dispute is whether "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. Under new Fla. R. Civ. P. 1.510, "[w]hen opposing parties tell two different stories, one of which is blatantly contradicted by the record, so that no reasonable jury could believe it, a court should not adopt that version of the facts for purposes of ruling on a motion for summary judgment." *Scott v. Harris*, 550 U.S. 372, 380 (2007). In Florida it will no longer be plausible to maintain that "the existence of any competent evidence creating an issue of fact, however credible or incredible, substantial or trivial, stops the inquiry and precludes summary judgment, so long as the 'slightest doubt' is raised." citing Bruce J. Berman & Peter D. Webster, *Berman's Florida Civil Procedure* §1.510:5 (2020 ed.) (describing Florida's pre-amendment summary judgment standard). *In re Amendments to Fla. Rule of Civil Procedure 1.510* (Fla. 2021).

77. Florida's Supreme Court went on to say that "where [Fed. R. Civ. P.] 56(a) says that the Court should state on the record its reasons for granting or denying a summary judgment motion, new [Fla. R. Civ. P.] 1.510(a) says that the Court ***shall*** do so". The wording of the new rule makes clear that this Court's obligation in this regard is mandatory. To comply with this requirement, it will not be enough for this Court to make a conclusory statement that there is or is not a genuine dispute as to a material fact. This Court must state the reasons for its decision with enough specificity to provide useful guidance to the parties and, if necessary, to allow for appellate review. On a systemic level, the Supreme Court agreed with the commenters who said that this requirement is critical to ensuring that Florida courts embrace the federal summary judgment standard in practice, and not just on paper. *In re Amendments to Fla. Rule of Civil Procedure 1.510*

(Fla. 2021).

78. The federal legal standard for summary judgment is well-settled: A party may obtain summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The parties may support their positions by citation to the record, including inter alia, depositions, documents, affidavits, or declarations. Fed. R. Civ. P. 56(c). An issue is genuine if "a reasonable trier of fact could return judgment for the non-moving party." A fact is material if it "might affect the outcome of the suit under the governing law." The Court is to view the facts in the light most favorable to the non-moving party and draws all reasonable inferences in its favor. . . . The moving party shoulders the initial burden of showing the absence of a genuine issue of material fact. Once this burden is satisfied, "the nonmoving party 'must make a sufficient showing on each essential element of the case for which he has the burden of proof.'" Accordingly, the non-moving party must produce evidence, going beyond the pleadings, and by its own affidavits, or by depositions, answers to interrogatories, and admissions on file, designating specific facts to suggest that a reasonable jury could find in his favor. *Rubenstein v. Fla. Bar*, 72 F. Supp. 3d 1298, 1307–08 (S.D. Fla. 2014) (J. Bloom).

79. The party seeking summary judgment bears the initial burden of demonstrating the absence of a genuine issue of material fact, and that he is entitled to judgment as a matter of law. Fed. R. Civ. P. 56(c); *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 90 S. Ct. 1598, 26 L.Ed.2d 142 (1970); *American Viking Contractors, Inc. v. Scribner Equipment Co.*, 745 F.2d 1365 (11th Cir. 1984). To prevail on a motion for summary judgment, the movant must show that the [non-movant] has offered no evidence to support an essential element of his case, or present affirmative evidence that [non-movant] will be unable to prove one or more essential elements of the case at

trial. *Celotex Corp v Catrett,* 477 U.S. 317, 322, 106 S. Ct. 2548, 91 L.Ed.2d 265 (1986). If the movant successfully negates an essential element of the [non-movant]'s case, the burden shifts to the [non-movant] to come forward with evidence demonstrating a genuine issue of material fact for trial. *Id.; American Viking* at 1369.

80. However, "the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no *genuine* issue of *material* fact." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 247-48; 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986). A fact is "material" if it might affect the outcome of the suit under the governing law. *Id* at 248. A dispute is "genuine" if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Id.* ███████ testimony that all profit is interest, does not create a genuine issue of material fact, because it counters the clear and unambiguous language of the respective and collective Transaction Documents, as well as Florida's Usury Statute, in particular, Fla. Stat. §687.03(4), which specifically excludes payments received as profits pursuant to profit participations agreements from the calculation of interest under the law.

81. When the moving party has carried its initial burden under Rule 56(c), its opponent must do more than simply show that there is some metaphysical doubt as to the material facts. *Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp.,* 475 U.S. 574, 106 S. Ct. 1348, 89 L.Ed. 2d 538 (1986). Thus, "[a] mere scintilla of evidence in support of the non-moving party will not suffice to overcome a motion for summary judgment." *Young v. City of Palm Bay, Fla.,* 358 F.3d 859, 860 (11th Cir. 2004). Likewise, "'unsupported speculation ... does not meet a party's burden of producing some defense to a summary judgment motion'" and "does not create a genuine issue of fact." *Cordoba v. Dillard's Inc.,* 419 F.3d 1169 (11th Cir. 2005).

82. Rather, the party opposing summary judgment must either point to evidence in the record, or present additional evidence sufficient to withstand a directed verdict motion at trial based on the alleged evidentiary deficiency. *Celotex Corp,* 477 U.S. at 333 n. 3 ("Once the moving party has attacked whatever record evidence — if any — the nonmoving party purports to rely upon, the burden of production shifts to the nonmoving party, who must either (1) rehabilitate the evidence attacked in the moving party's papers; (2) produce additional evidence showing the evidence of a genuine issue for trial as provided in Rule 56(c), or (3) submit an affidavit explaining why further discovery is necessary as provided in Rule 56(f). *Andersen,* 477 U.S. at 250.

83. In evaluating the evidence presented at the summary judgment phase, this Court should be mindful that "bare and self-serving" allegations that are not based on personal knowledge are inadequate to survive summary judgment. *Stewart v. Booker T. Washington Insurance,* 232 F.3d 844, 851 (11th Cir. 2000). Kristen claimed in her deposition testimony that she had no personal knowledge of the transactions underlying these documents, and that is was her husband Scott who would have such knowledge[17]. While admitting the defaults under the Transaction Documents, Scott's self-serving deposition testimony[18] [19] nonetheless amounted to no more than

---

[17] Excerpted pages from Kristen's August 8, 2022 deposition transcript are attached hereto as Composite Exhibit D to this Summary Judgment Motion. See pg. 35, lines 5-9, & 16-25, pg. 65, lines 18-25, pg. 66, line 1, through pg. 73, line 5, pg. 87, lines 13-24, pg. 88, lines 13-25, pg. 89, lines 1-7, pg. 91, lines 10-23, pg. 92, lines 9-11, pg. 93, lines 2 through pg. 95, line 18, pg. 104, lines 18-21, pg. 175, lines 4-22, pg. 176, line 11 through pg. 177, line, pg. 177, lines 14-16, pg. 178, lines 2-17, pg. 181, lines 7-9, pg. 182, lines 1-3, pg. 182, line 19 through p. 183, line 9, pg. 184, lines 9-14, pg. 185, lines 7-13, pg. 186, lines 10-15, pg. 186, line 25 through pg. 188, line 17, pg. 188, line 24 through pg. 189, line 2, pg. 190, lines 7-19, and pg. 191, lines 10-21.

[18] Excerpted pages from the transcript of Scott's Bankruptcy Rule 2004 examination of himself, as Excell's corporate representative, are attached hereto as Composite Exhibit E to this Summary Judgment Motion. See pg. 54, line 7 though pg. 55, line 15, pg. 61, line 17 through pg. 64, line 20, and pg. 167, line 14 through pg. 168, line 6.

[19] Excerpted pages from Scott's August 9, 2022 deposition transcript are attached hereto as Composite Exhibit F to this Summary Judgment Motion. See pg. 64, line 2, through pg. 65, line 3, pg. 67, line 3, through pg. 68, line 6, pg. 70, lines 8 through pg. 72, line 9, pg. 72, line 19, through pg. 73, line 13, pg. 83, line 24, through pg. 84, line 24, pg. 88, line 12, through pg. 109, line 21, pg. 115, lines 17 through 20, pg. 117, line 4 through pg. 125, line 8, pg. 156, lines 2 through 23, pg. 172, line 18, through pg. 174, line 9, pg. 174, lines 14 through 24, pg. 175, lines 12 through 17, pg. 180, line 1, through pg. 182, ln. 1, pg. 185, line 4, through pg. 187, line 24, pg. 190, lines 11 through 22, pg. 191, line 14, through pg. 194, line 4, pg. 198, line 25, through pg. 200, line 24, pg. 201, line 10, through pg. 214,

him repeatedly claiming that despite what any Transaction Document that he executed and acknowledged to be clear and unambiguous might say, or any admissions on his part within the same, or within any emails, texts, or letters, that he may have received or sent, that to him all the payments made to Plaintiff by Excell for Plaintiff's Share of Profits under the Profit Participation Agreements were not profit, as stated therein, but were rather interest charged at a usurious rate.

84. Defendants have failed to present evidence[20], nor can they, of a sufficient disagreement to require submission to a jury of the issues raised in the Summary Judgment Motion. Defendants have not met, nor can they meet, their substantive evidentiary burden of proof that they must meet at trial to support the claims set forth in the Usury Defense to the Complaint, which under the law is the only touchstone that accurately measures whether a genuine issue of material fact exists to be tried.

85. Further, Plaintiff, as the moving party, does not bear the burden of persuasion at trial on Defendants' Usury Defense, and as such it can, and should, obtain summary judgment without disproving the non-moving Defendants' Usury Defense. Plaintiff can, and has, satisfied its initial burden of production by establishing that if Defendants, as the nonmoving parties must prove the allegations set forth in their Usury Defense, and the issues raised in this Summary Judgment Motion, at trial, then Plaintiff, as the moving party, at summary judgment can and has both produced evidence by way of the collective Transaction Documents, that Defendants' allegations and Usury Defense is not so, and also has pointed out in the Summary Judgment Motion that Defendants, as the nonmoving parties, lack the evidence to prove Defendants' allegations and

---

line 22, pg. 216, line 21, through pg. 217, line 25, pg. 218, line 1, through pg. 220, line 3, pg. 223, line 1, through pg. 224, line 15, pg. 225, line 5, through pg. 233, line 2, pg. 242, lines 2 through 6, pg. 243, line 4, through pg. 246, line 25, pg. 248, line 10, through pg. 250, line 2, pg. 250, line 13, through pg. 258, line 24, and pg. 259, line 9, through pg. 260, line 23.

[20] In either of their deposition testimonies.

Usury Defense to the Complaint.

86. Since Defendants bear the burden of persuasion at trial on the allegations and claims set in their Usury Defense to the Complaint, Plaintiff need not set forth any evidence, even though it has extensively and overwhelmingly done so. There does not exist a genuine factual dispute precluding the entry of summary judgment in favor of Plaintiff since the evidence is such that a reasonable jury could not return a verdict for Defendants. When, as here, opposing parties tell two different stories, one of which, like Defendants', is blatantly contradicted by the record as set forth in the collective Transaction Documents, so that no reasonable jury could believe it, this Court should not adopt Defendants' version of the facts for purposes of ruling on the Summary Judgment Motion. In Florida, Defendants can no longer maintain that "the existence of any competent evidence creating an issue of fact, however credible or incredible, substantial or trivial, stops the inquiry and precludes summary judgment, so long as the 'slightest doubt' is raised." *Id.*

87. As such, and based upon the Federal standard articulated hereinabove by the Florida Supreme Court, this Court should enter summary judgment in favor of Plaintiff against Defendants' first, and only, Usury Defenses to the Complaint, on the basis of Fla. Stat. §687.03(4), which precludes calculating as interest against the Notes Plaintiff made to Excell, the profits, if any, Plaintiff received from Excell pursuant to the two Profit Participation Agreements for Excell's respective Wholesale and Locate Programs, which Notes Defendants had absolutely and unconditionally guaranteed, and had stated annual interest rates on their face of only 1.85% each.

88. Accordingly, because Defendants' first and only Usury Defense is barred, as a matter of law, by Fla. Stat. §687.03(4), it fails to state an affirmative defense to the Complaint, and should have summary judgment against it, pursuant to Fla. R. Civ. P. 1.510, since there is no genuine dispute as to any material fact, and Plaintiff is entitled to a judgment in its favor on the

Usury Defense as a matter of law.

*WHEREFORE*, for the foregoing reasons, Plaintiff respectfully requests this Honorable Court enter an Order entering summary judgment in its favor and against Defendants' Usury Defense, and grant it such further relief as this Court deems just and proper.

## VERIFICATION OF SUMMARY JUDGMENTY MOTION

STATE OF COLORADO        )
                             ) SS:
COUNTY OF EAGLE      )

Under penalties of perjury, I declare that I have read the foregoing Verified Motion for Summary Judgment, and the facts stated in it are true and accurate to the best of my belief and personal knowledge.

Before me, the undersigned authority, a notary public duly authorized to administer oaths and take acknowledgments, personally appeared Plaintiff, Kenneth J. Goodman, as Trustee ("Goodman" or the "Trustee") of the DCG 2008 Irrevocable Wealth Trust ("Plaintiff", "DCG" or the "Trust"), who first being duly sworn upon oath, deposes and states the foregoing paragraphs are true and correct:

1.      I make this Verification in support of Plaintiff, Kenneth J. Goodman, as Trustee ("Goodman" or the "Trustee") of the DCG 2008 Irrevocable Wealth Trusts ("Plaintiff", "DCG" or the "Trust"), Verified Summary Judgment Motion (the "Verified Summary Judgment Motion"), pursuant to Fla. R. Civ. P. 1.510, and Fla. Stat. §687.03(4), for summary judgment against, Defendants, Scott Zankl ("Scott") and Kristen Zankl's ("Kristen")(collectively Scott and Kristen shall be referred to as either "Defendants", "Guarantors", or the "Zankls") First Affirmative Defense of usury (the "Usury Defense"), as asserted in their Answer ("Answer") and Affirmative Defense to Plaintiff's Complaint (the "Complaint") to enforce the absolute and

unconditional guarantees that the Defendants executed in favor of Plaintiff with respect to the debts owing to Plaintiff from Excell Auto Group, Inc., ("Excell"), a Florida corporation owned, operated and managed by Defendants.

2.      I am Trustee of the Trust, and in such capacity I have personal knowledge of the matters set forth herein, and make this affidavit based upon the same.

3.      Each of the factual statements made in the Complaint, and this Verified Summary Judgment Motion, are true and correct to the best of my knowledge and belief, and are based upon my own personal knowledge, to which I would testify to in my direct examination if called to court to testify in this matter, under penalty of perjury.

4.      In my capacity as Trustee of the Trust, I also serve as the custodian of the Trust's business records (the "Business Records"). Each of the exhibits attached to the Complaint, the Proofs of Claim, and referenced in this Verified Summary Judgment Motion, are part of the Trust's Business Records, kept by it in the regular course of its business, and it was and is the regular practice of the Trust for one of its employees or representatives with knowledge of the act, event, condition, opinion, or diagnosis, recorded to make the Business Record or to transmit information thereof to be included in such Business Records; and the Business Record was made at or near the time or reasonably soon thereafter. The Business Records attached to the Complaint, the Proofs of Claim, and referenced in this Verified Summary Judgment Motion, are the exact duplicates of the original.

5.      Each of the exhibits attached to the Complaint, the Proofs of Claim, and referenced in this Verified Summary Judgment Motion, have either been received by me from Defendants, or internally prepared documents prepared for the benefit of Defendants, or at the behest of Defendants, in connection with Defendants and the Trust's business between them, and are part of

37

the Trust's Business Records.

6.    I personally attended the depositions of both Scott and Kristen in both this case, and in the Excell Bankruptcy case, and have personal knowledge of their testimony and admissions made by each of them at their respective depositions in both cases.

7.    I am familiar with each of the documents attached to and/ or referenced in the Complaint, and the Verified Summary Judgment Motion, and where so indicated executed each of those documents on behalf of the Trust.

8.    Further I am familiar with the executed signatures of both Scott and Kristen, from my past dealings with them, as well as from their acknowledgment of signatures on certain documents at their depositions, and recognize their respective executed signatures to be those affixed to the documents attached to and/ or referenced in the Complaint, and the Verified Summary Judgment Motion, where their respective signatures are so indicated to have been executed by them upon each of those documents.

9.    The Trust lent the monies to Excell, as set forth in each of the documents attached to and/ or referenced in the Complaint and the Verified Summary Judgment Motion, and neither Excell, nor either of Defendants, have made any payments to the Trust with respect to those amounts due and owing to the Trust by them.

10.    Any and all payments received by the Trust were from Excell, and not from either of Defendants, and each of those payments were made on account of, and pursuant to the Profit Participation Agreements attached to and/ or referenced in the Complaint and the Verified Summary Judgment Motion, and were the payments of 50% of profits earned by Excell from the purchase and/ or sale of vehicles, pursuant to those agreements, and not the payment of interest, under the subject Notes.

11.     The annual amount of interest, none of which has ever been received from Excell, or the Defendants, under each of the Notes is as set forth within the respective Notes as being 1.875%, and upon default by Excell, which Scott acknowledged at his deposition did occur, accelerates up to the maximum allowable annual interest rate under the law of 24.99%.

12.     There has never been an agreement between myself and Scott, either orally and/ or writing, or by way of course of conduct, either before or after the entering into of these transactions between Excell and the Trust, to ever treat or consider the receipt of payments under the Profit Participation Agreements, to be anything other than profits from the sale of high end luxury automobiles, as described in the Wholesale and Locate Programs, as set forth in the respective Profit Participation Agreements, and definitely not as interest payments under either of the Notes.

13.     The Trust would not have made any of the loans, or provided any monies to Excell as described in, and as set forth in the Complaint, and the Verified Summary Judgment Motion, and the exhibits attached to and referenced within each, if Excell did not execute and deliver to it the respective Profit Participation Agreements, and/ or if the Zankls had not executed and delivered to it the respective Guarantees, as required by them to do under the respective Notes, with the execution and delivery of each being material inducements to the Trust to have entered into the loans made, and the lending of the monies, to Excell.

14.     The Trust has never received IRS Form 1099-INT from Excell with respect to any interest ever having been paid to the Trust from Excell.

[Balance of page left intentionally blank]

FURTHER AFFIANT SAYETH NAUGHT.

Kenneth J. Goodman

SWORN TO AND SUBSCRIBED before me this 26th day of August, 2022, by Kenneth J.

Goodman, who has produced Florida Driver's License No. G35 551058 11 0 to me.

**SHEILA L SANCHEZ**
**NOTARY PUBLIC**
**STATE OF COLORADO**
**NOTARY ID 20134039222**
**MY COMMISSION EXPIRES 06/21/2025**

Notary Signature

Sheila Sanchez

Print Notary Name

NOTARY PUBLIC

State of Colorado at Large

My Commission Expires 6/21/2025

40

**Fill in this information to identify the case:**

Debtor 1   EXCELL Auto Group, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Southern District of Florida**

Case number:  **22−12790**

FILED

**U.S. Bankruptcy Court**
**Southern District of Florida**

5/27/2022

**Joseph Falzone, Clerk**

## Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

DCG 2008 Irrevocable Wealth Trust

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor          UH−SI, LLC, a Florida limited liability company

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

DCG 2008 Irrevocable Wealth Trust

Name

c/o Kenneth J. Goodman, as Trustee
1001 East Telecom Drive
Boca Raton, FL 33432

Contact phone          9543098772

Contact email          ireich@nasonyeager.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

Where should payments to the creditor be sent? (if different)

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)          Filed on _____
                                                                                    MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

**6. Do you have any number you use to identify the debtor?**

☑ No
☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

**7. How much is the claim?**

$ 1500000.00

**Does this amount include interest or other charges?**
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Promissory Note, dated 9/18/19, as amended, 12/5/19 & 11/2/20, & Profit Participation Agreement, dated 9/1/19

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____%

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410                     Proof of Claim                     page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No |
|---|---|---|
| | | ☐ Yes. *Check all that apply:* |

Amount entitled to priority

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).    $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).    $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).    $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).    $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).    $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies    $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    5/27/2022

MM / DD / YYYY

/s/ Ivan J. Reich

Signature

Print the name of the person who is completing and signing this claim:

Name    Ivan J. Reich

First name    Middle name    Last name

Title    Attorney in fact

Company    Nason Yeager Gerson Harris & Fumero, P.A

Identify the corporate servicer as the company if the authorized agent is a servicer

Address    750 Park of Commerce Blvd. Suite 210

Number   Street

Boca Raton, FL 33487

City   State   ZIP Code

Contact phone    5619827114    Email    ireich@nasonyeager.com

Official Form 410      Proof of Claim      page 3

THIS AMENDED AND RESTATED PROMISSORY NOTE AMENDS, RESTATES AND REPLACES, IN ITS ENTIRETY, THAT CERTAIN CONSOLIDATED PROMISSORY NOTE (LOCATE PROGRAM) DATED SEPTEMBER 18, 2019 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $1,020,000.00) (THE "**2019 NOTE**"). THIS AMENDED AND RESTATED PROMISSORY NOTE IS BEING ISSUED TO MEMORALIZE AN ADDITIONAL ADVANCE BY LENDER TO BORROWER IN THE ORIGINAL PRINCIPAL AMOUNT OF $480,000.00 ("**ADDITIONAL ADVANCE**"). EXCEPT FOR THE ADDITIONAL ADVANCE, THIS AMENDED AND RESTATED PROMISSORY NOTE DOES NOT EVIDENCE ANY OTHER INDEBTEDNESS OF BORROWER IN EXCESS OF THE 2019 NOTE.  BORROWER WARRANTS AND REPRESENTS THAT IT WILL TIMELY PAY ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES DUE AND PAYABLE BY REASON OF THE ADDITIONAL ADVANCE, AND OTHERWISE HAS PAID ALL OTHER DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES DUE AND PAYABLE IN CONNECTION WITH 2019 NOTE. A TRUE AND CORRECT COPY OF THE 2019 NOTE IS ATTACHED TO THIS AMENDED AND RESTATED PROMISSORY NOTE.

## AMENDED AND RESTATED PROMISSORY NOTE
### (LOCATE PROGRAM)

U.S. $1,500,000.00

Boca Raton, Florida
December 5, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,500,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Amended and Restated Promissory Note ("**Note**") shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note.  Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on May 1, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in continued conjunction with that certain Profit Participation Agreement (Locate Program) dated September 18, 2019 between Borrower and Lender ("**Locate Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

(1) Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Locate Program (as defined in the Locate Program Profit Participation Agreement).

(2) Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

1

(3)      Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)      Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Locate Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Locate Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)      The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)      Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**").  In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)      There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Locate Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)      No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)      Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

2

(10)     For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death or disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents.  As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under the 2019 Note, and as an inducement to Lender to enter into the loan evidenced by the 2019 Note, Borrower caused Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, that certain Unconditional Guaranty (Locate Program) effective as of September 18, 2019 ("**Original Guaranty**"), under which Guarantor unconditionally guarantees to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under the 2019 Note and the other Documents. To further secure Borrower's performance of all of its obligations under this Amended and Restated Promissory Note and the Documents, and as an inducement to Lender to enter into the Loan, Borrower will cause Guarantor to execute and deliver a ratification of the Original Guaranty, under which Guarantor will unconditionally ratify, confirm and adopt the Original Guaranty as being in full force and effect, and which Original Guaranty will now unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Amended and Restated Note, together with the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[AMENDED AND RESTATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____

Print Name: _____

Name: Scott Zankl
Title: Vice President

WITNESS 2:

Address of Borrower:
   1001 Clint Moore Road, #101
   Boca Raton, Florida 33487

Print Name: _____

\\fs1\docs\11985\11985-26414\849105.doc/bch

6

## EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT
(Wholesale Program)

THIS EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT ("**Agreement**"), effective as of November 2, 2020 ("**Effective Date**"), is between EXCELL AUTO GROUP, INC., a Florida corporation ("**Company**"), SCOTT ZANKL and KRISTEN ZANKL (collectively, "**Guarantors**") and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST ("**DCG Trust**", with Company, Guarantors and DCG Trust being sometimes individually referred to as a "**Party**", or collectively as "**Parties**", as the context so requires).

RECITALS:

A.       DCG Trust has previously loaned Company an original principal sum of $1,850,000.00 ("**Loan**"), as evidenced by that certain Consolidated Promissory Note (Wholesale Program) dated September 18, 2019 executed by Company in favor of DCG Trust, its successors and/or assigns ("**Note**").

B.       To secure Company's performance of all of its obligations under the Loan and Loan Documents (which capitalized term, when used in this Agreement, will have the same meaning ascribed to it in the Guaranty (as herein defined)), Guarantors executed and delivered that certain Unconditional Guaranty (Wholesale Program) effective as of September 18, 2019 ("**Guaranty**").

C.       In connection with the Loan, Company and DCG Trust entered into that certain Profit Participation Agreement (Wholesale Program) dated September 18, 2019 ("**Profit Participation Agreement**").

D.       Company and DCG Trust wish to amend the Note and Profit Participation Agreement, and Guarantors wish to ratify, confirm and adopt their duties, responsibilities, liabilities and obligations under the Guaranty, all as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, as applicable, agree as follows:

1.    Recitals. The above stated Recitals are true and correct and are incorporated herein by this reference.

2.    Maturity Date/Outside Termination Date. The Maturity Date (as originally defined in the Note) and Outside Termination Date (as originally defined in the Profit Participation Agreement) are each hereby amended and will now mean October 31, 2021.

3.    Ratification of Note/Profit Participation Agreement. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company hereby (a) absolutely, unconditionally and irrevocably ratifies, confirms and adopts all of the terms and conditions of, and all of its duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, each of the Note and Profit Participation Agreement (as amended, modified and ratified by this Agreement) and (b) represents and warrants to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Company under the Note, Profit Participation Agreement and any of the other Loan Documents remain true and correct, in all respects, as of the Effective Date, (ii) Company is not in breach or default under any of the terms and conditions of the Note, Profit Participation Agreement and/or any of the other Loan Documents and (iii) Company does not have any claims or defenses against DCG Trust that could give rise to any defense, offset or counterclaim in connection with the enforcement of the Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents (all as amended, modified and ratified by this Agreement).

4.    Ratification of Guaranty. In partial consideration of DCG Trust's agreement to enter into this Agreement, Guarantors hereby absolutely, unconditionally, and irrevocably ratify, confirm and adopt all of the terms and conditions of, and all of their duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, the Guaranty (as amended, modified and ratified by this Agreement), and hereby acknowledge and agree that (a) the Guaranty is in full force and effect and (b) the Guaranty and Guarantors shall continue to guarantee, without limitation,

all of Company's duties, responsibilities, liabilities and obligations with respect to the repayment of Loan and performance under the Note and other Loan Documents (all as amended, modified and supplemented by this Agreement and all as may hereafter be further amended, modified, supplemented, extended, renewed and/or restated). Guarantors hereby further represent and warrant to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Guarantors under the Guaranty remains true and correct, in all respects, as of the Effective Date, (ii) Guarantors are not in breach or default under any of the terms and conditions of the Guaranty and (iii) Guarantors do not have any claims and/or defenses against DCG Trust that could give rise to any defense, offset, claim or counterclaim in connection with the enforcement of the Guaranty (as amended, modified and ratified by this Agreement).

5.   Release. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company and Guarantors hereby forever, irrevocably and unconditionally release and discharge DCG Trust, its agents, trustees, servants, employees, directors, officers, attorneys, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporation and organizations who have acted in its behalf of and from any and all damages, losses, claims, demands, liabilities, obligations, actions, costs, expenses, fees (including, without limitation, attorneys' fees) and causes of action whatsoever which they may have or claim to have as of the date of execution of this Agreement, and whether currently known or unknown, accrued or accrued, and of every nature and extent whatsoever on account of or in any way touching, concerning, arising out of or founded upon the subject Loan, Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealings between the parties up to and including the Effective Date.

6.   Miscellaneous. In the event of any conflict between the express terms of this Agreement and the terms of the Note, Profit Participation Agreement and/or other Loan Documents, the express terms of this Agreement shall control. Each Party represents and warrants, on its own respective behalf, that the person signing this Agreement on such Party's behalf is duly authorized to execute and deliver this Agreement, and that this First Agreement constitutes a legal, valid and binding obligation of each such Party. Each Party further represents and warrants, on its own respective behalf, that it has reviewed this Agreement with its legal counsel, or otherwise had an opportunity to review this Agreement with its legal counsel. Therefore, in connection with the foregoing, this Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one in the same Agreement. If this Agreement is executed and delivered digitally or electronically (whether by PDF file, DocuSign or otherwise) the digital or electronic copy, respectively, will be treated as an original for all purposes. This Agreement shall become effective and binding only upon execution and delivery of this Agreement by all of the parties hereto.

**[SIGNATURES ON NEXT PAGE]**

Each of Company, Guarantors and DCG Trust has caused this Agreement to be duly executed, which Agreement is effective as of the Effective Date.

**DCG TRUST**:

_____
Kenneth J. Goodman, as Trustee of
the DCG 2008 Irrevocable Wealth Trust

**COMPANY**:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

**GUARANTORS**:

_____
Name: Scott Zankl

_____
Name: Kristen Zankl

THIS PROMISSORY NOTE IS A CONSOLIDATION AND RENEWAL OF (i) THAT CERTAIN PROMISSORY NOTE DATED JULY 1, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $520,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $520,000.00), AND (ii) THAT CERTAIN PROMISSORY NOTE DATED SEPTEMBER 4, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $500,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $500,000.00 (COLLECTIVELY, THE "**ORIGINAL NOTES**"). THE TERMS AND CONDITIONS SET FORTH HEREIN SHALL CONTROL THE OBLIGATIONS OF BORROWER WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THE ORIGINAL NOTES. THIS PROMISSORY NOTE DOES NOT EVIDENCE ANY INDEBTEDNESS OF BORROWER IN EXCESS OF THE ORIGINAL NOTES RENEWED HEREBY. BORROWER WARRANTS AND REPRESENTS THAT ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE BEEN PAID IN CONNECTION WITH THE ORIGINAL NOTES. ACCORDINGLY, NO ADDITIONAL DOCUMENTARY STAMP TAXES OR INTANGIBLE TAXES ARE DUE IN CONNECTION WITH THIS PROMISSORY NOTE.

## CONSOLIDATED PROMISSORY NOTE
### (LOCATE PROGRAM)

U.S. $1,020,000.00

Boca Raton, Florida
September 18, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,020,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Note shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on May 1, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in conjunction with that certain Profit Participation Agreement (Locate Program) dated of even date herewith between Borrower and Lender ("**Locate Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

(1) Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Locate Program (as defined in the Locate Program Profit Participation Agreement).

(2) Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

(3)     Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)     Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Locate Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Locate Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)     The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)     Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**"). In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)     There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Locate Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)     No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)     Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has

otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

(10)  For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other the Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death or disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents. As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

4

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under this Note, and as an inducement to Lender to enter into this Loan, Borrower will cause Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, simultaneously with Borrower's execution and delivery of this Note, an unconditional guaranty that is acceptable to Lender under which Guarantor will unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Note and the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[CONSOLIDATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

Print Name: Michele Porcelli

WITNESS 2:

Print Name:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

Address of Borrower:
  1001 Clint Moore Road, #101
  Boca Raton, Florida 33487

## PROFIT PARTICIPATION AGREEMENT
(Locate Program)

THIS PROFIT PARTICIPATION AGREEMENT (the "**Agreement**") is entered into as of the ___ day of September, 2019 ("**Effective Date**") by and between EXCELL AUTO GROUP, INC., a Florida corporation (the "**Company**"), and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**DCG Trust**").

RECITALS:

A.       The Company is engaged in the business of the purchase and sale of luxury vehicles, which business includes the operation of a Locate Program (as hereinafter defined).

B.       DCG Trust, on even date herewith, has loaned to the Company the sum of $1,020,000.00 (which, together with any and all renewals and future advances of and/or under the Note (as herein defined) being the "**Loan Proceeds**"), as evidenced by that certain Consolidated Promissory Note of even date herewith, all as may be renewed, extended, substituted and/or further modified (the "**Note**").

C.       In consideration of the Loan, the Company has offered to provide a profit participation interest in the Locate Program, in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1. **Recitals**.  The foregoing recitals are true.

2. **Profit Participation**.

a.       In connection with the Company's operation of the Locate Program in accordance with this Agreement, the Company will pay to DCG Trust 50.00% of the Locate Vehicle Profit for each Locate Vehicle (the "**Profit Participation**"), all in accordance with the terms and conditions of this Agreement. Each Profit Participation will be deemed fully earned by DCG Trust in accordance with the hereinafter described terms and conditions of this subsection a., with each fully earned Profit Participation thereafter being due and payable by the Company to DCG Trust in accordance with Section 2.c.(4) of this Agreement. The Company and DCG Trust acknowledge and agree that a Profit Participation for a Locate Vehicle is deemed fully earned by DCG Trust as of the date that the following two conditions are satisfied for each Locate Vehicle: (1) The Company has entered into a Client PSA for a Locate Vehicle and (2) the Company has entered into a corresponding Third Party Dealer PSA for the required Locate Vehicle under such subsection (1) Client PSA. In connection with the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company and DCG Trust acknowledge and agree that neither the consummation of a Locate Vehicle Delivery, the payment by Client of the Client Purchase Price Balance nor any other event shall be deemed or otherwise imputed as any additional condition to a Profit Participation for a Locate Vehicle being deemed fully earned by (and thereafter due and payable to) DCG Trust. The payment of the Profit Participation is in addition to, and not in lieu or modification of, the payment of all principal, interest, costs, expenses and other fees otherwise due and payable by the Company to DCG Trust under the Note. With respect to this subsection a, capitalized terms used, but not otherwise defined, in this subsection a. will have the respective meaning otherwise ascribed to it in this Agreement.

b.       For purposes of this Agreement, the "**Locate Program**" is categorized and defined as a vehicle purchase and sale program whereby (1) an independent third party retail client of the Company

("**Client**") enters into a binding purchase and sale agreement with Company ("**Client PSA**") whereby Client identifies and otherwise agrees to purchase from the Company, at a specified fixed purchase price provided for in the Client PSA ("**Client Purchase Price**"), a luxury vehicle that is not otherwise then within Company's vehicle inventory ("**Locate Vehicle**") and simultaneously therewith Client deposits with Company a non-refundable cash deposit, (2) Company thereafter locates the Locate Vehicle within the inventory of an independent third party vehicle dealer ("**Third Party Dealer**"), (3) Company thereafter enters into a purchase and sale agreement with the Third Party Dealer ("**Third Party Dealer PSA**") under which the Company agrees to purchase from the Third Party Dealer, and such Third Party Dealer agrees to sell and deliver (as described in subsection (4) below) to the Company, at a specified fixed purchase price provided for in the Third Party Dealer PSA ("**Third Party Dealer Purchase Price**"), the Locate Vehicle, and simultaneously therewith, the Company uses the Loan Proceeds, or portion thereof, to pay to the Third Party Dealer the Third Party Dealer Purchase Price, (5) the Third Party Dealer thereafter, in accordance with the Third Party Dealer PSA, delivers the Locate Vehicle to the delivery location specified in the Client PSA ("**Locate Vehicle Delivery**") and (6) immediately upon completion of the Locate Vehicle Delivery, the Client and Company consummate the purchase and sale of the Locate Vehicle in accordance with the terms and conditions of the Client PSA.

c.    In connection with Company's operation of the Locate Program and payment of the Profit Participation, for each Locate Vehicle, the Company covenants to the deliver to DCG Trust the following respective documents, confirmations, information and payments (as and where applicable) within the following respective timeframes:

(1)    Within two (2) business days after the Client and Company execute and deliver a Client PSA for a Locate Vehicle, the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided in Section 6, the following information:

(A)    The make, model and year of the then applicable Locate Vehicle, together with any additional specifications required of the Client under the then applicable Client PSA with respect to the then applicable Locate Vehicle (such as, but not limited to, color and mileage requirements) (collectively, "**Client Specifications**");

(B)    A true, correct and, subject to Permitted Redaction, complete copy of the Client PSA, which shall include, at a minimum, the Client Purchase Price, the amount of the Client Deposit and the Client Specifications. Prior to the delivery of any Client PSA in accordance with this subsection (B), the Company will be solely responsible for redacting all personal information contained therein relating to the Client (such as, but not limited to, name, address and social security number of the Client) in order to comply with applicable laws governing personal information and data privacy (the "**Permitted Redaction**"); and

(C)    The amount of the Client Deposit, together with confirmation that the Company is in receipt of such Client Deposit, under the then applicable Client PSA (with such Client Purchase Price, less such Client Deposit, being the "**Client Purchase Price Balance**").

(2)    Within two (2) business days after the Company and Third Party Dealer execute and deliver the Third Party Dealer PSA for the Locate Vehicle required under the then applicable Client PSA, Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided in Section 6, the following documents and information (as and where applicable):

(A)    A confirmation (1) as to which Client PSA the respective Third Party Dealer PSA is intended to satisfy and (2) that the Locate Vehicle under such Third Party Dealer PSA satisfies the Client Specifications under the then applicable Client PSA;

(B)    A true, correct and complete copy of such Third Party Dealer PSA, which shall include, at a minimum, the Third Party Dealer Purchase Price and the make, model and year of the Locate Vehicle required under the then applicable Client PSA; and

(C)    A confirmation of the Locate Vehicle Profit (as herein defined) for the Locate Vehicle required under the then applicable Client PSA. For purposes of this Agreement, the "**Locate Vehicle Profit**" is equal to the Client Purchase Price under the then applicable Client PSA less the Third Party Dealer Purchase Price under the then applicable Third Party Dealer PSA for the Locate Vehicle required under such Client PSA; and

(D)    A confirmation as to the estimated date and time that the Locate Vehicle Delivery will occur.

(3)    Within two (2) business days after the occurrence a Locate Vehicle Delivery for a Locate Vehicle required under the then applicable Client PSA, the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided for in Section 6, the following confirmations:

(A)    Confirmation that the then applicable Client has accepted delivery of its Locate Vehicle in accordance with its applicable Client PSA;

(B)    Confirmation that the Company is in receipt of the Client Purchase Price Balance due and payable under such then applicable Client PSA; and

(C)    Confirmation as to (a) the expected make, model and year of the next Locate Vehicle(s), (b) the expected Profit Participation under such next Locate Vehicle(s) and (c) the timing of the next Client PSAs for such next Locate Vehicle(s).

(4)    On the first day of each month during the term of this Agreement ("**Payment Date**"), the Company will deliver to DCG Trust:

(A)    By and through a wire transfer of U.S. federal funds pursuant to the wire instructions attached hereto as Schedule 1, an amount of money equal to all of the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement during the immediately preceding calendar month; and

(B)    By and through electronic mail to the e-mail address provided for in Section 6, an excel worksheet identifying each Locate Vehicle, Client Purchase Price and Third Party Dealer Purchase Price to support the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement (and, pursuant to subsection (A) above, paid to DCG Trust) during the immediately preceding calendar month.

In the event, however, the Payment Date for any month occurring during the term of this Agreement would fall on a Saturday, Sunday or a federal or state holiday during which DCG Trust's banking institution is closed, the Payment Date for each such applicable month will automatically be amended and deemed to be the last business day immediately preceding such original Payment Date.

d.    The Company's obligation to deliver the Profit Participation to DCG Trust shall have priority over anything to the contrary as may be set forth in any entity documents created for the Company and shall be binding upon the Company and its officers, directors and shareholders, and in no event shall such Profit Participation be subject to any dilution.

3. **Termination of Agreement**.

      a.     Subject to the terms and conditions of this Section 3, this Agreement will terminate effective as of May 1, 2020 ("**Outside Termination Date**"); provided, however, each of the Company and DCG Trust shall also have the right to terminate this Agreement prior to the Outside Termination Date by delivering written notice of such early termination to the other no later than 30-days prior to the Outside Termination Date (the "**Early Termination Notice**"), in which event (1) the Agreement will terminate effective as of the date that is 30 days after delivery of such Early Termination Notice (the "**Early Termination Date**", with the Outside Termination Date and Early Termination Date each being sometimes referred to as the "**Applicable Termination Date**") and (2) notwithstanding anything contained in the Note to the contrary, (a) the Early Termination Date will be deemed the "Maturity Date" for purposes of the Note and (b) effective as of such Early Termination Date, the Company will pay to DCG Trust all of the outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under the Note.

      b.     As of the Applicable Termination Date, the Company will also pay to DCG Trust all of then outstanding, but not yet paid, Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement.

4. **No Interest**.    DCG Trust and the Company agree that the payment of the above-described Profit Participation is dependent upon the success of the Company's operation of the Locate Program, and such payment shall not be included in the calculation of any payments due under the Note. Should the payment of the Profit Participation be classified as the payment of interest resulting in the computation or earning of interest in excess of the maximum legal rate of interest which is legally permitted under applicable law, if any, then any and all such excess shall be and the same is hereby waived by DCG Trust, and any all such excess shall be automatically credited against and in reduction of the balance due under the Note, and any portion of the excess which exceeds the balance due under the Note then shall be paid by DCG Trust to Company with no future liability to DCG Trust.

5. **No Ownership Interest**.  The right to payment of the Profit Participation hereunder does not constitute an ownership interest in all or any portion of the Company.  The Company shall have the sole and absolute right to control the operation of the Locate Program; provided, however, as material consideration for, and as an inducement to, DCG Trust entering into this Agreement, the Company warrants and represents to, and otherwise for the benefit of, DCG Trust, and otherwise covenants, as and where applicable, as to the following:

      a.     A Locate Vehicle will never be obtained from, deemed a part of, or otherwise included within, any of Company's "dealer floor plan" for purpose of any dealer floor plan financing obtained by Company in connection with Company's operation of its business located at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

      b.     No chattel mortgage, bill of sale, security agreement, financing statement or other title retention agreement (except those executed in favor of DCG Trust) has been or will be executed with respect to any Locate Vehicle.

      c.     The Company will collect and pay, prior to delinquency, all applicable State of Florida sales tax, use tax or other taxes required to be paid or collected by Company with respect to any Locate Vehicle, and all penalties and interest thereon, if any.

      d.     The Company will comply promptly with all federal, state and local laws, ordinances and regulations relating to operation of the Locate Program and will obtain and keep in good standing all

4

necessary licenses, permits and approvals required or desirable for the lawful operation of the Locate Program.

e.      The Company will not (1) engage with, or otherwise accept any funds from, any person, group, entity or nation that is acting, directly or indirectly for, or on behalf of, that is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, (2) enter into any transactions contemplated by this Agreement, directly or indirectly, on behalf of, or instigate or facilitate the transactions contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation specified in subsection (1) above. Additionally, the Company is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

f.      That all other warranties, representations and covenants of the Company in the Note are ratified, confirmed and adopted and otherwise incorporated into this Agreement.

In connection with the foregoing, the Company hereby protects, indemnifies and saves harmless DCG Trust, its trustees, principals, beneficiaries and employees, from and against any and all liabilities, obligations, claims, liens, damages (including, without limitation, actual, speculative and special damages), penalties, causes of action, costs, fees and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by or asserted against DCG Trust or any of such persons by reason of or otherwise in connection with (a) the Company's operation of its business (including, without limitation, the Locate Program), (b) any failure on the part of the Company to perform or comply with any applicable federal, state and/or local laws, ordinances and regulations and/or any of the terms, duties, responsibilities and/or obligations under, or otherwise in accordance with, this Agreement and/or the Note and (c) any inaccuracy in any representation or warranty made by the Company under this Agreement and/or the Note. The protections, indemnification and save harmless provisions and obligations herein will survive the expiration or earlier termination of this Agreement.

6.  **Notices**.  All notices, statements, demands or other communications ("notice(s)") to be given under or pursuant to this Agreement, or which a party hereto may wish to give, must be in writing, addressed to the other party at its address as provided below, and delivered in person, by electronic mail, overnight delivery service or by certified or registered mail, return receipt requested and postage prepaid. Such notice will be deemed to have been delivered on the date of hand delivery, on the date of delivery by electronic mail transmission (unless such delivery is made on a non-business day or on any day after 5 p.m., in which event delivery will be deemed to have been made on the following business day) or on the day of delivery when sent by overnight delivery service or mailed as aforesaid (which would also be the day receipt is rejected), as the case may be.  Any party may from time to time change its address or facsimile number for receipt of notices by sending a notice to the other parties specifying such new information.

|  |  |
|---|---|
| To the Company: | To DCG Trust: |
| Excell Auto Group, Inc. | DCG 2008 Irrevocable Wealth Trust |
| Attn: Scott Zankl | c/o Interface Properties |
| 1001 Clint Moore Road, #101 | Attn: Kenneth J. Goodman, as Trustee |
| Boca Raton, Florida 33487 | 1001 East Telecom Drive |
| E-Mail: Scott@excellauto.com | Boca Raton, Florida 33432 |
|  | E-Mail: ken@interfaceproperties.com |

7. **Miscellaneous**.

a. This Agreement will be construed in accordance with the laws of the State of Florida. The parties hereby irrevocably consent and submit to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Agreement.

b. Each party hereto represents and warrants that they have not dealt with any broker or finder in connection with this Agreement.

c. The parties have participated freely in the negotiation and preparation of this Agreement , have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Agreement will not be construed more strongly against either party regardless of which party is responsible for its preparation.

d. Time is of the essence. Any time periods provided for herein which ends on a Saturday, Sunday or a legal holiday will extend to 5:00 p.m. of the next business day.

e. In connection with any litigation arising out of this Agreement, including, without limitation, all trial, appellate and post-judgment proceedings, the prevailing party will be entitled to recover reasonable attorneys' fees and costs.

f. This Agreement, together with the Note, contains all the terms, promises, covenants, conditions and representations made by or entered into by and between DCG Trust and Company with respect to the subject matter of this Agreement, and supersedes all prior discussions and agreements, whether written or oral.

g. This Agreement will bind and accrue to the benefit of the parties hereto and their heirs, executors, administrators, assigns and successors in interest; provided, however, in no event will the Company have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Agreement without the prior written consent of DCG Trust, which consent may be granted or withheld in DCG Trust's sole and absolute discretion. If any portion of this Agreement is determined to be unlawful, the remaining portions will remain in full force and effect as if such unlawful portion(s) did not appear herein.

h. This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, will be deemed an original, but all such counterparts will constitute one and the same agreement. Any signature delivered by a party by facsimile transmission will be deemed to be an original signature.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered on the Effective Date.

Signed, sealed and delivered
in the presence of:

COMPANY:

WITNESS 1:

EXCELL AUTO GROUP, INC., a
Florida corporation

Print Name: Kathy Kidpar

By: _____
Name: Scott Zankl
Title: President

WITNESS 2:

Print Name: Michele Porcelli

WITNESS 1:

DCG TRUST:

Print Name: Kathy Kidpar

Kenneth J. Goodman, as Trustee of the DCG 2008
Irrevocable Wealth Trust

WITNESS 2:

Print Name: Michele Porcelli

\\fs1\docs\11985\11985-26414\815768.doc/bch

7

**SCHEDULE 1**

**DCG TRUST WIRE INSTRUCTIONS**

# WIRING INSTRUCTIONS:  DCG 2008 Irrevocable Trust

Bank:              Seaside Bank

Bank Address:      201 S Orange Avenue
                   Orlando, FL 32801

Routing #:         063116083

Account #:         ██████████

Credit to:         DCG 2008 Irrevocable Trust
                   1001 E Telecom Drive
                   Boca Raton, FL 33431

**Fill in this information to identify the case:**

Debtor 1   EXCELL Auto Group, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Southern District of Florida**

Case number:   **22−12790**

FILED

U.S. Bankruptcy Court
Southern District of Florida

5/27/2022

Joseph Falzone, Clerk

## Official Form 410
## Proof of Claim
04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. Do not send original documents; they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

DCG 2008 Irrevocable Wealth Trust

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor        UH−SI, LLC, a Florida limited liability company

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom? _____

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

Where should notices to the creditor be sent?

DCG 2008 Irrevocable Wealth Trust

Name

c/o Kenneth J. Goodman, as Trustee
1001 East Telecom Drive
Boca Raton, FL 33432

Contact phone        5619827114

Contact email        ireich@nasonyeager.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one): _____

Where should payments to the creditor be sent? (if different)

Name

Contact phone _____

Contact email _____

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known) _____        Filed on _____
                                                                                          MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing? _____

**Part 2: Give Information About the Claim as of the Date the Case Was Filed**

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☒ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| | |
|---|---|
| 7. **How much is the claim?** | $ 1850000.00   **Does this amount include interest or other charges?**<br>☒ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| | |
|---|---|
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Promissory Note, dated 9/18/19, as amended on 11/2/20, and Profit Participation Agreement, dated 9/18/19 |

9. **Is all or part of the claim secured?**

☒ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim*.
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed
☐ Variable

| | |
|---|---|
| 10. **Is this claim based on a lease?** | ☒ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| | |
|---|---|
| 11. **Is this claim subject to a right of setoff?** | ☒ No<br>☐ Yes. Identify the property: _____ |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☒ No | | |
| | | ☐ Yes. *Check all that apply:* | | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).   $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).   $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).   $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).   $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).   $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies   $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☒ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date   5/27/2022
MM / DD / YYYY

/s/ Ivan J. Reich
Signature

Print the name of the person who is completing and signing this claim:

| Name | Ivan J. Reich |
| | First name   Middle name   Last name |
| Title | Attorney in fact |
| Company | Nason Yeager Gerson Harris & Fumero, P.A |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 750 Park of Commerce Blvd. Suite 210 |
| | Number   Street |
| | Boca Raton, FL 33487 |
| | City   State   ZIP Code |
| Contact phone | 5619827114   Email   ireich@nasonyeager.com |

Official Form 410   Proof of Claim   page 3

THIS PROMISSORY NOTE IS A CONSOLIDATION AND RENEWAL OF (i) THAT CERTAIN PROMISSORY NOTE DATED FEBRUARY 16, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $700,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $700,000.00), (ii) THAT CERTAIN PROMISSORY NOTE DATED MAY 16, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $250,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $250,000.00), (iii) THAT CERTAIN PROMISSORY NOTE DATED OCTOBER 2, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $350,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $350,000.00), (iv) THAT CERTAIN PROMISSORY NOTE DATED DECEMBER 11, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $300,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $300,000.00) AND (iii) THAT CERTAIN PROMISSORY NOTE DATED JANUARY 10, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $250,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $250,000.00) (COLLECTIVELY, THE "**ORIGINAL NOTES**"). THE TERMS AND CONDITIONS SET FORTH HEREIN SHALL CONTROL THE OBLIGATIONS OF BORROWER WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THE ORIGINAL NOTES. THIS PROMISSORY NOTE DOES NOT EVIDENCE ANY INDEBTEDNESS OF BORROWER IN EXCESS OF THE ORIGINAL NOTES RENEWED HEREBY. BORROWER WARRANTS AND REPRESENTS THAT ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE BEEN PAID IN CONNECTION WITH THE ORIGINAL NOTES. ACCORDINGLY, NO ADDITIONAL DOCUMENTARY STAMP TAXES OR INTANGIBLE TAXES ARE DUE IN CONNECTION WITH THIS PROMISSORY NOTE.

## CONSOLIDATED PROMISSORY NOTE
### (WHOLESALE PROGRAM)

U.S. $1,850,000.00

Boca Raton, Florida
September 18, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,850,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Note shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on September 30, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in conjunction with that certain Profit Participation Agreement (Wholesale Program) dated of even date herewith between Borrower and Lender ("**Wholesale Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

1

(1)     Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Wholesale Program (as defined in the Wholesale Program Profit Participation Agreement).

(2)     Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

(3)     Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)     Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Wholesale Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Wholesale Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)     The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)     Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**"). In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)     There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Wholesale Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)     No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)     Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

(10)    For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other the Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death and disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents. As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling

such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under this Note, and as an inducement to Lender to enter into this Loan, Borrower will cause Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, simultaneously with Borrower's execution and delivery of this Note, an unconditional guaranty that is acceptable to Lender under which Guarantor will

unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Note and the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[CONSOLIDATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

Print Name: _____

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

WITNESS 2:

Print Name: _____

Address of Borrower:
   1001 Clint Moore Road, #101
   Boca Raton, Florida 33487

\\fs1\docs\11985\11985-26414\815767.doc/bchh

7

## EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT
(Wholesale Program)

THIS EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT ("**Agreement**"), effective as of November 2, 2020 ("**Effective Date**"), is between EXCELL AUTO GROUP, INC., a Florida corporation ("**Company**"), SCOTT ZANKL and KRISTEN ZANKL (collectively, "**Guarantors**") and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST ("**DCG Trust**", with Company, Guarantors and DCG Trust being sometimes individually referred to as a "**Party**", or collectively as "**Parties**", as the context so requires).

RECITALS:

A.       DCG Trust has previously loaned Company an original principal sum of $1,850,000.00 ("**Loan**"), as evidenced by that certain Consolidated Promissory Note (Wholesale Program) dated September 18, 2019 executed by Company in favor of DCG Trust, its successors and/or assigns ("**Note**").

B.       To secure Company's performance of all of its obligations under the Loan and Loan Documents (which capitalized term, when used in this Agreement, will have the same meaning ascribed to it in the Guaranty (as herein defined)), Guarantors executed and delivered that certain Unconditional Guaranty (Wholesale Program) effective as of September 18, 2019 ("**Guaranty**").

C.       In connection with the Loan, Company and DCG Trust entered into that certain Profit Participation Agreement (Wholesale Program) dated September 18, 2019 ("**Profit Participation Agreement**").

D.       Company and DCG Trust wish to amend the Note and Profit Participation Agreement, and Guarantors wish to ratify, confirm and adopt their duties, responsibilities, liabilities and obligations under the Guaranty, all as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, as applicable, agree as follows:

1.    <u>Recitals</u>. The above stated Recitals are true and correct and are incorporated herein by this reference.

2.    <u>Maturity Date/Outside Termination Date</u>. The Maturity Date (as originally defined in the Note) and Outside Termination Date (as originally defined in the Profit Participation Agreement) are each hereby amended and will now mean October 31, 2021.

3.    <u>Ratification of Note/Profit Participation Agreement</u>. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company hereby (a) absolutely, unconditionally and irrevocably ratifies, confirms and adopts all of the terms and conditions of, and all of its duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, each of the Note and Profit Participation Agreement (as amended, modified and ratified by this Agreement) and (b) represents and warrants to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Company under the Note, Profit Participation Agreement and any of the other Loan Documents remain true and correct, in all respects, as of the Effective Date, (ii) Company is not in breach or default under any of the terms and conditions of the Note, Profit Participation Agreement and/or any of the other Loan Documents and (iii) Company does not have any claims or defenses against DCG Trust that could give rise to any defense, offset or counterclaim in connection with the enforcement of the Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents (all as amended, modified and ratified by this Agreement).

4.    <u>Ratification of Guaranty</u>. In partial consideration of DCG Trust's agreement to enter into this Agreement, Guarantors hereby absolutely, unconditionally, and irrevocably ratify, confirm and adopt all of the terms and conditions of, and all of their duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, the Guaranty (as amended, modified and ratified by this Agreement), and hereby acknowledge and agree that (a) the Guaranty is in full force and effect and (b) the Guaranty and Guarantors shall continue to guarantee, without limitation,

all of Company's duties, responsibilities, liabilities and obligations with respect to the repayment of Loan and performance under the Note and other Loan Documents (all as amended, modified and supplemented by this Agreement and all as may hereafter be further amended, modified, supplemented, extended, renewed and/or restated). Guarantors hereby further represent and warrant to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Guarantors under the Guaranty remains true and correct, in all respects, as of the Effective Date, (ii) Guarantors are not in breach or default under any of the terms and conditions of the Guaranty and (iii) Guarantors do not have any claims and/or defenses against DCG Trust that could give rise to any defense, offset, claim or counterclaim in connection with the enforcement of the Guaranty (as amended, modified and ratified by this Agreement).

5.  Release. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company and Guarantors hereby forever, irrevocably and unconditionally release and discharge DCG Trust, its agents, trustees, servants, employees, directors, officers, attorneys, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporation and organizations who have acted in its behalf of and from any and all damages, losses, claims, demands, liabilities, obligations, actions, costs, expenses, fees (including, without limitation, attorneys' fees) and causes of action whatsoever which they may have or claim to have as of the date of execution of this Agreement, and whether currently known or unknown, accrued or accrued, and of every nature and extent whatsoever on account of or in any way touching, concerning, arising out of or founded upon the subject Loan, Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealings between the parties up to and including the Effective Date.

6.  Miscellaneous. In the event of any conflict between the express terms of this Agreement and the terms of the Note, Profit Participation Agreement and/or other Loan Documents, the express terms of this Agreement shall control. Each Party represents and warrants, on its own respective behalf, that the person signing this Agreement on such Party's behalf is duly authorized to execute and deliver this Agreement, and that this First Agreement constitutes a legal, valid and binding obligation of each such Party. Each Party further represents and warrants, on its own respective behalf, that it has reviewed this Agreement with its legal counsel, or otherwise had an opportunity to review this Agreement with its legal counsel. Therefore, in connection with the foregoing, this Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one in the same Agreement. If this Agreement is executed and delivered digitally or electronically (whether by PDF file, DocuSign or otherwise), the digital or electronic copy, respectively, will be treated as an original for all purposes. This Agreement shall become effective and binding only upon execution and delivery of this Agreement by all of the parties hereto.

**[SIGNATURES ON NEXT PAGE]**

Each of Company, Guarantors and DCG Trust has caused this Agreement to be duly executed, which Agreement is effective as of the Effective Date.

**DCG TRUST**:

_____
Kenneth J. Goodman, as Trustee of
the DCG 2008 Irrevocable Wealth Trust

**COMPANY**:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

**GUARANTORS**:

_____
Name: Scott Zankl

_____
Name: Kristen Zankl

# PROFIT PARTICIPATION AGREEMENT
(Wholesale Program)

THIS PROFIT PARTICIPATION AGREEMENT (the "**Agreement**") is entered into as of the day of September, 2019 ("**Effective Date**") by and between EXCELL AUTO GROUP, INC., a Florida corporation (the "**Company**"), and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**DCG Trust**").

RECITALS:

A.    The Company is engaged in the business of the purchase and sale of luxury vehicles, which business includes the operation of a Wholesale Program (as hereinafter defined).

B.    DCG Trust, on even date herewith, has loaned to the Company the sum of $1,850,000.00 (which, together with any and all renewals and future advances of and/or under the Note (as herein defined) being the "**Loan Proceeds**), as evidenced by that certain Consolidated Promissory Note of even date herewith, all as may be renewed, extended, substituted and/or further modified (the "**Note**").

C.    In consideration of the Loan, the Company has offered to provide a profit participation interest in the Wholesale Program, in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Recitals**. The foregoing recitals are true.

2.    **Profit Participation**.

a.    In connection with the Company's operation of the Wholesale Program in accordance with this Agreement, the Company will pay to DCG Trust 50.00% of the Wholesale Vehicle Profit for each Wholesale Vehicle (the "**Profit Participation**"), all in accordance with the terms and conditions of this Agreement. Each Profit Participation will be deemed fully earned by DCG Trust in accordance with the hereinafter described terms and conditions of this subsection a., with each fully earned Profit Participation thereafter being due and payable by the Company to DCG Trust in accordance with Section 2.c.(5) of this Agreement. The Company and DCG Trust acknowledge and agree that a Profit Participation for a Wholesale Vehicle is deemed fully earned by DCG Trust as of the date that the following two conditions are satisfied for each Wholesale Vehicle: (1) The Company has entered into a Sale Dealer PSA for a Wholesale Vehicle and (2) the Company has entered into a corresponding Buy Dealer PSA for the required Wholesale Vehicle under such subsection (1) Sale Dealer PSA. In connection with the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company and DCG Trust acknowledge and agree that neither the consummation of a Wholesale Vehicle Delivery, the payment by Buy Dealer of the Buy Dealer Purchase Price nor any other event shall be deemed or otherwise imputed as any additional condition to a Profit Participation for a Wholesale Vehicle being deemed fully earned by (and thereafter due and payable to) DCG Trust. The payment of the Profit Participation is in addition to, and not in lieu or modification of, the payment of all principal, interest, costs, expenses and other fees otherwise due and payable by the Company to DCG Trust under the Note. With respect to this subsection a, capitalized terms used, but not otherwise defined, in this subsection a. will have the respective meaning otherwise ascribed to it in this Agreement.

b.      For purposes of this Agreement, the "**Wholesale Program**" is categorized and defined as a vehicle purchase and sale program whereby (1) an independent third party vehicle dealer ("**Sale Dealer**") enters into a binding purchase and sale agreement with Company ("**Sale Dealer PSA**") whereby Company identifies and otherwise agrees to purchase from the Sale Dealer, at a specified fixed purchase price provided for in the Sale Dealer PSA ("**Company Purchase Price**"), a luxury vehicle from the Sale Dealer's vehicle inventory ("**Wholesale Vehicle**"), (2) Company thereafter locates another independent third party vehicle dealer (as opposed to private, individual client) that desires to purchase the Wholesale Vehicle ("**Buy Dealer**"), (3) Company thereafter enters into a purchase and sale agreement with the Buy Dealer ("**Buy Dealer PSA**") under which the Buy Dealer agrees to purchase from the Company, and the Company agrees to sell to the Buy Dealer, at a specified fixed purchase price provided for in the Buy Dealer PSA ("**Buy Dealer Purchase Price**"), the Wholesale Vehicle, (4) the Company uses the Loan Proceeds, or portion thereof, to pay the Company Purchase Price to the Sale Dealer in accordance with the terms and conditions of the Sale Dealer PSA and (5) the Company causes the Sale Dealer to thereafter, in accordance with the Sale Dealer PSA, deliver the Wholesale Vehicle directly to Buy Dealer in accordance with the delivery location required by Buy Dealer in accordance with the Buy Dealer PSA ("**Wholesale Vehicle Delivery**").

c.      In connection with Company's operation of the Wholesale Program and payment of the Profit Participation, for each Wholesale Vehicle, the Company covenants to the deliver to DCG Trust the following respective documents, confirmations, information and payments (as and where applicable) within the following respective timeframes:

(1)      On the first day of each month during the term of this Agreement (the "**Document Delivery Date**"), the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided for in Section 6:

(A)      An excel worksheet, in a form consistent with the worksheet attached hereto as Schedule 2, identifying (i) the make, model, year and vehicle information number ("**VIN**") of each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month, (ii) the Company Purchase Price and Buyer Dealer Purchase Price for each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month and (iii) the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement (and, pursuant to subsection (2) below, to be paid by the Company to DCG Trust) during the immediately preceding calendar month; and

(B)      A true, correct and complete copy each Sale Dealer PSA and Buy Dealer PSA entered for each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month.

(2)      On the fifteenth (15th) day of each month during the term of this Agreement ("**Payment Date**"), the Company will deliver to DCG Trust, by and through a wire transfer of U.S. federal funds pursuant to the wire instructions attached hereto as Schedule 1, an amount of money equal to all of the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement during the immediately preceding calendar month; provided, however, in the event a Payment Date for any month occurring during the term of this Agreement would fall on a Saturday, Sunday or a federal or state legal holiday during which DCG Trust's banking institution is closed, the Payment Date for each such applicable month will automatically be amended and deemed to be the last business day immediately preceding such original Payment Date.

d.      The Company's obligation to deliver the Profit Participation to DCG Trust shall have priority over anything to the contrary as may be set forth in any entity documents created for the Company and shall

2

be binding upon the Company and its officers, directors and shareholders, and in no event shall such Profit Participation be subject to any dilution.

3. **Termination of Agreement**.

a. Subject to the terms and conditions of this Section 3, this Agreement will terminate effective as of the Maturity Date (as defined in the Note) ("**Outside Termination Date**"); provided, however, each of the Company and DCG Trust shall also have the right to terminate this Agreement prior to the Outside Termination Date by delivering written notice of such early termination to the other no later than 30-days prior to the Outside Termination Date (the "**Early Termination Notice**"), in which event (1) the Agreement will terminate effective as of the date that is 30 days after delivery of such Early Termination Notice (the "**Early Termination Date**", with the Outside Termination Date and Early Termination Date each being sometimes referred to as the "**Applicable Termination Date**") and (2) notwithstanding anything contained in the Note to the contrary, (a) the Early Termination Date will be deemed the "Maturity Date" for purposes of the Note and (b) effective as of such Early Termination Date, the Company will pay to DCG Trust all of the outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under the Note.

b. As of the Applicable Termination Date, the Company will also pay to DCG Trust all of then outstanding, but not yet paid, Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement.

4. **No Interest**. DCG Trust and the Company agree that the payment of the above-described Profit Participation is dependent upon the success of the Company's operation of the Wholesale Program, and such payment shall not be included in the calculation of any payments due under the Note. Should the payment of the Profit Participation be classified as the payment of interest resulting in the computation or earning of interest in excess of the maximum legal rate of interest which is legally permitted under applicable law, if any, then any and all such excess shall be and the same is hereby waived by DCG Trust, and any all such excess shall be automatically credited against and in reduction of the balance due under the Note, and any portion of the excess which exceeds the balance due under the Note then shall be paid by DCG Trust to Company with no future liability to DCG Trust.

5. **No Ownership Interest**. The right to payment of the Profit Participation hereunder does not constitute an ownership interest in all or any portion of the Company. The Company shall have the sole and absolute right to control the operation of the Wholesale Program; provided, however, as material consideration for, and as an inducement to, DCG Trust entering into this Agreement, the Company warrants and represents to, and otherwise for the benefit of, DCG Trust, and otherwise covenants, as and where applicable, as to the following:

a. A Wholesale Vehicle will never be obtained from, deemed a part of, or otherwise included within, any of Company's "dealer floor plan" for purpose of any dealer floor plan financing obtained by Company in connection with Company's operation of its business located at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

b. No chattel mortgage, bill of sale, security agreement, financing statement or other title retention agreement (except those executed in favor of DCG Trust) has been or will be executed with respect to any Wholesale Vehicle.

c. The Company will collect and pay, prior to delinquency, all applicable State of Florida sales tax, use tax or other taxes required to be paid or collected by Company with respect to any Wholesale Vehicle, and all penalties and interest thereon, if any.

d.      The Company will comply promptly with all federal, state and local laws, ordinances and regulations relating to operation of the Wholesale Program and will obtain and keep in good standing all necessary licenses, permits and approvals required or desirable for the lawful operation of the Wholesale Program.

e.      The Company will not (1) engage with, or otherwise accept any funds from, any person, group, entity or nation that is acting, directly or indirectly for, or on behalf of, that is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, (2) enter into any transactions contemplated by this Agreement, directly or indirectly, on behalf of, or instigate or facilitate the transactions contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation specified in subsection (1) above. Additionally, the Company is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

f.      That all other warranties, representations and covenants of the Company in the Note are ratified, confirmed and adopted and otherwise incorporated into this Agreement.

In connection with the foregoing, the Company hereby protects, indemnifies and saves harmless DCG Trust, its trustees, principals, beneficiaries and employees, from and against any and all liabilities, obligations, claims, liens, damages (including, without limitation, actual, speculative and special damages), penalties, causes of action, costs, fees and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by or asserted against DCG Trust or any of such persons by reason of or otherwise in connection with (a) the Company's operation of its business (including, without limitation, the Wholesale Program), (b) any failure on the part of the Company to perform or comply with any applicable federal, state and/or local laws, ordinances and regulations and/or any of the terms, duties, responsibilities and/or obligations under, or otherwise in accordance with, this Agreement and/or the Note and (c) any inaccuracy in any representation or warranty made by the Company under this Agreement and/or the Note. The protections, indemnification and save harmless provisions and obligations herein will survive the expiration or earlier termination of this Agreement.

6.  **Notices**.  All notices, statements, demands or other communications ("notice(s)") to be given under or pursuant to this Agreement, or which a party hereto may wish to give, must be in writing, addressed to the other party at its address as provided below, and delivered in person, by electronic mail, overnight delivery service or by certified or registered mail, return receipt requested and postage prepaid. Such notice will be deemed to have been delivered on the date of hand delivery, on the date of delivery by electronic mail transmission (unless such delivery is made on a non-business day or on any day after 5 p.m., in which event delivery will be deemed to have been made on the following business day) or on the day of delivery when sent by overnight delivery service or mailed as aforesaid (which would also be the day receipt is rejected), as the case may be.  Any party may from time to time change its address or facsimile number for receipt of notices by sending a notice to the other parties specifying such new information.

| | |
|---|---|
| To the Company: | To DCG Trust: |
| Excell Auto Group, Inc. | DCG 2008 Irrevocable Wealth Trust |
| Attn: Scott Zankl | c/o Interface Properties |

4

1001 Clint Moore Road, #101         Attn: Kenneth J. Goodman, as Trustee
Boca Raton, Florida 33487            1001 East Telecom Drive
E-Mail: Scott@excellauto.com       Boca Raton, Florida 33432
                                       E-Mail: ken@interfaceproperties.com

7. **Miscellaneous**.

a.      This Agreement will be construed in accordance with the laws of the State of Florida. The parties hereby irrevocably consent and submit to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Agreement.

b.      Each party hereto represents and warrants that they have not dealt with any broker or finder in connection with this Agreement.

c.      The parties have participated freely in the negotiation and preparation of this Agreement , have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Agreement will not be construed more strongly against either party regardless of which party is responsible for its preparation.

d.      Time is of the essence.  Any time periods provided for herein which ends on a Saturday, Sunday or a legal holiday will extend to 5:00 p.m. of the next business day.

e.      In connection with any litigation arising out of this Agreement, including, without limitation, all trial, appellate and post-judgment proceedings, the prevailing party will be entitled to recover reasonable attorneys' fees and costs.

f.      This Agreement, together with the Note, contains all the terms, promises, covenants, conditions and representations made by or entered into by and between DCG Trust and Company with respect to the subject matter of this Agreement, and supersedes all prior discussions and agreements, whether written or oral.

g.      This Agreement will bind and accrue to the benefit of the parties hereto and their heirs, executors, administrators, assigns and successors in interest; provided, however, in no event will the Company have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Agreement without the prior written consent of DCG Trust, which consent may be granted or withheld in DCG Trust's sole and absolute discretion.  If any portion of this Agreement is determined to be unlawful, the remaining portions will remain in full force and effect as if such unlawful portion(s) did not appear herein.

h.      This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, will be deemed an original, but all such counterparts will constitute one and the same agreement.  Any signature delivered by a party by facsimile transmission will be deemed to be an original signature.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered on the Effective Date.

Signed, sealed and delivered
in the presence of:

COMPANY:

WITNESS 1:

EXCELL AUTO GROUP, INC., a
Florida corporation

Print Name:

By: _____
Name: Scott Zankl
Title: President

WITNESS 2:

Print Name: Michele Porcelli

WITNESS 1:

DCG TRUST:

Print Name:

Kenneth J. Goodman, as Trustee of the DCG 2008
Irrevocable Wealth Trust

WITNESS 2:

Print Name: Michele Porcelli

\\fs1\docs\11985\11985-26414\815769.doc/bch

## SCHEDULE 1

**DCG TRUST WIRE INSTRUCTIONS**

## WIRING INSTRUCTIONS:  DCG 2008 Irrevocable Trust

Bank:              Seaside Bank

Bank Address:      201 S Orange Avenue
                   Orlando, FL 32801

Routing #:         063116083

Account #:         ███████████

Credit to:         DCG 2008 Irrevocable Trust
                   1001 E Telecom Drive
                   Boca Raton, FL 33431

## SCHEDULE 2

### EXCEL SHEET

| # | Purchase Date | Date Money In | # Days Money Out | Amount Out | Amount In | Profit Per Car | amount owed | Vehicle Desc. |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | 11/12/18 | not yet | | $110,000 | $115,000 | $5,000 | $2,500 | 2014 bentley flying s |
| 3 | 11/15/18 | not yet | | $300,000 | $309,000 | $9,000 | $4,500 | 15 avebntador |
| | 11/16/18 | not yet | | $200,000 | $208,000 | $8,000 | $4,000 | 2015 ferrari 458 |
| 5 | 11/20/18 | not yet | | $225,000 | $230,000 | $5,000 | $2,500 | 2017 huracan |
| 6 | 11/18/19 | not yet | | $100,000 | $105,000 | $5,000 | $2,500 | 2010 ferrari californi |
| 7 | 11/19/18 | not yet | | $160,000 | $170,000 | $10,000 | $5,000 | 2017 porsche turbo |
| | | | | | | | | |
| | 11/20/18 | not yet | | $300,000 | $306,000 | $6,000 | $3,000 | 2014 aventador |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |

**Fill in this information to identify the case:**

Debtor 1   EXCELL Auto Group, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court    **Southern District of Florida**

Case number:  **22−12790**

**FILED**

**U.S. Bankruptcy Court**
**Southern District of Florida**

6/22/2022

**Joseph Falzone, Clerk**

## Official Form 410
## Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) **that you received.**

| Part 1: | Identify the Claim |
| --- | --- |

**1. Who is the current creditor?**

DCG 2008 Irrevocable Wealth Trust

Name of the current creditor (the person or entity to be paid for this claim)

Other names the creditor used with the debtor          DCG 2008 Irrevocable Wealth Trust

**2. Has this claim been acquired from someone else?**

☑ No
☐ Yes. From whom?

**3. Where should notices and payments to the creditor be sent?**

Federal Rule of Bankruptcy Procedure (FRBP) 2002(g)

**Where should notices to the creditor be sent?**

DCG 2008 Irrevocable Wealth Trust

Name

c/o Kenneth J. Goodman, as Trustee
1001 East Telecom Drive
Boca Raton, FL 33432

Contact phone          9543098772

Contact email          ireich@nasonyeager.com

Uniform claim identifier for electronic payments in chapter 13 (if you use one):

**Where should payments to the creditor be sent?** (if different)

Name

Contact phone

Contact email

**4. Does this claim amend one already filed?**

☑ No
☐ Yes. Claim number on court claims registry (if known)          Filed on

MM / DD / YYYY

**5. Do you know if anyone else has filed a proof of claim for this claim?**

☑ No
☐ Yes. Who made the earlier filing?

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| **6. Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

**7. How much is the claim?**  $ _____220000.00_____

Does this amount include interest or other charges?
☑ No
☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Deposit held see attachment No. 4 _____

**9. Is all or part of the claim secured?**

☑ No
☐ Yes. The claim is secured by a lien on property.

**Nature of property:**
☐ Real estate.    If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*
☐ Motor vehicle
☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

Value of property:    $ _____

Amount of the claim that is secured:    $ _____

Amount of the claim that is unsecured:    $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

Amount necessary to cure any default as of the date of the petition.    $ _____

**Annual Interest Rate** (when case was filed)    _____ %

☐ Fixed
☐ Variable

**10. Is this claim based on a lease?**

☑ No
☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

**11. Is this claim subject to a right of setoff?**

☑ No
☐ Yes. Identify the property: _____

Official Form 410    Proof of Claim    page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No |
| | | ☐ Yes. *Check all that apply:* | Amount entitled to priority |

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(_) that applies  $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

The person completing this proof of claim must sign and date it. FRBP 9011(b).

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    6/22/2022

MM / DD / YYYY

/s/ Ivan J. Reich

Signature

Print the name of the person who is completing and signing this claim:

| Name | Ivan J. Reich |
| | First name    Middle name    Last name |
| Title | Attorney in fact |
| Company | Nason Yeager Gerson Harris & Fumero, P.A |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 750 Park of Commerce Blvd. Suite 210 |
| | Number    Street |
| | Boca Raton, FL 33487 |
| | City    State    ZIP Code |
| Contact phone | 5619827114    Email    ireich@nasonyeager.com |



July 16, 2020

Mr. Scott Zankl
1001 Clint Moore Road
Boca Raton, FL 33487

Re:     Confirmation of balances owed to DCG 2008 Irrev Trust

Dear Scott,

My accountants are preparing an updated Personal Financial Statement.  For that reason, your signature below shall confirm the following:

1. We have a Locate Program agreement in place dated December 5, 2019 with an outstanding balance of $1,500,000 as of today's date.

2. We have a Wholesale Program agreement in place dated September 18, 2019 with an outstanding balance of $1,850,000 as of today's date.

3. We have two $200,000 Locate advances outstanding evidenced by two notes dated March 17, 2020 and June 25, 2020.

4. Excell Auto has a current deposit from Ken Goodman in the principal amount of $220,000 which represents the value of a Lamborghini Urus which Ken is driving on a daily basis.  Upon the return of the vehicle and, at ████ request, that deposit will be returned.

Your truly,
DCG 2008 IRREVOCABLE WEALTH TRUST("DCG")

Kenneth J. Goodman
Trustee

The aforementioned information outlined in items 1 through 4 is accurate and currently outstanding in favor of DCG.

EXCELL AUTO GROUP

Scott Zankl, Vice President

IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
IN AND FOR PALM BEACH COUNTY, FLORIDA
CASE NO.: 502022CA005035XXXXMB


KENNETH J. GOODMAN, as TRUSTEE of the DCG 2008
IRREVOCABLE WEALTH TRUST.

          Plaintiff,

-vs-

SCOTT ZANKL and KRISTEN ZANKL,

          Defendants.
_____


ZOOM REMOTE DEPOSITION OF KRISTEN ZANKL



Monday, August 8, 2022
10:15 a.m. - 3:16 p.m.




2255 Glades Road
Suite 205E
Boca Raton, Florida 33431




Reported By:
Denise T. Medina, RMR
Notary Public, State of Florida
Boca Raton Office   Job #J8504808



```
 1    APPEARANCES:

 2    On behalf of the Plaintiff:

 3          IVAN J. REICH, ESQUIRE (VIA ZOOM)
            NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
 4          3001 PGA Boulevard, Suite 305
            Palm Beach Gardens, FL  33410
 5          E-mail: ireich@nasonyeager.com

 6

 7    On behalf of the Defendants:

 8          HARRY WINDERMAN, ESQUIRE (VIA ZOOM)
            WEISS, HANDLER & CORNWELL, P.A.
 9          2255 Glades Road, Suite 205E
            Boca Raton, FL  33431
10          E-mail: hb@whcfla.com
                  -and-
11          GUY FRONSTIN, ESQUIRE (VIA ZOOM)
            LAW OFFICE OF GUY FRONSTIN, P.A.
12          4800 N. Federal Highway, Suite 205B
            Boca Raton, FL  33431
13          E-mail: guy@fronstinlaw.com

14

15    ALSO PRESENT: KENNETH J. GOODMAN (VIA ZOOM)
                     SCOTT ZANKL (VIA ZOOM)
16

17

18

19

20

21

22

23

24

25
```



```
 1                          --   -   -

 2                        I N D E X

 3                          --   -   -

 4   WITNESS:                DIRECT CROSS REDIRECT RECROSS

 5   KRISTEN ZANKL

 6     BY MR. REICH              5

 7   MARKED QUESTIONS: Line 13, Page 36
                       Lines 13-14, Page 43
 8                     Lines 7-8, Page 108

 9                          --   -   -

10                     E X H I B I T S

11                          --   -   -

12   NUMBER              DESCRIPTION              PAGE

13   PLF.'S EXHIBIT 1   Re-Notice of Taking Deposition  6

14   PLF.'S EXHIBIT 2   Complaint                      27

15   PLF.'S EXHIBIT 3   Defendants' Answer and

16                      Affirmative Defenses           62

17   PLF.'S EXHIBIT 4   Proof of Claim 51              73

18   PLF.'S EXHIBIT 5   Claim Number 6-1               84

19   PLF.'S EXHIBIT 6   Claim Number 17                88

20   PLF.'S EXHIBIT 7   DCG Trust Payments             89

21   PLF.'S EXHIBIT 8   Driver's license              55

22   PLF.'S EXHIBIT 9   Loan document                  59

23   PLF.'S EXHIBIT 10  Complaint                     104

24   (CONTINUED)

25
```



KRISTEN ZANKL                                          August 08, 2022
KENNETH J. GOODMAN vs SCOTT ZANKL                              4

```
 1                    E X H I B I T S  (CONTINUED)

 2

 3    NUMBER              DESCRIPTION              PAGE

 4    PLF.'S EXHIBIT 11   Complaint                112

 5    PLF.'S EXHIBIT 12   Complaint                115

 6    PLF.'S EXHIBIT 13   Complaint                120

 7    PLF.'S EXHIBIT 14   Complaint                121

 8    PLF.'S EXHIBIT 15   Verified complaint       126

 9    PLF.'S EXHIBIT 16   Complaint                133

10    PLF.'S EXHIBIT 17   Complaint                136

11    PLF.'S EXHIBIT 18   Final Judgment           142

12    PLF.'S EXHIBIT 19   Motion for Final Judgment 143

13    PLF.'S EXHIBIT 20   Complaint                147

14    PLF.'S EXHIBIT 21   Confession of Judgment   162

15    PLF.'S EXHIBIT 22   Continuing Guaranty of

16                        Judgment                 168

17    PLF.'S EXHIBIT 23   Payment log              171

18    PLF.'S EXHIBIT 24   Payment log              190

19

20

21

22

23

24

25
```



```
 1                P R O C E E D I N G S

 2                      -  -  -

 3        Zoom remote deposition taken before Denise T.

 4   Medina, Registered Merit Reporter and Notary Public

 5   in and for the State of Florida at Large, in the

 6   above cause.

 7                      -  -  -

 8   Thereupon

 9                     (KRISTEN ZANKL)

10   having been first remotely duly sworn or affirmed,

11   was examined and testified as follows:

12                THE WITNESS:  Yes.

13                THE COURT REPORTER:  Thank you.

14                DIRECT EXAMINATION

15   BY MR. REICH:

16        Q    Okay.  Good morning, Mrs. Zankl.

17        A    Good morning.

18        Q    My name is Ivan Reich.  I am the attorney

19   for what is known as the DCG 2008 Irrevocable Wealth

20   Trust, the Plaintiff in the case that we have

21   pending in the Circuit Court of Palm Beach County.

22   The case number is 502022CA005035XXXXMB.  I'm going

23   to show you a document.  Can you see this, Mrs.

24   Zankl?

25        A    Yes.
```



```
 1        Q    Okay.  And have you seen this document

 2   before?  It is your notice of taking deposition

 3   today via Zoom.  Do you see that?

 4        A    Yes.

 5        Q    Was that shared with you by your counsel?

 6        A    Yes.

 7        Q    Okay.  And you're here pursuant to that

 8   re-notice of taking deposition here today?

 9        A    That's correct.

10        Q    Thank you.

11             MR. REICH:  Madam Court Reporter, I'll

12        mark that as Plaintiff's Exhibit 1.

13             THE COURT REPORTER:  Sure.

14             (The document was marked Plaintiff's

15              Exhibit Number 1 for identification.)

16   BY MR. REICH:

17        Q    Let me ask you a little bit of a

18   background question, Mrs. Zankl.  What is your, what

19   is your educational background?  Actually, Zankl is

20   your married name.  What is your married name --

21   what is your maiden name?

22        A    Bokinsky.

23        Q    Can you spell that for the court reporter,

24   please?

25        A    Sure.  B-o-k-i-n-s-k-y.
```



1     Q   Are you familiar with what's called the

2  Locate program at Excell?

3     A   I knew that existed as well.  I don't know

4  the details.

5     Q   You don't know the details of that.  So is

6  it your testimony that anything in conjunction with

7  the financing of Excell you don't have personal

8  knowledge of?

9     A   That's correct.

10    Q   The same thing would be true with Karma

11  Palm Beach?

12    A   That's correct.

13    Q   Are you familiar with the terms of any of

14  the agreements --

15    A   No.

16    Q   Let me finish.  Are you familiar with the

17  terms of any of the agreements between this trust

18  and Excell?

19    A   No.

20    Q   Are you familiar with the terms of the

21  wholesale program between Excell and the trust?

22    A   No.

23    Q   Are you familiar with the terms of the

24  Locate program at Excell with the trust?

25    A   No.



```
 1   BY MR. REICH:

 2       Q    What do you know about that sentence about

 3   its truth or non-truth?

 4            MR. WINDERMAN:  Form.

 5   BY MR. REICH:

 6       Q    In the answer, you denied this paragraph.

 7   Is there anything in this paragraph that is untrue

 8   based upon your own personal knowledge?

 9            MR. WINDERMAN:  Form.

10   BY MR. REICH:

11       Q    You can tell me when you have finished

12   reading the paragraph.

13            THE WITNESS:  I can answer?

14            MR. WINDERMAN:  Yeah.

15            THE WITNESS:  No.  I don't know anything

16       about this.

17   BY MR. REICH:

18       Q    Okay.  Let's go to Paragraph 9.  Is there

19   anything in Paragraph 9 that you have personal

20   knowledge about?  Please read it to yourself.

21       A    I don't have to read it because I don't

22   know anything about these agreements.  I wasn't

23   involved.  I was never involved and I don't know

24   anything about them.  I did not have anything to do

25   with the finance of the company.  I basically came
```



1   in.   I was always around for the marketing aspects

2   of our business.   We had several events, maybe 35,

3   40 events a year and I would come to marketing

4   events.   I would help plan the marketing events from

5   home with Sandra, our marketing representative.

6   2022 in January I started coming in a little bit

7   more full time for HR purposes mainly and writing

8   policy and procedure.   Other than that, I was not

9   involved in this aspect of the business at all.

10       Q    Okay.   Thank you.   Now I'm going to ask

11  you to please answer the question, ma'am.   Okay.

12  With respect to Paragraph 9, do you have any

13  personal knowledge that supports the denial in your

14  answer that you made?

15             MR. WINDERMAN:   Form.

16             THE WITNESS:   I have, I was not a part of

17      this deal.   I don't know anything about it.

18  BY MR. REICH:

19       Q    Answer the question, ma'am.   Do you have

20  personal knowledge of any of the facts that support

21  your denial of Paragraph 9 of this complaint?

22             MR. WINDERMAN:   Form.

23             THE WITNESS:   I was not involved in this.

24      I had nothing to do with it.

25



```
 1   BY MR. REICH:
 2        Q    Okay.  Do you have personal knowledge that
 3   supports your denial of Paragraph 9 of the
 4   complaint?
 5        A    No.  I don't have any knowledge of this.
 6        Q    Okay.  I'm going to ask you the same exact
 7   question in Paragraph 10.  Please review it.  Okay?
 8   And tell me if you have any personal knowledge that
 9   supports your denial of Paragraph 10 of the
10   complaint.
11             MR. WINDERMAN:  Form.
12             THE WITNESS:  Okay.  Once again, I have no
13        knowledge of this.
14   BY MR. REICH:
15        Q    Thank you.  The same question with respect
16   to Paragraph 11.  Please read it.  Okay?  Do you
17   have any knowledge, do you have any personal
18   knowledge that supports your denial of Paragraph 11
19   of the complaint?
20             MR. WINDERMAN:  Form.
21             THE WITNESS:  No personal knowledge of
22        this document at all.
23   BY MR. REICH:
24        Q    I'm asking you specifically do you have
25   any personal knowledge that supports your denial of
```



```
 1   Paragraph 11 of the complaint as set forth in your
 2   answer.
 3            MR. WINDERMAN:   Form.
 4   BY MR. REICH:
 5        Q    Answer, please.
 6        A    Okay.  I know nothing about this.
 7        Q    Okay.  So is your answer no, you have no
 8   personal knowledge or that you do have personal
 9   knowledge?
10        A    No, I have no personal knowledge.  I have
11   never seen these documents.
12        Q    I'm going to go to Paragraph 12.  Do you
13   have any personal knowledge that supports your
14   denial as set forth in your answer in Paragraph 12
15   of the complaint?
16            MR. WINDERMAN:   Form.
17            THE WITNESS:   I have, once again, I have
18        no knowledge about this.
19   BY MR. REICH:
20        Q    Okay.  So the answer is no, you have no
21   personal knowledge?
22        A    That is correct.
23        Q    Thank you.  With respect to Paragraph 13,
24   if you could please read the same.  Do you have any
25   personal knowledge that supports your denials as set
```



```
 1    forth in your answer to Paragraph 13 of the
 2    complaint?
 3              MR. WINDERMAN:  Form.
 4    BY MR. REICH:
 5         Q    You may answer.
 6         A    No.  I don't know about these.
 7         Q    So your answer is no, you have no personal
 8    knowledge to that question?
 9         A    I have no personal knowledge.
10         Q    Okay.  Paragraph 14.  Please read it to
11    yourself.  Again, I'm going to ask you the question.
12    Do you have any personal knowledge that supports
13    your denial set forth in your answer as to Paragraph
14    14 of the complaint?
15         A    I have no personal knowledge about this.
16         Q    I ask you the next question as to
17    Paragraph 15.  Okay.  Please read it.
18         A    I have no personal knowledge about this.
19         Q    About Paragraph 15?
20         A    No.
21         Q    Let me ask you the question as I asked
22    before to be consistent.  Do you have any personal
23    knowledge that supports your denial as set forth in
24    your answer as to Paragraph 15 of the complaint?
25         A    No.  I have no personal knowledge of this.
```



1      Q    Okay.  The same thing with Paragraph 16.

2  Do you have any personal knowledge --

3      A    I have no personal knowledge about this.

4      Q    Let me ask my question, please.  Do you

5  have any personal knowledge that supports your

6  denials as set forth in your answer as to Paragraph

7  16 of the complaint?

8      A    I have no personal knowledge about this.

9      Q    Okay.  Let's go read Paragraph 17.  Do you

10  have any personal knowledge that would support your

11  denial as set forth in your answer to Paragraph 17

12  of the complaint?

13      A    I have no personal knowledge.

14      Q    Do you have any -- let's look at Paragraph

15  18.  It's a little longer.  Can you still see

16  Paragraph 18, ma'am?

17      A    Yes.

18      Q    Okay.  Take a moment to read it.  And I'm

19  going to ask you the same question.  Do you have any

20  personal knowledge that would support your denial as

21  set forth in your answer as to the allegations set

22  forth in Paragraph 18 of the complaint?

23      A    I have no personal knowledge.

24      Q    I'm going to ask you to read Paragraph 19.

25  Have you read it, ma'am?



```
1          A     Uh-huh.  I have no personal knowledge.
2          Q     You have no personal knowledge that would
3    support your denials as set forth in your answer to
4    Paragraph 19 of the complaint?
5          A     That is correct.  I have no personal
6    knowledge.
7          Q     With respect to Paragraph 20, do you have
8    any personal knowledge that would support your
9    denials as set forth in your answer to Paragraph 20
10   of the complaint?
11         A     I have no personal knowledge.
12         Q     Do you have, I'm going to show you
13   Paragraph 21.  Do you have any personal knowledge
14   that would support your denials as set forth in your
15   answer as to Paragraph 21 of the complaint?
16         A     I have no personal knowledge.
17         Q     Do you have any personal -- I show you
18   Paragraph 22.  Do you have any personal knowledge
19   that would support your denials as set forth in your
20   answer as to Paragraph 22 of the complaint?
21         A     I have no personal knowledge.
22         Q     I'm going to go to Paragraph 24.  Can you
23   read Paragraph 24?  Do you have any personal
24   knowledge that would support your denials as set
25   forth in your answer as to the allegations set forth
```



```
 1    in Paragraph 24 of the complaint?

 2         A    I have no personal knowledge.

 3         Q    Do you have, let's go to Paragraph 25.  Do

 4    you have any personal knowledge that would support

 5    your denials as set forth in your answer and to the

 6    allegations set forth in Paragraph 25 of the

 7    complaint?

 8         A    I have no personal knowledge.

 9         Q    In Paragraph 26, do you have any personal

10    knowledge that would support your denials as set

11    forth in your answer to Paragraph 26 of the

12    complaint?

13         A    I have no personal knowledge.

14         Q    Let's go to Paragraph 28.  Do you have any

15    personal knowledge that would support your denials

16    as set forth in your answer as to the allegations

17    set forth in Paragraph 28 of the complaint?

18         A    I have no personal knowledge.

19         Q    Let's read Paragraph 29.  Do you ave any

20    personal knowledge that would support your denials

21    as set forth in your answer as to the allegations

22    set forth in Paragraph 29 of the complaint?

23         A    I have no personal knowledge.

24         Q    Let's go to Paragraph 30.  Do you have any

25    personal knowledge that would support your denials
```



1    as set forth in your answer as to the allegations

2    set forth in Paragraph 30 of the complaint?

3              MR. WINDERMAN:  Form.

4              THE WITNESS:  I have no personal

5         knowledge.

6    BY MR. REICH:

7         Q    Okay.  And let me now go to -- let me stop

8    sharing this for a minute.  Ma'am, I'm going to show

9    you what has been marked as Plaintiff's Exhibit 4.

10             (The document was marked Defendant's

11             Exhibit Number 4 for identification.)

12        Q    Do you see that, ma'am?

13        A    I see it.

14        Q    It's Proof of Claim Number 51 in the

15   Excell Auto Group, Inc., Chapter 7 bankruptcy case,

16   Number 22-12790-EPK.  It was filed on May 27, 2022.

17   Do you see that, ma'am?

18        A    Yes.

19        Q    Okay.  And there is a proof of claim filed

20   by the DCG 2008 Irrevocable Wealth Trust.  Do see

21   that?

22        A    I see it.

23        Q    And it's filed by Ken Goodman as trustee

24   of that trust --

25        A    Okay.



1   that?

2       A    I see that.

3       Q    Okay.  And I'm going to take you to the

4   signature page of that document.  It starts on Page

5   6 of that document, 6 of 9, which is Claim 6-1, Part

6   4, and 19 of 22.  The signature on the right-hand

7   side of that page, whose signature is that?

8       A    Scott's.

9       Q    I'm sorry.  Wait.  Let me shrink that.

10  Let me ask that question again.  The signature at

11  the top right-hand side of that page.

12      A    Yes.  That's Scott's.

13      Q    Thank you, ma'am.  Have you ever seen

14  Schedule 2 to this EXCEL sheet with respect to this

15  Profit Participation Agreement?  And I will shrink

16  this document so you can see the full page.

17      A    You don't need to shrink it down because

18  my answer is no, sir, I haven't seen it.  I told you

19  I have not, I was not involved in this aspect of the

20  business.  I have no knowledge of this and I was not

21  involved at all.

22      Q    Okay.  So you have no knowledge regarding

23  the EXCEL sheet that was attached hereto?

24      A    That is correct.  I have no knowledge.

25      Q    Thank you.  Do you see what is marked as



```
 1   Plaintiff's Exhibit 6, Claim Number 17 in the Excell
 2   bankruptcy, ma'am?  Do you see that?
 3        A    I see Exhibit 6, yes.
 4                  (The document was marked Plaintiff's
 5                  Exhibit Number 6 for identification.)
 6        Q    Dated 6/22, filed June 22nd, 2022, in the
 7   amount of -- sorry.  Strike that.  Filed by DCG 2008
 8   Irrevocable Wealth Trust.  Do you see that, ma'am?
 9        A    I see that.
10        Q    Okay.  By Ken Goodman as trustee in the
11   amount of $220,000.  Do you see that, ma'am?
12        A    I see that.
13        Q    I'm going to show you a letter that is
14   part of this exhibit, Page 1, Part 2, and I'm going
15   to shrink it down so we can see the whole thing.
16   Have you seen this document before, ma'am?  If you
17   can't read it, I'll make it larger for you.
18        A    No, I have not.
19        Q    Okay.  Are you aware of, do you have any
20   personal knowledge with respect to the statement
21   made in numbered Paragraph 1 of this July 16, 2020,
22   letter from Mr. Goodman to your husband?
23        A    No.  I have no knowledge of this.
24        Q    Do you have any knowledge with respect to
25   Paragraph 2 of this letter dated July 16, 2022, from
```



 1   Mr. Goodman to your husband?
 2            Did you hear my question, ma'am?
 3            MR. WINDERMAN:  She is reading it.
 4            THE WITNESS:  I'm just reading through
 5        just -- okay.  No.  I have no knowledge.  I
 6        have no knowledge of this document period and I
 7        have no knowledge of Number 2, 3 or 4 either.
 8   BY MR. REICH:
 9        Q    Okay.  I'm going to ask you to look at the
10   bottom of the document and I'm going to enlarge it.
11   Do you see there where it says Scott Zankl,
12   Vice-President of Excell Auto Group?  Do you see
13   that?
14        A    I see that.
15        Q    Whose signature is that?
16        A    Scott's.
17        Q    Thank you.  I'm going to show you a
18   document marked Plaintiff's Exhibit 7.  Do you see
19   that, ma'am?
20        A    I see that.
21            (The document was marked Plaintiff's
22             Exhibit Number 7 for identification.)
23        Q    It says "DCG Trust Payments."  Have you
24   seen this document before?
25        A    No.



```
 1   transactions?

 2        A    I was not familiar with any of these.

 3        Q    Okay.  Are you familiar with -- strike

 4   that.  Are you in any way familiar with the interest

 5   that was charged on any of the loans that are the

 6   subject matter of this lawsuit?

 7             MR. WINDERMAN:  Form.

 8             THE WITNESS:  No.

 9   BY MR. REICH:

10        Q    Do you have any personal knowledge as to

11   the interest charged in this lawsuit by the

12   Plaintiff other than that as set forth in the loan

13   documents that are referenced and attached to the

14   complaint?

15        A    No.  I was, I don't know any of the, I

16   mean, there's discussion now that the interest rate

17   was unusually high.

18        Q    What was that interest rate?

19        A    What was it?  I don't know.

20        Q    How did you calculate it?

21        A    I don't know.

22        Q    Who calculated it for you?

23        A    I don't know.

24        Q    Do you have an accountant that calculated

25   it for you?
```



KRISTEN ZANKL                                          August 08, 2022
KENNETH J. GOODMAN vs SCOTT ZANKL                              92

```
 1        A     No.
 2        Q     Did Scott calculate it for you?
 3              MR. WINDERMAN:  That would be covered by
 4        the marital privilege.
 5              MR. REICH:  Okay.
 6              MR. WINDERMAN:  You can ask Scott
 7        tomorrow.
 8  BY MR. REICH:
 9        Q     Did anyone other than Scott calculate it
10  for you?
11        A     No.
12        Q     Did you have any documents in your
13  possession or control that would counter the
14  statement of interest as set forth in the various
15  loan documents attached to the complaint?
16              MR. WINDERMAN:  Form.
17              THE WITNESS:  Do I have --
18  BY MR. REICH:
19        Q     Any documents in your possession or
20  control that would counter the, calculate the
21  recitals of interest as set forth in the loan
22  documents attached to the complaint.
23        A     Meaning do I have any other type of
24  documents that would say that it was something else?
25        Q     Yes.
```



```
 1        A     No.
 2        Q     Okay.  Do you acknowledge that there was a
 3   loan between Excell and the trust?
 4        A     I would acknowledge that there was
 5   business, that Scott and Kenny conducted business,
 6   but I was not brought in as, I was never involved in
 7   that aspect.  So I wouldn't know if it was a loan,
 8   an investment.  I don't know what the parameters
 9   are.  I would just say that I know that they
10   conducted business.
11        Q     Okay.  Let me ask you this question.
12   Okay?  Do you see what's has been marked as
13   Plaintiff's Exhibit 3?
14        A     I see that.
15        Q     And we are going to go down to the
16   affirmative defenses.  Do you see that?
17        A     I see that.
18        Q     Okay.  And I'm going to ask you to, do you
19   have any personal knowledge that would support your
20   first affirmative defense as set forth in Paragraph
21   4 of your affirmative defenses attached to your
22   answer?
23        A     So do I have any personal knowledge about
24   this, about --
25        Q     The allegations set forth in Paragraph 4
```



```
 1    of your affirmative defenses.
 2         A    I have no personal knowledge.  Once again,
 3    I was not involved.  I had nothing to do with this.
 4         Q    Okay.  My question for you is do you have
 5    personal knowledge with respect to the allegations
 6    set forth in Paragraph 4.
 7         A    I have no personal knowledge.
 8         Q    You have no personal knowledge.  Do you
 9    have personal knowledge of the first element of
10    usurious loans set forth under A of the first
11    affirmative defenses?
12         A    I have no personal, I have no knowledge
13    about this whatsoever.
14         Q    I'm just asking you.  What is set forth in
15    Paragraph 4 as your first affirmative defense where
16    it says the elements of a usurious loan are the
17    following and it has a Subpart A, do you have any
18    personal knowledge of any facts that support
19    Paragraph A to this affirmative defense?
20         A    I do not.
21         Q    Do you have any personal knowledge of any
22    facts that would support Paragraph B of this
23    affirmative defense?  Do you see that?
24         A    I see that.
25         Q    Do you have any personal knowledge of
```



```
 1   that?
 2        A    No, I do not.
 3        Q    Do you have any personal knowledge that
 4   supports the allegation set forth in Paragraph 4C of
 5   your first affirmative defense?  Do you see that?
 6        A    Yes, I see it.  I have no personal
 7   knowledge.  I was not involved.  I do not have any
 8   personal knowledge of any of the documents, of any
 9   of the agreements that Scott and Kenny had.
10        Q    I'm going to ask you again with respect to
11   4C, do you have any personal knowledge that supports
12   your allegation set forth in 4C of your affirmative
13   defenses?
14        A    No, I have no personal knowledge.
15        Q    Okay.  Do you have any personal knowledge
16   that supports your allegations set forth in
17   Paragraph 4C of your first affirmative defense?
18        A    I have no personal knowledge.
19             MR. REICH:  I'm going to take a ten-minute
20        break, and hopefully we could be done soon.
21        Okay?  We are off the record, Madam Court
22        Reporter.
23             (A recess was held.)
24             MR. REICH:  Back on the record.
25
```



1          attached exhibits in the case of Woodside

2          Credit, LLC, versus Excell Auto Sport and

3          Service, Inc., et al., including Kristen Zankl,

4          the deponent, E-filed on April 29th, 2022,

5          under E-filing Number 148682373 in Case Number

6          5022CA004086XXXXMB, Division AB.

7                    (The document was marked Plaintiff's

8                    Exhibit Number 10 for identification.)

9     BY MR. REICH:

10         Q    Ma'am, are you familiar with Woodside

11    Credit, LLC?

12         A    Yes.  I'm familiar with Woodside.

13         Q    What was the nature of the relationship

14    between yourself and Woodside Credit?

15         A    I did not really have a relationship with

16    Woodside Credit.  It was Scott that had the

17    relationship with Woodside Credit.

18         Q    Do you have any knowledge regarding the

19    documents or the allegations of that complaint that

20    I just went over with you?

21         A    No.

22         Q    Are you familiar with a company called

23    Bal, B-a-l, Investments, LLC?

24         A    Bal, yes.  I know of Bal through post,

25    post bankruptcy.



```
 1   Excell Auto Group.
 2        Q    I'm just checking with you.
 3        A    Just clarifying.
 4        Q    All right.  And you have no knowledge
 5   about this particular transfer for 3543 on 10/12; is
 6   that correct?
 7        A    That's correct.
 8        Q    I'm going to go back.  Do you have any
 9   knowledge regarding the particular check, the
10   $37,000 check that I just mentioned to you on Page
11   4?
12        A    I have absolutely no knowledge.
13        Q    I'm going to go up here and there's a
14   November 9th transaction for $100,000, a wire
15   transfer.  Do you see that?
16        A    I do see that.
17        Q    Okay.  And do you have any knowledge
18   regarding that transaction?
19        A    Once again, I absolutely have no knowledge
20   about any of the transfers, any of the flow of money
21   with Kenny.  I was not involved in this aspect of
22   the business.
23        Q    Okay.  And then I'm going to take you
24   through, I'm going to enlarge that for you.  There
25   is a check here from Excell Auto Group.  Do you see
```



 1  that on Page 6 for 36,965?

 2       A    I see it highlighted.  Yes.  I see it.

 3       Q    You see it's from Excell Auto Group?

 4       A    I see that that's what it says, Excell

 5  Auto Group.

 6       Q    That's not a payment from you or Scott; is

 7  that correct?

 8       A    This says Excell Auto Group.  That's what

 9  I would imagine is the bank account since that's

10  what it says.

11       Q    Do you have personal knowledge regarding

12  this transaction?

13       A    I have no personal knowledge.

14       Q    Okay.  Let's go down.  And this other

15  highlighted transaction on Page 7, do you have any

16  knowledge of that transaction?

17       A    I think you already asked me about that

18  one.  But I will tell you again.  No, I had

19  absolutely no knowledge.

20       Q    That is a different one.  This is on Page

21  6 of 22.  The one I asked you about before was on

22  Page 4 of 14.  Do you see that?

23       A    I see that.

24       Q    So regarding the latter one, you have no

25  knowledge of that one either?



1       A    I have no knowledge.

2       Q    Okay.  I'm going to go to another check

3   for 32,000 from Excell to the trust.  Do you see

4   that document on Page 8?

5       A    I see that.

6       Q    And that's from Excell Auto Group; is that

7   correct?

8       A    That's what it says at the top of the

9   check.

10      Q    That is not from either you or Scott; is

11  that correct?

12      A    That's correct.  My name is Kristen.  Not

13  Excell Auto Group.

14      Q    And you have no personal knowledge

15  regarding that transaction; is that correct?

16      A    I have no personal knowledge.

17      Q    Okay.  And the next document is a check on

18  Page 9 for 32,750 again payable to the trust by

19  Excell Auto Group.  Do you see that document?

20      A    I see that document.

21      Q    That is not a payment from either you or

22  Scott; is that correct?

23      A    That's correct.

24      Q    Who is it from?

25      A    The top of the check says Excell Auto



1   Group.

2        Q    Do you have any personal knowledge

3   regarding this transaction?

4        A    No personal knowledge.

5        Q    Okay.  Let's go on.  On 8/2, there's a

6   highlighted transaction for $34,000.  Do you have

7   any personal knowledge regarding this transaction?

8        A    I do not have any personal knowledge of

9   this transaction or any other transaction that may

10  have taken place with Mr. Goodman, Mr. Goodman's

11  trust or any other aspects of Mr. Goodman.  I have

12  absolutely no knowledge of any financial dealings

13  with Mr. Goodman.

14       Q    Like I said, so your answer to that

15  question would be you do not have any personal

16  knowledge with respect to this transaction?

17       A    No, I do not.

18       Q    Thank you.  I'm going to go to the next

19  page.  There is a check for 37,900 on Page 11 of

20  this document.  It purports to be from Excell to the

21  trust.  Do you see that, ma'am?

22       A    Yes.  I see it.

23       Q    Okay.

24            MR. WINDERMAN:  Let the record reflect,

25       Ivan, that you've highlighted these checks.



1   BY MR. REICH:

2       Q    Did that check come from yourself or your

3   husband, ma'am?

4       A    No.

5       Q    Who is that check from?

6       A    It says Excell Auto Group.

7       Q    Do you have any personal knowledge

8   regarding that check or that transaction?

9       A    No.

10      Q    Okay.  Ma'am, do you have check-signing

11  capacity for Excell?

12      A    I do.

13      Q    Okay.  When did you first have

14  check-signing capacity?

15      A    I don't know.

16      Q    Ma'am, I'm assuming you no longer have it

17  since the company is in bankruptcy; is that correct?

18      A    That's correct.

19      Q    Okay.  But prior to then, how far back did

20  you first have check-signing capacity for Excell?

21      A    I don't know.

22      Q    Okay.  I'm going to go to the next page

23  where it says 12 of 42.  There's a highlighted

24  $32,750 transaction.  Do you see that document?

25      A    Yes.



1      Q    Do you have any personal knowledge

2  regarding that transaction or that check?

3      A    No.

4      Q    Did that money come from you or your

5  husband?

6      A    No.

7      Q    Do you have any reason to believe that

8  that money belonged to you or your husband?

9      A    It came from Excell Auto Group.

10     Q    Okay.  What about all these other checks

11 and transactions that we talked about?  Do they

12 belong to you and your husband?

13     A    From my knowledge, if the check was

14 written out of Excell Auto Group, that's where it

15 came from.

16     Q    Okay.  So you don't have any personal

17 claim to those funds; do you?

18     A    No.

19     Q    Do you know whether, do you know on any of

20 these transactions what portion of these monies were

21 for interest or otherwise?

22     A    I don't know.

23     Q    Okay.  Let's go to the next one.  We're

24 now on Page 13 of 42.  There's a check for $31,375.

25 And to make life easier for us, with respect to this



1    check, would your answer be the same as it relates

2    to every other check that I've shown you so far as

3    part of this document?

4         A    Yes.  I don't know anything about it.

5         Q    Okay.  So you have no personal knowledge

6    regarding this document?

7         A    That's correct.

8         Q    Or this transaction?

9         A    That's correct.

10        Q    That's an Excell check?

11        A    Yes.  It looks that way.

12        Q    Is that from Excell's funds?

13        A    Yes.

14        Q    It did not come from either you or your

15   husband; correct?

16        A    It came from Excell Auto Group.

17        Q    Did it come from you or your husband?

18        A    No.  It says Excell Auto Group right at

19   the top of the check.

20        Q    Did it come from you or your husband?

21        A    No.

22        Q    Thank you.  That's all I'm asking.  The

23   next document, Page 14 of 42, a $7900 check.  Do you

24   see signatures on that check?

25        A    I do.



1     Q   Who is that?

2     A   Well, with the first letter being S, it

3 could be Scott.  But, once again, I was not standing

4 over him when he was signing it.  So --

5     Q   Hold on a second.  Okay.  So is it your

6 testimony that it looks like Scott's signature to

7 you?

8     A   It could be, yes.

9     Q   Okay.  And do you have any personal

10 knowledge of this transaction or this check?

11     A   No.

12     Q   Do you have any knowledge as to how much

13 of this is interest?

14     A   I have no idea.

15     Q   And this check came from Excell Auto

16 Group?

17     A   Yes.  That's what it says.

18     Q   And the payments were made from Excell

19 funds?

20     A   That's what it looks like.

21     Q   Did any of these payments come from, did

22 this payment come from either you or your husband?

23     A   No.  It says, the check says clearly

24 Excell Auto Group.

25     Q   Did this money come from you or your



1   husband?

2       A    No.

3       Q    Thank you.  The next document, next page,

4   Page 15 of 42 is a transaction on June 18th for

5   3543.44.  Are you familiar with that transaction?

6       A    No.

7       Q    Do you have any personal knowledge

8   regarding the same?

9       A    No.  I don't know anything about it.

10      Q    Do you know the source of the funds of

11  that money?

12      A    No.  I don't know.  I did not read the

13  bank statements.  I don't know anything about that.

14      Q    Was that your money or your husband's

15  money?

16          MR. WINDERMAN:  We will be happy to

17      stipulate that none of these checks and none of

18      these payments came from Mr. or Mrs. Zankl's

19      personal account.  They all came out of Excell

20      Auto.  And as we discussed off the record, this

21      is an Excell Auto action and I've reached out

22      to the trustee to see if she'll assign it to us

23      for collection.

24          MR. REICH:  All right.  That's fine.

25      Let's go on.  On several occasions, Harry,



1        you've not said that you're not going to be

2        suing for these amounts on behalf of the Zankls

3        in this action as the counterclaim in this

4        case.  So, you know, we'll see about that.

5    BY MR. REICH:

6        Q    Let's go to the next document.  This is on

7    Page 16 for $31,500.  Do you see that check, ma'am,

8    that has been highlighted by your counsel?

9        A    I see it.

10       Q    Okay.  Do you have any knowledge regarding

11   this transaction or this check?

12       A    No.

13       Q    Do you have any knowledge whether any of

14   this amount is interest?

15       A    No.

16       Q    Okay.  And this memo came from Excell Auto

17   Group; is that correct?

18       A    That's what it says at the top of the

19   check.

20       Q    Since your counsel has already stipulated

21   and you agree with your counsel's stipulation, none

22   of this came from you or your husband; is that

23   correct?

24       A    Correct.

25       Q    With respect to the two checks on Page 17



1    of 42, one for 40,000 and one for 31,500, would your

2    answer be the same as it was to all the other

3    questions about these checks?

4         A    That's correct.  I have no knowledge and

5    nothing to do with them.

6         Q    Okay.  But I'm saying would your answer be

7    the same with respect to every other question that I

8    have asked you about all these other checks in this

9    document.

10        A    Yes, that would be correct.

11        Q    Okay.  And with respect to this

12   transaction on Page 18, which is on 0507, which is

13   highlighted for 3543.44, would your answer be the

14   same as it would be with respect to every one of

15   these other transactions?

16        A    Yes.

17        Q    And with respect to this check on Page 19

18   that has been highlighted for $36,500, would your

19   answer be the same as it was with respect to every

20   other check as it relates to this document?

21        A    Yes.

22        Q    And with respect to on Page 20, the check

23   for 35,900, would your answer be the same --

24        A    Yes.

25        Q    -- as it relates to every other check that



1   has been referenced in this document?

2        A    Yes.

3        Q    To every question that has been asked.

4   Thank you.  And with respect to -- I'll make it

5   easy.  With respect to every electronic withdrawal

6   payment on this document, would your answer be the

7   same?

8        A    Yes.

9        Q    With respect to every other check that is

10  highlighted on this document, would your answer be

11  the same?

12       A    Yes.

13       Q    Okay.  Okay.  So this document which is

14  Exhibit 23, all the payments referenced within this

15  document you have no personal knowledge of; is that

16  correct?

17       A    That's correct.

18       Q    All the payments came from Excell; is that

19  correct?

20       A    That's what it looks like.

21       Q    And none of those payments came from you

22  or Scott; is that correct?

23       A    That's correct.

24       Q    And you have no personal knowledge what

25  portion of any of these payments are interest or



1    anything else; is that correct?

2         A    That's correct.

3         Q    Okay.  I'm going to make your life a

4    little bit easier here and stop sharing this.  Hold

5    on a second.  Just give me one moment.  I'm going to

6    share a screen with you which is a payment log to

7    Goodman 2020 to IRGFMNLC4.pdf.  This is a 29-page

8    document.  Do you see that document, ma'am?

9         A    I see one page, yes.

10        Q    Okay.  And I'll scroll through it and

11   you'll see there is banking statements.  Do you see

12   that?

13        A    I see them.

14        Q    On this one-page document, have you seen

15   this document before?

16        A    No.

17        Q    Were you involved in the preparation of

18   this document?

19        A    No.

20        Q    This handwriting where it says additional

21   interest, do you know whose handwriting that is?

22        A    No.

23        Q    Is that Scott's?

24        A    I don't know.

25        Q    Okay.  I'm going to make life a little



1  easier with respect to this and this is the same

2  Account ▉▉▉▉ from Chase that we were referencing in

3  the last document which was Plaintiff's Exhibit 23.

4  This is now marked Plaintiff's Exhibit 24.

5          (The document was marked Plaintiff's

6          Exhibit Number 24 for identification.)

7      Q    Okay.  Would your answers be the same if I

8  showed you the various highlighted transactions as

9  they were to every one of the highlighted

10 transactions in Plaintiff's Exhibit 23?

11     A    Yes.  My answer would be the same.

12     Q    And that would be with respect to each

13 check that is highlighted, you have no have personal

14 knowledge of the check or the transaction itself;

15 correct?

16     A    That is correct.

17     Q    Or the calculation of how much of that is

18 interest and how much is not; is that correct?

19     A    That's correct.

20     Q    And that each of those funds came from

21 Excell?

22     A    That appears so, yes.

23     Q    And none of these payments came from you

24 or your husband?

25     A    No.



1      Q      And that's with respect to the checks and

2   with respect to the wires, the wire transfer

3   payments?   Would that be the same?

4      A      That would be the same.

5      Q      Do you know how many of these documents

6   relate to the profit sharing or profit participation

7   agreement that the Plaintiff had with Excell in this

8   case?

9      A      Could you repeat that question?

10     Q      Of all these transactions that have been

11  sent to me by your counsel that have been

12  highlighted Plaintiff's Exhibits 23 and 24, do you

13  know how many of these documents were related to the

14  profit participation agreement entered into that we

15  referenced earlier in this case?

16          MR. WINDERMAN:   Form.

17          THE WITNESS:   I couldn't answer that.   I

18      have no idea.   I was not involved in that

19      aspect of the business and I was not involved

20      in any type of agreement that Scott and Kenny

21      had.

22          MR. REICH:   Okay.   I have no further

23      questions for the witness, Harry.

24          MR. WINDERMAN:   Thank you.   What time are

25      we starting tomorrow?



EXHIBIT E

Page 1

UNITED STATES BANKRUPTCY COURT
SOUTHERN DISTRICT OF FLORIDA


IN RE:                          CASE NO. 22-12790-EPK

EXCELL AUTO GROUP, INC.,

        Debtor.
_____/


341 MEETING OF CREDITORS

May 13, 2022

        The above-entitled cause came on for a Section
341 Meeting of Creditors before Nicole Testa Mehdipour,
one of the trustees in the UNITED STATES BANKRUPTCY COURT,
in and for the SOUTHERN DISTRICT OF FLORIDA, via Zoom
Videoconference, on May 13, 2022, commencing at or about
8:39 a.m., and the following proceedings were had.


















        Transcribed from a digital recording by:
           Cheryl L. Jenkins, RPR, RMR

Page 2

```
 1                   APPEARANCES VIA ZOOM:

 2

 3         NICOLE TESTA MEHDIPOUR, Trustee

 4

 5                 FURR & COHEN, by
                 ROBERT FURR, Esquire
                 ALAN CRANE, Esquire
 6               JASON RIGOLI, Esquire
                        and
 7               DAVID A. RAY, P.A., by
                 DAVID A. RAY, Esquire
 8       On behalf of Nicole Testa Mehdipour

 9

10            WEISS HANDLER & CORNWELL, by

               ████████████████████
11             On behalf of the Debtor

12                 WERNICK LAW, by
              AARON A. WERNICK, Esquire
13       On behalf of Kristin and Scott Zankl

14

15              SHRAIBERG PAGE, by
              BRADLEY SHRAIBERG, Esquire
       On behalf of Franklin Capital Funding, LLC
16

17       RAPPAPORT OSBORNE & RAPPAPORT, by
               JORDAN RAPPAPORT, Esquire
18     On behalf of Richard Applegate, Andrew Greenberg,
       Richard Greenberg, Stefano Riga and Tarek Aboualazzm

19

20                MELAND BUDWICK, by
               JAMES C. MOON, Esquire
21                      and
         CHRISTOPHER GEON, Esquire (in-house counsel)
22   On behalf of Chapford Specialty Finance, LLC and Chapford
               Credit Opportunities Fund, LP

23

24

25
```

Page 3

1                    ALSO PRESENT VIA ZOOM
2

3                M.A. DINKIN LAW FIRM, by
                MITCHELL A. DINKIN, Esquire
        On behalf of Savannah Row Development Company, LLC
4
5                    AKERMAN, LLP, by
                    BRETT MARKS, Esquire
6                   EYAL BERGER, Esquire
        On behalf of Ed Brown and Millco Atwater, LLC
7
8                    NASON YEAGER, by
                  IVAN J. REICH, Esquire
9       On behalf of the DCG 2008 Irrevocable Wealth Trust
10
                  MORITT HOCK & HAMROFF, by
11                THERESA DRISCOLL, Esqurie
        On behalf of Integrated Vehicle Leasing
12
13    LEIDERMAN SHELOMITH ALEXANDER + SOMODEVILLA, by
                  ZACH B. SHELOMITH, Esquire
14         On behalf of Woodside Credit, LLC
15
                  BRINKLEY MORGAN, by
16                MARK LEVY, Esquire
              On behalf of Chad Zakin
17
18            NATHAN G. MANCUSO, Esquire
        On behalf of Excell Auto Sport and Service, Inc.
19
20      BEIGHLEY MYRICK UDELL & LYNNE, by
                THOMAS ZEICHMAN, by
21       On behalf of Prestige Luxury Cars, LLC
22
                  JAMES MILLER, Esquire
23    On behalf of Auto Wholesale of Boca, MMS Ultimate and
                    Moshe Farache
24
25

Page 4

1
2                        BREUER LAW, by
                  STEPHEN C. BREUER, Esquire
                   On behalf of David Amsel
3
4                      BAKER DONELSON, by
                   TRAVIS HARVEY, Esquire
5             On behalf of BAL Investments, LLC
6                        PACK LAW, by
                   JOE PACK, Esquire
7                 JESSY KREHL, Esquire
   On behalf of Greenbucket, OLP EAG, LLC and EAG Wholesale
8
9              DANIEL GOLD, Trial Attorney
                 Office of the U.S. Trustee
10               Department of Justice
11
                   ALSO PRESENT
12
                  Adam Balinsky
13
                 Aaron Parkinson
14
                  Mr. Goodman
15
               Matthew Troccoli
16
                  Sean Kirwan
17
                   Mr. Baum
18
                 Greg Nelson
19
                Gregor Rasard
20
                  Alex Byall
21
               Barry Lefkowitz
22
               Lillian Roberts
23
                  - - - - - - -
24
25

Page 5

1

2                      **WITNESS**

Scott Zankl                              Page
3    Examination by Ms. Mehdipour        8
     Examination by Mr. Moon             98
4    Examination by Mr. Dinkin           110
     Examination by Ms. Driscoll         112
5    Examination by Mr. Shelomith        116
     Examination by Mr. Shraiberg        121,168
6    Examination by Ms. Roberts          128
     Examination by Mr. Krehl            131
7    Examination by Mr. Miller           136
     Examination by Mr. Harvey           157
8    Examination by Mr. Dinkin           110
     Examination by Ms. Driscoll         112

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

OUELLETTE & MAULDIN  COURT REPORTERS, INC.
(305) 358-8875

Page 6

1              MS. MEHDIPOUR:  All right.  Good morning

2    everyone.  Again, this is Trustee Nicole Mehdipour.  I've

3    been appointed by the United States Trustee's Office as

4    the Chapter 7 bankruptcy trustee in this case.

5              Today we're here for the 341 Meeting of

6    Creditors for Excell Auto Group, which filed a Chapter 7

7    bankruptcy on April 8th, 2022.

8              Pursuant to the U.S. Department of Justice

9    Executive Office for United States Trustees, any

10   electronic recording in any manner whatsoever, whether

11   it's audio, photograph or video is strictly prohibited.

12   No one is permitted to record or televise the debtor, me,

13   or any party in this proceeding.  By dialing into this

14   meeting you are agreeing and acknowledging that you accept

15   these terms.

16             For those of you who are not familiar with

17   the way a 341 Meeting works, this is an official forum

18   where I get to ask the debtor any questions about assets

19   and liabilities, and then I'll open up the forum to any

20   creditors or parties in interest who would like to ask

21   questions.

22             All right.  Mr. Winderman, would you please

23   let me know, I see three people, who is here today on

24   behalf of the debtor?

25             MR. WINDERMAN:  I'm here, Harry Winderman,

Page 7

1    from Weiss Handler & Cornwell.  Along with me is

2    Scott Zankl, who is appearing on behalf of the debtor.

3    He's accompanied by his wife, Kristin Zankl, and his other

4    bankruptcy counsel, Aaron Wernick.

5               MS. MEHDIPOUR:  Is anyone else in the room?

6               MR. WINDERMAN:  No, ma'am, I would announce

7    them.

8               MS. MEHDIPOUR:  Thank you.  Okay.  Good

9    morning.

10             All right.  Does Ms. Zankl intend to testify

11    today on behalf of the debtor in any manner?

12              MR. WINDERMAN:  No, ma'am.

13              MS. MEHDIPOUR:  Thank you.

14             All right.  I've reviewed the photo ID for

15    Scott Zankl.  Mr. Zankl, I need to swear you in.  Would

16    you please confirm that you're -- would you raise your

17    right hand?  Is Scott in the middle, Mr. Zankl in the

18    middle?  I see him.

19             Okay.  There are a lot of people on this

20    Zoom and so it's hard for me to see.  There we go.

21             All right.  Sir, do you affirm to tell truth

22    the truth, the whole truth, and nothing but the truth

23    under penalty of perjury?

24              MR. ZANKL:  I do.

25    Thereupon,

```
 1                    SCOTT ZANKL,

 2   having been first duly sworn, was examined and testified

 3   as follows:

 4                    EXAMINATION

 5   BY MS. MEHDIPOUR:

 6          Q.    Would you please state your full name for

 7   the record?

 8          A.    Scott Zankl.

 9                MS. MEHDIPOUR:  All right.  We already have

10   appearances for the debtor.

11                At this point, although it's going to take a

12   bit of time, I am going to ask any creditors or parties in

13   interest to make an appearance, and so if you would please

14   state your name, if you are an attorney, who you

15   represent, and if you represent multiple parties, would

16   you please list those parties?

17                I think the best way to do this would be for

18   me to just call out those folks that I see, and that I

19   recognize on the Zoom meeting.  So we'll go with Mr. Moon.

20                MR. MOON:  Thank you.  James Moon, M-o-o-n,

21   on behalf of Chapford Specialty Finance, LLC and Chapford

22   Credit Opportunities Fund, LP.

23                MS. MEHDIPOUR:  Thank you.  Good morning.

24                All right.  Mr. Dinkin.

25                MR. DINKIN:  Good morning.  My name is
```

Page 54

1          A.     I mean --

2          Q.     Was there anyone that you believed was

3    similar in terms of the lending relationship to Savannah

4    Row?

5          A.     Can you give me some examples and I will

6    answer?

7          Q.     Do you remember anyone else approaching you

8    about a similar relationship, where there was an offer to

9    lend money, and you signed an agreement, can you give me

10   another example of an entity that you did that with?

11         A.     Yes, I mean, there are other groups that are

12   on here.

13         Q.     Okay.  Let's talk about one of them, give me

14   an example of one of them.

15         A.     I'm trying to think of the names of the

16   entities.  DCG, I guess.

17         Q.     DCG?

18         A.     I think that's one of them, yeah.

19         Q.     Okay.

20         A.     They had different entities.

21         Q.     All right.  Do you remember how that

22   relationship first came up with DCG?

23         A.     I don't remember exactly how it came up, no.

24         Q.     Okay.  Do you remember how much money they

25   loaned you, or provided to you?

Page 55

```
 1          A.     I'd have to see the documents.

 2          Q.     Okay.  Do you know if payments were made to

 3    DCG on account of --

 4          A.     Yes.

 5          Q.     Yes.

 6                 Okay.  Were those monthly?

 7          A.     Yes.

 8          Q.     Were they supposed to be interest payments?

 9          A.     Yes.

10          Q.     Was there a split of profit with DCG?

11          A.     No.

12          Q.     Okay, and what document memorialized this

13    relationship?

14          A.     It would have been the contracts that we

15    signed.

16          Q.     And those would be located in the debtor's

17    books and records?

18          A.     Yes.

19          Q.     Okay.  What about Mr. Ed Brown?

20                 MR. WINDERMAN:  Madam Trustee, when you

21    reach a breaking point, we'd like five minutes.

22                 MS. MEHDIPOUR:  Sure, I'm happy to take that

23    now.

24                 MR. WINDERMAN:  Okay.  That's fine.  We

25    appreciate it.
```

Page 61

1   documents.

2          Q.    If payments were made, would you instruct

3   Teddi or Nidia to make those payments?

4          A.    Well, it was usually set in the documents.

5   If I had the documents in front of me, I could tell you.

6   There is actually due dates.  I don't have them in front

7   of me.

8          Q.    I understand that, but did Teddi and Nidia

9   have the discretion to make these payments, or did you

10  advise them to do it?

11         A.    No, they had the discretion.

12         Q.    So they didn't need to check with you first?

13         A.    No.

14         Q.    And they would be able to determine the

15  amounts that were being paid back on their own?

16         A.    They were established in the contracts.

17         Q.    Okay.  Getting back to DCG Trust, your

18  testimony before our break was that the payments were

19  interest only and not a share of profits, is that correct?

20         A.    Yes.

21         Q.    And were those tied to a specific vehicle?

22         A.    No.

23         Q.    They weren't.

24               Okay.  Do you recall having entered into a

25  document called a profit participation agreement with

1    TCG Trust?

2         A.    I'd have to see it.

3         Q.    And where would copies of any such

4    agreements be kept?

5         A.    They would have been in the office that you

6    referred to before --

7         Q.    Okay, but --

8         A.    -- in the accounting office.

9         Q.    -- as you sit here today, you don't recall

10   whether you had entered into something called profit

11   participation agreements?

12        A.    No, I'd have to see the document.

13        Q.    Okay.  Do you know why investors would be

14   indicating that their investments were tied to certain

15   vehicles?

16        A.    No.

17        Q.    Do you recall seeing anything in the banking

18   or the wire transfers where specific VINs were notated on

19   the wires that were coming in to Excell?

20        A.    No, I never really looked -- I never really

21   went in, that was something the office handled, the banks

22   and stuff, with the bank.

23        Q.    Okay, and as you sit here today, you don't

24   recall whether you had a profit sharing agreement with

25   Ken Goodman and DCG Trust, is that correct?

Page 63

1        A.    Yes.

2        Q.    Okay.  Do you recall, in general, whether

3   there was any private person either in their individual

4   name, the name of a company or trust, where investments

5   were made in specific vehicles?  That's my first question.

6        A.    No, I'd have to -- no, I'd have to see the

7   documents to determine that.

8        Q.    Okay, and the second part of that question

9   is whether you recall any private person, whether in the

10  name of a company or trust, or in their own name, entered

11  into an arrangement with you where they expected a split

12  of profits on the sale of any vehicle?

13       A.    Once again, I would have to just see the

14  documents for the arrangement, I'd have to see them.

15       Q.    Okay, and I'm not referring to anything

16  specific right now.

17             In the history of the company, which started

18  in 2000, do you have any recollection of whether there was

19  profit splitting with respect to any individual vehicles

20  that you sold?

21       A.    No.

22       Q.    You have no recollection or you believe that

23  profits were not split?

24       A.    I mean, we're going back 22 years, I don't

25  have any -- I don't remember exactly over the last

Page 64

1    22 years.

2          Q.    Okay.  Do you remember in the last five

3    years whether you had a profit splitting arrangement with

4    anyone with respect to an individual vehicle?

5          A.    No.

6          Q.    Okay, and with respect to the DCG Trust and

7    Ken Goodman, do you have any knowledge or recollection

8    about providing him with monthly reports?

9          A.    I'd have to see, I'd have to see the

10   documents you're talking about, no.

11         Q.    When investors were repaid, do you have any

12   understanding of why the funds went to companies or

13   businesses versus individuals?

14               MR. WINDERMAN:  We object to the use of the

15   word "investor".

16   BY MS. MEHDIPOUR:

17         Q.    Okay.  Did Excell ever report any interest

18   payments to the IRS?

19         A.    That would be a question for Teddi and

20   Nidia.  I didn't handle that.

21         Q.    So if there was a tax obligation or

22   liability, Teddi or Nidia would be the folks that would

23   deal with that aspect?

24         A.    Yes.

25         Q.    And did they have to come -- let me strike

Page 167

1      Q.    Okay.  Was your wife involved as well?

2      A.    No.

3      Q.    Do you have any recollection whether or not

4 your wife signed on behalf of Excell Auto?

5      A.    I'd have to see the documents to be able to

6 answer that question a hundred percent.

7      Q.    Okay.  In addition to your $5 million line

8 of credit that I was asking you about, do you have any

9 recollection of any profit sharing agreement with

10 BAL Investments?

11      A.    Without seeing those documents I cannot

12 answer the question a hundred percent.  I just would like

13 to have the contracts so I can answer, reference it.

14      Q.    In general practice, did Excell Auto enter

15 into profit sharing agreements where a specific automobile

16 was not nominated or discussed in that agreement?

17      A.    Can you rephrase that question?

18      Q.    Sure.

19            When you entered into agreements where

20 profits from the sale of an automobile would be split, or

21 shared, or otherwise nominated, at least in part, for a

22 payment to the lender, did those agreements always include

23 a specific identification of an automobile from which

24 those funds would emanate?

25      A.    No, no.

Page 168

1      Q.    If a specific vehicle was not nominated in a
2   profit sharing agreement, how would you determine the
3   source of the funds to be paid back to the lender?
4      A.    Without seeing the contract -- each contract
5   was different.  I'd have to see their specific contract to
6   be able to answer that question for you.
7      Q.    Did the inventory aspect of the Dealertrack
8   software have any notifications, identifiers, or otherwise
9   to let you know that the inventory was being booked for a
10  deal, that it was already pledged somewhere else for sale?
11     A.    No.
12           MR. HARVEY:  Madam Trustee, I have no more
13  questions, but reserve for the 2004 Examination.
14           MS. MEHDIPOUR:  Thank you, Mr. Harvey.
15           Mr. Shraiberg.
16           MR. SHRAIBERG:  Thank you, meritorious
17  defense Al trustee.  I just have one -- kind of a set of
18  questions with regard to some of your answers, both to
19  what was just stated to Mr. Harvey, as well as to me
20  earlier.
21                        EXAMINATION
22  BY MR. SHRAIBERG:
23     Q.    Both of us had asked whether you, your wife,
24  and any of the affiliate companies have guaranteed our
25  clients' loans.  Do you remember that?

Exhibit 'F'

# In the Matter Of:

## KENNETH J. GOODMAN V. SCOTT ZANKL

502022CA005035XXXXMB

## SCOTT ZANKL

*August 09, 2022*



800.211.DEPO (3376)
EsquireSolutions.com

ESQUIRE
DEPOSITION SOLUTIONS

```
 1        IN THE CIRCUIT COURT OF THE 15TH JUDICIAL CIRCUIT
              IN AND FOR PALM BEACH COUNTY, FLORIDA
 2
               CASE NO.   502022CA005035XXXXMB
 3

 4   KENNETH J. GOODMAN AS TRUSTEE
     OF THE DCG 2008 IRREVOCABLE WEALTH TRUST,
 5

 6        Plaintiff,

 7   v.

 8   SCOTT ZANKL and KRISTEN ZANKL,

 9        Defendants.

10   _____/

11

12                DEPOSITION OF SCOTT ZANKL
                    Pages 1 through 265
13                ZOOM VIDEO TELECONFERENCE

14

15

16              Tuesday, August 9, 2022
                 10:03 a.m. - 5:14 p.m.
17              Boca Raton, Florida 33431

18

19

20

21

22

23              Stenographically Reported By:
              Melodie P. Stafford, RPR, FPR
24                Registered Merit Reporter

25
```



1            APPEARANCES VIA ZOOM VIDEO TELECONFERENCE

2    On Behalf of the Plaintiff:
          NASON, YEAGER, GERSON, HARRIS & FUMERO, P.A.
3         3001 PGA Boulevard
          Suite 305
4         Palm Beach Gardens, Florida 33410
          561.686.3307
5         Ireich@@nasonyeager.com
          BY:  IVAN J. REICH, ESQUIRE
6

7
     On Behalf of the Defendants:
8         WEISS, HANDLER & CORNWELL, P.A.
          2255 Glades Road
9         Suite 205E
          Boca Raton, Florida 33431
10        561.997.9995
          Hbh@whcfla.com
11        BY:  HARRY WINDERMAN, ESQUIRE

12

13        LAW OFFICE OF GUY FRONSTIN, P.A.
          4800 North Federal Highway
14        Suite #205B
          Boca Raton, Florida 33431
15        561.447.4011
          Guy@fronstinlaw.com
16        BY:  GUY FRONSTIN, ESQUIRE

17

18   Also Present
          Kristen Zankl
19

20

21                 INDEX OF PROCEEDINGS

22
     Deposition of SCOTT ZANKL                          Page
23
     Direct Examination by Mr. Reich                       5
24   Certificate of Oath                                 262
     Certificate of Reporter                             263
25   Errata Sheet                                        264



SCOTT ZANKL                                                    August 09, 2022
KENNETH J. GOODMAN V. SCOTT ZANKL                                           3

1                    PLAINTIFFS' EXHIBITS

2     NUMBER         DESCRIPTION                           PAGE

3     Exhibit 25     3.03.23 email.......................152

4     Exhibit 26     Retail Installment Sales Contract...159

5     Exhibit 27     Text messages.......................164

6     Exhibit 28     3.05.22 email to Kathy Redpath
                     from Kenneth Goodman................154
7
      Exhibit 29     Series of texts.....................170
8
      Exhibit 30     3.04.22 email to Kenneth
9                    Goodman from Scott Zankl............157

10    Exhibit 31     Special Locate Agreement...........175

11    Exhibit 32     2.11.22 email to Kathy Redpath
                     from Kenneth Goodman................151
12
      Exhibit 33     1.20.22 email to Kathy Redpath
13                   from Kenneth Goodman................149

14    Exhibit 34     8.17.21 letter to Scott Zankl
                     from Kenneth Goodman................137
15
      Exhibit 35     Series of emails....................140
16
      Exhibit 37     Green Bucket Investment Locates.....178
17
      Exhibit 38     Wholesale...........................179
18
      Exhibit 39     Car Locate Reports..................181
19
      Exhibit 40     9.04.19 letter to Scott Zankl
20                   from Kenneth Goodman................137

21    Exhibit 41     7.01.19 letter to Scott Zankl
                     from Kenneth Goodman................134
22
      Exhibit 42     2.16.18 letter to Scott Zankl
23                   from Kenneth Goodman................126

24    Exhibit 43     12.11.18 letter to Scott
                     Zankl from Kenneth Goodman.........130
25



SCOTT ZANKL                                          August 09, 2022
KENNETH J. GOODMAN V. SCOTT ZANKL                                4

1   Exhibit 44    1.10.19 letter to Scott Zankl
                  from Kenneth Goodman................132
2
    Exhibit 45    5.16.18 letter to Scott Zankl
3                 from Kenneth Goodman................127

4   Exhibit 46    10.2.18 letter to Scott Zankl from
                  Kenneth Goodman.....................128
5
    Exhibit 47    Renotice of Taking Deposition....... 20
6
    Exhibit 50    7.06.20 Rule 2004 Exam of
7                 Kristen Zankl....................... 25

8   Exhibit 53    9.30.20 email to Kenneth
                  Goodman from Scott Zankl...........145
9
    Exhibit 54    11.30.20 email to Kenneth
10                Goodman from Scott Zankl...........146

11  Exhibit 55    1.11.21 email to Kenneth
                  Goodman from Scott Zankl...........147
12
    Exhibit 56    2.04.21 email to Kenneth
13                Goodman from Scott Zankl...........148

14  Exhibit 57    Scott Zankl's driver's license......149

15

16

17

18          (Exhibit No. 37 was retained by Mr. Reich.)

19

20

21

22

23

24

25



1        Deposition taken before Melodie P. Stafford,

2   Registered Merit Reporter and Notary Public in and for

3   the State of Florida at Large in the above cause.

4                    - - - - - - -

5            THE COURT REPORTER:  Do you solemnly swear or

6        affirm the testimony you give in this cause will

7        be the truth, the whole truth, and nothing but the

8        truth?

9            THE WITNESS:  I do.

10           THE COURT REPORTER:  Thank you.

11  THEREUPON,

12                    SCOTT ZANKL

13  having been first duly sworn, was examined and

14  testified as follows:

15                  DIRECT EXAMINATION

16  BY MR. REICH:

17       Q.   Good morning, Mr. Zankl.  Could you please

18  state your full name for the record, and spell your

19  last name?

20       A.   Scott Zankl.  And it's Z-A-N-K-L.

21       Q.   And your home address?

22       A.   16937 Pierre Circle, Delray Beach 33446.

23       Q.   Sir, are you currently employed?

24       A.   Yes.

25       Q.   Who are you employed by?



```
 1        A.   I'm sorry?

 2        Q.   Who are you employed by?

 3        A.   I still have an active business in Fort

 4   Lauderdale, Karma Broward.

 5        Q.   And what is your position with Karma Broward?

 6        A.   President.

 7        Q.   Are you an owner of that company?

 8        A.   Yes, sir.

 9        Q.   Are there any other owners?

10        A.   My wife.

11        Q.   And what is your percentage ownership of each

12   of those companies?

13        A.   50/50.

14        Q.   And do you own any other businesses, sir?

15        A.   Karma Palm Beach.

16        Q.   And are you -- are you an officer of that

17   company?

18        A.   I am, yes.

19        Q.   What is your position with that company?

20        A.   President.

21        Q.   And are there any other owners of Karma Palm

22   Beach?

23        A.   Yes.  My wife.

24        Q.   And what's your percentage ownership between

25   the two of you?
```



1     A.    50/50.

2     Q.    Is Karma Broward still in business?

3     A.    It's in business, but it's not selling any

4  cars right now.  But it's still in business, but

5  there's no revenue, and there isn't any car sales going

6  on right now.

7     Q.    Karma Palm Beach, same question?

8     A.    It is still active, but it's not doing any

9  business.

10     Q.    And were you an owner of a company called

11  Excell Auto?

12     A.    Yes.

13     Q.    There are different Excell Autos, aren't

14  there?  There's one that's a service company and one

15  that's the actual car company?

16     A.    Yes.  There's Excell Auto, which was the car

17  dealership, and then there's Excell Auto Sport and

18  Service.

19     Q.    Is the auto service one still in business?

20     A.    It is, yes.

21     Q.    And are you an owner of that company?

22     A.    I am.

23     Q.    Are there any other owners?

24     A.    There are.

25     Q.    Who are they?



1   gone over them.  That's really all I was asking.

2           Do you recognize this document as being that

3   which we just went over a few minutes ago?

4       A.   Yes, sir.

5       Q.   Again, same signature page as before in the

6   last document that we discussed a few minutes ago?  Is

7   that true, sir?

8       A.   It looks like the same, yes.

9       Q.   Thank you.  Okay.

10          Now I'm going to get to a new document, the

11  one we haven't discussed that.  And that starts on page

12  19 of 27 of this exhibit, which is Plaintiff's Exhibit

13  4.  And it's called Profit Participation Agreement,

14  Locate Program, dated September 18, 2019, which is the

15  same date as the other documents with respect to the

16  Locate Program, between Excell and the Plaintiff in

17  this action.

18          Do you see that document, sir?

19      A.   I do.

20      Q.   Have you seen that document before?

21      A.   I believe so, yes.

22      Q.   And I'm going to go down to the signature

23  page of that document, which would be on page 7 of that

24  document.  And is that your signature, there, sir, for

25  Excell Auto Group?  I'll shrink it so you can see the



1    whole page, if you want.

2           Does that appear to be your signature, sir?

3    A.    It does look like my signature, yes.

4           Wait.  Go back up for a second.

5    Q.    Sure.  Where do you want me to stop, on the

6    signature page?

7    A.    Yeah.  I mean, it's my signature, but once

8    again, I never signed this in front of Kenny, Michele

9    or Kathy, so I don't understand that.

10    Q.    All right.  Hold on.  I'm going to stop the

11    screen share.

12           Do you see this document, sir, marked as

13    Plaintiff's Exhibit 5?

14    A.    Yes.

15    Q.    Okay.  And it's Proof of Claim number 6 in

16    the same bankruptcy by the same Plaintiff in the Excell

17    case.  Have you seen this document before?

18    A.    I'm sure I have.  I've seen a lot.

19    Q.    And I'm going to scroll down.  And, again,

20    the first document is a document we went through over

21    Plaintiff's Exhibit 2, so we don't need to go into much

22    more detail on it in this document.

23           I'll just will ask you if you recognize it

24    again, which is a Consolidated Promissory Note,

25    Wholesale Note, in the amount of 1,850,000, dated



 1   looked at, which is the same document?

 2       A.   Yes.

 3       Q.   Again, a new document as part of this

 4   exhibit, which is Plaintiff's Exhibit 5.  And it's

 5   called a Profit Participation Agreement, Wholesale

 6   Program, dated September 18, 2019, which is the same

 7   date as the original wholesale -- the $1,850,000 loan

 8   that was executed.

 9            Are you familiar with this document,

10   Mr. Zankl?

11       A.   Yeah.  It looks -- it looks familiar.

12       Q.   And I'm going to go to the signature page on

13   that document, which will be page 19.  And I'll shrink

14   it a little, so you can see the whole page yourself.

15            Okay.  Is that your signature on this

16   document, sir, under Excell Auto Group?

17       A.   It looks like my signature.

18       Q.   By the way, were you president or authorized

19   representative of the company at the time this was

20   signed?

21       A.   Yes, I was.

22       Q.   And with respect to the other Profit

23   Participation Agreement that we discussed with respect

24   to the Locate Program, same question.  Were you either

25   president or authorized representative of Excell at the



1   time?
2        A.   I was.  But, once again, I didn't sign this
3   in front of any of these people though.
4        Q.   But you did sign it?  That's all I'm asking
5   you.
6        A.   Yeah.
7        Q.   Okay.  I'm going to screen share again for
8   you, sir.  Do you see this document on your screen
9   marked as Plaintiff's Exhibit 6?
10       A.   Yes.
11       Q.   It's proof of Claim number 17 in the Excell
12  Chapter 7 bankruptcy case, also filed by the Plaintiff
13  in this action.  Are you familiar with this document,
14  sir?
15       A.   I'm sure I've seen it.
16       Q.   I'm going to scroll you down to the
17  attachment to this exhibit.  It's a letter from
18  Interface Properties.  I'm going to shrink it down, so
19  we can see it better.  Can you still see this document,
20  sir?
21       A.   It's hard to read, but, I mean, I can kind
22  of.
23       Q.   I'll -- how about that?
24       A.   I can see it there.
25       Q.   Are you familiar with this document, sir?



1      A.   Yes.

2      Q.   Do you have personal knowledge as to the

3  allegations contained in paragraphs 6 through 30 of the

4  Complaint?

5      A.   I'd have to look at it.

6      Q.   Okay.  We'll go through that in a minute.

7  That's a fair answer.

8           And then you also raise an affirmative

9  defense.  Do you see that, the affirmative defense of

10  usury?  Do you see that, sir?

11      A.   Yes.

12      Q.   Did you provide Mr. Winderman or someone at

13  his firm with the information necessary to provide this

14  defense?

15      A.   Yes.

16      Q.   Do you have personal knowledge of the

17  allegations that are set forth in this defense?

18      A.   I'm sorry.  Say that again.

19      Q.   Do you have personal knowledge of the facts

20  necessary to support this defense?

21      A.   Oh, of the usurious?

22      Q.   Yeah.

23      A.   Yes, sir.

24      Q.   Do you know of anybody else who has personal

25  knowledge of these facts?



1      A.    No.

2      Q.    Okay.   Let's go to the Complaint.   Bear with

3  me a moment.

4      A.    Mr. Reich, question for you.   The last

5  question you asked me, can you just -- I don't know if

6  I answered it the way I wanted to.   Can you be more

7  specific when you say, Does anyone else know?   What do

8  you mean by that?   I didn't even think about...

9      Q.    Well, let's let the court reporter.   Oh,

10 wait.   Sorry.

11          THE COURT REPORTER:   Do you want me to read

12     it back, Counsel?

13          MR. REICH:   Yeah, please.

14          THE COURT REPORTER:   Your previous question

15     was:   Do you know of anybody else who has personal

16     knowledge of these facts?

17     A.    Do you mind explaining what you meant by

18 that?   Because I answered the question quickly and I

19 don't think I fully understood the question.

20     Q.    Do you know of anybody else who has personal

21 knowledge regarding the facts to supporting the

22 affirmative defense of usury that you've alleged?

23          I'm not the one who's alleged the usury

24 defense, so I don't know what facts you have or what

25 other people might have.   I'm just asking:   Do you know



1    if anybody has facts that would support this

2    affirmative defense?

3        A.    Well, yes.  I mean, as far as the payments go

4    that I was paying, yes.  The girls in my office would.

5        Q.    What would they know about the usurious

6    defense?

7        A.    Well, they would just know how much I was

8    paying, based on the wire transfers and checks that I

9    gave every month.

10       Q.    Okay.  Hold on one second, sir.  I'm going to

11   show you -- I don't know if we're on screen share yet.

12   Hold on.  Can you see it?  Again, this is Exhibit 2.

13   I'm going to show you paragraph 6.

14            Do you have personal knowledge of the facts

15   that support your denial -- well, first let me ask you

16   this:  Let's read into the record:  All conditions

17   precedent to bringing this lawsuit have occurred, been

18   excused, or otherwise have been waived.

19            What personal knowledge do you have that

20   supports your denial of this allegation of the

21   Complaint in paragraph 6?

22            MR. WINDERMAN:  Form.

23   BY MR. REICH:

24       Q.    You can answer.

25       A.    I don't think I understand the question.



1      Q.    You've raised a denial to this allegation.

2  What personal knowledge do you have that would support

3  your denial?

4           MR. WINDERMAN:    Form.

5      A.    What personal knowledge do I have that would

6  support my allegations?

7      Q.    You've denied this allegation.    What

8  knowledge do you have that supports this denial?

9      A.    The structure of the deal and what I was

10  paying every month.

11      Q.    Okay.   Explain.

12      A.    Well, based on what I was paying him every

13  month, it was 30 percent interest.

14      Q.    I'm not asking you about the interest, okay?

15  Let's talk about this.   What conditions precedent to

16  the bringing of this lawsuit have not occurred?

17      A.    I don't think I understand.

18      Q.    What conditions precedent to this lawsuit

19  have been excused?

20      A.    What conditions have been excused?

21      Q.    Yeah.

22      A.    I don't really understand.

23      Q.    A condition precedent is a requirement before

24  bringing a lawsuit, before the lawsuit can be brought.

25  So, what condition precedent to bringing this lawsuit



```
1        A.    Yes.

2        Q.    Why didn't you strike it out?

3        A.    Because that was what DC -- what Kenny

4   wanted.

5        Q.    Wait.  Kenny, is the trustee of the Trust,

6   who's the Plaintiff in this case?

7        A.    Yes.

8        Q.    The one who lent your company $1,850,000 ON

9   this case?

10        A.    Yes.

11        Q.    So, he wanted that in there; correct?

12        A.    Yes.

13        Q.    And you didn't want it?

14        A.    It didn't matter to me.  It didn't have

15   anything to really do with me.  It was done up for him

16   solely.

17        Q.    So, if that language wasn't in there,

18   would -- do you think Kenny would have lent you the

19   money?

20        A.    I don't know.  That's a good question.  That

21   would be more of a question answered by Kenny.

22        Q.    We're in good place now.  Let's finish this

23   paragraph.

24             Is there anything ambiguous about the Note,

25   other than the use of the term Wholesale?
```



1      A.    Well, and I think it said something about

2   50 percent profits or something.

3      Q.    Oh.  Where does it say that in there?

4      A.    I'm not sure.  One of the notes I believe it

5   says it.  I'm not sure if it's this one.

6      Q.    It says here:  Plaintiff performed its

7   obligation under the Wholesale Note.

8            How did Plaintiff not perform its obligations

9   under the Wholesale Note?

10     A.    No.  DCG did.  They funded the money.

11     Q.    And what about the other related loan

12  documents in connection with the same?

13           MR. WINDERMAN:  Form.

14  BY MR. REICH:

15     Q.    Did DCG perform its obligations under the

16  loan documents that were related to the Wholesale Note?

17     A.    It funded the money to Excell, yes.

18     Q.    Was there any other obligations that it had?

19     A.    No.

20     Q.    And do the terms and conditions of the

21  Wholesale Note require that the entire principal sum of

22  the Note and related interest be paid by

23  September 30th, 2020?

24     A.    It did say that, yes.

25     Q.    But that was extended to a later maturity



1    Q.   Is there anything unclear about those two

2  statements?

3    A.   No.

4    Q.   Is there anything ambiguous about those two

5  statements?

6    A.   No.

7    Q.   Let's go on.  Do you see where it says the

8  principal amount of the Note in both singularly, as

9  well as where it's defined as loan?  Do you see that,

10  sir?

11    A.   Yes.  It's the same as everyone.

12    Q.   I'm going to ask you to read the second full

13  paragraph of this document on this page, 26, starting

14  with the word "interest."  And I'll tell when you to

15  stop.

16    A.   Interest, computed on the basis of a 360-day

17  year for the actual number of days elapsed, on the

18  outstanding balance of principal evidenced by this Note

19  shall accrue interest at an annual interest rate equal

20  to 1.85 percent, which annual interest rate is equal to

21  the applicable federal rate for loans with a maturity

22  of less than three years on the date of this Note.

23    Q.   And did you read this provision when you

24  signed the document?

25    A.   I don't remember.



1     Q.   And do you know what the usurious rate of

2  interest is in the State of Florida?

3     A.   I do.

4     Q.   What is that?

5     A.    It depends on the dollar amount.  I believe,

6  if I'm correct, if it's over 500,000, I think the rate

7  is 25 percent.

8     Q.   Okay.

9     A.   Under 500,00 I think it's less.

10    Q.   And the principal amount of this Note is how

11  much?

12    A.   1,850,000.

13    Q.   Which is more than 500,000?

14    A.   Yes, sir.

15    Q.   So, is 1.85 percent annual interest less than

16  25 percent annual interest?

17    A.   Yes, it is.

18    Q.   Thank you.  Is there anything unclear on that

19  statement that you just read?  Is there anything

20  ambiguous about that statement which you just read?

21    A.   No.

22    Q.   Now I'm going to ask you to read in its

23  entirety the third full paragraph, starting with "This

24  Note."

25    A.    This Note is executed and delivered in



1   conjunction with that certain Profit Participation

2   Agreement, Wholesale Program, dated of even date

3   herewith between Borrower and Lender, Wholesale Program

4   Property Participation Agreement.

5        Q.   Okay.  Stop right there.  Okay.  Is there

6   anything untrue in that statement?

7        A.   Yes.

8        Q.   What?

9        A.   There wasn't any Wholesale Profit

10  Participation.

11       Q.   Didn't you just indicate before when I took

12  you through the various Proofs of Claim the Profit

13  Participation Agreement entitled Wholesale Profit

14  Participation Agreement that you executed on behalf of

15  the company?

16       A.   Yes.

17       Q.   Is there anything unclear in this statement

18  that you just read from this Promissory Note?

19            MR. WINDERMAN:  Form.  Asked and answered.

20            MR. REICH:  I never asked about him clear.  I

21       asked him about truthfulness.

22  BY MR. REICH:

23       Q.   Go ahead.  You may answer.  Is there anything

24  unclear in that statement that you just read?

25       A.   Unclear?



1        Q.   Yes.  Unclear.

2        A.   I mean, I don't think -- I'm not sure if it's

3   unclear.

4        Q.   Is there anything ambiguous?

5        A.   Well, yeah.  Profit Participation Agreement.

6   I mean, Wholesale Program, it's --

7        Q.   Okay.

8        A.   I mean, that's ambiguous.  What is it?

9        Q.   Well, in conjunction with -- well, I showed

10   you earlier the Profit Participation Agreement, which

11   was attached as an exhibit to the Proof of Claim of DCG

12   in the bankruptcy case.

13        A.   Right.

14        Q.   So, assuming that's the document we're

15   talking about, is there anything ambiguous about the

16   fact that the Note was executed and delivered in

17   conjunction with that agreement?

18        A.    I mean, the only thing is, like I said, there

19   wasn't a Wholesale Program.

20        Q.   You're saying there wasn't a Wholesale

21   Program.  We'll get to whether there was or there

22   wasn't a Wholesale Program or not, but for the time

23   being there's a specific document called Profit

24   Participation Agreement, Wholesale Program, that you've

25   already identified, and identified that you've



1  executed.  So, with that being said, the Note is

2  executed and delivered in conjunction with that

3  agreement which I just referenced, is there anything

4  ambiguous about that statement?

5      A.   No.

6      Q.   You can go to the fourth paragraph, which now

7  starts with the words "As material."  Can you read that

8  into the record, sir?

9      A.   As material consideration for and as an

10  inducement to Lender making this loan to Borrower,

11  Borrower warrants and represents to, and otherwise for

12  the benefit of Lender, and otherwise covenants, as an

13  where applicable, as to the following.

14      Q.   Stop right there.  Okay.  Read number 1.

15      A.    It says:  Borrower will use the loan proceeds

16  solely and exclusively for the purchase and sale of

17  vehicles in connection with Borrower's Wholesale

18  Program, as defined in the Wholesale Program

19  Participation Agreement.

20      Q.   And then go on to -- well, let's start with

21  that part.  Is there anything untrue in that statement

22  that is material consideration for, as an inducement to

23  the Plaintiff making this loan to Excell, that you

24  stipulated and you wanted it represented that Excell

25  would use the loan proceeds solely or exclusively for



1    the purchase and sale of vehicles in connection with

2    Excell's Wholesale Program, as defined in the Wholesale

3    Program Profit Participation Agreement, which is the

4    agreement that we referenced before?

5         A.    Is that a question or you just read it?

6         Q.    Is there anything untrue in that statement?

7         A.    Once again, there was not a Wholesale

8    Program.

9         Q.    Okay.  So, you're saying -- it's your

10   testimony there was not a Wholesale Program as defined

11   in the Wholesale Program Participation Agreement; is

12   that correct?

13        A.    Correct.

14        Q.    That is correct.  Okay.  Let's go here.

15   Well, actually, you know what?  We'll keep that as your

16   testimony.  And let's go on.

17             Subparagraph nine to that same statement.

18   Can you read on?

19        A.    Borrower has participated freely in the

20   negotiation --

21        Q.    Hold on.  Strike that.  Let me go back up to

22   what was before, all right, to paragraph -- to the

23   statement starting with, "As a material for

24   consideration for," in subparagraph 1 of that is there

25   anything unclear in that statement, other than your



1    testimony that there was no such thing as an Borrower

2    Wholesale Program, as defined in the Wholesale Program

3    Profit Participation Agreement?

4            MR. WINDERMAN:   Form.

5        A.   Well, I mean, that would be unclear.   There

6    isn't a Wholesale Program.

7        Q.   Other than that statement, is there anything

8    else unclear?

9        A.   Well, the proceeds would be used for the

10   Wholesale Program is unclear.

11       Q.   Why is that unclear?

12       A.   Because there wasn't one.

13       Q.   And is there anything ambiguous in that

14   statement?

15       A.   I would -- the loan proceeds being used for

16   the Wholesale Program.

17       Q.   Let's pull this up again.   Hold on one

18   second.   I'm going to show you a document as part of

19   Exhibit 5 that you've already identified as the Profit

20   Participation Wholesale Program on which you just

21   testified there is no such Wholesale Program.   Do you

22   see that, sir?

23       A.   I do.

24       Q.   Do you see the second "Recital" to this?   Can

25   you please read it, sir?



SCOTT ZANKL
KENNETH J. GOODMAN V. SCOTT ZANKL

```
1       A.    Which one?

2             MR. WINDERMAN:  B; right?

3       A.    B.?

4       Q.    That would be where the mouse is, where the

5   hand is.

6       A.    Yep.  Yep.

7             DCG Trust, on even date herewith, has loaned

8   to the company the sum of 1,850,000, which together

9   with any and all renewals and future advances of and/or

10  under the Note, as herein defined, being the loan

11  proceeds, as evidenced by the certain consolidated

12  Promissory Note of even date herewith, all as may be

13  renewed, extended, substituted and/or further modified,

14  the Note.

15      Q.    Is that true, sir?

16      A.    Yes.

17      Q.    Is there anything unclear about that?

18      A.    No.

19      Q.    Is there anything ambiguous about that?

20      A.    No.

21      Q.    Okay.  Please go to read C.

22      A.    In consideration of the loan, the company has

23  offered to provide a Profit Participation interest in

24  the Wholesale Program, in accordance with the terms of

25  this agreement.
```



1        Q.    Who is the company under this agreement, as

2   defined above?

3        A.    Excell Auto Group.

4        Q.    Okay.  And go to Recital number 1.  What does

5   that say?  Please read that.

6        A.    The foregoing recitals are true.

7        Q.    And you signed this document on behalf of

8   Excell; is that true, sir?

9        A.    Yes.

10       Q.    Now, under paragraph two, I'm going to ask

11   you to read it, okay, into the record, please, sir.

12       A.    Starting with "In Connection"?

13       Q.    2a, in connection.

14       A.    In connection with the company's operation of

15   the Wholesale Program, in accordance with this

16   agreement, the company will pay to DCG Trust 50 percent

17   of the wholesale vehicle profit for each wholesale

18   vehicle (the property participation) all in accordance

19   with the terms and conditions of this agreement.

20       Q.    Stop right there.

21       A.    Yes, sir.

22       Q.    Is there anything untrue about that sentence?

23       A.    Yes.  There was not a Wholesale Program.

24       Q.    There's not a Wholesale Program in accordance

25   with this agreement?



1        A.    No.

2        Q.    Is there anything unclear about this

3   sentence?

4        A.    Just the fact that there was no Wholesale

5   Program and there was not a 50 percent profit.

6        Q.    Despite the agreement that you just signed

7   that says so?

8        A.    Correct.

9        Q.    Is there anything ambiguous about this

10  statement?

11       A.    Just what I just said.  The Wholesale Program

12  and the profit.

13       Q.    So, you're saying that despite what this

14  agreement says, the company was not going to pay to DCG

15  Trust 50 percent of the wholesale vehicle profit, each

16  wholesale vehicle, in accordance with the terms of that

17  agreement; is that true?

18       A.    Yes.

19       Q.    The company was not going to do that?

20       A.    No.  There wasn't a Wholesale Program to do

21  that.

22       Q.    Okay.  I'm going to ask you to read into the

23  record the balance of this paragraph.  I know it's

24  long, okay?

25       A.    All in accordance with the terms and



1  conditions of this agreement, each Profit Participation

2  will be deemed fully earned by DCG Trust in accordance

3  with -- in accordance with the hereinafter described

4  terms and conditions of this Subsection A, with each

5  fully-earned profit participation thereafter being due

6  and payable by the company to DCG Trust in accordance

7  with Section 2c of this agreement the company --

8       Q.   2c or 2c5?

9       A.   2c5.

10      Q.   Can you -- of this agreement?  Go on.

11           Stop right there.  Is there anything untrue

12  about this statement?  Other than the fact that you

13  claim that there is no wholesale payment or profit

14  participation, is there anything in this statement that

15  is untrue other than that?

16      A.   Well, that's really what it says.

17      Q.   That's what it says.  It says that the

18  Wholesale Program is a profit participation.

19      A.   Right, but you're asking me if it's untrue.

20  The whole statement's untrue.  There isn't a wholesale.

21  There was a profit participation.

22      Q.   So, you signed a document that's not true and

23  made a representation that's not true to the Plaintiff

24  in this action?

25      A.   No.  I did not make a representation.  It



1  was -- Kenny drew these documents up, and that's how he

2  wanted it done.

3      Q.   And if Kenny didn't get what he wanted in

4  these documents, would Kenny have lent Excell this

5  money which is represented by the Wholesale Note?

6      A.   That's a great question.  That would be

7  asking Kenny.  I don't know.

8      Q.   Well, we'll get to that later.  We'll get to

9  that issue, because I think you signed documents

10  reflecting that, too.

11          Is there anything else in this agreement, in

12  this sentence, that is unclear or ambiguous, other than

13  what you just testified to a moment ago?

14      A.   I mean, that's pretty much everything in the

15  sentence.  But anything besides dealing with the profit

16  sharing and the Wholesale Program, it's not.

17      Q.   Which you claim despite the language of the

18  agreement does not exist?

19      A.   Correct.

20      Q.   Then read on starting with the words, "The

21  Company and DCG Trust."

22      A.   The Company and DCG Trust acknowledge and

23  agree that a Profit Participation for a wholesale

24  vehicle is deemed fully earned by DCG Trust as of the

25  date that the following two conditions are satisfied



1  for each wholesale vehicle:   The company has entered

2  into a Sale-Dealer PSA for a Wholesale Vehicle; and

3  two, the company has entered into a corresponding

4  Buy-Dealer PSA for the required wholesale dealer under

5  such --

6       Q.   Stop right there.

7       A.   Yeah.

8       Q.   Is there anything in that sentence which is

9  untrue?

10      A.   Well, yeah.   There wasn't a Wholesale

11  Program, so there wouldn't be a Sale-Dealer PSA, which

12  I'm not sure what PSA is, and a wholesale vehicle by

13  PSA.  I don't...

14      Q.   So, despite language in this Profit

15  Participation Agreement that talks about the Profit

16  Participation and a Wholesale Program, and the language

17  you're using which is describing the Wholesale Program,

18  you're saying there's no Profit Participation and

19  there's no Wholesale Program; is that correct?  Is that

20  your testimony here today?

21      A.   Sure.   That's what I've said the last 15

22  minutes, yes.

23      Q.   Well, notwithstanding what you just read, you

24  still maintain that position; is that correct, sir?

25      A.   That's true.   That is the truth, yes.



1          Q.    Notwithstanding what that says.

2                Okay.   Let's continue on, where it starts

3    with, "In connection with the foregoing."

4          A.    In connection with the foregoing, and not

5    withstanding anything contained in this Agreement to

6    the contrary, the Company and DCG Trust acknowledge and

7    agree that neither the consummation of a wholesale

8    vehicle delivery, the payment by Buy Dealer of the Buy

9    Dealer purchase price, nor any other event shall be

10   deemed or otherwise inputted – sorry, my glasses are –

11   as any additional condition to a profit participation

12   for a wholesale vehicle being deemed fully earned by

13   (and thereafter due and payable to) DCG Trust.

14         Q.    Again, does that change your opinion

15   whether -- well, let me ask you this:   Is there

16   anything in that statement that is untrue?

17         A.    Just it keeps referencing the wholesale

18   participation and wholesale, and there wasn't one.

19         Q.    So, there's nothing in that statement that

20   you had signed, an agreement that you had signed that

21   changes your participation that there was no Profit

22   Participation and there's no Wholesale Program; is that

23   correct?

24         A.    Yes, sir.   That's correct.

25         Q.    And is there you anything, other than that,



1  that position that there's no Profit Participation,

2  there's no Wholesale Program, that is unclear in that

3  sentence or ambiguous in that sentence?

4      A.   No.  It's not true about the wholesale

5  vehicles, about anything relating to that.

6      Q.   So, nothing that's contained in there where

7  it uses the words "the Company agrees and

8  acknowledges," you're saying that's not true, despite

9  you're saying -- you're agreeing and acknowledging

10  same?

11      A.   You're breaking up pretty bad there.  I

12  couldn't understand that.

13          MR. REICH:  Court Reporter, ask that question

14      again.

15          THE COURT REPORTER:  Actually, you did break

16      up on the end on the last three words.  I can read

17      it up to then.

18  BY MR. REICH:

19      Q.   Notwithstanding the language within that

20  sentence, in that paragraph that says, "The Company

21  agrees and acknowledges" are you still saying that that

22  is untrue?

23      A.   I am still saying there is no Wholesale

24  Program and there is no Profit Participation.

25      Q.   Notwithstanding that language that says you



1   agree to the same?

2          MR. WINDERMAN:  Objection.

3   BY MR. REICH:

4      Q.   You can answer the question, Mr. Zankl.

5      A.   My statement's not going to change.  There

6   was not a Wholesale Program and there wasn't Profit

7   Participation.

8      Q.   What does the word "agree" to you?

9      A.   I'm sorry.  What?

10     Q.   What does the word agree mean to you?

11     A.   Agree?

12     Q.   Yeah.

13     A.   I think everybody would have a different

14  definition, but "agree" to me means when somebody

15  agrees with whatever someone is either saying,

16  thinking, stating or anything.

17     Q.   What does "acknowledge" mean to you,

18  Mr. Zankl, personally?

19     A.   Acknowledge?

20     Q.   Yeah.

21     A.   I mean, it means a lot of different things in

22  my mind.  You can acknowledge something, whether you

23  agree or disagree.  You can acknowledge bringing

24  something to a point, acknowledging that that happened,

25  acknowledging that it's going to happen.  I mean,



1   there's a lot of different...

2        Q.    What is your understanding of what the words

3   "true" mean?

4        A.    True?

5        Q.    True.   T-R-U-E.   True.

6        A.    That's pretty easy.   That's something that

7   is -- that actually -- true, it's something that

8   happened or something that was accurately done or said.

9        Q.    What is your understanding of the word

10  "representation"?

11       A.    I would think that my definition of that is

12  just -- representation is what -- without using the

13  word again, something you represent.   Something you're

14  stating.

15       Q.    What is your understanding of the word

16  "reliance"?

17       A.    Reliance?   That's something, I guess,

18  reliance, you're relying -- I'm thinking of it as where

19  you're relying on somebody else, relying on somebody to

20  do something.

21       Q.    What is your understanding of the word

22  "material"?   And not in the context of like building

23  materials.

24       A.    I don't know.   I mean, there's -- that would

25  be one that I wouldn't be able to define too well,



1   material.  I don't know what you mean.  I'm thinking

2   material, like clothing and stuff.

3        Q.   How about in the terms of an adverb?

4        A.   Material?  I don't know.  That one's a good

5   one.

6        Q.   Do you understand the term "material" to be

7   used as substantive?

8        A.   I guess, yes.

9        Q.   Okay.  Let's go back to the next line under

10  the same paragraph with the cursor on it.  It starts

11  with, "The payment of the Profit Participation."  Do

12  you see that?

13       A.   Yep.

14       Q.   Okay.

15       A.   The payment of the Profit Participation is in

16  addition to, and not in lieu or a modification of, the

17  payment of all principal, interest -- interest, costs,

18  expenses and other fees otherwise due and payable by

19  the company to DCG Trust under the Note.

20       Q.   Stop right there.

21       A.   Yeah.

22       Q.   What do you understand that sentence to mean?

23       A.   I mean, what it's stating is that the Profit

24  Participation is on top of I guess the principal and

25  expenses and other fees.



1        Q.   What do the words "not in lieu of or

2    modification of" mean to you?

3        A.   Not in lieu of is not, in other words, not to

4    take away from or to be in place of something else.

5        Q.   What does "modification of" mean to you?

6        A.   Changing.

7        Q.   Is there anything untrue in that statement?

8        A.   Just the Profit Participation.

9        Q.   You're talking about the Profit Participation

10   as defined within the agreement that we're reading that

11   you claim doesn't exist?

12       A.   Yes.

13       Q.   So, is it your position that notwithstanding

14   the language that you just read in paragraph 2a,

15   second-to-the-last line, that depravement of the Profit

16   Participation is in addition to and not in lieu or

17   modification of the payment of all principal, interest,

18   cost, expenses and other fees due and payable by the

19   Company to DCG Trust under the Note, that somehow the

20   profits that were paid on vehicles through the Trust

21   constitute interest under the Wholesale Note?

22       A.   Now, all the payments -- yes.  All the

23   payments to DCG -- except I believe there was some

24   principal payments made, not many, all the other

25   payments were solely interest payments, not profit



1    payments.

2        Q.    Do you have any documents that reflect that?

3        A.    Documents, like something signed, or anything

4    like that?

5        Q.    Any document that you can think of that will

6    support the statement that you just made on the record

7    under oath in this proceeding?

8        A.    No document.  No, sir.

9        Q.    So, is it just your testimony?

10       A.    It is my testimony, yes.  Yes, it is my

11   testimony.

12       Q.    Does anybody else have personal knowledge of

13   the fact that you -- of the statement that you just

14   made on the record under oath in this proceeding?

15       A.    No, because it was just -- the only people

16   that knew about this deal was just Kenny Goodman and

17   myself.  They were the only two people that knew about

18   the deal.

19       Q.    So, you have nothing in writing that reflects

20   that these payments were interest; correct?

21       A.    No, sir.

22       Q.    Well, no, sir, that you do have documents, or

23   am I incorrect in my statement?

24       A.    No.  I don't have any documents.

25       Q.    And there's no other persons, other than



1  yourself and Mr. Goodman, that would have knowledge
2  concerning the matter of whether these payments were
3  interest or profit participations; is that correct,
4  sir?

5      A.    I mean, the girls in my office, I mean, they
6  were privy to the deal that we had, but they know that
7  there was no Wholesale Program or Locate Program.  So,
8  I'm not sure what they would testify, but there isn't
9  profit sharing, so I think the girls would testify that
10  assumed that this was all interest as well.

11      Q.    Let me ask you a question.  Did Excell ever
12  issue IRS Form 1099 INT to the Trust?

13      A.    No, because that's -- that was part of the
14  way this deal was structured was that when a deal is
15  structured like this on a loan and it's -- this is what
16  I was told by Kenny, was that structuring it in this
17  manner, making it a profit sharing or commission of
18  profits, versus interest and being paid to an entity,
19  that does not require my company to file a 1099 to the
20  IRS.  If it was interest, then yes, I'd have to file
21  the 1099, but if it's a profit sharing or a commission
22  to an entity, I'm not required to provide a 1099 to the
23  IRS.

24      Q.    INT or another 1099?

25      A.    A 1099 period is what I was told.  And I



1    didn't handle the 1099s.  Teddi did.  But we confirmed

2    that with our accountant, because that's what Kenny

3    told me, and so we just confirmed it, that since it

4    wasn't -- you know, that's why he wanted it set up this

5    way as a profit sharing versus interest, so that we

6    didn't have to do that.

7         Q.   So it's your testimony that no 1099 INT was

8    ever issued to the Trust; is that correct?

9         A.   We weren't required to because of the way it

10   was set up.

11        Q.   Was one ever issued?  I just want to confirm.

12        A.   No, sir.

13        Q.   And you're saying no other 1099s were ever

14   issued to the Trust of any other nature, not Is?

15        A.   I'm not sure what INT is.  Oh, you mean for

16   interest?

17        Q.   Yeah.  That's the 1099.  That's the form that

18   a company who pays interest is supposed to issue to the

19   company who receives interest.

20        A.   Correct.  No.  I don't believe there was ever

21   one done at all ever for DCG.

22        Q.   Let's go on.

23             MR. WINDERMAN:  Just a heads up, Ivan.

24             MR. REICH:  For what?

25             MR. WINDERMAN:  We're going to break for



 1   BY MR. REICH:

 2        Q.    You just read subparagraph 2b.  I was going

 3   to ask you to read to yourself --

 4        A.    It's right there.  Okay.

 5        Q.    -- through paragraph C.

 6             MR. WINDERMAN:  Form.

 7   BY MR. REICH:

 8        Q.    I'm just asking you to do that, sir.  Do you

 9   see --

10        A.    I've read it, yeah.

11        Q.    Do you recognize this language in the

12   agreement?

13        A.    I'm sorry.  What now?

14        Q.    Do you recognize this in the agreement?  Have

15   you seen this before, this language set forth in 2c?

16        A.    To be honest with you, no.  Not really.

17        Q.    Let me have you read it.  Let's make it

18   easier, because your counsel did raise a form

19   objection.  Could you read starting with the words, "In

20   connection," with respect to 2c.

21             MR. WINDERMAN:  Can we go off the record,

22        Ivan?

23             MR. REICH:  We're going to finish this,

24        Harry.  We're going to let you get out of here at

25        12:45.  We're going to finish.



1           confer after lunch?

2                  MR. REICH:  Sure we can.

3                  MR. WINDERMAN:   Thank you.

4           A.    In connection with Company's operation of the

5    wholesale program in payment of the Profit

6    Participation, for each Wholesale Vehicle the Company

7    covenants to deliver to DCG Trust the following

8    respective documents:  Confirmations, information and

9    payments, as in where applicable within the following

10   respective time frames.

11          Q.    Keep reading.

12          A.    Oh.  Number 1:  On the first day of each

13   month during the term of this agreement, the document

14   delivery date, the Company will deliver to DCG Trust by

15   and through electronic mail to the email address

16   provided for in Section 6.

17          Q.    Keep going.

18          A.    Okay.  A, an Excell Worksheet in a form

19   consistent with the worksheet attached hereto as

20   Schedule 2.  Identifying the make, model, year and

21   vehicle information number, VIN, of each Wholesale

22   Vehicle purchased and sold through the Wholesale

23   Program during the immediately-preceding calendar

24   month.

25                 The Company purchase price and Buyer Dealer



1   purchase price for each wholesale vehicle purchased and

2   sold through the Wholesale Program during the

3   immediately-preceding calendar month.

4              3, the Profit Participation deemed earned by

5   DCG Trust in accordance with the Section 2a of this

6   agreement, and pursuant to Subsection 2 below to be

7   paid by the Company to DCG Trust during the

8   immediately-preceding calendar month.

9        Q.   Keep going.  Just to until you get to B.

10       A.   B.  A true, correct and complete copy each

11  Sale Dealer PSA and Buy Dealer PSA entered for each

12  Wholesale Vehicle purchased and sold through the

13  Wholesale Program during the immediately-preceding

14  calendar month.

15       Q.   Stop there.

16       A.   Yeah.

17       Q.   Did you on behalf of Excell deliver the

18  documents addressed in this, these paragraphs, the

19  subparagraph, to Excell monthly on the first day of

20  each month by what's called the Document Delivery Date?

21       A.   To Excell?  What do you mean, did I provide

22  it to Excell?

23       Q.   And did you, on behalf of Excell, provide it

24  to the Trust?

25       A.   No.



1      Q.   Who provided it on behalf of the Trust?

2      A.   Oh, no.  I provided it, but I didn't provide

3   it on the 1st of every month, and I didn't provide a

4   sale, a true and correct complete copy of the Sale

5   Dealer and Buy Dealer PSA.  I didn't provide any of

6   that.

7      Q.   So, you did not provide any of the documents?

8   You, on behalf of Excell, did not provide any of the

9   documents referenced in this paragraph?

10      A.   No.  I did not say that.  I was referencing

11   what I did not provide.  I did provide an Excell

12   Worksheet, but it was not on the 1st of every month.  I

13   got it to DCG when basic -- whenever he requested it.

14      Q.   Notwithstanding that you didn't get it on the

15   1st of the month, did you provide such documents as

16   reflected in these paragraphs?

17      A.   Only one type of document.  It was just the

18   Excell Spreadsheet.  I never provided -- I did not

19   provide -- a Section B I did not provide.

20      Q.   Now, if you go on to the next paragraph,

21   subparagraph 2, it starts, "On the 15th," would you

22   read that, sir?

23      A.   On the 15th day of each month during the term

24   of this agreement, payment date, the Company will

25   deliver to DCA Trust by and through a wire transfer of



1  U.S. federal funds pursuant to the Wire instructions

2  attached here in Schedule 1, an amount of money equal

3  to all the Profit Participation deemed earned by DCG

4  Trust in accordance with the section of this agreement

5  during the immediately-preceding calendar month.

6          Provided, however, in the event a payment

7  date for any month occurring during the term of this

8  agreement would fall on a Saturday, Sunday, or a

9  federal or state holiday during which DCG Trust's

10 banking institution is closed, the payment date for

11 each such applicable month will automatically be

12 deemed -- or excuse me -- automatically will be amended

13 and deemed to be the last business day immediately

14 preceding such original immediate payment date.

15     Q.   Okay.  With respect to that, did you on

16 behalf of Excell comply with the terms of this section

17 of the agreement?

18     A.   Yes.  Yes and no.  Payments were made on

19 the -- not always on the 15th, but within a couple days

20 of the 15th there was an interest payment made to DCG.

21     Q.   Under this agreement?  Pursuant to this

22 agreement?

23     A.   Well, I mean, it was not equivalent to any

24 Profit Participation.

25     Q.   A payment pursuant to this agreement is my



1   only question.  Yes or no?

2        A.    There were payments made to this -- to them

3   on or just after the 15th of each month, yes.

4        Q.    Did you make -- did Excell -- did you on

5   behalf of Excell or through employees of Excell make

6   the payments to the Trust as referenced in the

7   paragraph you just read?

8        A.    We -- I -- Excell -- I never did the

9   payments, but Excell did do the payments.  The office

10  did do the payments on or about the 15th of each month

11  to DCG.

12       Q.    As in accordance with the paragraph that you

13  just read?

14       A.    No.  Not in accordance, because there was no

15  Profit Participation.  It was interest.

16       Q.    Okay.  So, you're saying it was interest.

17  Was it calculated under this formula that's set forth

18  in this paragraph?

19       A.    I'm sorry?

20       Q.    Was the methodology for figuring out what was

21  paid to DCG according to the formula set forth in this

22  paragraph of this agreement?

23       A.    No.

24       Q.    How was it calculated?

25       A.    It was calculated based on an annual, not a



1   monthly.

2        Q.    What's the interest rate under the --

3        A.    It was just over 30 percent.

4        Q.    Was there an agreement that says that?

5        A.    No, sir.  It's pretty evident by the

6   payments.  If you review the payments that were made,

7   it's pretty evident.

8        Q.    Let's go to paragraph four.  Why don't you

9   read that into the record, sir?  And then once you're

10  done with that, I'll ask you a few questions about it

11  and then I'll let Harry go, all right?

12       A.    Paragraph 4:  No interest.  DCG Trust and

13  Company agree that the payments of the above-described

14  Profit Participation is dependent upon the success of

15  the Company's operation of the Wholesale Program, and

16  such payment shall not be included in the calculation

17  of any payment due under the Note.

18           Should the payment of the Profit

19  Participation be classified as the payment of interest

20  resulting in the computation of earning of interest in

21  excess of the maximum legal rate of interest which is

22  legally permitted under applicable law, if any, then

23  any and all such excess shall be and the same is hereby

24  waived by DCG Trust, and any, all such excess shall be

25  automatically credited against and in the reduction of

1   the balance due under the Note, and any portion of the
2   excess which exceeds the balance due under the Note
3   then shall be paid by DCG Trust to Company, with no
4   future liability to DCG Trust.
5       Q.   Was there anything untrue in that statement?
6       A.   Yes.
7       Q.   What?
8       A.   Once again, it references Profit
9   Participation.
10      Q.   What about the part that says that these
11  payments under this agreement, these payments that
12  remain to the Trust are not to be considered interest
13  under the Note?
14      A.   That is why -- that's the whole reason why
15  Kenny did this as a Profit Participation is because the
16  interest rate he was charging me was above the usurious
17  laws, and that's why he did it this way is so that I
18  didn't have a defense.
19      Q.   So, didn't you previously testify in reading
20  the agreement on the Wholesale Note that the interest
21  rate was 1.85 percent, which is substantially below
22  25 percent?
23      A.   That is what was written on the agreement,
24  but tell me where I paid 1.85 percent interest.
25      Q.   That was the agreement that you signed?



1      A.    Well, then I paid him a hell of a lot more

2   money than I should have.

3      Q.    Well, you also signed a Profit Participation

4   Agreement that you said that you paid pursuant to that

5   as well, where you said despite what it's called, you

6   said it is not what it is?

7      A.    Correct.

8      Q.    And you've already testified you have no

9   documents that reflect any other interest, and you've

10  already testified that the only person who can testify

11  to this is you regarding your personal knowledge; is

12  that correct?

13            MR. WINDERMAN:    Form.

14     A.    No.    I said -- what I said, sir, was is that

15  the girls in my office knew that there was no Wholesale

16  Program and Locate Program.    They would -- I can't say

17  exactly what they would testify, but they would be

18  under the impression as well that these were all

19  interest payments.

20            And, you know, I've been doing this business

21  for 20 years, and I'm pretty good at it.    And if you

22  look at what was provided to you for the payments that

23  were made to Mr. Goodman since 2020, because that's all

24  I have as far as the bank statements go, I'd have to be

25  an absolute magician, Merlin, best person ever to walk



1   the earth in the car business, to be able to

2   consistently every month have within a few thousand

3   dollars of the same profit every single month, year

4   after year, when every other part of my business,

5   sales, profits, fluctuated by hundreds of thousands of

6   dollars per month, but yet just my agreement with

7   Mr. Goodman and DCG was the only consistency in my

8   company for 20 years.  Kind of hard to believe.

9           MR. REICH:  With that, I'm going to let

10      Mr. Winderman, your counsel, go.  We're going to

11      come back.  Harry, what time did we say we're

12      going to back?  1:30?  Is that what we agreed

13      upon?

14          MR. WINDERMAN:  Yes, it is.  Thank you.

15          MR. REICH:  Okay.

16          (A lunch recess was taken at 12:47 p.m.)

17          (Back on the record at 1:46 p.m.)

18          (Mr. Fronstin not attending via Zoom.)

19          MR. WINDERMAN:  Kristen Zankl has joined the

20      deposition.

21  BY MR. REICH:

22      Q.   I'm going to take you through a document.

23  I'm going to show you a document that I've marked as

24  Exhibit -- I haven't put it up yet, because it's still

25  loading, but it's going to be Exhibit 42.  Plaintiff's



1      A.    Yeah.   That would have been my wife's name.

2      Q.    So, you recognize this agreement that you

3    sent to Mr. Goodman on March 4, 2022, at 11:05; is that

4    correct?

5      A.    I mean, I just -- I looked at it earlier to

6    see it, but yeah.   This is something Kenny requested

7    that I sent him.

8      Q.    Why did Kenny request that you send it to

9    him?

10     A.    Because it fell in line with how the whole

11   deal was structured.   For him, from day one when we

12   talked about doing the investments and he wanted to put

13   money in, you know, he is a big real estate guy and

14   also would state it to me that, you know, he makes more

15   than 20, 25 percent on his money in real estate, and

16   that he can't loan me money based at those rates,

17   because then it would be usurious.   So, that's how Ken

18   came up with the idea about try to tie his money into

19   car deals and show that I was paying him commissions so

20   that he evaded that usury loss.   So he always wanted

21   backup with his -- for his money in case.   Perfect

22   example.   If I've got to go back and claim usury, then

23   he's got to have the defense.

24           MR. REICH:   Hold on a second.   I'm going to

25       show you Exhibit 30.   No.   That's not Exhibit 30.



1     Q.    And he says:  Did you wire the money to the

2   DCG Trust?

3          You said:  Yes.

4     A.    Yep.  Yep.

5     Q.    And then he indicates:  I will keep looking.

6     A.    Yep.  And then he said:  Money just now.

7   Thanks.

8     Q.    So, again, just with the last set of texts,

9   which in the last exhibit we talked about was Exhibit

10  27, those that are on the right are from Ken; those on

11  the left are from you; is that correct, sir?

12    A.    Yes.

13    Q.    And I'll tell you, these emails basically go

14  from June 2020 to November 21, 2021.  It's a 189-page

15  document.

16    A.    Yeah.  Those are text messages, yeah, not

17  emails.  Just correct it.

18    Q.    And then he says:  Good morning.  I see

19  there's a new exotic car dealership up on Yamato Road.

20  Do you know them?

21          And then writes:  Scott.  No wire.

22          $37,450 arrived.

23          Do you see that?

24    A.    Uh-huh.  Yes.

25    Q.    Do you know what that 37,450 is?



1        A.    Interest payment.

2        Q.    So, you say it's an interest payment.   Okay.

3    All right.

4             And then you see where it says -- he says:

5    Text me the wholesale list for May?

6        A.    Yeah.

7        Q.    With a little emoji after it?

8        A.    Yep.

9        Q.    Okay.   And then there's a picture, some

10   pictures.   Okay.

11            And I'm going to scroll a little further down

12   on this.   Do you see it's highlighted in yellow?

13   There's two texts, one that says:   6/16/20.   4:24 p.m.

14            It says:   Scott.   200,000 locate profit

15   status?   Thanks.

16            Do you see that, sir?

17       A.    I do.

18       Q.    Do you see your response to that?

19       A.    It says:   Should be wiring profit tomorrow.

20       Q.    Thank you.   And then I'm going to --

21       A.    "Profit" was our code word for "interest."

22       Q.    So, it's your testimony that "profit" and

23   "interest" were co-words, that whenever it was used in

24   any document or conversation or communication, that was

25   interest?   That's your testimony?



1        A.    Yes, sir.

2        Q.    Do you have an agreement to that effect in

3    writing?

4        A.    No.  We didn't have anything in writing.  I

5    wanted a side agreement with him in writing, but he

6    wouldn't do it.  And I understand why, because I'm

7    dealing with it today.  I never thought this was going

8    to happen, so I didn't protect myself like I should

9    have.

10       Q.    By the way, all these payments that went into

11   Excell from the Plaintiff in this case, the Trust, did

12   any of them go to you or your wife?

13       A.    No, sir.

14       Q.    Did any payments that went to the Trust, did

15   they go from you -- did they come from you or your

16   wife?

17       A.    The interest payments?  No?  They all came

18   from Excell.

19       Q.    They all came from Excell.  Got you.  So, all

20   payments, however they're characterized, whether the

21   characterization is profit on our side or interest on

22   your side, all payments came from Excell and not from

23   either Scott or Kristen Zankl; correct?

24       A.    Correct.  And not all the payments went to

25   DCG either, so...



1      Q.   Well, I understand there's other litigation

2   and there's other cases and there's other parties, but

3   I'm just talking about with respect to --

4      A.   No.  No.  No.  No.  No.  I'm saying some

5   payments went to Kelsey.  Some went to Interface.  Some

6   went to DCG.  Some went to Kenny himself.

7      Q.   But none of them came from you or your wife?

8      A.   No.

9      Q.   And none of them -- and they all came from

10  Excell; correct?

11     A.   Yes.

12     Q.   Okay.  So, rather than going through this

13  document anymore, would you confirm anytime the

14  words -- it's your testimony anytime the word "profit"

15  is used it is a code word for "interest"?  Is that your

16  testimony?

17     A.   Yes, sir.

18     Q.   Okay.  We don't need to go through this

19  document anymore.

20     A.   Because at the time we did this deal I didn't

21  know what --

22     Q.   Sir, there's not a pending question.

23     A.   I thought I was --

24     Q.   There's not a pending question.  I'll ask you

25  a question.



1        A.    Okay.

2        Q.    If your Counsel wants to take you on cross,

3    he may do so when the time comes.

4        A.    Okay.

5             MR. REICH:   I'm going to show you a document.

6        Plaintiff's 31.  I'm going to enlarge it for you,

7        put it on the screen.

8             (Plaintiff's Exhibit No. 31 was marked for

9        identification.)

10   BY MR. REICH:

11       Q.    Plaintiff's Exhibit 31, can you see that,

12   sir?

13       A.    I can see it, yes.

14       Q.    You see it's, again, a letter called Special

15   Locate Agreement, February 23, 2022, to Scott Zankl.

16   But this time it's to Karma of Palm Beach, Inc.  Do you

17   see that, sir?

18       A.    I do.

19       Q.    And it references a particular Rolls Royce,

20   with a particular VIN number.  Do you see that, sir?

21       A.    Oh, yes.  Sorry.  Yes.  Yes.

22       Q.    And I'm going to ask you to look at the

23   bottom of the document on the right-hand side, where it

24   says Scott Zankl, as President of Karma of Palm Beach,

25   Inc., and Individually.  Do you see that?



1     A.   I do.

2     Q.   Do you remember the day of the bankruptcy

3  filing, sir?

4     A.   Yeah.  It was like April 8th, I think.

5     Q.   Were you in the Excell offices on the date of

6  March 26, 2020?

7     A.   March 26?  No.  I was not.

8          MR. WINDERMAN:  Is that 2020?

9     A.   Oh, 2020?

10    Q.   I'm sorry.  March 26th or March 28th of 2022?

11    A.   No, I wasn't.

12    Q.   You were not?

13    A.   No.

14    Q.   I'm going to show you a document and ask you

15 whether you've ever seen it before?

16    A.   Okay.

17    Q.   By the way, did Excell do business at Bank of

18 America?

19    A.   We did loans for customers through Bank of

20 America, yes.

21    Q.   But did it have an account with Bank of

22 America?

23    A.   A long time ago, yes.

24    Q.   Did you personally?

25    A.   I don't think I had a personal account.  I



```
 1    don't recall.  If I did, it was a long time ago.
 2              MR. REICH:  Hold on a second.
 3              THE WITNESS:  Mr. Reich, can I just do a
 4         quick bathroom break again, please.
 5              MR. REICH:  This is a good time to take a
 6         break.  You want to go for like ten minutes, sir?
 7              THE WITNESS:  That's fine.  Thank you.
 8              MR. REICH:  Okay.
 9              (Off the record at 3:00 p.m.)
10              (Back on the record at 3:07 p.m.)
11              (Plaintiff's Exhibit No. 37 was marked for
12         identification.)
13    BY MR. REICH:
14         Q.    Sir, I show you what's been marked as
15    Plaintiff's 37.  With the exception of the handwriting
16    on these, are you familiar -- it's a 19-page report
17    that starts with Green Buckets Investment Locates.  It
18    says:  Locates 2019.  Do you see that, sir?
19         A.    I do.
20         Q.    And is this a document that was generated by
21    you or your office?
22         A.    Generated by me.
23         Q.    By you personally?
24         A.    Yes.
25         Q.    On behalf of Excell or for you personally?
```

1        A.    You asked if I did it.  I did the document.

2        Q.    You did the document.  Okay.  Was this one of

3    these -- the reports that was referenced in the

4    document we talked about before that you had said you

5    had sent a report to Mr. Goodman?  Do you remember

6    that, sir?

7        A.    Yes.

8        Q.    And this is one of those reports?

9        A.    Yes, sir.

10       Q.    A series of these reports?

11       A.    Yes.

12             MR. REICH:  Okay.  And that's Exhibit 37.

13             Hold on.  I'm going to pull up Exhibit 38.

14             (Plaintiff's Exhibit No. 38 was marked for

15       identification.)

16   BY MR. REICH:

17       Q.    With the exception of the handwriting where

18   it says "Wholesale" on here, okay, are these

19   documents --

20       A.    You're moving it around a lot.  It's hard

21   to --

22       Q.    Right.  Plaintiff's Exhibit 38, is this a

23   report that you prepared with respect to -- a report

24   provided to Mr. Goodman and the Trust?

25       A.    Yes.  That is a report.



1        Q.    And this is a multiple-page document.  36

2    pages.  Do you see these, sir?  I'm am scrolling

3    through them.

4        A.    Yes.

5        Q.    These are all reports that you provided --

6        A.    Yes, sir.

7        Q.    -- as to particular automobiles?  Do you see

8    that, in the Vehicle Descriptions?

9        A.    Well, some of the documents are specifying

10   with the VIN number, which would mean a vehicle, and

11   there's some of these documents don't have any VIN

12   numbers, so...

13       Q.    Okay.  We can keep going.  You have a VIN.

14   You have a Vehicle Description.  You have Amount Owed.

15   Profit per car.  Amount in.  Amount out.

16       A.    Right.  If you go up to the top, the first --

17   all the ones at the beginning didn't have VIN numbers.

18       Q.    Okay.  That's fine.  But these were reports

19   that you prepared and provided to Mr. Goodman pursuant

20   to the agreements executed between you; is that

21   correct?

22       A.    These were, yes.  I provided these.

23       Q.    Okay.

24             MR. REICH:  I'm going to show you another

25       one, which is going to be Plaintiff's Exhibit 39.



 1           (Plaintiff's Exhibit No. 39 was marked for

 2      identification.)

 3  BY MR. REICH:

 4      Q.   And when would these have been prepared as --

 5  around the time set forth in the agreements, the Profit

 6  Participation Agreements that you executed?

 7           MR. WINDERMAN:   Object to form.

 8      A.   No, sir.

 9      Q.   I'm sorry.  The time frame in those documents

10  that you executed, the Profit Participation

11  Agreements --

12      A.   Yes.

13      Q.   -- that were attached to Proof of Claims

14  number 5 and 6, okay, which would have been Exhibits 4

15  and 5 to this deposition, those documents had time

16  frames within by which reports were supposed to be

17  provided to the Plaintiff.  Were these the documents

18  that were provided under those time frames?

19      A.   No, sir.  They -- that's one of the things,

20  if you go back and look at Kenny's text messages, I was

21  bad at that, and there would be months and months that

22  would go by that he wouldn't get these documents.

23      Q.   But eventually you would get them to him;

24  correct?

25      A.   Eventually, yeah.  Some of them six months



1   after.

2        Q.   Okay.  All right.  I'm going to show you

3   what's Plaintiff's Exhibit 39.  And this is another

4   series of these -- again, with the exception of the

5   handwriting on there, are these again reports that were

6   prepared by you on behalf of Excell for the benefit of

7   the Plaintiff in this case?

8        A.   Yes.  They were provided, yes.

9        Q.   Were they prepared by you for Excell for the

10  benefit of Plaintiff in this case?

11       A.   They were provided by me to Mr. Goodman, DCG,

12  yes.

13       Q.   Okay.  So, your answer with respect to this

14  document would be the same as it was with respect to

15  the last two documents; is that correct, sir?

16       A.   Yes.

17       Q.   Okay.  I'm going to show you a document that

18  your lawyer provided to me just prior to your wife's

19  deposition yesterday, which I had marked yesterday as

20  Plaintiff's Exhibit 7.  Do you see that document?

21  Well, hold on.  I haven't put it up yet.  Sorry.  My

22  apology.

23            Do you see that document, sir?

24       A.   Yes.

25       Q.   Did you prepare this document?



1    A.    Yeah.   That's why I want to tell you, the

2    total, that total right there of the 609,000, that's

3    correct, but the total for '21, I made an adding error.

4    Q.    Okay.   Well, we'll get there in a minute, all

5    right?  And we're going to keep going.

6        This entry on 2/8/2021, what is that entry?

7    Additional interest and additional cash, what does that

8    mean?

9    A.    So, from time to time if I needed additional

10   cash, a quick injection of cash, Kenny did -- made that

11   available, and that's what that meant was the

12   additional interest was on additional capital paid in.

13       If it's not written "additional interest,"

14   then, for example, then those were the traditional

15   monthly payments.

16       Like the consistency, if you look here on

17   4/6 -- you're moving.  Like 4/6, you see 4/5, there's

18   35,000, 3/17, those payments are consistent with the

19   1st and the 15th, and they're all -- like I said,

20   they're all within almost the same amount.   They

21   fluctuate a little bit every month.

22   Q.    Why do the amounts of monthly payments or

23   bimonthly payments -- sorry -- biweekly payments that

24   you mentioned, why are those numbers are different

25   every month?



1        A.    Well, that was something that Kenny wanted to

2    do and discuss, because then if I made a payment to him

3    on the 1st and the 15th of the exact dollar amount

4    every single month, then that would be too obvious of

5    it being an interest payment, and it was supposed to

6    fluctuate on the 1st and 15, variations every month,

7    but still within that similar dollar amount, a

8    thousand, 1500, two grand difference.

9             But it was more of the annual basis on what

10   it added up to that had to be consistent and flow with

11   the sheets.  If you are look at the sheets I provided,

12   they match up with the payments that were made every

13   month.

14        Q.    Are you accusing Mr. Goodman and the Trust of

15   participating in tax fraud?

16        A.    No.  I don't know why.  I mean, the reason

17   that I was told that he wanted to do it this way was

18   just strictly for the usury.  That's all.

19        Q.    So, you're saying he actually mentioned the

20   words "usury" to you, and then put in his instruments,

21   okay, saying that it's not usurious; correct?

22        A.    Yeah.  Because he told me I couldn't pay

23   him the --

24        Q.    And then asked -- and then he had you sign

25   the document saying it's not usurious; correct?



1      A.   You didn't let me answer the question.

2      Q.   I'm just asking you simply a yes or no

3   question.  And then he had you sign a document --

4      A.   I didn't answer the question prior to that.

5   You didn't let me finish.  You started asking over it.

6   Can I finish the original question?  Then I'll answer

7   the second question.

8      Q.   I'd asked you a series of yes or no

9   questions.  I just asking yes or no, sir.

10         MR. WINDERMAN:  It wasn't a yes or no

11      question.  He can answer it any way he likes.

12      A.   So, you asked me the question if I was

13   accusing Mr. Goodman of something with tax fraud.  No.

14   Not at all.  Kenny -- no.  Kenny is not -- he's not

15   that guy.  He wanted to set this in place because of

16   what he makes on his real estate versus what he makes

17   in my investing with me.  I had to be equal to that or

18   more for him to do it.

19         By this, doing the sheets and showing it was

20   commissions versus interest, he couldn't draw up a loan

21   agreement at 31 percent or 32 percent.  No attorney

22   would even do that, because it's usurious.  So, this is

23   how he came up with getting around the usurious was

24   showing the profits on deals.

25      Q.   Okay.  Let's continue.  This document that



```
 1  say the dates?

 2       A.    '21 -- yeah.  It's January '21, through .

 3       Q.    Right.  Okay.

 4       A.    It goes from June '20 to March of '22 is the

 5  documents.

 6       Q.    Right.  So, June 1, 2020, through the end of

 7  the year is Plaintiff's Exhibit 24.  And from

 8  January 7th through the end of 2021 is Exhibit 23;

 9  correct?

10       A.    Yes, sir.

11       Q.    And these documents, I'll start with 23,

12  they're highlighted by you.  Did you do the

13  highlighting?

14       A.    Yes.

15       Q.    Is there a reason for particular highlights

16  on these transitions that you did?

17       A.    Well, go back up.

18             Yeah.  I started to highlight the consistency

19  on the payments for the bulk of the interest to show

20  the consistencies, and then I just stopped doing it

21  after the -- I didn't finish it.  I mean, I ran out of

22  time.

23       Q.    And then the backup to this is the Chase bank

24  account 3181; is that correct?

25       A.    Yes.
```



1    Q.   And whatever was highlighted, those are the

2  payments that are reflected in the summary exhibit that

3  you were showing me?

4    A.   Yes, sir, and they match up to the dates.  If

5  you reference the dates with the summaries, they all

6  match.

7    Q.   And again, as I asked your wife yesterday,

8  all these payments were made from Excell to its

9  recipient, either DCG or Kelsey; is that correct?

10    A.   From Excell, yes.

11    Q.   Right.  Not from yourself or your wife;

12  correct?

13    A.   No.

14    Q.   And it's your testimony that every one of

15  these dollars that went from Excell to the Plaintiff in

16  this case, or to Kelsey for that matter, okay, is

17  interest?  And it's not principal?  It's not profit?

18  It's pure interest?  Is that your testimony?

19    A.   Yes, sir.  Now, there were payments that were

20  principal, but I didn't list those on the documents.  I

21  only listed on these documents the interest payments.

22    Q.   Okay.  I'm going to get it out, these two

23  documents, okay.  And again, you testified that no

24  1099-INTs were ever issued on these?  That's correct,

25  sir?



1     A.    That is correct, yes.

2     Q.    Do you have any other written -- I was going

3  to ask you this.

4     A.    Yeah.

5     Q.    Do you remember the Profit Sharing Agreements

6  that I showed you before that were part of the Proofs

7  of Claim?

8     A.    Yes.

9     Q.    That you executed on behalf of Excell?

10    A.    Yes.

11    Q.    Would any of the other creditors of Excell,

12  did any of the other creditors -- not the exact same

13  agreement, but did they have a similar Profit

14  Participation or arrangement?  I know you call them all

15  interest, but do they have a similar arrangement by and

16  between yourself and them?

17    A.    I forget what call that.  One second.

18    Q.    What about Savannah Row?

19    A.    Savannah Row, no.  Savannah Row was -- that

20  was strictly a loan.  No nothing.  That was just a

21  loan.

22    Q.    So there's no profit participation?

23    A.    No.  No.  There was no profit participation

24  with anybody.  It was all loans and interest.

25    Q.    All loans and interest.  And were there



1   all -- every payments you paid back, Excell paid back

2   to any of these creditors were all in the form of

3   interest?

4        A.   No.   Some was principal.   It just depended

5   on -- on like, for example, Kenny.   There's checks that

6   I have copies of that were paid to DCG or Kelsey but it

7   wasn't interest, it was principal.

8        Q.   Do you know a name named Bhavin, B-H-A-V-I-N?

9        A.   Bhavin.   Yes.   Bhavin Shah.

10       Q.   Bhavin Shah.   Did you do business with him

11  through one of his companies?

12       A.   Yes.   Yes, I did.

13       Q.   Did you have a profit split arrangement with

14  him on vehicles?

15       A.   No.

16       Q.   What about Bill Grady?

17       A.   No.

18       Q.   Was he a creditor of Excell?

19       A.   Yes.

20       Q.   And you're saying that was completely

21  interest with him as well?

22       A.   Yes.

23       Q.   And what about Nick Stratagakis?

24       A.   Stratagakis.   I killed it, too.

25            Yeah, that was interest as well.



1      Q.    No profit participation with him as well?

2      A.    No.

3      Q.    Or any of his companies?

4      A.    No.

5            MR. REICH:  And just for the court reporter,

6      that's spelled S-T-R-A-T-I-G-A-K-I-S.  Goia is

7      G-O-I-A.  And Bhavin is B-H-A-V-I-N.

8   BY MR. REICH:

9      Q.    All right.  So, let's go -- okay.  We're

10  going to go back to Exhibit 4.  We left off before on

11  that document.  And where we left off was right after

12  paragraph four, No interest, okay.

13           So, to make this clear, it's not your

14  position that Plaintiff, the Trust, has any ownership

15  interest in Excell; is that correct?

16     A.    Yeah.  No ownership interest.

17     Q.    So, we'll skip paragraph five, okay?

18           Can you read the last paragraph in paragraph

19  five, before paragraph six, the notices?  Can you read

20  the first sentence, please?

21     A.    Where is it?

22     Q.    I put the cursor there.  Just after F.

23  Actually, you know what?  Sorry.  Go back.

24           Can you read paragraph F.?  It will be 5F.

25  It says:  No ownership interest, and then it says:  A,



```
 1   including, without limitation, the Locate Program.

 2            B, any failure on the part of the company to

 3   perform or comply with any applicable federal, state

 4   and/or local laws, ordinances and regulations.

 5       Q.   You can skip B, okay, and go on.  You can go

 6   to C.

 7       A.   Any inaccuracy in any representation or

 8   warranty made by the company under this agreement

 9   and/or Note, protections, indemnification and save

10   harmless provisions and obligations herein will survive

11   the expiration or earlier termination of this

12   agreement.

13       Q.   Do you know what it means to indemnify

14   somebody or a company?

15       A.   Is that to --

16       Q.   I'm just asking you a question.  I don't want

17   you to guess.  Do you have an understanding of what an

18   indemnification is?

19       A.   I do.  To explain it I might -- but I do

20   know, yes.

21       Q.   What's your understanding of the concept of

22   indemnifying?

23       A.   I guess excluding, protecting, not holding

24   anything against it, I guess.  I mean...

25       Q.   All right.  I'm going to take you now to the
```



1    miscellaneous provisions of this agreement, which is

2    claim number 5, and it's the Profit Participation as it

3    relates to the Locate.  I apologize.  Before I think we

4    were talking about participation of the Wholesale.

5    We're going to come back to that in a minute.  I just

6    want to, since I'm on this document, okay?

7             I'm going to ask you to read subpart C to

8    Section 7.  Do you see that, sir?

9        A.   What is it?

10       Q.   Subpart C.  I'll put the cursor by it.

11       A.   Yes, C.  Okay.  Got it.

12       Q.   Can you read that, please.

13       A.   The parties have participated freely in the

14   negotiation and preparation of this agreement.

15       Q.   Hold on.  Stop right there.  Is that true?

16       A.   I mean, I didn't do the agreement.  Kenny had

17   these done.  I don't...

18       Q.   Next.  Read the next set clause.

19       A.   Have each been advised to engage independent

20   legal counsel.

21       Q.   Were you advised to engage independent legal

22   counsel?

23       A.   No.

24       Q.   Even though the agreement says so?

25       A.   Yes, it says so, but I didn't know.  No one



```
 1   said anything to me but...
 2        Q.    The next clause.
 3        A.    Each had a reasonable opportunity to have any
 4   such independent legal counsel involved in such review
 5   and negotiations, or has otherwise knowingly at its
 6   sole election elected not to engage such independent
 7   legal counsel.
 8        Q.    Keep going.
 9        A.    And each waive any and all rights or remedies
10   it may have or be entitled to deriving from disparity
11   in size or from any significant disparate bargain
12   position.  Furthermore, this agreement will not be
13   construed more strongly against either party,
14   regardless of which party is responsible for its
15   preparation.
16        Q.    You see that language, sir?  Is there
17   anything unclear about that language?
18        A.    I mean, a lot of it's legal language,
19   attorney language.
20        Q.    Okay.  But you did read it before you signed
21   it?
22        A.    No.
23        Q.    But you signed the agreement?
24        A.    Yes.
25        Q.    And then E, will you read that real quick.
```



1      A.   In connection with any litigation arising out

2  of this agreement, including, without limitation, all

3  trial, appellate and post-judgment proceedings, the

4  prevailing party will be entitled to recover reasonable

5  attorney fees and costs.

6      Q.   You understand that means that there's an

7  attorney fee provision in this agreement?  Do you

8  understand that?

9      A.   I see that, yes.

10      Q.   This is important.  I'm going to ask you to

11  read F, please.

12      A.   This agreement, together with the Note,

13  contains all the terms, promises, covenants, conditions

14  and representations made by or entered into by and

15  between DCG Trust and Company with respect to the

16  subject matter of this agreement and supersedes all

17  prior discussions and agreements, whether written or

18  oral.

19      Q.   Let me ask you this question, sir:  When you

20  first claim that you had a discussion with Mr. Goodman

21  with respect to the fact that this is going to be

22  interest rather than a Profit Participation, did that

23  happen prior to entering into this agreement?

24      A.   Say that again.  I'm sorry.  You broke up at

25  the end.



1    Q.    You've already testified there's no written

2    documents to that effect.  But you did testify that

3    orally you and Mr. Goodman had an agreement that this

4    would be interest, not profit participation.  When did

5    that first conversation take place prior to the entry

6    of this agreement?

7    A.    When we first got started.  When he first did

8    his investments.  Because we talked about -- we had

9    talked about doing stuff together for a while after I

10   met him, because he was buying cars from me, but his

11   whole premise was that I could never -- he could never

12   charge me the interest that he makes on his real estate

13   deals.

14   Q.    So, let me ask you a question.  All these

15   conversations that you talked about --

16   A.    Yep.

17   Q.    Did they occur prior to the entering into

18   this agreement?

19   A.    Oh, yeah.

20   Q.    Okay.

21   A.    Yeah.  This was like back in -- right when we

22   first started doing stuff, like back I think in '16 or

23   '17, whenever we first did our first few deals.

24   Q.    I'm going to ask you to now look at the last

25   sentence of Subpart G.  Do you see that, sir?  Can you



1   read it?

2        A.   Where it says "If"?

3        Q.   "If any portion of this agreement."

4        A.   Yep.  If any portion of this agreement is

5   determined to be unlawful, the -- whoops -- the

6   remaining portions will remain in full force and

7   effect, as if such unlawful portions did not appear

8   herein.

9        Q.   And is it your testimony that the interest

10  you claim was charged as a result of this agreement is

11  unlawful?

12       A.   Yes.

13       Q.   That's your position?

14       A.   Yes.

15       Q.   So, it was your intention to enter into an

16  unlawful agreement?

17            MR. WINDERMAN:   Form.

18  BY MR. REICH:

19       Q.   Isn't it true, based upon your testimony,

20  that it was your intent to enter into an unlawful

21  agreement to avoid Florida usury rules?

22            MR. WINDERMAN:   Form.

23       A.   Not for me.  Not for me to avoid it.  I -- he

24  wanted to invest the money, and at the time I needed

25  the investment, and he told me what he needed to make



 1  on his money compared to the real estate, and I agreed

 2  to -- I agreed to pay him the interest he wanted.

 3       I knew -- at the time when we did this I

 4  really didn't know what the usury laws were or

 5  anything.  I mean, I was made aware of it at this time,

 6  but, you know, when him and I did this and when we were

 7  doing all these transactions and deals and paperwork,

 8  neither one of us ever dreamed we'd be sitting in this

 9  position; otherwise, I probably wouldn't have done the

10  deal.

11       Q.   And, so, you're saying that you wouldn't have

12  done the deal if you had known that you're dealing with

13  usury?

14       A.   No.  I'm saying if I had any idea that my

15  company was going to file bankruptcy and be defunct

16  like it was at the end I wouldn't have done this deal,

17  because the way the deal was structured, it didn't give

18  me any protection.  It was all Kenny's.  But he was the

19  one loaning the money, so I did what he wanted.

20       Q.   When did you first become aware that these

21  transactions, in your mind, were usurious?

22       A.   Well, I knew from day one, because he was

23  very upfront with me.  He's like, Scott, I can't charge

24  you what I make in my real estate.  He's like, I make

25  20, 30 percent on my money in my real estate.  I can't



1   charge you that legally on a contract for a loan

2   agreement.  No attorney's going to draw up a loan

3   agreement showing 30 percent interest.

4        Q.   Did Mr. Goodman tell you that he and the

5   Trust or any of his related entities could not loan you

6   money, okay, if you do not structure the transactions

7   in the way these transactions were structured?

8        A.   He said that he needed to be able to

9   structure -- I'm answering your question.

10        Q.   I'm asking you a yes or no question.  I'm

11   just --

12        A.   No.  It's not.  It's not a yes or no, sir.

13   It's not.

14        MR. WINDERMAN:  He can answer the question

15        any way he likes.

16        MR. REICH:  No.  He cannot.  He can answer

17        the yes or no.

18        MR. WINDERMAN:  And watch him do it.

19        Go ahead, Scott.

20        MR. REICH:  If he wants to explain, he can.

21        It's a simple question.

22        Madam Court Reporter, please.

23        MR. WINDERMAN:  He can answer the question

24        any way he likes, and if you don't like it, you

25        can ask him a different question.



1           Scott, answer the question.

2           MR. REICH:  Madam Court Reporter, read the

3     question.

4           THE COURT REPORTER:  All right.  One moment.

5           The question was:  Did Mr. Goodman tell you

6     that he and the Trust or any of his related

7     entities could not loan you money, okay, if you do

8     not structure the transactions in the way these

9     transactions were structured?

10    BY MR. REICH:

11         Q.   It just calls for a simple yes or no, sir.

12    I'm asking you yes or no to that question?

13         A.   Well, but there's not a simple answer.

14         Q.   Answer yes or no, and if you need to explain,

15    I will let you explain.  But just answer me.

16         A.   It's -- I can't answer that question as a yes

17    or no.  It's impossible.

18         Q.   Did Mr. Goodman tell you that he, the Trust,

19    or related entities, could not lend Excell, okay,

20    monies unless the transaction was structured in the way

21    that you say it was proposed to you by him?

22         A.   It had to be structured in a way that he was

23    protected and the Trust was protected from usurious

24    loans.  That's all he cared about.

25         Q.   Right.



1        A.    However we structured it, it didn't matter,

2    as long as --

3        Q.    I didn't ask you that question, sir.   I

4    haven't asked you that.

5        A.    I'm answering the question.

6            MR. WINDERMAN:   You don't interrupt the

7            witness in the middle of an answer.

8    BY MR. REICH:

9        Q.    Go on, sir.  All I want to know is when

10   Mr. Goodman had lent you the money about his

11   instruction.

12           MR. WINDERMAN:   I don't care what you want,

13           Ivan.  He gets to finish his answer.

14           MR. REICH:   I get to ask the questions,

15           Harry.  You don't get to do this, okay?  The

16           witness answers the questions he's asked.

17           MR. WINDERMAN:   The witness gets to answer

18           your question.  He's answered your question, and

19           if you don't like it, you can move to strike his

20           answer.

21           MR. REICH:   Then I'll move to strike his

22           answer.

23           MR. WINDERMAN:   He's answered the question.

24           If you want to call the judge...

25           MR. REICH:   I move to strike the answer as



```
 1        being nonresponsive, okay?
 2            MR. WINDERMAN:  He hasn't finished it.  When
 3        he finishes his answer, you can do whatever you'd
 4        like.  Let him finish his answer.
 5            MR. REICH:  Madam Court Reporter, okay, we'll
 6        mark that, okay?  I will ask the question a
 7        different way?
 8            MR. WINDERMAN:  Fine.  You're withdrawing
 9        your last question.
10            MR. REICH:  No.  I'm not withdrawing.  I'm
11        just asking a different question.  I'm still
12        marking that question.
13            MR. WINDERMAN:  Then he gets to finish.
14        Unless you withdraw your question, he gets to
15        answer it.
16  BY MR. REICH:
17        Q.   Yes or no, Mr. Goodman, okay.  Please answer
18   in either the affirmative or the negative.  Mr. Zankl.
19   Mr. Zankl?
20        A.   But I don't know the answer to the question.
21   That's the problem.  You're not letting me.
22        Q.   If the answer is I don't know, that's a
23   legitimate answer, sir.  I'm going to ask the question.
24            Do you know if Mr. Goodman would have lent
25   the money to Excell if Excell did not sign documents in
```



1    the manner in which it was presented to them?

2              MR. WINDERMAN:   Form.

3    BY MR. REICH:

4         Q.   Go ahead.  You can answer it.

5         A.   I don't know the answer to that question.

6         Q.   Did Mr. Goodman ever tell you that he, the

7    Trust, or any related entities would not have lent the

8    money unless the transaction was structured in the way

9    that is reflected in the signed documents?

10        A.   We went through like four different

11   structures, and like I said before, he would only loan

12   the money to Excell if we could structure it in a way

13   that he could make the money he makes with his real

14   estate transactions without any documentation showing

15   usury.  Then he would do the loan.  He didn't care how

16   it was structured, as long as he was protected.

17        Q.   Let's go up.  I'm go to a Locate document.

18   Claim 5.  And, again, I'm going to show you.  This is

19   the Claim 5, Exhibit 4.  Do you see here in Recital B,

20   it says:  Similars Recitals to the one on the Wholesale

21   Program that we discussed before.  Do you can see that,

22   sir?  Can you can read it to yourself.  You don't have

23   it read it.

24        A.   I see it, yes.

25        Q.   And the same thing with C?  It's the same



1    language?  Do you see that?

2         A.    Yes.

3         Q.    And you see in Recital 1, paragraph number 1?

4         A.    Yes.

5         Q.    Okay.  Well, do you see in 2a there's a

6    description of what's called the Locate Program and a

7    definition of the term Profit Participation.  Do you

8    see that?

9         A.    Yes.

10        Q.    Okay.  And do you see that under B there's an

11   actual definition of the Locate Program?  Do you see

12   that, sir?

13        A.    I'm just reading it real quick.  Yes.  I see

14   the definition.

15        Q.    Now, in Subpart C, it talks about the

16   delivery of certain documentation and information.  Do

17   you see that, under the Locate Program?  This is to be

18   provided from Excell to the Trust?

19        A.    I do see that.

20        Q.    You see that.  And then you see under Subpart

21   2 all of Subpart C --

22        A.    Well, wait a minute.  Wait.  Sorry.  You're

23   going so fast.  I was looking at that one that you went

24   you.  Can you go back up?

25        Q.    Sure, sir.  Right now I'm looking at C, to

1  where it says:  The Claim Purchase Price Balance.

2  That's what I was describing.

3      A.    Right.  On C, that's what I was trying to ask

4  you.  You asked me to read C.  I didn't quite finish

5  it.  It says:  Respective documents and confirmations

6  and information of payments.

7          Yes.  Okay.  These documents were provided.

8  Okay.

9      Q.    And these were the documents that you

10  provided that we discussed before, we went through the

11  various reports?

12      A.    No.  No, that's not true.  The documents that

13  you showed before were Wholesale, and some of them were

14  for his Locates.  But it says in this agreement that

15  within two business days after the client company

16  execute and deliver a client PSA, which I'm thinking is

17  a maybe purchase contract, I'm not sure, for a Locate

18  Vehicle.  The company will deliver to DCG Trust by and

19  through electronic email an email address provided the

20  make, model, year applicable and client under them

21  applicable respect.  I mean, none of that was provided.

22  So, the only thing that was provided was -- he

23  requested was a list every month.

24      Q.    Let's -- well, let's go to PSA.  Do you see

25  where it says:  Binding purchase and sale agreement



 1   with the company, where it says "Client PSA"?

 2        A.   Uh-huh.

 3        Q.   Do you understand what the Client PSA means

 4   under this agreement?

 5        A.   Yep.  Yep.

 6        Q.   Do you understand what the terms are, the

 7   defined terms are under this agreement as you've been

 8   reading it?

 9        A.   Yes.

10        Q.   Okay.  And then it says --

11        A.   I saw in the agreement I was in default from

12   day one.

13        Q.   And then it says:  Within two business days.

14   Do you see that language?

15        A.   Yes.

16        Q.   Okay.  And it talks about the Locate Vehicle

17   Profit in Subpart C.  Do you see that, sir?

18        A.   Are you talking -- yeah.  Where it says a

19   confirmation?

20        Q.   Yes, sir.

21        A.   I do see that, yeah.

22        Q.   And then under Subpart 3, it talks about the

23   payment date and how that's defined.  Do you see that,

24   sir?

25        A.   Let's see.



1        Q.   I'm sorry.  That's Subpart 4.

2        A.   On the first day of each month during the

3   terms of the agreement.  Yes.

4        Q.   Okay.  And you said payments were made

5   pursuant to that?

6        A.   Yes.  I mean, it was on or about the 1st.

7   There would be a couple months it was on the 2nd or

8   3rd, but it was relatively close to the 1st.

9        Q.   Okay.  And we already went through -- we went

10  through this language in number 4 with respect to the

11  Wholesale Agreement.  It's basically the same language.

12  Do you understand that?  It would be the same language

13  as was in the Wholesale Agreement language?  Do you

14  need to read it to yourself?

15       A.   Yeah.  I mean, and that's one of the things

16  that had to be on there, because it clearly states

17  there's no interest.

18       Q.   Yeah.  I agree.

19       A.   There's no other reason why that would be on

20  there, just to make sure it's stated way for sure.

21       Q.   Right.  There's no interest.  And that if for

22  some reason it was somehow interest, it would be capped

23  at the maximum legal rate of interest?  Do you see

24  that?

25       A.   Where does it say that?



1       Q.    In the number 4, second sentence.

2       A.    Let's see here.  Should the payment of the

3    Profit Participation be classified as a payment of

4    interest resulting in the computation or earning of

5    interest in excess of the maximum legal rate of

6    interest which is legally permitted under the law, if

7    any, then any and all such excess shall be and the same

8    is hereby waived.

9            Yep.  And automatically credited against the

10   reduction of the balance due under the Note.  Yep.  I

11   see that.

12      Q.    Okay.  Because that provision was put in

13   there to make sure that no matter under what

14   circumstances, no interest would be paid higher than

15   the maximum legal rate?  Is that your understanding,

16   sir?

17            MR. WINDERMAN:  Form.

18      A.    Well, I -- no.  My -- I mean, like I said, I

19   didn't even read this at the time, but my understanding

20   that's in there is, once again, to protect against the

21   profits.  I mean, I was paying way over 30 percent.  I

22   mean, you can do the math.

23      Q.    Okay.  I'm going to go back to Exhibit 5.

24   I'm sorry.  Now, we had already gone through Exhibit 5

25   before, which is Proof of Claim under the Wholesale.



1    A.    Yes.

2    Q.    And then you see the indemnification language

3  in the following paragraph was the same indemnification

4  language that you read before?

5    A.    Yes.

6    Q.    And then we go to 7, and the same language

7  under 7C that we talked about?

8    A.    Yes.  I see it.

9    Q.    Okay.  And the same thing, under 7F.  Do you

10  see that language, where my cursor so?  Isn't that

11  basically the same language, yeah, essentially the same

12  language as the Wholesale Profit Participation

13  Agreement?

14    A.    I think it's the same language, yeah.

15    Q.    And then the same thing in the last sentence

16  of G, 7G, regarding the severability if there's

17  anything unlawful?  Do you see that?

18    A.    Yes.

19    Q.    Okay.  So, it's the same language there as

20  well.  Okay.

21       I'm going to go back up, go back to the

22  Wholesale.  And this is the 1.8 -- $1,850,000

23  Consolidated Promissory Note Wholesale Program, okay,

24  which you've already identified twice now with respect

25  to both the Proof of Claim and with respect to Exhibit



1 | C to Plaintiff's Exhibit 2, which is part of the
2 | Complaint in this matter.
3 |          So, I'm going to go back.  We had already
4 | talked about -- you remember, we already talked about
5 | this paragraph on the interest, and the interest being
6 | 1.85 percent.  Do you remember us discussing that?
7 |     A.   Yes.
8 |     Q.   Okay.  And then we discussed also the fact
9 | that --
10 |     A.   But there was never an interest payment made
11 | at 1.85 percent.
12 |     Q.   Okay.  But my point is this is what the
13 | agreement says that you signed?
14 |     A.   Right.  I'm just saying that if that was the
15 | true case, then there'd be proof out of my bank
16 | statements I made the payments at 1.85 percent.
17 |     Q.   There is also the possibility that you never
18 | ever made an interest payment?
19 |     A.   Well, then I'd been in default, and I think
20 | he wouldn't have kept going with me for six years.
21 |     Q.   Well, didn't he extend your loan several
22 | times?
23 |     A.   Then that would -- if I was not making the
24 | 1.85 percent interest payments why would he keep
25 | extending it?



1      Q.    Well, let's keep going on to this agreement.

2            Go to -- we talked about this before.  You

3      read it into the record.  The Note was executed and

4      delivered in conjunction with that certain Profit

5      Participation Agreement Wholesale Program?  Do you see

6      that language there on the third paragraph, sir?

7      A.    Yes.

8      Q.    And that's the Profit Participation Agreement

9      Wholesale Program that we were just going over a few

10     minutes ago.  Do you understand that, sir?

11     A.    Yes.

12     Q.    And then it says:  The material consideration

13     for, as an inducement to Lender making this loan to

14     Borrower, that the Borrower, which is Excell, warrants

15     and represents to, and otherwise for the benefit of the

16     Lender, and otherwise covenants as wherein applicable

17     as to the following.

18           THE COURT REPORTER:  I'm sorry, Counsel.

19           Could you just slow down just a little bit?  It's

20           getting late in the day.

21           MR. REICH:  Sure.

22           THE COURT REPORTER:  Thank you.

23     BY MR. REICH:

24     Q.    In material consideration for, as an

25     inducement to, Lender making this loan to the Borrower,

1  Borrower warrants and represents to, and otherwise for

2  the benefit of, Lender, and otherwise covenants, as

3  wherein applicable, as to the following.

4           Okay.  1.  And we've gone over this before.

5  Borrower will use the loan proceeds solely and

6  exclusively for the purchase and sale of vehicles in

7  connection with Borrower's Wholesale Program, as

8  defined in the Wholesale Program Profit Participation

9  Agreement.

10          Mr. Zankl, we just went over the Wholesale

11  Program Profit Participation Program a few minutes ago.

12  Do you remember when I went over with you the

13  definition within that document of the Wholesale

14  Program as set forth in the document?  Do you remember

15  that, sir?

16     A.    Yeah.  This is the same document you're

17  reading again.

18     Q.    Right.  But I'm referencing,

19  cross-referencing the definition of Wholesale Program

20  that was in the Wholesale Program Profit Participation

21  Agreement that we just went through before.  Do you

22  remember that?

23     A.    Yes, sir.

24     Q.    Okay.

25     A.    It's the same document.



1    Q.    And then language similar to what was in that
2  Profit Participation Agreement, we never got to that
3  before.  Can you read subparagraph nine on page three
4  of that document, or six of page 22 of the entire
5  document?
6    A.    Borrower has participated freely in the
7  negotiations in preparation of this Note and the other
8  documents, has been advised to engage independent legal
9  counsel, has had a reasonable opportunity to have any
10  such independent legal counsel involved in such review
11  and negotiations, or has otherwise knowingly, at its
12  sole election, elected not to engage such independent
13  legal counsel, and waives any and all rights or
14  remedies it may have or be entitled to deriving from
15  disparity in the size or from any significant disparate
16  bargaining position in relation to Lender.
17    Q.    And that language is similar to the language
18  we read from the two Profit Participation Agreements
19  that you previously testified to; is that correct?
20    A.    Yes.
21    Q.    And you signed this document as well as those
22  other two documents; correct, sir?
23    A.    Yes.
24    Q.    Now we're going to go to this one paragraph
25  here.  And I'm not going to go into the detail, but you



 1            MR. WINDERMAN:   Form.

 2    BY MR. REICH:

 3       Q.   You can answer the question, Mr. Zankl.

 4       A.   No.

 5       Q.   B, if any warranty, representation made by

 6    Borrower in this Note or pursuant to the terms of any

 7    other documents shall at any time be false or

 8    misleading in any respect.   Do you see that, sir?

 9       A.   I do, yeah.

10       Q.   Okay.   Do you remember how you've stated that

11    there was no Profit Participation, despite what it says

12    in these agreements?

13       A.   Uh-huh.   Yes.

14       Q.   Do you remember how you said there's no

15    Wholesale Program, despite what it says in this

16    agreement?

17       A.   Yes.

18       Q.   Do you remember what you said about there not

19    being a Locate Program, despite what it says in these

20    agreements?

21       A.   Yes.

22       Q.   So, the terms Profit Participation, Wholesale

23    Program and Locate Programs are not as which they were

24    reflected in the agreements?   Is that your testimony?

25       A.   Yes.



1     Q.   Okay.  Let's go to -- go to I.  Excell filed

2   for bankruptcy; is that correct?

3     A.   Yes, what about all the other ones you're

4   skipping over?  Those don't matter?

5          MR. WINDERMAN:  No.  Don't ask him questions.

6   BY MR. REICH:

7     Q.   If you'd like me to go over them, that's

8   fine, but if they're not applicable, they're not

9   applicable.  I only need one of them in default for

10  there to be a default.

11    A.   Well, I'm saying that based on this agreement

12  I was in default in every single one of these cases.

13    Q.   You know what?  You're absolutely right.  I

14  agree with you.

15    A.   From day 1.  From the first day I signed it.

16    Q.   Right.  I --

17    A.   But yet it kept getting renewed.

18    Q.   Yet it kept getting renewed, okay?

19          So, then, again, if you go down further,

20  you'll see on the one, two, three, four, five -- fifth

21  line, okay.  Do you see where it says:  At the option

22  of Lender in its sole discretion, similar line that we

23  said before?

24    A.   Yes.

25    Q.   And then you then also you see again at the



1  second-to-last line where it says:  At the sole

2  discretion of Lender, with respect to the execution of

3  remedies?  Do you see that, sir?

4      A.    Yep.

5      Q.    Okay.  I'm going to ask you to read what's

6  now the fifth paragraph on page four of this document,

7  which is page seven of this exhibit.  Start reading

8  here, sir, where it says, "Nothing herein contained."

9      A.    Nothing herein contained, nor in any

10  instrument or transaction related hereto, shall be

11  construed or so operatory as to require Borrower, or

12  any person liable for the payment of the sums due

13  pursuant to this Note to pay interest in an amount or a

14  rate greater than the highest rate permissible under

15  applicable law as amended from time to time.

16           Should any interest or other charges made by

17  a Borrower, or any party liable for the payment of the

18  sums due pursuant to this Note, result in the

19  computation of earning of interest in excess of the

20  highest rate permissible under applicable law, then any

21  and all such excess shall be -- shall be and the same

22  is hereby waived by Lender.

23           All such excess shall be paid by Lender to

24  Borrower or to any party liable for the payment of the

25  sums due pursuant to this note.



1          It being the intent of the parties hereto,

2    then under no circumstances shall borrower or any party

3    liable for the payment of the sums due hereunder be

4    required to pay interest in excess of the highest rate

5    permissible under applicable law, as amended from time

6    to time.

7          Q.   You can stop there.  And this is basically

8    the same language that we read under paragraph four of

9    no usury both the two Profit Participation Agreements;

10   is that correct, sir?

11         A.   Same language, yes.

12         Q.   Then I'm going to go to the first sentence on

13   the next page, page five, that's part of the

14   already-existing paragraph.  Do you see the words

15   starting with "Furthermore," sir?  Could you read that,

16   please?

17         A.   Furthermore, during the continuation of any

18   default by Borrower in the payment of any installment

19   of interest, principal, or principal and interest under

20   this Note, or the occurrence of an event of default

21   hereunder, or the other documents, the interest rate

22   provided herein shall be increased to a rate which

23   shall be equal to the maximum rate of interest

24   allowable under the laws of the State of Florida.

25         Borrower --



1      Q.    You can stop there.  And, so, again, you

2  signed this agreement as well; correct, on behalf of

3  the company?

4      A.    Yes.

5      Q.    Okay.  And, again, sir, you were just advised

6  that you were in default from almost the beginning, and

7  according to this provision it says that basically the

8  interest rate will be the maximum allowable under the

9  law of the State of Florida; is that correct?

10     A.    Yes.

11     Q.    And you earlier said that for a loan that's

12  over $500,000 that maximum amount will be 25 percent;

13  is that correct?

14     A.    That's -- I mean, that's what I know.  I'm

15  not sure if I'm a hundred percent right, but that's

16  what I've been told.

17     Q.    Do you know how much interest is being sought

18  in this lawsuit against you by the Trust?

19     A.    How much interest?

20     Q.    Yeah.  How much accrued interest under the

21  terms of the Complaint.

22     A.    No, I don't.

23     Q.    I'm going to show you that.

24     A.    Oh, I'm sure it's under the legal limit.  It

25  would be crazy to be above it.



 1       Q.    You answered that question, because it is

 2  under the legal rate.

 3       A.    I'm sure it is.

 4       Q.    Let's go to --

 5       A.    Why would it be above?

 6       Q.    Because it's not usurious.

 7       A.    Exactly.

 8       Q.    Okay.  We agree.  Now we're all getting on

 9  the same page here, sir.

10       A.    That's what he's suing for.  That doesn't

11  mean the last six years.

12       Q.    Page five, okay?  I'm going to ask you to

13  read now the second, in the second full paragraph,

14  second sentence, starting with, "If any provisions."

15  Do you see that, sir?

16       A.    If any provisions of this Note shall be

17  deemed unenforceable under applicable law, such

18  provision shall be infective, but only to the extent of

19  such unenforceability, without invalidating the

20  remainder of such provisions or the remaining

21  provisions of this Note.

22       Q.    Do you understand what that means, sir?

23       A.    No.

24       Q.    Okay.  Next I'm going to go to the next

25  sentence.  Read on.



1      A.    All the terms and provisions of this note

2  shall be applicable to and be binding upon each and

3  every maker, endorser, surety, guarantor.  All other

4  persons who are or may become liable for the payment

5  hereof and their heirs, personal representatives,

6  successors or assigns, provided, however, in no event

7  will borrower have the right to pledge --

8      Q.    Actually, you know, you can stop right there,

9  after "provided," okay?

10          And then I'm going to ask you to go to --

11  hold on, sir.

12          So, I'm going to ask you to now read within

13  the next sentence, next paragraph, the paragraph that

14  starts with "Whenever," but the second sentence

15  starting with, "Neither this note."  Can you read that,

16  sir.

17      A.    Neither this Note nor any term of provision

18  hereof may be altered or amended in any manner except

19  by an instrument in writing signed by the Lender and

20  the Borrower.

21      Q.    Let's stop right there.  Did Mr. Goodman on

22  behalf of the Trust ever sign a written document

23  amending this agreement to indicate that these payments

24  were interest, rather than profit participation?

25          MR. WINDERMAN:  Form.



```
 1    BY MR. REICH:
 2        Q.   Well, let me ask you this:  Did Mr. Goodman,
 3    on behalf of the Trust, sign any document amending this
 4    Note, other than those that have been put into evidence
 5    in this case today in your deposition and that of your
 6    wife?
 7        A.   Sir, I've already answered the question.  You
 8    asked if I had any documents signed or anything from
 9    Mr. Goodman stating this.  I don't have anything.
10    There wouldn't be anything, and he wouldn't sign
11    anything, because then that would take away from these
12    contracts.
13        Q.   Okay.
14        A.   So, there wasn't anything ever signed.  It
15    was orally.  He knows it.  I know it.  That's what
16    matters.
17        Q.   So, there's no written or oral amendment to
18    this agreement, other than those that have been
19    executed in connection with this case that we've gone
20    through?
21             MR. WINDERMAN:  Asked and answered.
22    BY MR. REICH:
23        Q.   Just answer it.
24        A.   Ask the question again.
25             MR. REICH:  Madam Court Reporter, please
```



1          repeat the question.

2                  THE COURT REPORTER:  One moment, please.

3                  The question was:  There's no written or oral

4          amendment to this agreement, other than those that

5          have been executed in connection with this case

6          that we've gone through?

7                  MR. WINDERMAN:  I'm going to object to the

8          form of the question, since it's not an oral

9          agreement.  It is inconsistent and can't be

10         answered.

11                 MR. REICH:  Well, again you're coaching the

12         witness, and your speaking objections are

13         delineated on the record, Harry.

14                 MR. WINDERMAN:  Well, I'm going to leave that

15         on the record, since it's impossible question to

16         answer, since you can't have an executed oral

17         agreement.

18                 MR. REICH:  I said executed or oral.  So,

19         let's go back.  I'll make the question again.

20                 MR. WINDERMAN:  Thank you.

21         BY MR. REICH:

22         Q.   Is there any oral agreement or written

23         agreement?

24         A.   How can you have an oral written agreement?

25                 MR. WINDERMAN:  No.  No.  No.  He's



1      restating.

2   BY MR. REICH:

3      Q.    Oral agreement or a written agreement.  Do

4   you hear me, sir?

5      A.    Yes.  There was an oral agreement.  There was

6   nothing written.

7      Q.    That would amend the terms of this agreement?

8      A.    Oral agreement, yes.  Written terms, no.

9      Q.    So, you're saying there was an oral agreement

10  subsequent to the terms of this agreement that reflects

11  the interest position that you have taken throughout

12  this lawsuit?

13     A.    Yes.  And that goes all the way back to 2016

14  when we started doing deals together.

15     Q.    Let me ask you another question.  Has your

16  company, Excell, provided any 1099-IRTs to any other of

17  your creditors that you claim have been receiving

18  solely interest?

19     A.    That would be a question that you'd have to

20  ask Teddi, because I was not involved in the 1099s.

21     Q.    Did you ever instruct Teddie to issue 1099s

22  to those creditors?

23     A.    No.  I never.  I've never even had

24  discussions with her on 1099s.  She would usually reach

25  out to the individuals, and I don't know if she did



 1  with Kenny or not, and ask them how the structure was

 2  and if it was supposed to be receiving a 1099.

 3      Q.   All right.  Just give me one minute, please.

 4           MR. WINDERMAN:  Do you want to take five so

 5      you can get yourself together?

 6           MR. REICH:  No.  I just need another minute.

 7      Hold on.

 8           MR. WINDERMAN:  Okay.

 9  BY MR. REICH:

10      Q.   Let me go back to this document, okay?

11           I am going to ask you to read the very last

12  paragraph, starting on page five, runs into page six,

13  in its entirety into the record, please, sir.

14      A.   To further secure Borrower's performance of

15  all of its obligations under this Note, and as an

16  inducement to lender to enter into this loan, Borrower

17  will cause Scott Zankl and Kristen Zankl, collectively

18  Guarantor, to execute and deliver, simultaneously with

19  Borrower's execution and delivery of this Note, an

20  unconditional guaranty that is acceptable to lender

21  under which guaranty will unconditionally guarantee to

22  and for the benefit of Lender, its successors and/or

23  assigns, all of Borrower's duties and obligations under

24  this Note and other documents.

25      Q.   Okay.  Let's talk about some of the language



```
 1   BY MR. REICH:

 2       Q.    Do you see in connection with the loan the

 3   company and the Trust entered into a certain Profit

 4   Participation Agreement dated September 18, 2019?  Do

 5   you see that, sir?

 6       A.    Yes.

 7            MR. WINDERMAN:  Asked and answered.

 8            MR. REICH:  Harry, you know what?  Stop

 9       coaching the damn witness, all right?  This is

10       ridiculous.

11            MR. WINDERMAN:  I'm entitled to voice my

12       objection.

13            MR. REICH:  I did not -- I have never asked

14       him anything about this document other than he

15       signed it before, and I'm going -- I'm entitled to

16       ask him about the terms of the agreement that he

17       signed.

18            MR. WINDERMAN:  Go ahead.  You're wasting our

19       time.

20            MR. REICH:  Harry, you're wasting time, okay?

21       And I'm also going to ask the Court from now on in

22       the next deposition that we actually have a wide

23       screen on this or that we appear in person,

24       because I'm tired of you coaching the witness from

25       the side, which I know you've been doing.
```



```
 1            THE WITNESS:  He's not coaching me, sir.  I
 2       don't need a coach.
 3   BY MR. REICH:
 4       Q.   Let's go to D.  Do you see, Mr. Zankl, under
 5   D, that this agreement's intent is to amend the Note
 6   you already testified about and the Profit
 7   Participation Agreement that you already testified
 8   about?  Do you see that?
 9       A.   Yes.
10       Q.   Okay.  And then it says that the company and
11   the Trust and the Guarantors which to ratify, confirm
12   and adopt their duties, responsibilities, liabilities
13   and obligations under the guaranty.  Do you see that
14   language, sir?
15       A.   Yes.
16       Q.   Was that the intention of this agreement when
17   you executed it?
18       A.   As far as what do you mean?
19       Q.   Under the Recital D states there's a wish to
20   amend.  Was this the intent, okay, of you in executing
21   this agreement, to amend the note and Profit
22   Participation Agreement and Guaranty, as reflected in
23   Subpart D of the Recitals?
24       A.   There was nothing amended in this agreement.
25   All it was was extended.  There was nothing amended.
```



1    Q.    So, this agreement extended the maturity date

2    of the loan; correct?

3    A.    That's all it ever did.  There was nothing

4    amended besides that.

5    Q.    If this agreement didn't exist, the maturity

6    date would have come and gone and would have passed; is

7    that correct?

8    A.    Yes, but it was extended.

9    Q.    Pursuant to this agreement?

10    A.    Yes.

11    Q.    Okay.  And that's what this Subpart D of the

12    Recitals reflects, is that not, sir?

13    A.    It says it's to -- no.  This says it wishes

14    to amend the Note and Profit Participation Agreement

15    and Guarantors to ratify, confirm and adopt duties,

16    responsibilities, liabilities and obligations under the

17    guaranty in here provided.

18         It doesn't mention -- it doesn't say anything

19    in D about extending the contract.

20    Q.    How about we go to the next part where it

21    actually says that?  Let's go -- before we go there,

22    let's go to, number 1, the Recitals.  Do you see that?

23    Were those above-stated Recitals true and correct and

24    incorporated in here by reference when you signed it?

25    A.    Above Recitals are true and correct and



1  incorporated here in the reference.  Where does it --

2      Q.   Do you see where the cursor is?  It says:

3  Recitals.  And there are four lettered paragraphs.  Do

4  you see them?  I'm circling them.

5      A.   Yes.

6      Q.   Then it says "Recitals."  You notice that

7  the --

8      A.   Yeah.  It's -- it's correct, except for the

9  Profit Participation.  There's no profit.  That's the

10  only thing on this contract that's not accurate.  The

11  rest of this stuff is accurate.

12      Q.   Do you remember we just spent all this time

13  talking about a Profit Participation Agreement,

14  Wholesale Program, dated September 18, 2019, that I

15  went over with you extensively previously?

16      A.   Yes.

17      Q.   And that document is referenced in Subpart C.

18  Do you see that, sir?

19      A.   Yes.

20      Q.   Okay.  Again, I'm going to ask you:  Under 1,

21  where it says Recitals, are the above-stated Recitals

22  true and correct?

23      A.   No.

24      Q.   So, you're saying the document you signed and

25  represented to be true and correct is not correct and



1   is false; is that correct?

2       A.    When it comes to the Profit Participation

3   Agreement, there was no Profit Participation.

4       Q.    So, are you saying that that statement is

5   false?

6       A.    Yes.

7       Q.    That statement made by you and signed by you

8   in this document was false?

9       A.    And signed by Kenny, yes.

10      Q.    Okay.  Are you saying it's false?

11      A.    It's not accurate.  It was interest, not

12  profit.

13      Q.    Okay.  Do you see where the maturity date is

14  extended to October 31 of 2021?

15      A.    Yes.

16      Q.    Okay.  And then do you see in paragraph three

17  where it's ratifies the Note and Profit Participation

18  Agreement?

19      A.    Yes.

20      Q.    Do you see that language?

21      A.    I see it.

22      Q.    Okay.  Do I need you to read it into the

23  record or do you acknowledge that language is in the

24  agreement that you signed?

25      A.    It's in the agreement that I signed.



1   finished reading.

2       A.   Yeah.  I'm done.

3       Q.   Is there anything unclear or ambiguous with

4   respect to paragraph six in this document?

5       A.   No.

6       Q.   And on the next page, just confirm that you

7   did sign this document?

8       A.   Yes.

9       Q.   We'll get out of this exhibit.

10           I'm showing you a document you've already

11  indicated that you executed as part of Plaintiff's

12  Exhibit 2, which is now part of -- it was also part of

13  Exhibit 4, which is the Proof of Claim number 5 by the

14  Trust, which was called Amended and Restated Promissory

15  note, Locate Program, $1,500,000.  Do you see that,

16  sir?

17      A.   Yes.

18      Q.   Okay.  That also happens to be Exhibit F to

19  Plaintiff's Exhibit 2, okay?

20           And similar to the -- I'm going to show --

21  the provisions that I showed you on the Wholesale Note,

22  do you see the provision regarding interest in the

23  second paragraph there?

24      A.   Yes.

25      Q.   It's basically the same provision, except



1  with the distinction between changing the name of the

2  Note, okay, and the maturity dates, as it was in the

3  Wholesale Note we discussed before?

4      A.   I see that.

5      Q.   Okay.  And you see the next one where it

6  says:  This Note is executed and delivered in

7  conjunction with a certain Profit Participation

8  Agreement, the Locate Program, dated September 18,

9  2019?  Do you see that, sir?

10      A.   I do see that.

11      Q.   Remember we talked about the Locate Program

12  Profit Participation Agreement as I went through those

13  documents with you earlier?  Do you remember that, sir?

14      A.   Yes.

15      Q.   And you see that there's still similar

16  language here as with respect to the induced -- there's

17  a material consideration for and as an inducement to

18  the Trust to making this loan that you -- the company

19  make certain representations and warranties for the

20  benefit of the Lender regarding the use of the loan

21  proceeds?  Do you see that?

22      A.   Yeah.  That's the same language as the other

23  one.

24      Q.   Except the other one talks about Wholesale

25  Program, this one talks about Locate Program, but



1    otherwise it's the same; correct?

2         A.    Correct.  Yes.

3         Q.    And paragraph 9 was the same as it was in the

4    Promissory Note?  Do you see that?

5         A.    Yes.

6         Q.    And then terms of default basically is

7    similar to the ones that we had in the other item?  Did

8    you see that, sir?

9         A.    Yes.

10        Q.    Do you see the attorney's fees provision in

11   here, page seven?

12        A.    Yep.

13        Q.    Okay.  Do you see in here the paragraph which

14   is similar to the paragraph in the Wholesale Note

15   regarding interest and the capping of interest?  Do you

16   see where it says "Nothing herein contained"?  Do you

17   see t?

18        A.    Yes.

19        Q.    Basically the same paragraph as was in the

20   Wholesale Note?

21        A.    Yes.

22        Q.    And the similar language regarding the

23   maximum amount available by law under the next

24   paragraph --

25        A.    Yep.



1        Q.     -- if it comes overdue?  Do you see that?

2        A.     Yes.

3        Q.     Do you see under the next section, first

4    paragraph, page eight, the paragraph that starts with

5    "Borrower agrees," but starts with the sentence:   "If

6    any provision shall be deemed unenforceable."  Do you

7    see that?

8        A.     Yes.

9        Q.     Same sentence as it was in the Wholesale

10   Note?

11       A.     Looks like it, yes.

12       Q.     Okay.  Do you see the same provisions

13   regarding the terms and provisions of the Note shall be

14   binding upon the Guarantors?

15       A.     Yep.

16       Q.     Same language as was reflected in the

17   Wholesale Note?

18       A.     Yep.

19       Q.     Then you see in the next paragraph, second

20   sentence, where it says:  Neither this Note or any term

21   or provision thereunder, do you see that, may be

22   altered or amended?  Do you see that?

23       A.     Yep.

24       Q.     And then you see the paragraph that talks:

25   To further secure buyer's performance of their



1   obligations under the Note, and as an inducement to

2   entering into the Note, that Borrower's caused you and

3   your wife, as Guarantors, to execute and deliver that

4   conditional guaranty?  Do you see that language?

5        A.    Yes.

6        Q.    Other than the different notes and different

7   guaranties, is this the same language as was reflected

8   in the Wholesale Note that you saw before?

9        A.    Yes.

10       Q.    Any questions I would have asked you about

11  that document with respect to those particular

12  provisions, would your answer be the same?

13       A.    Yes.

14       Q.    I'm going to show you the Extension

15  Modification Ratification Agreement of the Wholesale

16  Program, which is similar to the one we did on the

17  Locate Program before?  Do you remember that, we went

18  through that before?

19       A.    Yes, sir.

20       Q.    When Mr. Winderman kept telling both of us

21  that this is irrelevant to the lawsuit?

22            MR. WINDERMAN:  Move to strike.

23  BY MR. WINDERMAN:

24       Q.    And you see where this extends the maturity

25  date, sir?



SCOTT ZANKL
KENNETH J. GOODMAN V. SCOTT ZANKL

August 09, 2022
253

1    A.   Yes.

2    Q.   And you see all the Recitals that we went

3    over before, they were similar to the one on the

4    Locate?

5    A.   Yes.

6    Q.   At the Ratification language in paragraphs

7    three and four are the same?

8    A.   Yep.

9    Q.   And the Release language is the same?

10   A.   Yes.

11   Q.   And the Miscellaneous language is the same?

12   A.   Yep.

13   Q.   And then this is $1,020,000 Locate Note that

14   was executed first on September 18, 2019.  Do you see

15   that is, sir?

16   A.   Yes.

17   Q.   Other than the prior Note, which is in a

18   greater amount and references the additional amounts

19   lent, okay, would you indicate this is basically the

20   same Note as before, that I showed you 4.5 million?

21   A.   Yes.

22   Q.   Thank you.  We already went over this Profit

23   Participation Agreement.  Now let's go to the

24   Complaint.

25        MR. REICH:   You know what, Harry?  You want



 1          to end at five.  We'll end at five, but we need to

 2          come back at some time earlier than second weaning

 3          in September, okay?  And if not, we'll file a

 4          motion to that effect.  I don't have that much

 5          more to go, but I may or may not be able to finish

 6          in an hour.  I think I can finish in an hour.

 7                MR. WINDERMAN:  Good.  Try.

 8                MR. REICH:  You want me to try to finish in

 9          an hour?

10                MR. WINDERMAN:  Yeah.

11                MR. REICH:  Then I will try to finish in an

12          hour, okay?  I'm going to take a five-minute break

13          right now, okay?  I have to go to the bathroom

14          myself.

15                (Off the record at 4:55 p.m.)

16                (Back on the record at 5:05 p.m.)

17   BY MR. REICH:

18          Q.    Mr. Zankl, you understood all the documents

19   that you entered into that were attached as exhibits to

20   the Complaint; correct?

21          A.    Yes.

22          Q.    You willingly entered into the documents;

23   correct?

24          A.    I'm sorry, what?

25          Q.    You willingly entered into the documents that



1  are attached as exhibits to the Complaint?

2      A.    Yes.

3      Q.    And other than those areas where you deemed

4  unclear in your previous testimony today or ambiguous

5  today with respect to interest versus proper

6  participation, those documents that are attached as

7  exhibits to the Complaint are otherwise clear and

8  ambiguous, correct?

9      A.    No.   There was more than that on those

10  contracts that weren't correct?

11      Q.    But otherwise, other than the issue regarding

12  the interest?

13      A.    No.   There's more.

14      Q.    Such as?   Give me an example.

15      A.    So, on those contracts that were not

16  accurate, I mean, if we have to go strictly by the

17  contract, where it says "profit," that was not correct.

18  It was interest.

19          Second was there never 1.85 percent ever

20  interest ever paid.

21          Third, the contracts required me to provide

22  documents to Mr. Goodwin on the 1st and the 15th of

23  every month, which I never did.   I supplied him

24  sometimes four or five months late.   And it also said

25  that payments were due on the 1st and 15th of every



1 month, and that didn't happen either.  I mean, I can go

2 on and on.  There's a lot of stuff in those contracts

3 that just --

4 　　　Q.　Sir, I'm not talking -- let's me make a

5 distinction here, okay.  1, I'm not talking about your

6 performance under the contract, but failure to provide

7 the documents that were supposed to be provided, okay?

8 Not your performance of the contract.  I'm talking

9 about is there anything in terms of the contract?

10 　　　A.　Those are in the terms.  I had to provide --

11 I had to do that stuff.

12 　　　Q.　To say what were unclear or ambiguous except

13 as to your testimony with respect to interest and

14 profit participation.  In carving those things out, you

15 made it clear today that you've said all along that

16 both before and after the signing of the agreement, you

17 had an oral agreement with Mr. Goodman regarding the

18 treatment of the monies paid as being either interest

19 or profit.  You stated your position loudly and clearly

20 in that regard, okay?

21 　　　　Other than what you claim to be ambiguous

22 language in that regard or unclear language in that

23 regard, is there anything else in the agreement that is

24 unclear or ambiguous?

25 　　　　We can get out of here by six with a simple



1  answer to that question, or I can continue to go

2  through the documents and ask you to specifically

3  identify that which is unclear or ambiguous.

4      A.   Do you want me to answer the question yes so

5  we can get out of here?  I mean, I'm answering the

6  question.

7      Q.   Is there anything other than your

8  characterization of the agreements with respect to

9  interest and profit?

10     A.   I just listed the other stiff.

11     Q.   You talked about the 1.85 percent.  You've

12  talked about interest.  You've talked profit.  You've

13  talk about Wholesale Program.  You've talked about

14  Locate Program.

15     A.   Right.  And also the Recitals.  In those

16  contracts there was Recitals that had to be performed.

17  Whether you want to acknowledge or not, it's in the

18  contract.  Those performances weren't done.

19          And it also in the contract stated that it

20  had to be signed and delivered, and none of that was

21  done either.  I'm just pointing out -- you're asking --

22  you're being never specific with these contracts,

23  Mr. Reich.  You're having me read specific sentences.

24          If we're going to get that specific, then we

25  really should get specific on the whole contract.  They



1    were never signed and delivered.  I never signed

2    anything and delivered anything to anybody, never

3    signed it in front of any witnesses.  None of the

4    recitals were ever performed.  None of the 1.85 percent

5    interest was ever paid, and it was not profit, it was

6    interest.  Other than that, those contracts are all

7    correct.

8         Q.    Thank you very much for the clarification,

9    Mr. Zankl.  I appreciate that.

10            And you said before that the Plaintiff

11   performed its obligations by providing the funding, as

12   reflected in those agreements; is that correct; sir?

13        A.    Yes.

14        Q.    And you said, is it your testimony that

15   Excell has been in default almost since the beginning?

16   Do you remember that, sir?

17        A.    I do.

18        Q.    And neither you nor yourself have made any

19   payments to the Trustee; correct?

20        A.    I'm sorry.  What?

21        Q.    Neither yourself nor your wife have made any

22   payments to the Plaintiff in this case; is that

23   correct?

24        A.    Personally, no.  No.

25        Q.    Now, you've also acknowledge in the other



```
 1   agreements you held and nod and guarantees in you will
 2   at other agreement there's attorneys fees provisions.
 3   Do you remember that is, sir?
 4        A.    Yes.  It was in the contract.  Yes.
 5        Q.    All the contracts attached as exhibits to the
 6   Complaint; correct, sir?
 7        A.    Yes.
 8        Q.    And you -- hold on one second.
 9              Mr. Zankl, did you have any other written
10   agreement with creditors of Excell, whether or not you
11   entered into agreement with them or not is irrelevant,
12   okay, that utilized terms of Profit Participation, yet
13   your understanding with that creditor or those payments
14   were to be treated as interest?
15              MR. WINDERMAN:  Form.
16   BY MR. REICH:
17        Q.    You may answer, Mr. Zankl.
18        A.    Yes.
19        Q.    Who would they be?
20        A.    The entity is Milco Atwater.
21        Q.    Go on.  Any others?
22        A.    Prestige Luxury.
23        Q.    Any others?
24        A.    Bow Investment?
25        Q.    Any others?
```


ESQUIRE
DEPOSITION SOLUTIONS

800.211.DEPO (3376)
EsquireSolutions.com

```
 1        A.   I can't think of right this second.  No.  I
 2   can't think of any.
 3        Q.   Do you know who the principals were of the
 4   various companies that you just identified?
 5        A.   Yeah.  Milco Atwater, that's the guy Nick
 6   Stratagakis you said earlier...
 7        Q.   Um-hm.  Who's the principal for Prestige?
 8        A.   Eddie Dubner.
 9        Q.   Okay.  And Bahl (phonetic)?
10        A.   I don't.  I don't know who the actual
11   principal is of that.
12        Q.   Was that Bhavin that we discussed earlier?
13        A.   No.  No.  No.  That's not Bhavin.
14        Q.   With respect to each of those, did any of
15   them -- is it your testimony here today that you were
16   unaware of whether those entities ever received
17   1099-INTs from Excell?
18        A.   I don't believe so, no.  I don't believe they
19   did.
20        Q.   And with respect to each of those, was the
21   "profit" also a code word for interest, like it was
22   with Mr. Goodman?
23        A.   Yes.
24             MR. REICH:  I have no further questions for
25             this witness, okay?
```

