# Exhibit E

**Fill in this information to identify the case:**

Debtor 1   EXCELL Auto Group, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Southern District of Florida**

Case number:  **22–12790**

FILED

**U.S. Bankruptcy Court**
**Southern District of Florida**

5/27/2022

**Joseph Falzone, Clerk**

Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1:  Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | DCG 2008 Irrevocable Wealth Trust <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor     UH–SI, LLC, a Florida limited liability company |
| **2. Has this claim been acquired from someone else?** | ☒ No <br> ☐ Yes. From whom? |
| **3. Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?** <br><br> DCG 2008 Irrevocable Wealth Trust <br> Name <br><br> c/o Kenneth J. Goodman, as Trustee <br> 1001 East Telecom Drive <br> Boca Raton, FL 33432 <br><br> Contact phone     9543098772 <br> Contact email     ireich@nasonyeager.com <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): <br><br>     **Where should payments to the creditor be sent?** (if different) <br><br> Name <br><br> Contact phone <br> Contact email |
| **4. Does this claim amend one already filed?** | ☒ No <br> ☐ Yes. Claim number on court claims registry (if known)     Filed on      MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☒ No <br> ☐ Yes. Who made the earlier filing? |

| Part 2: | Give Information About the Claim as of the Date the Case Was Filed |
|---|---|

| 6. Do you have any number you use to identify the debtor? | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |

| 7. How much is the claim? | $ 1500000.00 | **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |

| 8. What is the basis of the claim? | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br><br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Promissory Note, dated 9/18/19, as amended, 12/5/19 & 11/2/20, & Profit Participation Agreement, dated 9/1/19 |

| 9. Is all or part of the claim secured? | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>  **Nature of property:**<br>  ☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>  ☐ Motor vehicle<br>  ☐ Other. Describe: _____<br><br>  **Basis for perfection:** _____<br><br>  Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>  **Value of property:** $ _____<br><br>  **Amount of the claim that is secured:** $ _____<br><br>  **Amount of the claim that is unsecured:** $ _____  (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>  **Amount necessary to cure any default as of the date of the petition:** $ _____<br><br>  **Annual Interest Rate** (when case was filed) _____ %<br><br>  ☐ Fixed<br>  ☐ Variable |

| 10. Is this claim based on a lease? | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |

| 11. Is this claim subject to a right of setoff? | ☑ No<br>☐ Yes. Identify the property: _____ |

| Official Form 410 | Proof of Claim | page 2 |

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | Amount entitled to priority |
|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies  $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date  5/27/2022

MM / DD / YYYY

/s/ Ivan J. Reich

Signature

Print the name of the person who is completing and signing this claim:

Name  Ivan J. Reich

First name    Middle name    Last name

Title  Attorney in fact

Company  Nason Yeager Gerson Harris & Fumero, P.A

Identify the corporate servicer as the company if the authorized agent is a servicer

Address  750 Park of Commerce Blvd. Suite 210

Number  Street

Boca Raton, FL 33487

City  State  ZIP Code

Contact phone  5619827114    Email  ireich@nasonyeager.com

THIS AMENDED AND RESTATED PROMISSORY NOTE AMENDS, RESTATES AND REPLACES, IN ITS ENTIRETY, THAT CERTAIN CONSOLIDATED PROMISSORY NOTE (LOCATE PROGRAM) DATED SEPTEMBER 18, 2019 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $1,020,000.00) (THE "**2019 NOTE**"). THIS AMENDED AND RESTATED PROMISSORY NOTE IS BEING ISSUED TO MEMORALIZE AN ADDITIONAL ADVANCE BY LENDER TO BORROWER IN THE ORIGINAL PRINCIPAL AMOUNT OF $480,000.00 ("**ADDITIONAL ADVANCE**"). EXCEPT FOR THE ADDITIONAL ADVANCE, THIS AMENDED AND RESTATED PROMISSORY NOTE DOES NOT EVIDENCE ANY OTHER INDEBTEDNESS OF BORROWER IN EXCESS OF THE 2019 NOTE. BORROWER WARRANTS AND REPRESENTS THAT IT WILL TIMELY PAY ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES DUE AND PAYABLE BY REASON OF THE ADDITIONAL ADVANCE, AND OTHERWISE HAS PAID ALL OTHER DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES DUE AND PAYABLE IN CONNECTION WITH 2019 NOTE. A TRUE AND CORRECT COPY OF THE 2019 NOTE IS ATTACHED TO THIS AMENDED AND RESTATED PROMISSORY NOTE.

## AMENDED AND RESTATED PROMISSORY NOTE
### (LOCATE PROGRAM)

U.S. $1,500,000.00

Boca Raton, Florida
December 5, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,500,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Amended and Restated Promissory Note ("**Note**") shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on May 1, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in continued conjunction with that certain Profit Participation Agreement (Locate Program) dated September 18, 2019 between Borrower and Lender ("**Locate Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

(1) Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Locate Program (as defined in the Locate Program Profit Participation Agreement).

(2) Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

1

(3)     Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)     Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Locate Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Locate Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)     The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)     Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**").  In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)     There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Locate Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)     No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)     Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

2

(10)    For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other the Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death or disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents. As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

4

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under the 2019 Note, and as an inducement to Lender to enter into the loan evidenced by the 2019 Note, Borrower caused Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, that certain Unconditional Guaranty (Locate Program) effective as of September 18, 2019 ("**Original Guaranty**"), under which Guarantor unconditionally guarantees to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under the 2019 Note and the other Documents. To further secure Borrower's performance of all of its obligations under this Amended and Restated Promissory Note and the Documents, and as an inducement to Lender to enter into the Loan, Borrower will cause Guarantor to execute and deliver a ratification of the Original Guaranty, under which Guarantor will unconditionally ratify, confirm and adopt the Original Guaranty as being in full force and effect, and which Original Guaranty will now unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Amended and Restated Note, together with the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[AMENDED AND RESTATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____

Print Name: _____

Name: Scott Zankl
Title: Vice President

WITNESS 2:

Address of Borrower:
  1001 Clint Moore Road, #101
  Boca Raton, Florida 33487

Print Name: _____

\\fs1\docs\11985\11985-26414\849105.doc/bch

6

## EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT
### (Wholesale Program)

THIS EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT ("**Agreement**"), effective as of November 2, 2020 ("**Effective Date**"), is between EXCELL AUTO GROUP, INC., a Florida corporation ("**Company**"), SCOTT ZANKL and KRISTEN ZANKL (collectively, "**Guarantors**") and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST ("**DCG Trust**", with Company, Guarantors and DCG Trust being sometimes individually referred to as a "**Party**", or collectively as "**Parties**", as the context so requires).

RECITALS:

A.      DCG Trust has previously loaned Company an original principal sum of $1,850,000.00 ("**Loan**"), as evidenced by that certain Consolidated Promissory Note (Wholesale Program) dated September 18, 2019 executed by Company in favor of DCG Trust, its successors and/or assigns ("**Note**").

B.      To secure Company's performance of all of its obligations under the Loan and Loan Documents (which capitalized term, when used in this Agreement, will have the same meaning ascribed to it in the Guaranty (as herein defined)), Guarantors executed and delivered that certain Unconditional Guaranty (Wholesale Program) effective as of September 18, 2019 ("**Guaranty**").

C.      In connection with the Loan, Company and DCG Trust entered into that certain Profit Participation Agreement (Wholesale Program) dated September 18, 2019 ("**Profit Participation Agreement**").

D.      Company and DCG Trust wish to amend the Note and Profit Participation Agreement, and Guarantors wish to ratify, confirm and adopt their duties, responsibilities, liabilities and obligations under the Guaranty, all as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, as applicable, agree as follows:

1.      Recitals. The above stated Recitals are true and correct and are incorporated herein by this reference.

2.      Maturity Date/Outside Termination Date. The Maturity Date (as originally defined in the Note) and Outside Termination Date (as originally defined in the Profit Participation Agreement) are each hereby amended and will now mean October 31, 2021.

3.      Ratification of Note/Profit Participation Agreement. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company hereby (a) absolutely, unconditionally and irrevocably ratifies, confirms and adopts all of the terms and conditions of, and all of its duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, each of the Note and Profit Participation Agreement (as amended, modified and ratified by this Agreement) and (b) represents and warrants to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Company under the Note, Profit Participation Agreement and any of the other Loan Documents remain true and correct, in all respects, as of the Effective Date, (ii) Company is not in breach or default under any of the terms and conditions of the Note, Profit Participation Agreement and/or any of the other Loan Documents and (iii) Company does not have any claims or defenses against DCG Trust that could give rise to any defense, offset or counterclaim in connection with the enforcement of the Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents (all as amended, modified and ratified by this Agreement).

4.      Ratification of Guaranty. In partial consideration of DCG Trust's agreement to enter into this Agreement, Guarantors hereby absolutely, unconditionally, and irrevocably ratify, confirm and adopt all of the terms and conditions of, and all of their duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, the Guaranty (as amended, modified and ratified by this Agreement), and hereby acknowledge and agree that (a) the Guaranty is in full force and effect and (b) the Guaranty and Guarantors shall continue to guarantee, without limitation,

all of Company's duties, responsibilities, liabilities and obligations with respect to the repayment of Loan and performance under the Note and other Loan Documents (all as amended, modified and supplemented by this Agreement and all as may hereafter be further amended, modified, supplemented, extended, renewed and/or restated). Guarantors hereby further represent and warrant to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Guarantors under the Guaranty remains true and correct, in all respects, as of the Effective Date, (ii) Guarantors are not in breach or default under any of the terms and conditions of the Guaranty and (iii) Guarantors do not have any claims and/or defenses against DCG Trust that could give rise to any defense, offset, claim or counterclaim in connection with the enforcement of the Guaranty (as amended, modified and ratified by this Agreement).

5. <u>Release</u>. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company and Guarantors hereby forever, irrevocably and unconditionally release and discharge DCG Trust, its agents, trustees, servants, employees, directors, officers, attorneys, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporation and organizations who have acted in its behalf of and from any and all damages, losses, claims, demands, liabilities, obligations, actions, costs, expenses, fees (including, without limitation, attorneys' fees) and causes of action whatsoever which they may have or claim to have as of the date of execution of this Agreement, and whether currently known or unknown, accrued or accrued, and of every nature and extent whatsoever on account of or in any way touching, concerning, arising out of or founded upon the subject Loan, Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealings between the parties up to and including the Effective Date.

6. <u>Miscellaneous</u>. In the event of any conflict between the express terms of this Agreement and the terms of the Note, Profit Participation Agreement and/or other Loan Documents, the express terms of this Agreement shall control. Each Party represents and warrants, on its own respective behalf, that the person signing this Agreement on such Party's behalf is duly authorized to execute and deliver this Agreement, and that this First Agreement constitutes a legal, valid and binding obligation of each such Party. Each Party further represents and warrants, on its own respective behalf, that it has reviewed this Agreement with its legal counsel, or otherwise had an opportunity to review this Agreement with its legal counsel. Therefore, in connection with the foregoing, this Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one in the same Agreement. If this Agreement is executed and delivered digitally or electronically (whether by PDF file, DocuSign or otherwise), the digital or electronic copy, respectively, will be treated as an original for all purposes. This Agreement shall become effective and binding only upon execution and delivery of this Agreement by all of the parties hereto.

**[SIGNATURES ON NEXT PAGE]**

Each of Company, Guarantors and DCG Trust has caused this Agreement to be duly executed, which Agreement is effective as of the Effective Date.

**DCG TRUST**:

_____
Kenneth J. Goodman, as Trustee of
the DCG 2008 Irrevocable Wealth Trust

**COMPANY**:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

**GUARANTORS**:

_____
Name: Scott Zankl

_____
Name: Kristen Zankl

THIS PROMISSORY NOTE IS A CONSOLIDATION AND RENEWAL OF (i) THAT CERTAIN PROMISSORY NOTE DATED JULY 1, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $520,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $520,000.00), AND (ii) THAT CERTAIN PROMISSORY NOTE DATED SEPTEMBER 4, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $500,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $500,000.00 (COLLECTIVELY, THE "**ORIGINAL NOTES**"). THE TERMS AND CONDITIONS SET FORTH HEREIN SHALL CONTROL THE OBLIGATIONS OF BORROWER WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THE ORIGINAL NOTES. THIS PROMISSORY NOTE DOES NOT EVIDENCE ANY INDEBTEDNESS OF BORROWER IN EXCESS OF THE ORIGINAL NOTES RENEWED HEREBY. BORROWER WARRANTS AND REPRESENTS THAT ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE BEEN PAID IN CONNECTION WITH THE ORIGINAL NOTES. ACCORDINGLY, NO ADDITIONAL DOCUMENTARY STAMP TAXES OR INTANGIBLE TAXES ARE DUE IN CONNECTION WITH THIS PROMISSORY NOTE.

### CONSOLIDATED PROMISSORY NOTE
### (LOCATE PROGRAM)

U.S. $1,020,000.00

Boca Raton, Florida
September 18, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,020,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Note shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on May 1, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in conjunction with that certain Profit Participation Agreement (Locate Program) dated of even date herewith between Borrower and Lender ("**Locate Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

(1) Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Locate Program (as defined in the Locate Program Profit Participation Agreement).

(2) Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

1

(3)     Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)     Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Locate Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Locate Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)     The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)     Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**"). In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)     There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Locate Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)     No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)     Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has

2

otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

(10)    For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other the Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death or disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents. As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under this Note, and as an inducement to Lender to enter into this Loan, Borrower will cause Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, simultaneously with Borrower's execution and delivery of this Note, an unconditional guaranty that is acceptable to Lender under which Guarantor will unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Note and the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[CONSOLIDATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

Print Name: _Michele Porcelli_

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

WITNESS 2:

Print Name: _____

Address of Borrower:
  1001 Clint Moore Road, #101
  Boca Raton, Florida 33487

## PROFIT PARTICIPATION AGREEMENT
(Locate Program)

THIS PROFIT PARTICIPATION AGREEMENT (the "**Agreement**") is entered into as of the ___ day of September, 2019 ("**Effective Date**") by and between EXCELL AUTO GROUP, INC., a Florida corporation (the "**Company**"), and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**DCG Trust**").

RECITALS:

A.  The Company is engaged in the business of the purchase and sale of luxury vehicles, which business includes the operation of a Locate Program (as hereinafter defined).

B.  DCG Trust, on even date herewith, has loaned to the Company the sum of $1,020,000.00 (which, together with any and all renewals and future advances of and/or under the Note (as herein defined) being the "**Loan Proceeds**), as evidenced by that certain Consolidated Promissory Note of even date herewith, all as may be renewed, extended, substituted and/or further modified (the "**Note**").

C.  In consideration of the Loan, the Company has offered to provide a profit participation interest in the Locate Program, in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.  **Recitals**.  The foregoing recitals are true.

2.  **Profit Participation**.

a.  In connection with the Company's operation of the Locate Program in accordance with this Agreement, the Company will pay to DCG Trust 50.00% of the Locate Vehicle Profit for each Locate Vehicle (the "**Profit Participation**"), all in accordance with the terms and conditions of this Agreement. Each Profit Participation will be deemed fully earned by DCG Trust in accordance with the hereinafter described terms and conditions of this subsection a., with each fully earned Profit Participation thereafter being due and payable by the Company to DCG Trust in accordance with Section 2.c.(4) of this Agreement. The Company and DCG Trust acknowledge and agree that a Profit Participation for a Locate Vehicle is deemed fully earned by DCG Trust as of the date that the following two conditions are satisfied for each Locate Vehicle: (1) The Company has entered into a Client PSA for a Locate Vehicle and (2) the Company has entered into a corresponding Third Party Dealer PSA for the required Locate Vehicle under such subsection (1) Client PSA. In connection with the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company and DCG Trust acknowledge and agree that neither the consummation of a Locate Vehicle Delivery, the payment by Client of the Client Purchase Price Balance nor any other event shall be deemed or otherwise imputed as any additional condition to a Profit Participation for a Locate Vehicle being deemed fully earned by (and thereafter due and payable to) DCG Trust. The payment of the Profit Participation is in addition to, and not in lieu or modification of, the payment of all principal, interest, costs, expenses and other fees otherwise due and payable by the Company to DCG Trust under the Note. With respect to this subsection a, capitalized terms used, but not otherwise defined, in this subsection a. will have the respective meaning otherwise ascribed to it in this Agreement.

b.  For purposes of this Agreement, the "**Locate Program**" is categorized and defined as a vehicle purchase and sale program whereby (1) an independent third party retail client of the Company

("**Client**") enters into a binding purchase and sale agreement with Company ("**Client PSA**") whereby Client identifies and otherwise agrees to purchase from the Company, at a specified fixed purchase price provided for in the Client PSA ("**Client Purchase Price**"), a luxury vehicle that is not otherwise then within Company's vehicle inventory ("**Locate Vehicle**") and simultaneously therewith Client deposits with Company a non-refundable cash deposit, (2) Company thereafter locates the Locate Vehicle within the inventory of an independent third party vehicle dealer ("**Third Party Dealer**"), (3) Company thereafter enters into a purchase and sale agreement with the Third Party Dealer ("**Third Party Dealer PSA**") under which the Company agrees to purchase from the Third Party Dealer, and such Third Party Dealer agrees to sell and deliver (as described in subsection (4) below) to the Company, at a specified fixed purchase price provided for in the Third Party Dealer PSA ("**Third Party Dealer Purchase Price**"), the Locate Vehicle, and simultaneously therewith, the Company uses the Loan Proceeds, or portion thereof, to pay to the Third Party Dealer the Third Party Dealer Purchase Price, (5) the Third Party Dealer thereafter, in accordance with the Third Party Dealer PSA, delivers the Locate Vehicle to the delivery location specified in the Client PSA ("**Locate Vehicle Delivery**") and (6) immediately upon completion of the Locate Vehicle Delivery, the Client and Company consummate the purchase and sale of the Locate Vehicle in accordance with the terms and conditions of the Client PSA.

      c.      In connection with Company's operation of the Locate Program and payment of the Profit Participation, for each Locate Vehicle, the Company covenants to the deliver to DCG Trust the following respective documents, confirmations, information and payments (as and where applicable) within the following respective timeframes:

      (1)      Within two (2) business days after the Client and Company execute and deliver a Client PSA for a Locate Vehicle, the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided in Section 6, the following information:

      (A)      The make, model and year of the then applicable Locate Vehicle, together with any additional specifications required of the Client under the then applicable Client PSA with respect to the then applicable Locate Vehicle (such as, but not limited to, color and mileage requirements) (collectively, "**Client Specifications**");

      (B)      A true, correct and, subject to Permitted Redaction, complete copy of the Client PSA, which shall include, at a minimum, the Client Purchase Price, the amount of the Client Deposit and the Client Specifications. Prior to the delivery of any Client PSA in accordance with this subsection (B), the Company will be solely responsible for redacting all personal information contained therein relating to the Client (such as, but not limited to, name, address and social security number of the Client) in order to comply with applicable laws governing personal information and data privacy (the "**Permitted Redaction**"); and

      (C)      The amount of the Client Deposit, together with confirmation that the Company is in receipt of such Client Deposit, under the then applicable Client PSA (with such Client Purchase Price, less such Client Deposit, being the "**Client Purchase Price Balance**").

      (2)      Within two (2) business days after the Company and Third Party Dealer execute and deliver the Third Party Dealer PSA for the Locate Vehicle required under the then applicable Client PSA, Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided in Section 6, the following documents and information (as and where applicable):

      (A)      A confirmation (1) as to which Client PSA the respective Third Party Dealer PSA is intended to satisfy and (2) that the Locate Vehicle under such Third Party Dealer PSA satisfies the Client Specifications under the then applicable Client PSA;

(B)     A true, correct and complete copy of such Third Party Dealer PSA, which shall include, at a minimum, the Third Party Dealer Purchase Price and the make, model and year of the Locate Vehicle required under the then applicable Client PSA; and

(C)     A confirmation of the Locate Vehicle Profit (as herein defined) for the Locate Vehicle required under the then applicable Client PSA. For purposes of this Agreement, the "**Locate Vehicle Profit**" is equal to the Client Purchase Price under the then applicable Client PSA less the Third Party Dealer Purchase Price under the then applicable Third Party Dealer PSA for the Locate Vehicle required under such Client PSA; and

(D)     A confirmation as to the estimated date and time that the Locate Vehicle Delivery will occur.

(3)     Within two (2) business days after the occurrence a Locate Vehicle Delivery for a Locate Vehicle required under the then applicable Client PSA, the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided for in Section 6, the following confirmations:

(A)     Confirmation that the then applicable Client has accepted delivery of its Locate Vehicle in accordance with its applicable Client PSA;

(B)     Confirmation that the Company is in receipt of the Client Purchase Price Balance due and payable under such then applicable Client PSA; and

(C)     Confirmation as to (a) the expected make, model and year of the next Locate Vehicle(s), (b) the expected Profit Participation under such next Locate Vehicle(s) and (c) the timing of the next Client PSAs for such next Locate Vehicle(s).

(4)     On the first day of each month during the term of this Agreement ("**Payment Date**"), the Company will deliver to DCG Trust:

(A)     By and through a wire transfer of U.S. federal funds pursuant to the wire instructions attached hereto as Schedule 1, an amount of money equal to all of the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement during the immediately preceding calendar month; and

(B)     By and through electronic mail to the e-mail address provided for in Section 6, an excel worksheet identifying each Locate Vehicle, Client Purchase Price and Third Party Dealer Purchase Price to support the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement (and, pursuant to subsection (A) above, paid to DCG Trust) during the immediately preceding calendar month.

In the event, however, the Payment Date for any month occurring during the term of this Agreement would fall on a Saturday, Sunday or a federal or state holiday during which DCG Trust's banking institution is closed, the Payment Date for each such applicable month will automatically be amended and deemed to be the last business day immediately preceding such original Payment Date.

d.     The Company's obligation to deliver the Profit Participation to DCG Trust shall have priority over anything to the contrary as may be set forth in any entity documents created for the Company and shall be binding upon the Company and its officers, directors and shareholders, and in no event shall such Profit Participation be subject to any dilution.

3. **Termination of Agreement**.

a.      Subject to the terms and conditions of this Section 3, this Agreement will terminate effective as of May 1, 2020 ("**Outside Termination Date**"); provided, however, each of the Company and DCG Trust shall also have the right to terminate this Agreement prior to the Outside Termination Date by delivering written notice of such early termination to the other no later than 30-days prior to the Outside Termination Date (the "**Early Termination Notice**"), in which event (1) the Agreement will terminate effective as of the date that is 30 days after delivery of such Early Termination Notice (the "**Early Termination Date**", with the Outside Termination Date and Early Termination Date each being sometimes referred to as the "**Applicable Termination Date**") and (2) notwithstanding anything contained in the Note to the contrary, (a) the Early Termination Date will be deemed the "Maturity Date" for purposes of the Note and (b) effective as of such Early Termination Date, the Company will pay to DCG Trust all of the outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under the Note.

b.      As of the Applicable Termination Date, the Company will also pay to DCG Trust all of then outstanding, but not yet paid, Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement.

4. **No Interest**.      DCG Trust and the Company agree that the payment of the above-described Profit Participation is dependent upon the success of the Company's operation of the Locate Program, and such payment shall not be included in the calculation of any payments due under the Note.  Should the payment of the Profit Participation be classified as the payment of interest resulting in the computation or earning of interest in excess of the maximum legal rate of interest which is legally permitted under applicable law, if any, then any and all such excess shall be and the same is hereby waived by DCG Trust, and any all such excess shall be automatically credited against and in reduction of the balance due under the Note, and any portion of the excess which exceeds the balance due under the Note then shall be paid by DCG Trust to Company with no future liability to DCG Trust.

5. **No Ownership Interest**.  The right to payment of the Profit Participation hereunder does not constitute an ownership interest in all or any portion of the Company.  The Company shall have the sole and absolute right to control the operation of the Locate Program; provided, however, as material consideration for, and as an inducement to, DCG Trust entering into this Agreement, the Company warrants and represents to, and otherwise for the benefit of, DCG Trust, and otherwise covenants, as and where applicable, as to the following:

a.      A Locate Vehicle will never be obtained from, deemed a part of, or otherwise included within, any of Company's "dealer floor plan" for purpose of any dealer floor plan financing obtained by Company in connection with Company's operation of its business located at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

b.      No chattel mortgage, bill of sale, security agreement, financing statement or other title retention agreement (except those executed in favor of DCG Trust) has been or will be executed with respect to any Locate Vehicle.

c.      The Company will collect and pay, prior to delinquency, all applicable State of Florida sales tax, use tax or other taxes required to be paid or collected by Company with respect to any Locate Vehicle, and all penalties and interest thereon, if any.

d.      The Company will comply promptly with all federal, state and local laws, ordinances and regulations relating to operation of the Locate Program and will obtain and keep in good standing all

necessary licenses, permits and approvals required or desirable for the lawful operation of the Locate Program.

      e.      The Company will not (1) engage with, or otherwise accept any funds from, any person, group, entity or nation that is acting, directly or indirectly for, or on behalf of, that is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, (2) enter into any transactions contemplated by this Agreement, directly or indirectly, on behalf of, or instigate or facilitate the transactions contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation specified in subsection (1) above. Additionally, the Company is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

      f.      That all other warranties, representations and covenants of the Company in the Note are ratified, confirmed and adopted and otherwise incorporated into this Agreement.

      In connection with the foregoing, the Company hereby protects, indemnifies and saves harmless DCG Trust, its trustees, principals, beneficiaries and employees, from and against any and all liabilities, obligations, claims, liens, damages (including, without limitation, actual, speculative and special damages), penalties, causes of action, costs, fees and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by or asserted against DCG Trust or any of such persons by reason of or otherwise in connection with (a) the Company's operation of its business (including, without limitation, the Locate Program), (b) any failure on the part of the Company to perform or comply with any applicable federal, state and/or local laws, ordinances and regulations and/or any of the terms, duties, responsibilities and/or obligations under, or otherwise in accordance with, this Agreement and/or the Note and (c) any inaccuracy in any representation or warranty made by the Company under this Agreement and/or the Note. The protections, indemnification and save harmless provisions and obligations herein will survive the expiration or earlier termination of this Agreement.

      6.  **Notices**.  All notices, statements, demands or other communications ("notice(s)") to be given under or pursuant to this Agreement, or which a party hereto may wish to give, must be in writing, addressed to the other party at its address as provided below, and delivered in person, by electronic mail, overnight delivery service or by certified or registered mail, return receipt requested and postage prepaid. Such notice will be deemed to have been delivered on the date of hand delivery, on the date of delivery by electronic mail transmission (unless such delivery is made on a non-business day or on any day after 5 p.m., in which event delivery will be deemed to have been made on the following business day) or on the day of delivery when sent by overnight delivery service or mailed as aforesaid (which would also be the day receipt is rejected), as the case may be. Any party may from time to time change its address or facsimile number for receipt of notices by sending a notice to the other parties specifying such new information.

| | |
|---|---|
| To the Company: | To DCG Trust: |
| Excell Auto Group, Inc. | DCG 2008 Irrevocable Wealth Trust |
| Attn: Scott Zankl | c/o Interface Properties |
| 1001 Clint Moore Road, #101 | Attn: Kenneth J. Goodman, as Trustee |
| Boca Raton, Florida 33487 | 1001 East Telecom Drive |
| E-Mail: Scott@excellauto.com | Boca Raton, Florida 33432 |
| | E-Mail: ken@interfaceproperties.com |

7. **Miscellaneous**.

a.      This Agreement will be construed in accordance with the laws of the State of Florida. The parties hereby irrevocably consent and submit to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Agreement.

b.      Each party hereto represents and warrants that they have not dealt with any broker or finder in connection with this Agreement.

c.      The parties have participated freely in the negotiation and preparation of this Agreement , have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Agreement will not be construed more strongly against either party regardless of which party is responsible for its preparation.

d.      Time is of the essence.  Any time periods provided for herein which ends on a Saturday, Sunday or a legal holiday will extend to 5:00 p.m. of the next business day.

e.      In connection with any litigation arising out of this Agreement, including, without limitation, all trial, appellate and post-judgment proceedings, the prevailing party will be entitled to recover reasonable attorneys' fees and costs.

f.      This Agreement, together with the Note, contains all the terms, promises, covenants, conditions and representations made by or entered into by and between DCG Trust and Company with respect to the subject matter of this Agreement, and supersedes all prior discussions and agreements, whether written or oral.

g.      This Agreement will bind and accrue to the benefit of the parties hereto and their heirs, executors, administrators, assigns and successors in interest; provided, however, in no event will the Company have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Agreement without the prior written consent of DCG Trust, which consent may be granted or withheld in DCG Trust's sole and absolute discretion.  If any portion of this Agreement is determined to be unlawful, the remaining portions will remain in full force and effect as if such unlawful portion(s) did not appear herein.

h.      This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, will be deemed an original, but all such counterparts will constitute one and the same agreement.  Any signature delivered by a party by facsimile transmission will be deemed to be an original signature.

## [SIGNATURES ON NEXT PAGE]

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered on the Effective Date.

Signed, sealed and delivered                    COMPANY:
in the presence of:

WITNESS 1:                                       EXCELL AUTO GROUP, INC., a
                                                 Florida corporation

Print Name: Kathy Kidpar                         By: _____
                                                 Name: Scott Zankl
                                                 Title: President

WITNESS 2:

Print Name: Michele Porcelli


WITNESS 1:                                       DCG TRUST:

Print Name: Kathy Kidpar

                                                 Kenneth J. Goodman, as Trustee of the DCG 2008
                                                 Irrevocable Wealth Trust

WITNESS 2:

Print Name: Michell Porcell


\\fs1\docs\11985\11985-26414\815768.doc/bch

7

## SCHEDULE 1

**DCG TRUST WIRE INSTRUCTIONS**

## WIRING INSTRUCTIONS:  DCG 2008 Irrevocable Trust

Bank:              Seaside Bank

Bank Address:      201 S Orange Avenue
                   Orlando, FL 32801

Routing #:         063116083

Account #:         1000021947

Credit to:         DCG 2008 Irrevocable Trust
                   1001 E Telecom Drive
                   Boca Raton, FL 33431

**Fill in this information to identify the case:**

Debtor 1 ___EXCELL Auto Group, Inc.___

Debtor 2 _____
(Spouse, if filing)

United States Bankruptcy Court ___**Southern District of Florida**___

Case number: __**22–12790**__

FILED

**U.S. Bankruptcy Court**
**Southern District of Florida**

5/27/2022

**Joseph Falzone, Clerk**

Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

**Part 1:** | **Identify the Claim**
---|---

| | |
|---|---|
| 1. Who is the current creditor? | DCG 2008 Irrevocable Wealth Trust |
| | Name of the current creditor (the person or entity to be paid for this claim) |
| | Other names the creditor used with the debtor    UH–SI, LLC, a Florida limited liability company |
| 2. Has this claim been acquired from someone else? | ☑ No<br>☐ Yes. From whom? |
| 3. Where should notices and payments to the creditor be sent?<br><br>Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**<br><br>DCG 2008 Irrevocable Wealth Trust<br>Name<br><br>c/o Kenneth J. Goodman, as Trustee<br>1001 East Telecom Drive<br>Boca Raton, FL 33432<br><br>Contact phone ____5619827114____<br>Contact email ____ireich@nasonyeager.com____<br><br>Uniform claim identifier for electronic payments in chapter 13 (if you use one):<br>_____ | **Where should payments to the creditor be sent?** (if different)<br><br>_____<br>Name<br><br>Contact phone _____<br>Contact email _____ |
| 4. Does this claim amend one already filed? | ☑ No<br>☐ Yes. Claim number on court claims registry (if known) _____    Filed on _____<br>MM / DD / YYYY |
| 5. Do you know if anyone else has filed a proof of claim for this claim? | ☑ No<br>☐ Yes. Who made the earlier filing? _____ |

Official Form 410                         Proof of Claim                         page 1

| **Part 2:** | **Give Information About the Claim as of the Date the Case Was Filed** |
|---|---|

---

**6. Do you have any number you use to identify the debtor?**

☑ No

☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____

---

**7. How much is the claim?**

$ 1850000.00

**Does this amount include interest or other charges?**

☑ No

☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A).

---

**8. What is the basis of the claim?**

Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).

Limit disclosing information that is entitled to privacy, such as healthcare information.

Promissory Note, dated 9/18/19, as amended on 11/2/20, and Profit Participation Agreement, dated 9/18/19

---

**9. Is all or part of the claim secured?**

☑ No

☐ Yes. The claim is secured by a lien on property.

**Nature of property:**

☐ Real estate.  If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*

☐ Motor vehicle

☐ Other. Describe: _____

**Basis for perfection:** _____

Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)

**Value of property:** $ _____

**Amount of the claim that is secured:** $ _____

**Amount of the claim that is unsecured:** $ _____    (The sum of the secured and unsecured amounts should match the amount in line 7.)

**Amount necessary to cure any default as of the date of the petition:** $ _____

**Annual Interest Rate** (when case was filed) _____ %

☐ Fixed
☐ Variable

---

**10. Is this claim based on a lease?**

☑ No

☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____

---

**11. Is this claim subject to a right of setoff?**

☑ No

☐ Yes. Identify the property: _____

---

Official Form 410        Proof of Claim        page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No<br>☐ Yes. *Check all that apply:* | | Amount entitled to priority |
|---|---|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies  $ _____

\* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.**
**18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    5/27/2022

     MM / DD / YYYY

/s/ Ivan J. Reich

Signature

Print the name of the person who is completing and signing this claim:

| Name | Ivan J. Reich |
|---|---|
| | First name    Middle name    Last name |
| Title | Attorney in fact |
| Company | Nason Yeager Gerson Harris & Fumero, P.A |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 750 Park of Commerce Blvd. Suite 210 |
| | Number   Street |
| | Boca Raton, FL 33487 |
| | City   State   ZIP Code |
| Contact phone | 5619827114    Email   ireich@nasonyeager.com |

THIS PROMISSORY NOTE IS A CONSOLIDATION AND RENEWAL OF (i) THAT CERTAIN PROMISSORY NOTE DATED FEBRUARY 16, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $700,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $700,000.00), (ii) THAT CERTAIN PROMISSORY NOTE DATED MAY 16, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $250,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $250,000.00), (iii) THAT CERTAIN PROMISSORY NOTE DATED OCTOBER 2, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $350,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $350,000.00), (iv) THAT CERTAIN PROMISSORY NOTE DATED DECEMBER 11, 2018, IN THE ORIGINAL PRINCIPAL AMOUNT OF $300,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $300,000.00) AND (iii) THAT CERTAIN PROMISSORY NOTE DATED JANUARY 10, 2019, IN THE ORIGINAL PRINCIPAL AMOUNT OF $250,000.00 (OF WHICH THE OUTSTANDING PRINCIPAL BALANCE IS $250,000.00) (COLLECTIVELY, THE "**ORIGINAL NOTES**"). THE TERMS AND CONDITIONS SET FORTH HEREIN SHALL CONTROL THE OBLIGATIONS OF BORROWER WITH RESPECT TO THE INDEBTEDNESS EVIDENCED BY THE ORIGINAL NOTES. THIS PROMISSORY NOTE DOES NOT EVIDENCE ANY INDEBTEDNESS OF BORROWER IN EXCESS OF THE ORIGINAL NOTES RENEWED HEREBY. BORROWER WARRANTS AND REPRESENTS THAT ALL DOCUMENTARY STAMP TAXES AND INTANGIBLE TAXES HAVE BEEN PAID IN CONNECTION WITH THE ORIGINAL NOTES. ACCORDINGLY, NO ADDITIONAL DOCUMENTARY STAMP TAXES OR INTANGIBLE TAXES ARE DUE IN CONNECTION WITH THIS PROMISSORY NOTE.

### CONSOLIDATED PROMISSORY NOTE
#### (WHOLESALE PROGRAM)

U.S. $1,850,000.00

Boca Raton, Florida
September *11*, 2019

The undersigned maker (individually and collectively, "**Borrower**") jointly and severally, if applicable, promises to pay to the order of KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**Lender**"), at 1001 East Telecom Drive, Boca Raton, Florida 33432, or such other place as it may designate from time to time, the principal sum of $1,850,000.00 ("**Loan**" or "**Loan Proceeds**"), or so much thereof as shall have been advanced from time to time by Lender to Borrower, together with interest accruing thereon from the date hereof at the rate and time hereinafter provided.

Interest (computed on the basis of a 360-day year for the actual number of days elapsed) on the outstanding balance of principal evidenced by this Note shall accrue interest at an annual interest rate equal to 1.85%, which annual interest rate is equal to the applicable federal rate for loans with a maturity of less than three years on the date of this Note. Unless otherwise due and payable by Borrower to Lender prior to the Maturity Date (as herein defined) in accordance with the terms an conditions of this Note and/or any of the other Documents (as hereinafter defined), the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, will be due and payable by Borrower to Lender on September 30, 2020 ("**Maturity Date**"), all without notice or demand and with time being of the essence. This Note may be prepaid in part or in full at any time without prior notice, and, in the event of any prepayment of this Note, there will be no additional fee for such prepayment.

This Note is executed and delivered in conjunction with that certain Profit Participation Agreement (Wholesale Program) dated of even date herewith between Borrower and Lender ("**Wholesale Program Profit Participation Agreement**").

As material consideration for, and as an inducement to, Lender making this loan to Borrower, Borrower warrants and represents to, and otherwise for the benefit of, Lender, and otherwise covenants, as and where applicable, as to the following:

1

(1)     Borrower will use the Loan Proceeds solely and exclusively for the purchase and sale of vehicles in connection with Borrower's Wholesale Program (as defined in the Wholesale Program Profit Participation Agreement).

(2)     Borrower is a corporation that is duly formed and validly existing under the laws of the State of Florida, is in good standing and is otherwise authorized to transact business in the State of Florida.

(3)     Neither Borrower nor any person, group, entity or nation that Borrower is acting, directly or indirectly for, or on behalf of, is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, and Borrower is not engaging in the transactions contemplated by the Documents (as hereinafter defined), directly or indirectly, on behalf of, or instigating or facilitating the transactions contemplated by the Documents, directly or indirectly, on behalf of, any such person, group, entity or nation; and Borrower is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

(4)     Borrower has all requisite power and authority, acting alone and without the consent or joinder of any other party, (a) to enter into, execute and deliver, as and where applicable, the Note, the Wholesale Program Profit Participation Agreement and all other documents and agreements entered into, executed and/or otherwise delivered by, or on behalf of, Borrower in connection with the Loan (the Note, Wholesale Program Profit Participation Agreement and all such other documents and agreements being sometimes herein collectively referred to as "**Documents**") and (b) to perform and otherwise carry out all the obligations, transactions and agreements contemplated in the Documents.

(5)     The Documents have been approved by those persons having proper authority, and to the best of Borrower's knowledge are in all respects legal, valid and binding according to their terms.

(6)     Neither the entering into, execution and/or delivery of the Documents nor the performance or consummation of any of the obligations and transactions of Borrower under or otherwise contemplated by the Documents will result in any breach of, or constitute a default under, any lease, bank loan or credit agreement, or other instrument to which Borrower is a party or by which it may be bound or affected (including, without limitation, any loan(s) obtained by, and respective loan documents executed, entered into and/or otherwise delivered by or on behalf of, Borrower or any affiliate of Borrower from and to, respectively, SEASIDE NATIONAL BANK & TRUST, a national banking association, its successors and/or assigns ("**SNBT**").  In connection with the foregoing, Borrower warrants and represents that it has advised SNBT of, and SNBT has consented to, Borrower entering into, executing and delivering the Documents and performing or consummating the obligations and transactions of Borrower under or otherwise contemplated by the Documents.

(7)     There are no judgements against Borrower and Borrower has not received notice of any, and there are no actions, suits or proceedings pending in any court or before or by an arbitration tribunal or regulatory commission, department or agency or otherwise threatened which in any case, if adversely determined, could have an adverse effect on condition or operation of the Wholesale Program or would adversely affect the ability of Borrower to perform and otherwise consummate any of its obligations and transactions under or otherwise contemplated by the Documents.

(8)      No petition in bankruptcy (voluntary or otherwise), assignment for the benefit of creditors, or petition seeking reorganization or arrangement or other action under Federal or state bankruptcy law is pending against Borrower, and Borrower has not made an assignment for the benefit of creditors or admitted in writing its inability to pay its debts as they mature.

(9)      Borrower has participated freely in the negotiation and preparation of this Note and the other Documents, has been advised to engage independent legal counsel, has had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and waives any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position in relation to Lender.

(10)     For each calendar year occurring during the term of this Note, Borrower will deliver to Lender a true, correct and complete copy of Borrower's federal tax return no later than five (5) business days after such federal tax return is filed with the Internal Revenue Service (which obligation shall survive the Maturity Date as to any unfiled, as of the Maturity Date, federal tax return applicable to a calendar year occurring during the term of this Note).

The occurrence of any one or more of the following events, circumstances or conditions shall, at the sole election of Lender, constitute a default hereunder: (a) failure of Borrower to pay to Lender, within five (5) days after the same shall have become due and payable in accordance with the Note and/or any other Documents (as applicable), any principal, interest and/or other amounts due under this Note and/or any other of the Documents, respectively, or any fees owing to Lender; provided, however, there will be no cure or grace period in respect to the failure of Borrower to pay Lender the entire outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under this Note, on the Maturity Date; (b) If any warranty or representation made by Borrower in this Note or pursuant to the terms of any other Documents shall at any time be false or misleading in any respect; (c) If Borrower shall, for a period of ten (10) days, fail to keep, observe or perform any of the non-monetary terms or covenants contained in this Note or any of the other Documents or is unable or unwilling to meet its obligations thereunder; (d) The occurrence of any one or more event of default under any of the other the Documents; (e) A default by Borrower, any affiliate of Borrower or any officer, director or shareholder of Borrower with respect any other obligation of Borrower, such affiliate and/or such officer, director or shareholder of Borrower to Lender, or any affiliate of Lender, whether or not related to this Agreement; (f) The death and disability of Scott Zankl; (g) Scott Zankl is no longer an officer of, or owns a controlling interest in, Borrower; (h) The pledge, hypothecation, levy, encumbrance or transfer of an ownership interest in Borrower without the prior written consent of Lender; and/or (i) If there is filed by or against Borrower or any Guarantor (as hereinafter defined) a petition in bankruptcy or a petition for the appointment of a receiver or trustee of the assets of Borrower or any Guarantor, and any such petition is not dismissed within thirty (30) days of the date of filing, or if Borrower or any Guarantor files a petition for reorganization under any of the provisions of the Bankruptcy Code or of any similar law, state, federal, or foreign, or if Borrower or any Guarantor makes a general assignment for the benefit of creditors or makes any insolvency assignment or is adjudicated insolvent by any court of competent jurisdiction. At any time after the occurrence of any such event of default, the indebtedness evidenced by this Note and/or any note(s) or other obligation(s) which may be taken in renewal, extension, substitution or modification of all or any part of the indebtedness evidenced thereby and all other obligations of Borrower to Lender howsoever created and existing shall, at the option of Lender in its sole discretion, immediately become due and payable without demand upon or notice to Borrower, and Lender shall be entitled to exercise the other remedies set forth in the Documents, provided by law and/or provided in equity. The remedies of Lender as provided herein, or in the Documents, shall be cumulative and concurrent and may be pursued singularly, successively or together, at the sole discretion of Lender, and may be exercised as often as the occasion thereof shall arise.

No release of any party liable upon or in respect of this Note shall release any other such party. No single or partial exercise of any power hereunder or under any instrument or agreement securing or guaranteeing this Note shall preclude other or further exercises thereof or the exercise of any other power. The Lender hereof shall at all times have the right to proceed against Borrower and/or any Guarantor or any portion of the security for payment of this Note in such order and in such manner as the Lender may deem fit, without waiving any rights with respect to any other security or guaranty. No delay or omission on the part of the Lender hereof in exercising any right hereunder shall operate as a waiver of such right or of any right under this Note.

Borrower hereby waives presentment for payment, demand, notice of dishonor and protest and agrees that any collateral, lien or right of setoff securing any indebtedness evidenced by this Note may, from time to time, in whole or in part, be exchanged or released, and any person liable on or with respect to this Note may be released, all without notice to or further reservations of rights against Borrower, any endorser, surety or Guarantor (as hereinafter defined) and all without in any way affecting or releasing the liability of Borrower, any endorser, surety or Guarantor.

Borrower hereby agrees to pay all out-of-pocket costs, expenses and fees, including, without limitation, reasonable attorneys' fees, incurred by Lender in connection with the collection of the indebtedness or other payments evidenced by or owning to Lender in connection with this Note or the other Documents, in enforcing any of the rights, powers, remedies and privileges of Lender hereunder or under the other Documents, or in connection with any further negotiations, modifications, releases, or otherwise incurred by Lender in connection with this Note and/or any of the other Documents.  As used in this Note, the term "attorneys' fees" shall mean reasonable charges and expenses for legal services rendered to or on behalf of Lender in connection with the collection of the indebtedness evidenced by this Note at any time whether prior to the commencement of judicial proceedings and/or thereafter at the trial and/or appellate level and/or in pre-judgment and post-judgment or bankruptcy proceedings. Borrower also agrees to pay, prior to delinquency, any and all documentary stamp taxes and intangible taxes arising by reason of the execution and delivery of Original Notes, this Note and the other Documents.

Any notice to the Borrower provided for in this Note shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express, addressed to the Borrower at the address provided below in Borrower's signature block, or to such other address as Borrower may designate by notice in writing to the Lender. Any notice to the Lender shall be given by delivering or mailing such notice by hand delivery, certified mail, return-receipt-requested or Federal Express to the Lender at the address stated in the first paragraph of this Note, or at such address as may have been designated by notice to Borrower.

Nothing herein contained, nor in any instrument or transaction related hereto, shall be construed or so operate as to require Borrower, or any person liable for the payment of the sums due pursuant to this Note, to pay interest in an amount or at a rate greater than the highest rate permissible under applicable law as amended from time to time. Should any interest or other charges made by Borrower, or any party liable for the payment of the sums due pursuant to this Note, result in the computation or earning of interest in excess of the highest rate permissible under applicable law, then any and all such excess shall be and the same is hereby waived by Lender, and all such excess shall be paid by Lender to Borrower or to any party liable for the payment of the sums due pursuant to this Note, it being the intent of the parties hereto that under no circumstances shall Borrower or any party liable for the payment of the sums due hereunder, be required to pay interest in excess of the highest rate permissible under applicable law as amended from time to time.

If any installment of interest, principal or principal and interest shall become overdue, in addition to such payment, a "late charge" in the amount of ten percent (10.00%) of such overdue payment shall be paid by Borrower to Lender on demand for the purpose of defraying the expenses incident to handling

4

such delinquent payments. Furthermore, during the continuation of any default by Borrower in the payment of any installment of interest, principal or principal and interest under this Note or the occurrence of an event of default hereunder or the other Documents, the interest rate provided herein shall be increased to a rate which shall be equal to the maximum rate of interest allowable under the laws of the State of Florida. Borrower hereby irrevocably consents and submits to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Note or any of the other Documents.

To the extent that Lender receives any payment on account of any of Borrower's obligations, and any such payment(s) or any part thereof are subsequently invalidated, declared to be fraudulent or preferential, set aside, subordinate and/or required to be repaid to a trustee, receiver or any other person or entity under any bankruptcy act, state or federal law, common law or equitable cause, then, to the extent of such payment(s) received, Borrower's obligations or part thereof intended to be satisfied shall be revived and continue in full force and effect, as if such payment(s) had not been received by Lender and applied on account of Borrower's obligations.

Borrower agrees that this Note shall be deemed to have been made under and shall be governed by the laws of the State of Florida in all respects, including matters of construction, validity and performance. If any provisions of this Note shall be deemed unenforceable under applicable law, such provision shall be ineffective, but only to the extent of such unenforceability, without invalidating the remainder of such provision or the remaining provisions of this Note. All of the terms and provisions of this Note shall be applicable to and be binding upon each and every maker, endorser, surety, guarantor, all other persons who are or may become liable for the payment hereof and their heirs, personal representatives, successors or assigns; provided, however, in no event will Borrower have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Note and/or the Documents without the prior written consent of Lender, which consent may be granted or withheld in Lender's sole and absolute discretion.

Whenever the context so requires, words used in the singular shall be construed to mean or include the plural and vice versa, and pronouns of any gender shall be construed to mean or include any other gender or genders. Neither this Note nor any term or provision hereof may be altered or amended in any manner except by an instrument in writing signed by the Lender and the Borrower. It is expressly understood and agreed that the Lender shall never be construed for any purpose as a partner, joint venturer, co-principal or associate of the Borrower or of any person or party claiming by, through or under the Borrower in the conduct of their respective businesses.

TIME IS OF THE ESSENCE AS TO EACH PROVISION OF THIS NOTE OR THE OTHER DOCUMENTS WHICH REQUIRES BORROWER TO TAKE ANY ACTION WITHIN A SPECIFIED TIME PERIOD.

BORROWER AND LENDER (BY ACCEPTING THIS NOTE) HEREBY MUTUALLY WAIVE TRIAL BY JURY IN ANY ACTION, PROCEEDING OR COUNTERCLAIM BROUGHT BY EITHER BORROWER OR LENDER AGAINST THE OTHER AND BASED UPON, ARISING OUT OF, OR IN CONNECTION WITH, THIS NOTE, THE LOAN OR THE OTHER DOCUMENTS SECURING OR EXECUTED IN CONNECTION WITH THE LOAN EVIDENCED BY THIS NOTE.

To further secure Borrower's performance of all of its obligations under this Note, and as an inducement to Lender to enter into this Loan, Borrower will cause Scott Zankl and Kristen Zankl (collectively, "**Guarantor**") to execute and deliver, simultaneously with Borrower's execution and delivery of this Note, an unconditional guaranty that is acceptable to Lender under which Guarantor will

unconditionally guaranty to, and for the benefit of, Lender, its successors and/or assigns, all of Borrower's duties and obligations under this Note and the other Documents.

**[SIGNATURE ON NEXT PAGE]**

**[CONSOLIDATED PROMISSORY NOTE SIGNATURE PAGE]**

Signed, sealed and delivered
in the presence of:

WITNESS 1:

Print Name: Kathy Kilpart

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

Address of Borrower:
   1001 Clint Moore Road, #101
   Boca Raton, Florida 33487

WITNESS 2:

Print Name: Michell Porcelli

\\fs1\docs\11985\11985-26414\815767.doc/bchh

7

## EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT
(Wholesale Program)

THIS EXTENSION, MODIFICATION AND RATIFICATION AGREEMENT ("**Agreement**"), effective as of November 2, 2020 ("**Effective Date**"), is between EXCELL AUTO GROUP, INC., a Florida corporation ("**Company**"), SCOTT ZANKL and KRISTEN ZANKL (collectively, "**Guarantors**") and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST ("**DCG Trust**", with Company, Guarantors and DCG Trust being sometimes individually referred to as a "**Party**", or collectively as "**Parties**", as the context so requires).

RECITALS:

A.        DCG Trust has previously loaned Company an original principal sum of $1,850,000.00 ("**Loan**"), as evidenced by that certain Consolidated Promissory Note (Wholesale Program) dated September 18, 2019 executed by Company in favor of DCG Trust, its successors and/or assigns ("**Note**").

B.        To secure Company's performance of all of its obligations under the Loan and Loan Documents (which capitalized term, when used in this Agreement, will have the same meaning ascribed to it in the Guaranty (as herein defined)), Guarantors executed and delivered that certain Unconditional Guaranty (Wholesale Program) effective as of September 18, 2019 ("**Guaranty**").

C.        In connection with the Loan, Company and DCG Trust entered into that certain Profit Participation Agreement (Wholesale Program) dated September 18, 2019 ("**Profit Participation Agreement**").

D.        Company and DCG Trust wish to amend the Note and Profit Participation Agreement, and Guarantors wish to ratify, confirm and adopt their duties, responsibilities, liabilities and obligations under the Guaranty, all as hereinafter provided.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are acknowledged, the Parties, as applicable, agree as follows:

1.        Recitals. The above stated Recitals are true and correct and are incorporated herein by this reference.

2.        Maturity Date/Outside Termination Date. The Maturity Date (as originally defined in the Note) and Outside Termination Date (as originally defined in the Profit Participation Agreement) are each hereby amended and will now mean October 31, 2021.

3.        Ratification of Note/Profit Participation Agreement. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company hereby (a) absolutely, unconditionally and irrevocably ratifies, confirms and adopts all of the terms and conditions of, and all of its duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, each of the Note and Profit Participation Agreement (as amended, modified and ratified by this Agreement) and (b) represents and warrants to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Company under the Note, Profit Participation Agreement and any of the other Loan Documents remain true and correct, in all respects, as of the Effective Date, (ii) Company is not in breach or default under any of the terms and conditions of the Note, Profit Participation Agreement and/or any of the other Loan Documents and (iii) Company does not have any claims or defenses against DCG Trust that could give rise to any defense, offset or counterclaim in connection with the enforcement of the Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents (all as amended, modified and ratified by this Agreement).

4.        Ratification of Guaranty. In partial consideration of DCG Trust's agreement to enter into this Agreement, Guarantors hereby absolutely, unconditionally, and irrevocably ratify, confirm and adopt all of the terms and conditions of, and all of their duties, responsibilities, warranties, representations, covenants, obligations and liabilities under, the Guaranty (as amended, modified and ratified by this Agreement), and hereby acknowledge and agree that (a) the Guaranty is in full force and effect and (b) the Guaranty and Guarantors shall continue to guarantee, without limitation,

all of Company's duties, responsibilities, liabilities and obligations with respect to the repayment of Loan and performance under the Note and other Loan Documents (all as amended, modified and supplemented by this Agreement and all as may hereafter be further amended, modified, supplemented, extended, renewed and/or restated). Guarantors hereby further represent and warrant to, and for the benefit of, DCG Trust that (i) each and every warranty, representation, agreement and other covenant of, or made by, Guarantors under the Guaranty remains true and correct, in all respects, as of the Effective Date, (ii) Guarantors are not in breach or default under any of the terms and conditions of the Guaranty and (iii) Guarantors do not have any claims and/or defenses against DCG Trust that could give rise to any defense, offset, claim or counterclaim in connection with the enforcement of the Guaranty (as amended, modified and ratified by this Agreement).

5.  Release. In partial consideration of DCG Trust's agreement to enter into this Agreement, Company and Guarantors hereby forever, irrevocably and unconditionally release and discharge DCG Trust, its agents, trustees, servants, employees, directors, officers, attorneys, affiliates, subsidiaries, successors and assigns, and all persons, firms, corporation and organizations who have acted in its behalf of and from any and all damages, losses, claims, demands, liabilities, obligations, actions, costs, expenses, fees (including, without limitation, attorneys' fees) and causes of action whatsoever which they may have or claim to have as of the date of execution of this Agreement, and whether currently known or unknown, accrued or accrued, and of every nature and extent whatsoever on account of or in any way touching, concerning, arising out of or founded upon the subject Loan, Note, Profit Participation Agreement, Guaranty and/or any of the other Loan Documents, including, but not limited to, all such loss or damage of any kind heretofore sustained, or that may arise as a consequence of the dealings between the parties up to and including the Effective Date.

6.  Miscellaneous. In the event of any conflict between the express terms of this Agreement and the terms of the Note, Profit Participation Agreement and/or other Loan Documents, the express terms of this Agreement shall control. Each Party represents and warrants, on its own respective behalf, that the person signing this Agreement on such Party's behalf is duly authorized to execute and deliver this Agreement, and that this First Agreement constitutes a legal, valid and binding obligation of each such Party. Each Party further represents and warrants, on its own respective behalf, that it has reviewed this Agreement with its legal counsel, or otherwise had an opportunity to review this Agreement with its legal counsel. Therefore, in connection with the foregoing, this Agreement will be interpreted without regard to any presumption or rule requiring construction against the party causing this Agreement to be drafted. This Agreement may be executed in counterparts, each of which will be deemed an original and all of which, when taken together, will constitute one in the same Agreement. If this Agreement is executed and delivered digitally or electronically (whether by PDF file, DocuSign or otherwise) the digital or electronic copy, respectively, will be treated as an original for all purposes. This Agreement shall become effective and binding only upon execution and delivery of this Agreement by all of the parties hereto.

**[SIGNATURES ON NEXT PAGE]**

Each of Company, Guarantors and DCG Trust has caused this Agreement to be duly executed, which Agreement is effective as of the Effective Date.

**DCG TRUST**:

_____
Kenneth J. Goodman, as Trustee of
the DCG 2008 Irrevocable Wealth Trust

**COMPANY**:

EXCELL AUTO GROUP, INC., a
Florida corporation

By: _____
Name: Scott Zankl
Title: President

**GUARANTORS**:

_____
Name: Scott Zankl

_____
Name: Kristen Zankl

## PROFIT PARTICIPATION AGREEMENT
(Wholesale Program)

THIS PROFIT PARTICIPATION AGREEMENT (the "**Agreement**") is entered into as of the day of September, 2019 ("**Effective Date**") by and between EXCELL AUTO GROUP, INC., a Florida corporation (the "**Company**"), and KENNETH J. GOODMAN AS TRUSTEE OF THE DCG 2008 IRREVOCABLE WEALTH TRUST, its successors and/or assigns ("**DCG Trust**").

RECITALS:

A.    The Company is engaged in the business of the purchase and sale of luxury vehicles, which business includes the operation of a Wholesale Program (as hereinafter defined).

B.    DCG Trust, on even date herewith, has loaned to the Company the sum of $1,850,000.00 (which, together with any and all renewals and future advances of and/or under the Note (as herein defined) being the "**Loan Proceeds**), as evidenced by that certain Consolidated Promissory Note of even date herewith, all as may be renewed, extended, substituted and/or further modified (the "**Note**").

C.    In consideration of the Loan, the Company has offered to provide a profit participation interest in the Wholesale Program, in accordance with the terms of this Agreement.

NOW, THEREFORE, in consideration of the mutual covenants contained herein and other good and valuable consideration, the receipt and sufficiency of which are hereby acknowledged, the parties agree as follows:

1.    **Recitals**.  The foregoing recitals are true.

2.    **Profit Participation**.

a.    In connection with the Company's operation of the Wholesale Program in accordance with this Agreement, the Company will pay to DCG Trust 50.00% of the Wholesale Vehicle Profit for each Wholesale Vehicle (the "**Profit Participation**"), all in accordance with the terms and conditions of this Agreement. Each Profit Participation will be deemed fully earned by DCG Trust in accordance with the hereinafter described terms and conditions of this subsection a., with each fully earned Profit Participation thereafter being due and payable by the Company to DCG Trust in accordance with Section 2.c.(5) of this Agreement. The Company and DCG Trust acknowledge and agree that a Profit Participation for a Wholesale Vehicle is deemed fully earned by DCG Trust as of the date that the following two conditions are satisfied for each Wholesale Vehicle: (1) The Company has entered into a Sale Dealer PSA for a Wholesale Vehicle and (2) the Company has entered into a corresponding Buy Dealer PSA for the required Wholesale Vehicle under such subsection (1) Sale Dealer PSA. In connection with the foregoing, and notwithstanding anything contained in this Agreement to the contrary, the Company and DCG Trust acknowledge and agree that neither the consummation of a Wholesale Vehicle Delivery, the payment by Buy Dealer of the Buy Dealer Purchase Price nor any other event shall be deemed or otherwise imputed as any additional condition to a Profit Participation for a Wholesale Vehicle being deemed fully earned by (and thereafter due and payable to) DCG Trust. The payment of the Profit Participation is in addition to, and not in lieu or modification of, the payment of all principal, interest, costs, expenses and other fees otherwise due and payable by the Company to DCG Trust under the Note. With respect to this subsection a, capitalized terms used, but not otherwise defined, in this subsection a. will have the respective meaning otherwise ascribed to it in this Agreement.

b.      For purposes of this Agreement, the "**Wholesale Program**" is categorized and defined as a vehicle purchase and sale program whereby (1) an independent third party vehicle dealer ("**Sale Dealer**") enters into a binding purchase and sale agreement with Company ("**Sale Dealer PSA**") whereby Company identifies and otherwise agrees to purchase from the Sale Dealer, at a specified fixed purchase price provided for in the Sale Dealer PSA ("**Company Purchase Price**"), a luxury vehicle from the Sale Dealer's vehicle inventory ("**Wholesale Vehicle**"), (2) Company thereafter locates another independent third party vehicle dealer (as opposed to private, individual client) that desires to purchase the Wholesale Vehicle ("**Buy Dealer**"), (3) Company thereafter enters into a purchase and sale agreement with the Buy Dealer ("**Buy Dealer PSA**") under which the Buy Dealer agrees to purchase from the Company, and the Company agrees to sell to the Buy Dealer, at a specified fixed purchase price provided for in the Buy Dealer PSA ("**Buy Dealer Purchase Price**"), the Wholesale Vehicle, (4) the Company uses the Loan Proceeds, or portion thereof, to pay the Company Purchase Price to the Sale Dealer in accordance with the terms and conditions of the Sale Dealer PSA and (5) the Company causes the Sale Dealer to thereafter, in accordance with the Sale Dealer PSA, deliver the Wholesale Vehicle directly to Buy Dealer in accordance with the delivery location required by Buy Dealer in accordance with the Buy Dealer PSA ("**Wholesale Vehicle Delivery**").

c.      In connection with Company's operation of the Wholesale Program and payment of the Profit Participation, for each Wholesale Vehicle, the Company covenants to the deliver to DCG Trust the following respective documents, confirmations, information and payments (as and where applicable) within the following respective timeframes:

(1)      On the first day of each month during the term of this Agreement (the "**Document Delivery Date**"), the Company will deliver to DCG Trust, by and through electronic mail to the e-mail address provided for in Section 6:

(A)      An excel worksheet, in a form consistent with the worksheet attached hereto as Schedule 2, identifying (i) the make, model, year and vehicle information number ("**VIN**") of each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month, (ii) the Company Purchase Price and Buyer Dealer Purchase Price for each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month and (iii) the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement (and, pursuant to subsection (2) below, to be paid by the Company to DCG Trust) during the immediately preceding calendar month; and

(B)      A true, correct and complete copy each Sale Dealer PSA and Buy Dealer PSA entered for each Wholesale Vehicle purchased and sold through the Wholesale Program during the immediately preceding calendar month.

(2)      On the fifteenth (15th) day of each month during the term of this Agreement ("**Payment Date**"), the Company will deliver to DCG Trust, by and through a wire transfer of U.S. federal funds pursuant to the wire instructions attached hereto as Schedule 1, an amount of money equal to all of the Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement during the immediately preceding calendar month; provided, however, in the event a Payment Date for any month occurring during the term of this Agreement would fall on a Saturday, Sunday or a federal or state holiday during which DCG Trust's banking institution is closed, the Payment Date for each such applicable month will automatically be amended and deemed to be the last business day immediately preceding such original Payment Date.

d.      The Company's obligation to deliver the Profit Participation to DCG Trust shall have priority over anything to the contrary as may be set forth in any entity documents created for the Company and shall

be binding upon the Company and its officers, directors and shareholders, and in no event shall such Profit Participation be subject to any dilution.

3. **Termination of Agreement**.

a.       Subject to the terms and conditions of this Section 3, this Agreement will terminate effective as of the Maturity Date (as defined in the Note) ("**Outside Termination Date**"); provided, however, each of the Company and DCG Trust shall also have the right to terminate this Agreement prior to the Outside Termination Date by delivering written notice of such early termination to the other no later than 30-days prior to the Outside Termination Date (the "**Early Termination Notice**"), in which event (1) the Agreement will terminate effective as of the date that is 30 days after delivery of such Early Termination Notice (the "**Early Termination Date**", with the Outside Termination Date and Early Termination Date each being sometimes referred to as the "**Applicable Termination Date**") and (2) notwithstanding anything contained in the Note to the contrary, (a) the Early Termination Date will be deemed the "Maturity Date" for purposes of the Note and (b) effective as of such Early Termination Date, the Company will pay to DCG Trust all of the outstanding principal balance, together with accrued but unpaid interest and all other amounts due and payable under the Note.

b.       As of the Applicable Termination Date, the Company will also pay to DCG Trust all of then outstanding, but not yet paid, Profit Participation deemed earned by DCG Trust in accordance with Section 2.a. of this Agreement.

4. **No Interest**.    DCG Trust and the Company agree that the payment of the above-described Profit Participation is dependent upon the success of the Company's operation of the Wholesale Program, and such payment shall not be included in the calculation of any payments due under the Note. Should the payment of the Profit Participation be classified as the payment of interest resulting in the computation or earning of interest in excess of the maximum legal rate of interest which is legally permitted under applicable law, if any, then any and all such excess shall be and the same is hereby waived by DCG Trust, and any all such excess shall be automatically credited against and in reduction of the balance due under the Note, and any portion of the excess which exceeds the balance due under the Note then shall be paid by DCG Trust to Company with no future liability to DCG Trust.

5. **No Ownership Interest**.    The right to payment of the Profit Participation hereunder does not constitute an ownership interest in all or any portion of the Company.  The Company shall have the sole and absolute right to control the operation of the Wholesale Program; provided, however, as material consideration for, and as an inducement to, DCG Trust entering into this Agreement, the Company warrants and represents to, and otherwise for the benefit of, DCG Trust, and otherwise covenants, as and where applicable, as to the following:

a.       A Wholesale Vehicle will never be obtained from, deemed a part of, or otherwise included within, any of Company's "dealer floor plan" for purpose of any dealer floor plan financing obtained by Company in connection with Company's operation of its business located at 1001 Clint Moore Road, Suite 101, Boca Raton, Florida 33487.

b.       No chattel mortgage, bill of sale, security agreement, financing statement or other title retention agreement (except those executed in favor of DCG Trust) has been or will be executed with respect to any Wholesale Vehicle.

c.       The Company will collect and pay, prior to delinquency, all applicable State of Florida sales tax, use tax or other taxes required to be paid or collected by Company with respect to any Wholesale Vehicle, and all penalties and interest thereon, if any.

d.     The Company will comply promptly with all federal, state and local laws, ordinances and regulations relating to operation of the Wholesale Program and will obtain and keep in good standing all necessary licenses, permits and approvals required or desirable for the lawful operation of the Wholesale Program.

e.     The Company will not (1) engage with, or otherwise accept any funds from, any person, group, entity or nation that is acting, directly or indirectly for, or on behalf of, that is named by any Executive Order (including the September 24, 2001, Executive Order Blocking Property and Prohibiting Transactions With Persons Who Commit, Threaten to Commit, or Support Terrorism) or the United States Treasury Department as a terrorist, "Specially Designated National and Blocked Person," or is otherwise a banned or blocked person, group, entity, or nation pursuant to any law that is enforced or administered by the Office of Foreign Assets Control, (2) enter into any transactions contemplated by this Agreement, directly or indirectly, on behalf of, or instigate or facilitate the transactions contemplated by this Agreement, directly or indirectly, on behalf of, any such person, group, entity or nation specified in subsection (1) above. Additionally, the Company is not, and shall not become, a person or entity whose activities are regulated by the International Money Laundering Abatement and Financial Anti-Terrorism Act of 2001 or the regulations or orders thereunder.

f.     That all other warranties, representations and covenants of the Company in the Note are ratified, confirmed and adopted and otherwise incorporated into this Agreement.

In connection with the foregoing, the Company hereby protects, indemnifies and saves harmless DCG Trust, its trustees, principals, beneficiaries and employees, from and against any and all liabilities, obligations, claims, liens, damages (including, without limitation, actual, speculative and special damages), penalties, causes of action, costs, fees and expenses (including without limitation, reasonable attorneys' fees and expenses whether or not litigation has been commenced and in all trial, bankruptcy and appellate proceedings) imposed upon, incurred by or asserted against DCG Trust or any of such persons by reason of or otherwise in connection with (a) the Company's operation of its business (including, without limitation, the Wholesale Program), (b) any failure on the part of the Company to perform or comply with any applicable federal, state and/or local laws, ordinances and regulations and/or any of the terms, duties, responsibilities and/or obligations under, or otherwise in accordance with, this Agreement and/or the Note and (c) any inaccuracy in any representation or warranty made by the Company under this Agreement and/or the Note. The protections, indemnification and save harmless provisions and obligations herein will survive the expiration or earlier termination of this Agreement.

6.     **Notices**.   All notices, statements, demands or other communications ("notice(s)") to be given under or pursuant to this Agreement, or which a party hereto may wish to give, must be in writing, addressed to the other party at its address as provided below, and delivered in person, by electronic mail, overnight delivery service or by certified or registered mail, return receipt requested and postage prepaid. Such notice will be deemed to have been delivered on the date of hand delivery, on the date of delivery by electronic mail transmission (unless such delivery is made on a non-business day or on any day after 5 p.m., in which event delivery will be deemed to have been made on the following business day) or on the day of delivery when sent by overnight delivery service or mailed as aforesaid (which would also be the day receipt is rejected), as the case may be.  Any party may from time to time change its address or facsimile number for receipt of notices by sending a notice to the other parties specifying such new information.

To the Company:                                   To DCG Trust:
Excell Auto Group, Inc.                          DCG 2008 Irrevocable Wealth Trust
Attn: Scott Zankl                                   c/o Interface Properties

4

1001 Clint Moore Road, #101
Boca Raton, Florida 33487
E-Mail: Scott@excellauto.com

Attn: Kenneth J. Goodman, as Trustee
1001 East Telecom Drive
Boca Raton, Florida 33432
E-Mail: ken@interfaceproperties.com

7. **Miscellaneous**.

a.        This Agreement will be construed in accordance with the laws of the State of Florida. The parties hereby irrevocably consent and submit to the exclusive jurisdiction of the courts in Palm Beach County, Florida and the United States District Court serving Palm Beach County, Florida and waives any objection based on venue or *forum non conveniens* with respect to any action instituted therein arising under this Agreement.

b.        Each party hereto represents and warrants that they have not dealt with any broker or finder in connection with this Agreement.

c.        The parties have participated freely in the negotiation and preparation of this Agreement , have each been advised to engage independent legal counsel, have each had a reasonable opportunity to have any such independent legal counsel involved in such review and negotiations (or has otherwise knowingly, at its sole election, elected not to engage such independent legal counsel) and each waive any and all rights or remedies it may have or be entitled to deriving from disparity in size or from any significant disparate bargaining position. Furthermore, this Agreement will not be construed more strongly against either party regardless of which party is responsible for its preparation.

d.        Time is of the essence.  Any time periods provided for herein which ends on a Saturday, Sunday or a legal holiday will extend to 5:00 p.m. of the next business day.

e.        In connection with any litigation arising out of this Agreement, including, without limitation, all trial, appellate and post-judgment proceedings, the prevailing party will be entitled to recover reasonable attorneys' fees and costs.

f.        This Agreement, together with the Note, contains all the terms, promises, covenants, conditions and representations made by or entered into by and between DCG Trust and Company with respect to the subject matter of this Agreement, and supersedes all prior discussions and agreements, whether written or oral.

g.        This Agreement will bind and accrue to the benefit of the parties hereto and their heirs, executors, administrators, assigns and successors in interest; provided, however, in no event will the Company have the right to pledge, hypothecation, levy, encumbrance or transfer any of its rights, interests, duties, liabilities and/or obligations under this Agreement without the prior written consent of DCG Trust, which consent may be granted or withheld in DCG Trust's sole and absolute discretion.  If any portion of this Agreement is determined to be unlawful, the remaining portions will remain in full force and effect as if such unlawful portion(s) did not appear herein.

h.        This Agreement may be executed in any number of counterparts and by different parties to this Agreement on separate counterparts, each of which, when so executed, will be deemed an original, but all such counterparts will constitute one and the same agreement.  Any signature delivered by a party by facsimile transmission will be deemed to be an original signature.

**[SIGNATURES ON NEXT PAGE]**

IN WITNESS WHEREOF, the parties have caused this Agreement to be executed and delivered on the Effective Date.

Signed, sealed and delivered
in the presence of:

COMPANY:

WITNESS 1:

EXCELL AUTO GROUP, INC., a
Florida corporation

Print Name:

By: _____
Name: Scott Zankl
Title: President

WITNESS 2:

Print Name: Michele Porcelli

WITNESS 1:

DCG TRUST:

Print Name:

Kenneth J. Goodman, as Trustee of the DCG 2008
Irrevocable Wealth Trust

WITNESS 2:

Print Name: Michele Porcelli

\\fs1\docs\11985\11985-26414\815769.doc/bch

**SCHEDULE 1**

**DCG TRUST WIRE INSTRUCTIONS**

**WIRING INSTRUCTIONS:  DCG 2008 Irrevocable Trust**

| | |
|---|---|
| Bank: | Seaside Bank |
| Bank Address: | 201 S Orange Avenue<br>Orlando, FL 32801 |
| Routing #: | 063116083 |
| Account #: | 1000021947 |
| Credit to: | DCG 2008 Irrevocable Trust<br>1001 E Telecom Drive<br>Boca Raton, FL 33431 |

**SCHEDULE 2**

**EXCEL SHEET**

| # | Purchase Date | Date Money In | # Days Money Out | Amount Out | Amount In | Profit Per Car | amount owed | Vehicle Desc. |
|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | |
| 2 | 11/12/18 | not yet | | $110,000 | $115,000 | $5,000 | $2,500 | 2014 bentley flying s |
| 3 | 11/15/18 | not yet | | $300,000 | $309,000 | $9,000 | $4,500 | 15 avebntador |
| | 11/16/18 | not yet | | $200,000 | $208,000 | $8,000 | $4,000 | 2015 ferrari 458 |
| 5 | 11/20/18 | not yet | | $225,000 | $230,000 | $5,000 | $2,500 | 2017 huracan |
| 6 | 11/18/19 | not yet | | $100,000 | $105,000 | $5,000 | $2,500 | 2010 ferrari californi |
| 7 | 11/19/18 | not yet | | $160,000 | $170,000 | $10,000 | $5,000 | 2017 porsche turbo |
| | | | | | | | | |
| | 11/20/18 | not yet | | $300,000 | $306,000 | $6,000 | $3,000 | 2014 aventador |
| 10 | | | | | | | | |
| 11 | | | | | | | | |
| 12 | | | | | | | | |
| 13 | | | | | | | | |
| 14 | | | | | | | | |
| 15 | | | | | | | | |
| 16 | | | | | | | | |
| 16 | | | | | | | | |
| 17 | | | | | | | | |
| 18 | | | | | | | | |
| 19 | | | | | | | | |
| 20 | | | | | | | | |
| 21 | | | | | | | | |
| 22 | | | | | | | | |
| 23 | | | | | | | | |
| 24 | | | | | | | | |
| 25 | | | | | | | | |
| 26 | | | | | | | | |
| 27 | | | | | | | | |
| 28 | | | | | | | | |

<table>
<tr><td colspan="2">

**Fill in this information to identify the case:**

Debtor 1   EXCELL Auto Group, Inc.

Debtor 2
(Spouse, if filing)

United States Bankruptcy Court   **Southern District of Florida**

Case number:   **22-12790**
</td>
<td>

FILED

**U.S. Bankruptcy Court**
**Southern District of Florida**

6/22/2022

**Joseph Falzone, Clerk**
</td></tr>
</table>

Official Form 410
# Proof of Claim

04/19

Read the instructions before filling out this form. This form is for making a claim for payment in a bankruptcy case. Do not use this form to make a request for payment of an administrative expense. Make such a request according to 11 U.S.C. § 503.

Filers must leave out or redact information that is entitled to privacy on this form or on any attached documents. Attach redacted copies of any documents that support the claim, such as promissory notes, purchase orders, invoices, itemized statements of running accounts, contracts, judgments, mortgages, and security agreements. **Do not send original documents;** they may be destroyed after scanning. If the documents are not available, explain in an attachment.

A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both. 18 U.S.C. §§ 152, 157, and 3571.

Fill in all the information about the claim as of the date the case was filed. That date is on the notice of bankruptcy (Form 309) that you received.

## Part 1: Identify the Claim

| | |
|---|---|
| **1. Who is the current creditor?** | DCG 2008 Irrevocable Wealth Trust <br><br> Name of the current creditor (the person or entity to be paid for this claim) <br><br> Other names the creditor used with the debtor     DCG 2008 Irrevocable Wealth Trust |
| **2. Has this claim been acquired from someone else?** | ☑ No <br> ☐ Yes. From whom? |
| **3. Where should notices and payments to the creditor be sent?** <br><br> Federal Rule of Bankruptcy Procedure (FRBP) 2002(g) | **Where should notices to the creditor be sent?**     **Where should payments to the creditor be sent?** (if different) <br><br> DCG 2008 Irrevocable Wealth Trust <br> Name                  Name <br><br> c/o Kenneth J. Goodman, as Trustee <br> 1001 East Telecom Drive <br> Boca Raton, FL 33432 <br><br> Contact phone     9543098772          Contact phone <br><br> Contact email     ireich@nasonyeager.com      Contact email <br><br> Uniform claim identifier for electronic payments in chapter 13 (if you use one): |
| **4. Does this claim amend one already filed?** | ☑ No <br> ☐ Yes. Claim number on court claims registry (if known)          Filed on <br><br>                                                     MM / DD / YYYY |
| **5. Do you know if anyone else has filed a proof of claim for this claim?** | ☑ No <br> ☐ Yes. Who made the earlier filing? |

Official Form 410                    Proof of Claim                    page 1

**Part 2:** Give Information About the Claim as of the Date the Case Was Filed

| | |
|---|---|
| 6. **Do you have any number you use to identify the debtor?** | ☑ No<br>☐ Yes. Last 4 digits of the debtor's account or any number you use to identify the debtor: _____ |
| 7. **How much is the claim?** | $ _____220000.00_____   **Does this amount include interest or other charges?**<br>☑ No<br>☐ Yes. Attach statement itemizing interest, fees, expenses, or other charges required by Bankruptcy Rule 3001(c)(2)(A). |
| 8. **What is the basis of the claim?** | Examples: Goods sold, money loaned, lease, services performed, personal injury or wrongful death, or credit card. Attach redacted copies of any documents supporting the claim required by Bankruptcy Rule 3001(c).<br>Limit disclosing information that is entitled to privacy, such as healthcare information.<br><br>Deposit held see attachment No. 4 |
| 9. **Is all or part of the claim secured?** | ☑ No<br>☐ Yes. The claim is secured by a lien on property.<br>**Nature of property:**<br>☐ Real estate.   If the claim is secured by the debtor's principal residence, file a *Mortgage Proof of Claim Attachment* (Official Form 410–A) with this *Proof of Claim.*<br>☐ Motor vehicle<br>☐ Other. Describe: _____<br><br>**Basis for perfection:** _____<br><br>Attach redacted copies of documents, if any, that show evidence of perfection of a security interest (for example, a mortgage, lien, certificate of title, financing statement, or other document that shows the lien has been filed or recorded.)<br><br>**Value of property:**   $ _____<br><br>**Amount of the claim that is secured:**   $ _____<br><br>**Amount of the claim that is unsecured:**   $ _____   (The sum of the secured and unsecured amounts should match the amount in line 7.)<br><br>**Amount necessary to cure any default as of the date of the petition:**   $ _____<br><br>**Annual Interest Rate** (when case was filed)   _____ %<br><br>☐ Fixed<br>☐ Variable |
| 10. **Is this claim based on a lease?** | ☑ No<br>☐ Yes. **Amount necessary to cure any default as of the date of the petition.** $ _____ |
| 11. **Is this claim subject to a right of setoff?** | ☑ No<br>☐ Yes. Identify the property: _____ |

Official Form 410                        Proof of Claim                        page 2

| 12. | Is all or part of the claim entitled to priority under 11 U.S.C. § 507(a)? | ☑ No |
|---|---|---|
| | | ☐ Yes. *Check all that apply:* |

| | | Amount entitled to priority |
|---|---|---|

A claim may be partly priority and partly nonpriority. For example, in some categories, the law limits the amount entitled to priority.

☐ Domestic support obligations (including alimony and child support) under 11 U.S.C. § 507(a)(1)(A) or (a)(1)(B).  $ _____

☐ Up to $3,025* of deposits toward purchase, lease, or rental of property or services for personal, family, or household use. 11 U.S.C. § 507(a)(7).  $ _____

☐ Wages, salaries, or commissions (up to $13,650*) earned within 180 days before the bankruptcy petition is filed or the debtor's business ends, whichever is earlier. 11 U.S.C. § 507(a)(4).  $ _____

☐ Taxes or penalties owed to governmental units. 11 U.S.C. § 507(a)(8).  $ _____

☐ Contributions to an employee benefit plan. 11 U.S.C. § 507(a)(5).  $ _____

☐ Other. Specify subsection of 11 U.S.C. § 507(a)(__) that applies  $ _____

* Amounts are subject to adjustment on 4/1/22 and every 3 years after that for cases begun on or after the date of adjustment.

## Part 3: Sign Below

**The person completing this proof of claim must sign and date it. FRBP 9011(b).**

If you file this claim electronically, FRBP 5005(a)(2) authorizes courts to establish local rules specifying what a signature is.

**A person who files a fraudulent claim could be fined up to $500,000, imprisoned for up to 5 years, or both.
18 U.S.C. §§ 152, 157 and 3571.**

Check the appropriate box:

☐ I am the creditor.

☑ I am the creditor's attorney or authorized agent.

☐ I am the trustee, or the debtor, or their authorized agent. Bankruptcy Rule 3004.

☐ I am a guarantor, surety, endorser, or other codebtor. Bankruptcy Rule 3005.

I understand that an authorized signature on this Proof of Claim serves as an acknowledgment that when calculating the amount of the claim, the creditor gave the debtor credit for any payments received toward the debt.

I have examined the information in this Proof of Claim and have a reasonable belief that the information is true and correct.

I declare under penalty of perjury that the foregoing is true and correct.

Executed on date    6/22/2022
                    MM / DD / YYYY

/s/  Ivan J. Reich

Signature

Print the name of the person who is completing and signing this claim:

| Name | Ivan J. Reich |
|---|---|
| | First name        Middle name        Last name |
| Title | Attorney in fact |
| Company | Nason Yeager Gerson Harris & Fumero, P.A |
| | Identify the corporate servicer as the company if the authorized agent is a servicer |
| Address | 750 Park of Commerce Blvd. Suite 210 |
| | Number   Street |
| | Boca Raton, FL 33487 |
| | City   State   ZIP Code |
| Contact phone | 5619827114        Email   ireich@nasonyeager.com |

Official Form 410                          Proof of Claim                          page 3



July 16, 2020

Mr. Scott Zankl
1001 Clint Moore Road
Boca Raton, FL 33487

Re:     Confirmation of balances owed to DCG 2008 Irrev Trust

Dear Scott,

My accountants are preparing an updated Personal Financial Statement. For that reason, your signature below shall confirm the following:

1.  We have a Locate Program agreement in place dated December 5, 2019 with an outstanding balance of $1,500,000 as of today's date.

2.  We have a Wholesale Program agreement in place dated September 18, 2019 with an outstanding balance of $1,850,000 as of today's date.

3.  We have two $200,000 Locate advances outstanding evidenced by two notes dated March 17, 2020 and June 25, 2020.

4.  Excell Auto has a current deposit from Ken Goodman in the principal amount of $220,000 which represents the value of a Lamborghini Urus which Ken is driving on a daily basis. Upon the return of the vehicle and, at Ken's request, that deposit will be returned.

Your truly,
DCG 2008 IRREVOCABLE WEALTH TRUST("DCG")


Kenneth J. Goodman
Trustee

The aforementioned information outlined in items 1 through 4 is accurate and currently outstanding in favor of DCG.

EXCELL AUTO GROUP


Scott Zankl, Vice President

1001 E. Telecom Drive ▪ Boca Raton ▪ Florida ▪ 33431 ▪ T. (561) 989-8079